# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE[1] ("John"), | : **Civil Action No.:** |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| HAVERFORD COLLEGE | : |
| | : |
| Defendant. | : |
| | : |
| | : |

## VERIFIED COMPLAINT

Plaintiff John Doe[1] ("John"), by his attorneys, files this complaint ("Complaint") against Defendant Haverford College ("Haverford" or the "College"), and alleges as follows:

## THE NATURE OF THIS ACTION

1.      Through this lawsuit, John attempts to undo an injustice perpetrated against him by Haverford, to wit, the College's illegal removal of him from the varsity team on which he served as a captain, and its refusal to reinstate him, in violation of its own policies and of Title IX of the Education Amendments of 1972.  He also seeks to halt the related gender-based harassment, defamation, and emotional distress to which he has been subjected, and to have the associated harm redressed.

2.      This case concerns Haverford's decision to sanction John for purported, but fictitious, sexual misconduct even though the College never received a complaint against John,

---

[1] Contemporaneously with the filing of this Complaint, John is filing a Motion for Permission to Proceed Under Pseudonym.  As set forth in the Motion, John is entitled to proceed pseudonymously because of the highly sensitive nature of the disciplinary proceeding against him that forms the basis for his Complaint, the damaging nature of the false rumor and false smears against John's reputation associated with that proceeding, and the fact that Haverford is fully aware of his identity and will not be prejudiced in any way.

never initiated an investigation into any allegations against John, never held a hearing, and never determined that John was responsible for any type of sexual misconduct whatsoever. Nevertheless, John, a varsity athlete and captain of a successful sports team at Haverford, was unceremoniously removed from his team by the College purely because of an unsupported— and false—*rumor* that he had sexually assaulted a female student on campus.  And the College repeatedly denied John's multiple requests for reinstatement, offering as a basis only the false rumor and shifting pretextual explanations.

3.      From the outset, John has consistently denied engaging in any sexual misconduct.  And since learning the identity of the purported victim of the falsely rumored misconduct, John has consistently denied any sexual or intimate contact at all, or indeed any physical contact whatsoever, with the purported victim.

4.      Some of the Haverford students who participated in spreading the false rumor also took action against other men at Haverford as part of a campaign of harassment intended to intimidate, bully, and punish certain male students due to their purported mistreatment of women.  The gender-based harassment included online posts identifying John by name and calling on all Haverford students to "bully" him.  Among the students spreading the false rumor were two of John's co-captains, who reported the false allegation to their coach.  The coach, a mandatory reporter for the College, notified Haverford's Title IX Office of the allegation and instructed John to step away from the team until it was resolved.

5.      The Title IX Office quickly concluded that the allegation was nothing more than an unsubstantiated rumor and confirmed that no purported victim had accused John of any wrongdoing.  The Title IX Office went so far as to affirmatively reach out to the student identified by the rumor mill as the purported victim, and that student confirmed that the rumor

had no basis.

6.      Once the Title IX Office concluded that John was not the subject of any complaint and was a student in good standing with the College, entitled to all the rights and privileges provided by the school, John attempted to rejoin his team.

7.      Instead, Haverford informed John that because certain of his teammates continued to believe the (false and baseless) rumor, he was no longer welcome on a team for which the coaches had selected him as a captain just a few months prior.  By banning John from the team, the College acceded to the demands of students who falsely identified John as a sexual predator, thereby depriving him—without the process required by law and by Haverford's own policies—of his final seasons of NCAA competition before he graduates in May 2023.

8.      Haverford's decision to ban John from participating in his sport and from representing Haverford as a captain on the field of play has only served to embolden the rumormongers and to exacerbate the spreading of the rumor within the student population that John is an adjudicated perpetrator of sexual violence against women.  Students now logically assume that since John was punished, he must have been found responsible for sexual assault.

9.      Since his removal from the team, John has participated in multiple meetings with several College deans, his coach, his teammates, the Title IX Coordinator, and the Athletic Director, exhausting every possible avenue to resolve the unjust and untenable decision the College made to impose an athletic ban on John solely because of a rumor the College knew to be false.  John's parents have similarly corresponded with the College President and have spoken with the Dean of the College and John's Advising Dean in an attempt to resolve the unfair treatment of their son.  All to no avail—the College, through the coach and with the

support of the Athletic Director and senior administrators, remains steadfast in its decision to disqualify John from representing the College in his sport.

10.     The decision to remove John from his team and to prohibit his return—a decision communicated to John initially by his coach and most recently by Haverford's Athletic Director and to John's parents by the Dean of the College—was an official sanction from the College imposed solely on the basis of a false rumor of sexual misconduct by John.

11.     But Haverford's policies—by which the College is contractually bound—expressly prohibit the College from imposing such a sanction for alleged sexual misconduct without a formal hearing and finding of responsibility, neither of which occurred.  The College's Sexual Misconduct Policy states in no uncertain terms: "The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  And the policy specifically identifies removal from a sports team as a disciplinary sanction the College may impose following the required hearing and determination of sexual misconduct.  The policy plainly requires that the College hold a hearing and make a determination *before* imposing any disciplinary sanction, including removal from a sports team.  But in the case of the false rumor concerning John, the College never held a hearing—much less found John responsible at such a hearing or permitted any appeal—thereby breaching its contractual obligations to John as set forth in its written policies.

12.     Haverford also failed to protect John from the gender-based harassment he experienced on campus.  John reported his harassment, including the online post calling on students to "bully" him, to a College dean and asked Haverford to initiate a disciplinary proceeding against those responsible.  John advised the College that he feared for his safety and that he was being harassed and ostracized by his peers as a result of the false and malicious

rumor.  Haverford did nothing to discipline those responsible for the harassment.  Worse, Haverford essentially ratified, and certainly fanned the flames of, the gender-based harassment by kicking John off his team, refusing to reinstate him, and removing his name from the team roster, thereby publicly, and falsely, portraying John as responsible for sexual misconduct—indeed a heinous crime—that he never committed.

13.     John files this Complaint to compel Haverford to comply with its own policies and withdraw his athletic sanction so that he may compete in his final seasons of NCAA athletics.  John also seeks to hold Haverford accountable for its deliberate indifference to, and active participation in, the ongoing gender-based harassment John has experienced at the College and for its defamation of him, which has effectively denied John access to the full rights and privileges of his education and has caused John to experience severe emotional distress that has negatively affected John's studies and required psychological counseling.

## THE PARTIES AND JURISDICTION

14.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a natural person, citizen of the United States, and resident of the state of New York.  John is currently enrolled as a student at Haverford College.

15.     Defendant Haverford College is a private liberal arts college located in Haverford, Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

16.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 because (i) the federal law claim arises under a statute of the United States, and (ii) John and Haverford are citizens of different states and the amount in controversy exceeds $75,000.

17.     This Court has personal jurisdiction over Haverford because Haverford conducts business within the Commonwealth of Pennsylvania.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Haverford is located in this judicial district, and all of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

19.     John is a senior in good standing at Haverford who is beginning his final collegiate semester.  John is on course to graduate in May 2023 with a Bachelor of Arts degree.

20.     The coach of John's team is an employee and agent of the College.  He is in a position of authority and influence at the College due to his long-tenured status.

21.     Haverford is a highly selective liberal arts institution, with a small close-knit community of fewer than 1500 students, all undergraduates.  Haverford is rooted in Quaker history and traditions and takes pride in the purported culture of trust and respect among its students.

22.     John chose to attend Haverford for several reasons, including both its academic rigor, with small classes and direct access to senior faculty, and its emphasis on inclusivity, respect, openness, and integrity, with fellow students who would largely share those same core values.

23.     John also wanted to continue a strong and longstanding family connection with the College.  His family has been attending Haverford since before the Civil War, and John is the fifth generation of his family to attend the College.  John first fell in love with Haverford when, as ninth-grader, he attended a Haverford reunion on campus.

24.     In addition to Haverford's strong academics and culture, and his family's close

connection to the College, John was drawn to Haverford for the opportunity it presented for him to participate in intercollegiate athletics, a core reason that he selected the school.  John was a multi-sport athlete in high school: captain of two varsity teams, all-league on another team, and a varsity letter winner in a fourth sport.  Because of Haverford's small size, John was confident that he would potentially be a competitive prospect for multiple varsity teams at the College.  In September 2018, a year before John matriculated at Haverford, when he was still considering various colleges, John reached out to his (prospective) coach, stated his interest in Haverford and his desire to join the team, and attempted to arrange an in-person meeting when John visited the College's campus.  Although their schedules did not align at that time, they corresponded, and John sought out the coach when he arrived on campus in September 2019.

25.     John's confidence in his ability to make a team at Haverford was well-founded. Starting in the first semester of his freshman year, 2019, John has been a top competitor in his chosen sport at Haverford.  In the fall of his junior year, 2021, he was selected by the coaching staff as a co-captain.  John is a disciplined and dedicated athlete, a tireless worker, and an engaged and supportive teammate.  He is also a member of the Centennial Conference Academic Honor Roll.

26.     John earned his spot on the roster through his talent and dedication, and he meets all criteria established by the team, the College, and the NCAA to participate fully in intercollegiate varsity athletics.  Prior to the incidents described in this complaint, John never had an issue with any of his coaches or teammates, never had been accused of being disruptive to the team, and never had a disciplinary issue with Haverford of any kind.

27.     John's status as a varsity athlete and co-captain is a central part of his identity at school and is tangible representation of the countless hours of his life, starting at a young age,

that he has dedicated to becoming the strongest athlete he can be. John earned the right to compete for his school and to represent Haverford on the field of play.

28.     John's position on the team also has been an essential source of friendship and camaraderie for him at the College. Team members train together and compete together, and frequently have meals together, study together, and socialize together. The friendships he formed and the support those friendships provided have been an important part of his identity and his experience of college at Haverford.

### The False Rumor About John

29.     In January or February 2022, unbeknownst to John, a false and vicious rumor began to circulate on campus that John had raped a female student.

30.     This rumor was entirely false—indeed fabricated out of whole cloth. John had had no sexual or intimate contact of any kind, or any physical contact at all, with the woman whom he later came to understand was the purported victim in the rumor as well as an originator of the rumor.

31.     John subsequently learned that he was the target of a specific campaign of gender-based harassment, which began with the invention of the rumor and continued with its circulation and propagation among the student population through both in-person communication and social media.

### Haverford's Improper Removal Of John From The Team Based On The False Rumor

32.     In late January or early February 2022, one of John's co-captains ("Captain A") repeated the rumor to various members of the team as well as to John's other co-captains.

33.     Captain A was among the original propagators of the false rumor and took direct action to ostracize John from his peers. Captain A had purportedly received the rumor from

another student and had no independent basis to believe or repeat the false rumor. Nevertheless, he took it upon himself to enlist the help of several teammates to approach the coach to share the false rumor and to seek John's removal from the team.

34.     On the evening of February 3, Captain A contacted John to inform him of a captains' meeting that he had scheduled to take place in 15 minutes.  At the meeting, Captain A and the other captains confronted John with the rumor, which consisted solely of the bare allegation that he had raped an unnamed female student.  They provided no specificity whatsoever with regard to the identity of the purported victim, the date, the timeframe, the place, the context, or any other detail.  Knowing, even without receiving any associated context, that the rumor was utterly false and baseless, John denied it.

35.     On February 4, the following morning, Captain A, on behalf of himself and the other co-captains, sent an e-mail message to John stating: "[W]e do not think it is in the best interest of the team for you to be a part of this team anymore."

36.     John did not respond to the e-mail message and instead reached out to his coach to discuss the matter.

37.     Midday on February 4, John met with his coach.  The coach advised John that the co-captains had spoken with him already, that he (the coach) was a mandatory Title IX reporter (someone required by the College by virtue of their position to report allegations of sexual misconduct), and that he would be providing the information from the co-captains to the Title IX office for further investigation.  The coach shared no other information with John concerning the false rumor.

38.     During the meeting, the coach instructed John to step away from the team until the Title IX process was resolved.

39.     Although John vehemently denied the false and defamatory rumor, he followed the instruction of his coach.  That afternoon, he sent an e-mail message to his teammates stating that due to "serious rumors" brought to him by the co-captains he was resigning from the team "until further notice."

40.     That evening, Captain A and the other co-captains held an athletes-only team meeting in which Captain A informed John's teammates—falsely—that John had been kicked off the team for committing sexual assault.

### Haverford's Improper Denial Of John's Reinstatement To The Team

41.     Based on his discussion with the coach, John expected to hear from the College's Title IX Office, even though he knew that he had assaulted no one and had had no sexual contact with anyone that could possibly form the basis for such a claim.  After hearing nothing for more than a week, on February 13, 2022, John e-mailed Haverford's Title IX Coordinator to request a meeting.  John wanted to learn the nature of the allegation against him, including the identity of the purported victim, and to learn whether a sexual misconduct complaint had been made against him.

42.     On February 16, John met with the Title IX Coordinator in a Zoom conference. The Title IX Coordinator advised John that the coach had informed her of the rumored allegation that John's teammates had relayed to the coach.  She confirmed that her office had not received any formal complaint against John and further confirmed that no evidence concerning the rumor existed apart from unspecified text messages (presumably consisting of the text chain through which the rumor was spread).  John asked to review the text messages, but the Title IX Coordinator denied his request.  She also refused to describe, even generally, what the texts stated or who had sent and/or received them.

43.     The Title IX Coordinator explicitly advised John that she had seen nothing that warranted an investigation and confirmed that there was no complaint against him. Accordingly, Haverford's Title IX Office, through the Title IX Coordinator, confirmed that the College had no basis to impose any sanctions or interim restrictions of any kind against John.

44.     The Title IX Coordinator advised John during their meeting that he was, as far as the College was concerned, a student in good standing and that he should continue with his life at Haverford as normal.

45.     John then met with his coach, informed the coach that there was no Title IX complaint pending against him and no investigation of him of any kind, said that he had been advised that he should resume his regular activities, and asked to rejoin the team.

46.     To John's shock and dismay, the coach was not willing to permit John to rejoin the team despite the fact that the allegation against him consisted of nothing but an unsubstantiated rumor—which John categorically denied—and the fact that John was a student in good standing with the College.  The coach said only that the co-captains did not want him on the team but failed to offer any justification for their sentiment or for his acquiescence to it. The coach instead stated that they should all meet to discuss the matter after the upcoming spring break.

47.     Haverford has no written policy that gives varsity student athletes the authority to make decisions regarding team roster or membership.  John's coach had full authority to restore John's membership to the team, and he did not need permission from or agreement by any students to do so.  Moreover, allowing students to impose sanctions for alleged or even actual sexual misconduct is contrary to Haverford's Sexual Misconduct Policy.

48.     Nevertheless, in an attempt to be cooperative and to quell the false rumor that

had so badly maligned John and his reputation, on March 14, the first day after spring break, John sent an e-mail message to his coach and co-captains asking to schedule the meeting prior to his rejoining the team.

49.     The next morning, on March 15, the coach responded directly to John only and requested that the two of them meet alone before any meeting with the co-captains.  John met the coach in his office later that day.

50.     The coach advised John that his co-captains were adamant that John not be allowed back on the team because of their belief in the "allegation," which John knew to be false and of which he had been cleared by the Title IX Office.  John pointed out that the players had no authority to dictate the team roster, which the coach did not dispute.

51.     Nevertheless, the coach proposed to schedule a larger meeting with not only the co-captains, but also Haverford's Athletic Director and the Title IX Coordinator.

52.     Again, attempting to be cooperative, John agreed.  John particularly hoped that hearing directly from the Title IX Coordinator would alleviate the concerns of his coach and teammates.

53.     Upon information and belief, the coach had no intention of allowing John to rejoin the team when he suggested the meeting.

54.     In an apparent effort to find some other, pretextual, basis to exclude John from the team, the coach requested that John meet him for a training session on March 18 so that he could assess John's fitness level.  John complied with the request, met with his coach, and demonstrated that he was athletically fit to compete.

55.     On the day of the purported fitness test, before actually starting the test, the coach reiterated to John that his teammates did not want him back because of their belief in the

"allegation." John again denied that there was any truth to the rumor and reiterated his desire to resume his position as a co-captain of the team. The exchange with the coach during the fitness test was distressing to John given that the coach continued to give credence to the false rumor, despite his denials and the lack of an actual complaint or even a shred of factual support.

56.     On March 22, John participated in the in-person group meeting that his coach had scheduled, with: (i) the Title IX Coordinator; (ii) the Athletic Director; (iii) a Senior Associate Dean of the College; (iv) the coach; and (v) the co-captains.

57.     During the meeting, the Title IX Coordinator confirmed for all in attendance that no complaint had ever been filed against John and that no Title IX investigation was ongoing or contemplated.

58.     Despite this confirmation, Captain A and one of the other co-captains voiced their continuing opposition to John's participation on the team. Captain A stated that he did not care about the lack of a Title IX complaint because, in his view, victims do not trust the Title IX process. Captain A stated, in words or substance, that he believed the rumor and that the lack of a Title IX complaint was not an indication of the absence of an underlying issue, but rather the absence of faith by the purported victim in reporting it.

59.     During the meeting, Captain A read aloud the text message he said he had received from another Haverford student and through which he had learned of the rumor.[2] In the that message, the other student said that she had already sent the rumor to two of John's friends and intended to spread it as broadly as possible across campus.

60.     Captain A also began to level groundless generalized smears against John's character, specifically calling John a misogynist. He and one other co-captain for the first time

---

[2] John understood the text was from someone other than the purported victim – i.e. Captain A was relying on second-hand, whisper-down-the-lane allegations.

raised the vague notion of additional unspecified instances of other purportedly offensive behavior toward women, despite pointing to no actual instances of improper conduct.  Because they were unable to provide a single example of any specific conduct John had engaged in that formed the basis of their attacks, it became apparent to John that the smears were simply designed to offer a pretextual basis to keep him off the team given the lack of substance to the false sexual assault rumor.

61.     Despite the inability of John's co-captains to identify anything to support their untenable position other than the false rumor and the pretextual false smears, the coach sided with John's co-captains in the March 22 meeting and declared that John would not be permitted to rejoin the team.  The coach made this decision unilaterally, despite the absence of a complaint or anything other than a fact-free rumor to suggest that an actual victim ever existed.

62.     The Title IX Coordinator, the Athletic Director, and the Associate Dean said nothing in response to the coach's decision, but their silence ratified the decision to sanction John based on the rumor and to ban him from participating in his sport.

63.     John was visibly shaken and traumatized by the personal attacks he experienced during the meeting, so much so that the Associate Dean in attendance pulled him aside at the conclusion of the meeting to ask if he was OK and subsequently contacted John's Advising Dean to check in on him.

### The Fallout From Haverford's Improper Decisions

64.     As a result of Haverford's removal of John from the team and rejection of his request for reinstatement, John was exiled from the sport he loves and from a team on which he had been selected as a captain just months prior.  The College imposed this sanction based on a student-led campaign of harassment.

65.     John's separation from the team was already known by team members, and the denial of his reinstatement also quickly became known.

66.     Haverford removed John's name from the team roster published on its website, effectively publicizing even beyond the membership of the team itself the fact that John had been punished by the College.

67.     Given Haverford's small size and tightly intertwined community, the College's decision to ban John from his sport, to strip his title of co-captain, and to remove him from the team website had the immediate impact of legitimizing, both to team members and to students across the campus, the otherwise threadbare allegation rumored to exist against John.  The sanction effectively ratified the false notion that John had committed a sexual assault and only intensified the harassment and ostracism to which John had been subjected following his removal from the team.

68.     Following his removal from the team, John was immediately rendered persona non grata by his former teammates.  Teammates with whom he had formerly trained and competed, with whom he shared meals and socialized, immediately started ignoring him, isolating him on Haverford's campus.  That treatment has continued to date.  And not only has John been socially shunned generally, he has been told both by former teammates and by non-team friends that they can no longer associate with him as a result of the rumor.

69.     On March 23, 2022, the day after the meeting in which he denied John's reinstatement to the team, John's coach added insult to injury by sending an e-mail message to John that suggested John had psychological problems or mental illness that he should address by withdrawing from Haverford and seeking counseling.  In his message, the coach stated:

> I strongly feel that you will benefit greatly by getting out of here,
> NOW, and getting some really good psychological therapy. . . .  I

think that is your best chance of getting well.  Even if you can't
continue classes I think you would be better off leaving. . . .  You
also . . . need to confront some issues that are keeping you from
fulfilling your potential.  Get that help now, as soon as you can and
start moving towards a brighter future.

70.     John forwarded the coach's e-mail message to his Advising Dean the next day.

71.     On March 25, John happened upon the Dean of the College and introduced

himself.  The Dean had received the coach's March 23 e-mail message from the Advising Dean,

and he told John that the message was inappropriate and that the coach was in no position to

suggest that John should leave Haverford.

72.     Separately, John's Advising Dean confirmed later that day that she, the Athletic

Director, and the Dean of the College were all in agreement that the coach's March 23 e-mail

message was improper—a conclusion that they also communicated in a telephone call with

John's mother on April 15—and that the coach had no basis for suggesting that John should

leave Haverford.  Yet they did nothing to correct the improper sanction that the coach had

imposed against John, banning him from the team.

73.     In late March, John learned that the campaign of gender-based harassment

extended to social media, and that he was not the only target.  In a March 27 social media post,

a female Haverford student identified John by name as first in a list of six male Haverford

students.  The post identified the group of male students, including John, as sexual assaulters

and called on all Haverford students to harass and intimidate them, stating specifically:

"everyone should also bully them."  The post questioned how these six male students were

permitted to remain at the school and stated that any students who remain friends with them

"sicken me."  The posts were not only false but encouraged harassment and violence against

John.  John showed these posts to his Advising Dean the next day, and, at her request, sent them

to her on April 1.

**Haverford's Refusal To Reconsider Its Improper Decisions And Failure To
Address The Campaign Of Harassment**

74.     Between March 23 and May 5, 2022, John met with his Advising Dean *eight*

*times* to discuss the unfair sanction imposed by the school, as well as the ongoing gender-based

harassment he was experiencing and the impact it was having on his studies and emotional

well-being.  They also discussed the unfairness of the process to which John had been subjected

and the generally toxic social climate on campus.[3]

75.     On April 7, John formally requested in writing that Haverford convene a

disciplinary panel to investigate the actions of the students involved in the gender-based

harassment he had experienced since early February that had resulted in his removal from the

team, the denial of his reinstatement, the destruction of his reputation, and the public call to

bully him and five other men based on purported sexual assaults.  John's message identified the

students he believed were responsible for initiating and continuing the harassment.

76.     In his request, John wrote: "I went from being a respected leader on a team that I

have been a part of since my first semester on campus to a persona non grata amongst my

teammates. . . . I have been unable to practice or participate . . . and I have been menaced by

coaching staff, teammates, and individuals on campus."

77.     Two days later, on April 9, John requested in writing, in an e-mail message to his

Advising Dean, that the College restore him to the team and asked for a plan of action to do so.

---

[3] For example, Haverford's honor code, which is written by students and ratified annually by the student
body, expressly provides that a student's expression of political beliefs that are not in keeping with
"community standards" may violate the honor code.  *See* https://www.thefire.org/news/july-2021-speech-
code-month-haverford-college.  Students face disciplinary action up to and including separation from the
College for infractions of the honor code.  The Foundation for Individual Rights and Expression (FIRE)
ranks Haverford College in the bottom 30% of colleges in the country for its restrictions on free speech.
*Id.*

78.     The College ignored John's requests.  John's Advising Dean said only that she would see what she and others might be able to do to "support" John but did not convene a disciplinary panel or otherwise respond to his request to discipline the students responsible for his ongoing gender-based harassment.  And the College provided no tangible support to him.

79.     On April 15, at John's request, John's Advising Dean and the Dean of the College spoke with John's mother by telephone to discuss the treatment John had experienced from the students and the coach.  During the call, both deans acknowledged that the coach had failed to handle the rumor appropriately and had otherwise behaved inappropriately.  They agreed that the coach should have contacted the administration regarding the rumor rather than taking matters into his own hands.  They further acknowledged that the coach's March 23 e-mail message was improper.

80.     During the conversation, John's Advising Dean and the Dean of the College also said that they had spoken with Captain A, whom they described as a powerful social figure on campus, and told him that it was not appropriate for him to be involved in this issue—spreading rumors and getting John kicked off the team.  They said that the Athletic Director would speak to the coach and led John's mother to believe that they would handle the situation and have John reinstated onto the team.

81.     Both deans also disclosed during the call that the Title IX Office had reached out to the student who had initiated the rumor—the purported victim of the fictitious sexual assault—and that, as part of an otherwise confidential communication, she had confirmed that she would not be filing a complaint against John and had never intended to file a complaint against him.

82.     John believes he knows the identity of the female student who was contacted by

Haverford's Title IX Office and who was rumored to be a potential victim.  John has never had

sexual relations or intimate contact of any kind—or indeed any physical contact whatsoever at

any point in time—with this person.  Therefore, John avers upon information and belief that the

female student did not just advise Haverford that she would not be filing a complaint, but also

advised Haverford that she would have no basis to do so because she had never had sexual

contact with John.

83.     Upon information and belief, Haverford has actual knowledge that the only

identifiable rumored "victim" of sexual assault has denied the rumor.

84.     Several weeks later, on May 4, John had a follow-up meeting with the Title IX

Coordinator.  During this meeting, the Title IX Coordinator disclosed that she had spoken with

the two students involved in the initial spreading of the false rumor, Captain A and the female

student who purportedly told Captain A that John had assaulted one of her friends.  The Title IX

coordinator told John that she had told both of them that her office was available to assist

someone in making a Title IX complaint, not to entertain rumors, and that no complaint existed

against John.  She reiterated to John that there was no complaint against him and redirected him

to the Dean's Office for any further assistance.

85.     The next day, May 5, John met with the Dean of the College and the Athletic

Director to again pointedly request reinstatement to the team and to discuss the ongoing

mistreatment to which John was subject, in part due to the misperception among the student

population that John had been sanctioned and disqualified from his sport for committing sexual

assault.

86.     The Dean of the College and the Athletic Director did not agree to John's request

to be reinstated.  The Dean said that the situation between John, the coach and his co-captains

was too contentious, that John's return would only aggravate the situation, and that John's desire to rejoin the team would lead other team members and the coach to quit.  He said that the best solution was for John to remain excluded from the team.  The Dean and the Athletic Director, who is also the Athletics *Diversity & Inclusion* Designee, justified their decision to exclude John by stating that his ability to participate in athletics was a privilege, not a right, and that the coach did not want to have him on the team.  As a result, the semester and school year ended with no resolution.

87.     Apart from being unjustly kicked of the team and denied reinstatement, John suffered from, and has continue to suffer from, a diminished ability to perform his academic work both in and outside of the classroom as a result of the abuse and ostracism to which he was and has been subjected.  He needed multiple extensions during the spring 2022 semester to complete his academic work, and, as a result, was forced to take an incomplete in one of his courses, which he was required to make up over the course of the summer.

88.     John's mood, confidence, and overall mental health also suffered and have continued to suffer.  And as the 2022 fall semester approached, he dreaded his return to a campus on which he felt unwelcome and where he feared further bullying and intimidation.

**Haverford's Continued Failure To Address The Campaign Of Harassment In The Fall 2022 Semester**

89.     John's fears were well-founded.  During the fall 2022 semester, John continued to experience harassment and ostracism.  For example, in early September, shortly after returning to campus, John was physically assaulted during an outdoor Haverford social event.  Specifically, he was intentionally body-checked by a student whom he did not know but whom he believes to be a friend of one of the individuals spreading the false rumor.

90.     Also in early September, John walked up to greet a friend whom he had not seen

since the end of the preceding (2021) fall term.  She told him that she had heard the rumor about him and that she could not be friends with him any longer.  She has not spoken to him and has ignored him since.

91.     And John continues to be shunned by his former teammates.  Early in the semester, hoping that their treatment of him might be different following the summer break, John attempted to engage in the dining center with former teammates with whom he used to be friends, and they completely ignored him.  With one or two exceptions, all of his teammates have all continued to ignore him since.

92.     In early November, John encountered one of his former teammates in the weight room.  The teammate said that he believed the rumor that had circulated about John because it was not the kind of rumor that people made up.  John told the teammate that what he was hearing was untrue, but the teammate did not believe him.

93.     As a result of these kinds of experiences, John felt, and has continued to feel, compelled to limit his interactions with other students and spent, and has continued to spend, most of his time studying in his dormitory room unless going to class, getting meals, or working out, with very little campus social interaction.

**Haverford's Sham Plan To Reintegrate John Onto The Team**

94.     As detailed above, Haverford not only has failed to protect John from a campaign of gender-based harassment and abuse, but also has in fact endorsed that treatment by ratifying an unjust punishment for rumored, but nonexistent, sexual misconduct.  Worse still, throughout the fall 2022 semester, the College held out to John the carrot of reinstatement to the team while simultaneously leading John down a dead-end path—a path that continued to vest in John's teammates, in particular Captain A, the power to maintain his exclusion from the team

based on the false rumor of sexual misconduct.

95.     John reached out to Haverford through his parents and through counsel prior to the start of the fall 2022 semester, in August and September 2022, again to request that Haverford permit John to rejoin the team and address the ongoing gender-based mistreatment John was experiencing on campus.  But rather than affirmatively fixing the situation— reinstating John on the team and taking steps to stop the mistreatment he had received and was still receiving—the College instead endorsed fact-free innuendo against John that attempted to justify that mistreatment.  It also proposed a sham path to "reintegration" that effectively required John to convince his coach and Captain A—both of whom had caused his unjust removal in the first place and blocked his reinstatement at every turn—that they should permit him to rejoin the team.  Needless to say, they did not.

96.     On September 2, John's father sent a detailed letter to Haverford's president describing the campaign of bullying, harassment, intimidation, and ostracism by fellow students based on the false rumor, and the ratification of that rumor by Haverford through its unwarranted and unjust removal of John from the team.  That letter received no response.

97.     On October 6, John's grandmother sent an e-mail message to Haverford's president attempting to appeal to her and the College's integrity and values, asking that the College not accept unfounded rumors as evidence of guilt and instead choose to support a young man who had done nothing wrong but had experienced the consequences of a culture of bullying.  That e-mail message received no response.

98.     The only response that was forthcoming from the College came through its lawyer, who initially spun a yarn, counter to all facts, that John had *voluntarily* quit the team and, what's more, that he was *never denied* reinstatement by the coach or anyone at the College.

Indeed, according to counsel, John was, and had always been, welcome to rejoin the team and needed only to ask, completely ignoring the litany of requests John had made and meetings in which he had participated that were designed to do just that.

99.    Nevertheless, taking the College at its word, on September 9, John proposed a plan through which Haverford would assign a senior administrator to oversee his reintegration onto the team and to support and protect him. The monitor would meet with the coach to convey that John would be welcomed back as a co-captain of the team. The coach, in turn, would hold a team meeting to convey that John had been the subject of a rumor but that no complaint against him ever existed and that, regardless, Haverford policy is that he would be entitled to the presumption of innocence, the same presumption anyone is afforded when accused of misconduct. The coach also would convey that it is antithetical to Haverford's principles to exclude someone from a College activity based on an uncorroborated rumor and that any attempt by team members to exclude or shun John would not be tolerated.

100.    Haverford rejected John's proposal. On September 20, Haverford sent a letter stating that John "can return to the team" but that first he had to reach out to the coach to discuss "how he intends to play his own role in contributing to a positive team environment" and then he also would have to participate in a meeting with the coach, Captain A, and the other new co-captains (none of whom had been captains in March 2022).

101.    The letter also raised again the vague smears, first leveled in the March 22 meeting, which it falsely described as "personal observations" of what the co-captains deemed to be "offensive behaviors toward women."

102.    The co-captains raised no personal observations of purportedly offensive conduct toward women or anyone else by John in the March 22 meeting or any other time.

Indeed, to this date, neither Captain A nor any other captain, team member, other student, or college employee has specified a single instance of purportedly improper or offensive conduct by John toward women or anyone else.

103.    As John pointed out in a responsive letter on September 30, Haverford's proposal was designed to fail.  It required John, the victim of false rumor and subsequent innuendo, again to plead with the coach, who on four previous occasions had denied or refused to reinstate him and who repeatedly had told him that the other co-captains did not want him on the team.

104.    John's September 30 letter noted that further discussions with Captain A and other co-captains would be pointless.  Those conversations had already taken place and consisted of little more than a verbal attack on John and an unwillingness by his attackers to believe that the rumor that John had committed sexual assault was untrue.  Captain A had previously made clear his belief at the March 22 meeting that despite the lack of a complaint he continued to believe the rumor and would act to make sure that John stayed off the team regardless.

105.    John's September 30 letter also noted that despite the denials by John, and the lack of any complaint or evidence of misconduct whatsoever—or even a specific allegation as to any time, place, or manner of any purported assault—the College appeared still to credit the vicious false rumor and the subsequent smears rather than to believe John, the victim of that false rumor.  John had identified significant and ongoing harm to himself through bullying, shunning, and a rush to judgment based on nothing more than a false rumor, to which he had been subjected by the coach, two of the co-captains, and other students.  And the bullying and ostracism of John was continuing, with no protection by the College.  This harm remained

unaddressed, indeed unacknowledged, by the College.

106.    Nevertheless, despite his misgivings with the College's proposed approach, and recognizing that no other path existed, short of filing a lawsuit, that could lead him back onto the team, John agreed to attend the meetings in good faith in an attempt to be cooperative and to rebuild his relationship with his teammates and to rejoin the team.

107.    John met first with his coach, on October 24, 2022.  The meeting was also attended by a dean who acted as facilitator for the discussion.  John and the coach also each had a "support" person present, in John's case his Advising Dean.  Both support people were Haverford administrators who said nothing during the meeting and, in John's case, said nothing before or after the meeting either.

108.    In the meeting, the coach acknowledged to John that the rumor of a sexual assault—which was unsubstantiated, unalleged through any complaint from any purported victim, and unequivocally denied by John—was not a proper basis to keep John from rejoining the team.

109.    But the coach also raised the pretextual specter of the smears as a basis to keep John off the team, stating that John's teammates had concerns other than the rumored sexual assault.  He said that those purported "other concerns" formed the basis for the desire of those teammates to prevent John from being permitted to rejoin the team, although he did not know what they were.

110.    John asked the coach to describe the other teammates' concerns.  Not only did the coach not know what these purported "other concerns" were, he evidently had no interest in learning what they were.  The coach said that he would not participate in John's ensuing meeting with Captain A and the other (new) co-captains.  Instead John should meet with the co-

25

captains alone.

111.    Recognizing that he had been the target not only of the false rumor but of subsequent false innuendo, John immediately after the meeting with his coach asked the dean facilitator to reconvene the meeting so that he could get clarification from his coach as to the co-captains' (purported) "other concerns," asking specifically what those concerns were so that John could address them.  But the coach refused to reconvene the discussion and told the dean facilitator that the co-captains were the ones from whom John should obtain clarification regarding their (purported) other concerns.

112.    Despite John's expressed willingness to make himself available to meet at any time, Haverford did not schedule John's meeting with the co-captains until December 2, five and a half weeks later, after the start of the team's season.  And not all four captains chose to participate—only Captain A and one other (new) co-captain decided to do so.  Haverford appointed the same dean to act as facilitator for the meeting and to guide the discussion.

113.    In the protracted lead-up to that meeting, John continued to engage with the College in good faith but also continued to express his reservations.  Anticipating that Captain A would raise the pretextual smears and innuendo as a basis for his purported unwillingness to permit John to rejoin the team, John sent an e-mail message to the dean facilitator on October 26 in which he stated:

> As you know, I was asked to step away from the team, and prevented from returning at the insistence of [Captain A] (as well as a previous captain), based on a false rumor, which was the only concern raised at the time.  After I confirmed that no actual complaint against me existed (and not having had intimate contact with anyone that could even form the basis for a complaint), I repeatedly met with [the coach] and, on each occasion, was told that the other co-captains did not want me on the team.  In the last meeting, on March 22 (with [the coach], the co-captains, and others), [Captain A] for the first time, raised the vague notion of

26

other unspecified "concerns," but when asked for more detail so
that I could respond, was not able to provide any (other than
generally saying, without providing a single example, that I made
misogynistic comments, which is something that I do not do).
So, I remain concerned that the current process will require me
once again to defend myself against false and vague rumors that
attack my character.  I am also worried that I will be at the mercy
of other students, one of whom initially confronted me with the
rumor and ever since has insisted on my removal from the team
and blocked my reinstatement.  At the March 22 meeting, he was
unwilling even to consider that the rumor was untrue, stating that
just because there wasn't a Title IX complaint did not mean the
rumor was untrue.

Even though I have these concerns, I have agreed to participate in
this process in good faith, and will continue to participate even
though it feels to me like the goalposts have shifted from a
decision which I understood would be made by [the coach] to a
decision heavily influenced by (even if not formally made by) the
other co-captains.

114.    John's message went on to express his concern that the meeting with Captain A

and another co-captain not be a repeat of the "group pile-on" that happened at the March 22

meeting, and to make two requests: (i) separate meetings with each co-captain to reduce peer

pressure and (ii) that the dean facilitator push the co-captains to provide specific examples of

any complaints they or others had regarding his behavior.

115.    Both of John's requests were refused.  The dean facilitator wrote back to John to

say that he would not push the co-captains to answer any specific questions and that John would

have to ask individuals to state their specific concerns and then ask clarifying questions.

116.    The next day, October 27, John wrote back to the facilitating Dean:

I was expressing my concern that these meetings not be a repeat of
what happened last spring, where vague accusations were made
against me that I had a great deal of difficulty responding to, other
than to say they were not true.  And [the coach] again mentioned
that the co-captains might have concerns, but he didn't know
exactly what they were.  So if any of them has specific concerns to
share with me, I simply wanted to know what they were.

117.     In early November, John came to learn that his coach was spreading lies to team

members that John was trying, through his lawyers, to have the coach fired.

118.     So, on November 13, John again wrote to the dean facilitator to express his

concerns both regarding Captain A's influence in a group setting and with respect to the coach's

continued lack of open-mindedness to his reinstatement:

> Even though I am agreeing to a group meeting, that does not lessen
> my reservations about a group meeting, given my experience with
> the pile-on at the March 22 meeting.  I'm also not convinced that a
> group meeting will allow each captain, individually, a chance to
> speak openly and to hear my experience without the group
> pressure.  I say all of this given the history of one captain [Captain
> A], who has a lot of influence, having persistently sought to keep
> me off the team.  Another told me as recently as a week ago that he
> still believes the false rumor . . . [I also learned] that [the coach]
> said I was trying, through my lawyers, to have him fired.  This is
> not true, but it is the kind of false accusation and group pressure
> I've been dealing with and am concerned about.  I wanted you to
> have this background as the person whose role it is to facilitate a
> civil dialogue.

119.     In the days leading up to the meeting, the dean facilitator e-mailed the three

participating students to set the ground rules.  Among the goals he laid out were to "[c]onfront

past misunderstandings" and to "discuss potential of [John] returning to the team."  The

facilitator's e-mail message also asked the students to be "as specific as possible" when

discussing any grievance that they had with one another.

120.     The meeting took place on December 2, 2022.  The facilitator, John, Captain A,

and a new co-captain attended.  John was again accompanied by his Advising Dean, who acted

as his "support person" but who again said nothing before, during, or after the meeting.

121.     During the facilitated discussion, Captain A remained steadfast in his view that

John should not be permitted back on the team.  Notably, the new co-captain, who had not been

part of any prior discussions, admitted having only attenuated knowledge of the rumor and its

promulgation.  In other words, the new co-captain had only third-hand information of the

second-hand information on which Captain A and the prior co-captain relied to malign John's

character.

122.     Despite the facilitator's instruction to be specific in identifying issues, Captain A

only generally said that he (purportedly) had issues with John's treatment of women.  Neither

he nor the new co-captain did or could identify any event or occurrence that concerned them,

nor could they provide a specific example of anything John had ever said or done toward

women or otherwise to substantiate their statements about John's character.  Captain A

expressed his concern that it would be difficult to explain John's prospective return to the team

to other teammates and that John's return would make team leadership look bad.

123.     As John pressed the two co-captains as to the basis for their purported concerns,

it became clear that the co-captains were still crediting, or at least purporting to credit, the false

rumor and that their belief that John had committed sexual assault was the only basis for their

statements about John.  John reiterated to his teammates that the rumor was false and baseless

and that false allegations were not a reason to exclude him from the team.

124.     Following the meeting with the two co-captains, and having heard nothing from

his coach or the College in the immediate wake of the meeting, John e-mailed his coach again

on December 14 to request that he be reinstated.  His message described the meeting with the

two co-captains and asked the coach to put him back on the team:

> As I am sure you know, I had my meeting with two of the captains
> at the end of the week before last. . . .  As I have repeatedly
> expressed, I would like to be back on the team, and I hope that you
> see that I have taken this process seriously and participated fully.
>
> I assume that you have been informed that any concerns that the
> captains may have had are based only on the one unsubstantiated

> rumor that I have repeatedly stated is not true.  I also understood
> you to recognize in our meeting that it was not a basis for my
> continuing to be kept off the team.  I know you were under the
> impression that the captains may have had additional information
> beyond that false rumor, but they confirmed at the meeting that
> they do not.
>
> It would seem that these two meetings have served to resolve any
> remaining doubts that may have existed concerning the original
> basis for my stepping away from the team or any other
> concerns.  So I believe that I should be able to rejoin the team, and
> am ready to do so.

125.    John's coach did not respond to the e-mail message.  Instead, John received an e-mail message the following day from the Athletic Director asking John for a meeting.  The Athletic Director informed John that the Assistant Athletic Director (a lawyer) also would be present and that the purpose of the meeting was to inform John of the status of his membership on the team.

126.    On December 19, John met with the Athletic Director and the Assistant Athletic Director in a Zoom conference.  The meeting was extremely brief, lasting less than ten minutes.  The Athletic Director told John simply that the coach had decided that "it was not in the best interest of the team" for John to rejoin.

127.    When John asked the Athletic Director why the coach felt this way, she read a prepared statement from the coach stating that his decision was based on unspecified "feedback" following his meetings with John and John's meeting with the two co-captains.  When John asked for the reasoning behind the decision, the Athletic Director said that the coach had full discretion and autonomy with respect to managing the roster.  John asked if the decision was fair to him, which the Athletic Director deliberately misinterpreted, answering only that it was fair for coaches to manage their rosters.

128.    John asked pointedly whether the false rumor was the basis for the coach's

30

decision to exclude him, to which the Athletic Director responded (falsely) that she did not have any information about the rumor or whether it was the basis for the decision. John finally asked why the coach was not present to explain his decision, to which the Athletic Director had no response.

129.    In fact, just as in the spring 2022 semester, the coach was never open to John's return to the team in the fall 2022 semester and did not participate in good faith in the College's purported attempt to have John reintegrated onto the team. Recognizing that the rumor was not a sound basis to keep John off the team, he instead relied on equally unsound pretextual innuendo involving unspecified generalized concerns about John's behavior—about which he admittedly had no knowledge—thereby effectively turning the reinstatement decision over to Captain A. Meantime, he poisoned the well by spreading lies to the captains about what John was purportedly doing to have him fired, in an attempt to corrupt the College's already deeply flawed sham plan that was (purportedly) designed for John's reinstatement.

130.    On January 6, 2023, John's parents had a conference with the Dean of the College both to try to understand the bewildering and manifestly unjust treatment their son had received, and continued to receive, by Haverford and its agents over the course of nearly a year and in an attempt to convince the College to correct course. Neither goal was successful. The Dean refused to alter the decision excluding John from the team.

131.    Like the coach, and like Captain A, the Dean raised the bogeyman of the purported existence of other unspecified concerns within the team, none of which by his own admission he actually knew or could state but all of which he purportedly thought were a valid reason to keep John off the team. Like the Athletic Director, he emphasized the unfettered discretion that coaches have to manage their rosters, emphasizing that this discretion

represented a change in policy that had been communicated to all varsity team members the previous semester.  He also cited "team disruption," by which he meant that the very teammates who watched Haverford unjustly and illegally kick John off the team and repeatedly refuse his reinstatement, and who consequently had spent months ostracizing and harassing John as a Haverford-branded sexual predator, might be disturbed by the unexplained return of such a person to the team and so might want to quit the team.

### **Haverford Has Inflicted And Continues To Inflict Harm On John**

132.    As a result of Haverford's actions, John was excluded from participating on his team between February and May 2022.  He has already missed the start of the current season and, without judicial relief, will lose the ability to participate in the final season of his collegiate career.

133.    Even though John has a completely clean disciplinary history and is a student in good standing with the College, his reputation at Haverford has been destroyed by the false rumor and successful smear campaign carried out by several students with the assistance of Haverford's coaching staff and ratified by Haverford's administration.  Haverford's administrative staff, including the Athletic Director, several deans, and the Title IX Coordinator have all supported the decision of John's coach to ban him from sport for arbitrary, capricious *and false* reasons.  The false rumor against John now bears the imprimatur of an official college sanction, further entrenching the misconceptions held by John's peers.

134.    The way Haverford has chosen to manage this situation is antithetical to the Quaker values of civil confrontation and community restoration that the College purports to endorse as a central aspect of its unique identity.  Rather than foster a fair and just solution to a situation that Haverford knows was created by lies spread by students, the College has cast

aside its values and prostrated itself to the demands of a small group of students whose assertions about John are false and malicious.

135.     John continues to be the target of unchecked gender-based harassment and ostracism by his peers at Haverford.  His college experience has been devasted by the false and malicious rumor and its mishandling by the College, which senselessly allowed it to form the basis of an official College sanction.

136.     John has received and continues to receive psychological counseling to help him cope with the stress and anguish he has experienced and continues to experience through harassment, bullying, and ostracism by his peers, as well as by the College's explicit acceptance and even tacit endorsement of this treatment.  Haverford not only has done nothing to protect John from the harassment, but also has acceded to the demands of the harassing students by imposing an unjustified, character-impugning sanction against John.

## COUNT I
### Breach of Contract

137.     John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

138.     Haverford maintains a Sexual Misconduct Policy (hereafter "the Policy") that prohibits "Sexual Harassment" as that term is defined by Title IX of the Educational Amendments of 1972 and its implementing regulations.  It specifically prohibits "any conduct on the basis of sex that is alleged to have occurred in a College Education Program or Activity," which "a reasonable person would determine to be so severe, pervasive, and objectively offensive such that it effectively denies a person equal access to the College's Programs or Activities." (A true and correct copy of the Policy is attached hereto as **Exhibit A**).

139.     The Policy prohibits Sexual Assault among other types of sexual misconduct.

33

140.     The Policy also prohibits "unwelcome conduct of a sexual nature, including but not limited to . . . verbal or nonverbal conduct of a sexual nature that is sufficiently serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, residential, or social environment under both an objective and subjective standard" (Ex. A at p. 3).

141.     The Policy establishes Haverford's exclusive procedures for addressing alleged sexual misconduct violations.  It states that "[r]eports of Sexual Misconduct committed by any student or employee (including faculty and staff) of the Haverford community **will be resolved according to the procedures outlined in this Policy**, unless otherwise noted." (Ex. A at p. 4) (emphasis added).

142.     Haverford's Policy promises its students that "**[t]he College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal**, unless otherwise resolved through an Alternative Resolution Process."  (*Id.* at p. 19) (emphasis added).

143.     The Policy allows the College to address formal complaints from individuals alleging to be the victim of sexual harassment, as well as anonymous reports of violative conduct.  (*Id.* at p. 9).

144.     The Policy makes clear that "[a]ny person may report Sexual Misconduct in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's oral or written report."

145.     The Policy further provides that "[o]nce an individual provides a report of Sexual Misconduct, the report will be reviewed by the Title IX Coordinator. . . .  Using the

information gathered through the Online Reporting Form, the College will promptly contact the Complainant to discuss appropriate Supportive Measures and to explain the process for filing a Formal Complaint. . . .  Complainants are not required to respond to outreach from the College and the College will respect this decision, with limited exceptions where it is obligated by law or to act in the safety interest of the community."  (*Id.* at p. 8).

146.   Upon receipt of a formal complaint, the Policy sets forth detailed procedures for resolving the allegations through either an "Alternative Resolution Process" or a formal "Resolution Process."  (*Id.* at pp. 15-26).

147.   Under the Alternative Resolution Process, the College may reach an "Administrative Resolution" whereby the responding student admits responsibility.  In that case the parties will be given the opportunity to attend a "sanctions hearing" with an advisor, and to submit impact statements for the panel's consideration in determining an appropriate sanction. The College must issue a written decision regarding the sanction imposed.  (*Id.* at p. 16).

148.   Pursuant to the Alternative Resolution Process, the College may also initiate a Facilitated Resolution.  The Policy provides that "Parties may elect to enter an Alternative Resolution Process at any time after the filing of the Formal Complaint and prior to a Determination Regarding Responsibility if both the complainant and the respondent provide informed written consent."  In that case a trained facilitator will attempt to mediate a negotiated resolution between the parties that must be memorialized in a written agreement. (*Id.* at p. 17).

149.   The filing of a Formal Complaint by a Complainant or by the Title IX Coordinator triggers the College's formal Resolution Process, which in turn mandates a detailed set of procedures for the investigation, hearing, determination, and appeal processes that must be followed.  (*Id.* at pp. 14, 17 – 25).  Certain of these processes, including the provision of a

Notice of Allegations, the conducting of an Investigation, the holding of a Hearing, and the permitting of an appeal, also are required before the College can impose any disciplinary sanction for sexual misconduct, regardless of whether a Formal Complaint has been filed.

150.    Either party may appeal the responsibility and/or sanction determination, and the College must issue a written decision detailing the rationale for either granting or denying the appeal.

151.    Upon a determination of responsibility, the Policy permits Haverford to impose a range of sanctions on the responsible student, including "**Removal from** organization, **team** and/or committee;" "**Revocation of leadership** or supervisory **position**;" and "loss of campus housing **or other privileges.**" (*Id*. at p. 24) (emphases added).

152.    Haverford's Policy prohibits the College from disciplining students facing allegations of sexual misconduct without a formal finding of responsibility. (*Id.* at p. 19) ("The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal, unless otherwise resolved through an Alternative Resolution Process.")

153.    By reporting to the Title IX Coordinator the allegation that John had sexually assaulted a female student, John's coach invoked and initiated the Policy.

154.    Consistent with the Policy, the Title IX Coordinator contacted the alleged victim to determine if she would like to pursue a formal complaint and determined that she did not. In fact, the alleged victim confirmed that she was not assaulted by John.

155.    Consistent with the Policy and based on the facts and information available to her, the Title IX Coordinator determined that the safety interests of the community did not justify any action by Haverford with respect to sexual misconduct allegedly committed by John.

156.     The College did not pursue its Formal Resolution Process, or its Alternative Dispute Resolution Process with regard to any allegations that it received concerning John's purported sexual misconduct.

157.     The College made no determination of responsibility finding that John had actually committed any sexual misconduct.  Nor did the College hold any hearing to determine whether John had committed any sexual misconduct.

158.     Accordingly, the College was prohibited under the Policy from imposing any sanction against John for any reported alleged sexual misconduct.

159.     Similarly, to the extent John's coach, Captain A, and/or any of John's other co-captains reported that John had engaged in misogynistic and/or sexist behavior toward women—despite their inability to point to any examples of John's conduct to support that allegation—such allegations also fall within the Policy's definition of "Other Gender-Based Misconduct – unwelcome conduct of a sexual nature."

160.     As such, John was entitled to the procedural protections promised by the Policy before the College could sanction him with removal from his team and loss of his leadership position as co-captain for those allegations as well.

161.     By permitting John's coach, as an agent of the College, to sanction John with removal from the team based on John's reported sexual misconduct, Haverford breached the procedural protections promised to John under the Policy and violated its promise not to impose sanctions associated with sexual misconduct without a formal hearing and a finding of responsibility.

<u>COUNT II</u>
**Violation of Title IX Deliberate Indifference to Sex/Gender Discrimination 20 U.S.C. §§ 1681, et seq.**

162.    John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

163.    Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

164.     Haverford College is a recipient of federal funds and is therefore bound by Title IX and its regulations.

165.    As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from sexual harassment and assault, discrimination based on gender, and retaliation for having exercised rights protected by Title IX.

166.    A federally-funded educational institution violates Title IX if it has actual knowledge that a student is being subjected to gender-based harassment and fails to reasonably respond to protect the student.

167.    Haverford had actual knowledge that John was the target of gender-based harassment, which included students and coaching staff spreading false and defamatory allegations that John had committed sexual assault and engaged in other purported misogynistic behavior.

168.    The harassment John experienced was part of a larger campaign against a group of male students who had been identified as sexual assaulters by a contingent of students.  The

group of men, including John, were subjected to cyber-bullying, verbal harassment, as well as exclusion from social and collegiate groups and organizations.

169.    Haverford had actual knowledge of the sex-based harassment John experienced because John reported it to his Advising Dean and provided her with evidence in the form of a copy of the social media posts from a Haverford student calling on the community to bully John and five other male students.

170.    John requested that disciplinary action be taken against the students who were responsible for spreading the false allegations about John and for attempting to incite harassment and potential violence against John and the other male students identified in the post.

171.    Haverford took no action to discipline any of the students involved and permitted the campaign of harassment to continue unchecked.

172.    Haverford participated in the campaign of harassment by publicly removing John from his sports team at the request of his harassers, without any legitimate basis to do so, thereby creating and reinforcing a misperception that John had committed sexual misconduct.

173.    Haverford's improper sanction against John created a false impression that the College had found him responsible for sexual assault, which it had not, and only served to intensify the harassment John experienced on campus—all of which John reported to the College.

174.    John was subjected to a hostile educational environment and excluded from the rights and privileges he had earned as a student-athlete in good standing with the College.

175.    At all relevant times, Haverford exercised substantial control over the students and employees that participated in the harassment.

176.     Haverford acted with deliberate indifference to the acts of sex/gender-based harassment by failing to take any action to prevent them, deter the students and/or employees responsible, and/or protect John from sex-based harassment.

177.     Haverford also acted with deliberate indifference to acts of sexual harassment by failing to take immediate, effective remedial steps to resolve John's allegations of sex/gender-based harassment.

178.     Haverford's repeated failure to respond promptly and appropriately to the harassment caused John, on the basis of his sex, to be denied from receiving the benefits of Haverford's educational programs and activities in violation of Title IX.

179.     Haverford acted intentionally and with deliberate indifference to the repeated denial of John's access to educational opportunities or benefits.

180.     John is entitled to an injunction requiring Haverford to take substantial steps to remedy its deliberate indifference to John's reports of harassment and sex-based discrimination and to restore the rights and privileges it wrongfully stripped from John.

## COUNT III
### False Light – Defamation

181.     John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

182.     Haverford was aware that John's teammates had accused him of sexual misconduct, including but not limited to sexual assault and sexual harassment of women on campus.

183.     Haverford was aware that John's teammates had no evidence to support their allegation and that the allegation that John had committed sexual assault were literally false.

184.     Despite Haverford's knowledge of the falsity of the claims against John,

Haverford imposed an official sanction against John based solely on those allegations.

185.    Haverford's decision to sanction John by publicly stripping John of his leadership position as captain, removing him from the sports team, and deleting his name and information from the team website was done in the context of rumored sexual misconduct allegations and created the appearance that John had been found responsible for sexual assault.

186.    Haverford was aware of and recklessly disregarded the risk that its actions would place John in a false light among the student, faculty, and staff population at Haverford as well as across the athletic league in which John competes.

187.    Haverford is well aware of the significant social stigma attached to allegations of sexual assault, that reasonable people would take serious offense to such a label, and was indifferent to the harm its actions caused to John.

188.    John experienced threats, harassment and humiliation as a result of being mislabeled by Haverford through the unlawful sexual misconduct sanction it imposed against him.

**COUNT IV**
**Intentional Infliction of Emotional Distress**

189.    John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

190.    As detailed in this Complaint, Haverford's conduct in knowingly participating in a false campaign of harassment against John was extreme and outrageous.

191.    Haverford had actual knowledge that the female student John was rumored to have assaulted affirmatively denied the veracity of the allegation.  Haverford also had knowledge that the other allegations being leveled against John by other students and the College's own coaching staff were completely without basis.

41

192.    Despite this knowledge, Haverford allowed its coach and Athletic Director to sanction John for an unsubstantiated and false rumor that John committed sexual assault.

193.    Haverford's coach and Athletic Director intended their conduct to inflict severe emotional distress, or knew there was at least a high probability that their conduct would cause severe emotional distress to John.

194.    As a result of the above-described conduct, John has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including shame, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands the following relief from Defendant Haverford College:

a.    An award of compensatory damages in an amount exceeding $75,000 to be determined at trial;

b.    The issuance of a permanent injunction ordering Haverford to reverse the sanction prohibiting John from participating in his sport;

c.    An award of the costs and expenses of suit;

d.    Attorneys' fees; and

e.    Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff John Doe demands a trial by jury on all issues so triable.


Dated:  January 25, 2023

By:  */s/ Patricia M. Hamill*
      Patricia M. Hamill, Esq.
      Andrew S. Gallinaro, Esq.
      Conrad O'Brien, PC
      1500 Market Street, Suite 3900
      Centre Square, West Tower
      Philadelphia, PA 19102
      (215) 864-9600
      phamill@conradobrien.com
      agallinaro@conradobrien.com

## VERIFICATION

The undersigned hereby swears under pains and penalties of perjury that the facts stated in the foregoing Verified Complaint are true and accurate to the best of his knowledge.

_____
John Doe

# EXHIBIT A

# HAVERFORD
## COLLEGE

**Sexual Misconduct Policy**

This page intentionally left blank

**Table of Contents**

Introduction ........................................................................................................................... 1

    Title IX ............................................................................................................................ 1

    U.S. Department of Education Final Rule under Title IX .............................................. 1

    Bi-College Policy Development .................................................................................... 1

Sexual Misconduct Policy .................................................................................................... 2

    General Rules of Application ......................................................................................... 4

        Effective Date ........................................................................................................... 5

        Non-Discrimination in Application .......................................................................... 5

        Disability Accommodations ...................................................................................... 5

        Alcohol and Drug Use Amnesty ............................................................................... 5

    Policy Definitions .......................................................................................................... 5

        Advisor ...................................................................................................................... 5

        Complainant .............................................................................................................. 6

        Confidential Resource .............................................................................................. 6

        Consent ..................................................................................................................... 6

        Education Program or Activity includes: ................................................................. 7

        Formal Complaint .................................................................................................... 7

        Hearing Panel ........................................................................................................... 7

        Investigator .............................................................................................................. 7

        Privacy ..................................................................................................................... 7

        Resolution Process ................................................................................................... 8

        Respondent ............................................................................................................... 8

Reporting Sexual Misconduct to the College ...................................................................... 8

    Anonymous Reports ....................................................................................................... 9

    Title IX Coordinator ...................................................................................................... 9

    Support and Resources ................................................................................................... 9

        Supportive Measures ................................................................................................ 9

        Supportive Resources ............................................................................................. 10

            On-Campus Resources ...................................................................................... 10

Regional Resources ............................................................................................... 11

National Resources ............................................................................................... 11

Emergency Removal ................................................................................................. 11

Administrative Leave ............................................................................................... 12

Resolution Process ...................................................................................................... 12

Filing a Formal Complaint ...................................................................................... 12

Multi-Party or Multi-Allegation Situations .......................................................... 12

Determining Jurisdiction and Mandatory Title IX Dismissal ............................... 13

Discretionary Title IX Dismissal of Complaint .................................................... 13

Notice of Dismissal ........................................................................................... 13

Withdrawal or Resignation While Charges are Pending .................................... 14

Notice of Allegations .............................................................................................. 14

Advisors ................................................................................................................. 15

Alternative Resolution ............................................................................................ 15

Role of the Alternative Resolution Facilitator ..................................................... 16

Confidentiality .................................................................................................... 16

Alternative Resolution Options ............................................................................ 16

Administrative Resolution ................................................................................. 16

Facilitated Resolution ....................................................................................... 17

Formal Resolution Process ..................................................................................... 17

Notice of Meetings and Interviews ...................................................................... 17

Request for Delay ................................................................................................ 17

Investigation ....................................................................................................... 17

General Rules of Investigations ........................................................................ 17

Ongoing Notice ................................................................................................. 18

Review of Evidence .......................................................................................... 18

Investigative Report ......................................................................................... 19

Hearing ................................................................................................................ 19

General Rules of Hearings ................................................................................ 19

Continuances or Granting Extensions ............................................................... 19

Participants in the Hearing ................................................................................ 19

Hearing Procedures ............................................................................................... 21

Questioning Procedure ......................................................................................... 21

Hearing Recording & Transcript ......................................................................... 22

Determination Regarding Responsibility ................................................................. 22

Standard of Proof ................................................................................................. 22

Considerations for Evaluating Testimony and Evidence ..................................... 22

Written Determination Regarding Responsibility ............................................... 23

Timeline of Determination Regarding Responsibility ......................................... 24

Sanctions ................................................................................................................... 24

Appeals ..................................................................................................................... 24

Retaliation ...................................................................................................................... 25

Appendix I: Rules of Decorum for Resolution Process Hearings ............................... 28

Acknowledgement ......................................................................................................... 31

This page intentionally left blank

# Introduction

## Title IX

Title IX of the Educational Amendments of 1972 prohibits any person in the United States from being discriminated against on the basis of sex in seeking access to any educational program or activity receiving federal financial assistance. The U.S. Department of Education, which enforces Title IX, has long defined the meaning of Title IX's prohibition on sex discrimination broadly to include various forms of sexual harassment and sexual violence that interfere with a student's ability to equally access educational programs and opportunities.

## U.S. Department of Education Final Rule under Title IX

On May 19, 2020, the U.S. Department of Education issued a Final Rule under Title IX of the Education Amendments of 1972 that:

- Defines the meaning of "sexual harassment" (including forms of sex-based violence),
- Addresses how an institution must respond to reports of misconduct falling within that definition of sexual harassment, and
- Mandates a grievance process that an institution must follow to comply with the law in these specific covered cases before issuing a disciplinary sanction against a person accused of sexual harassment.

*See*, 85 Fed. Reg. 30026 (May 19, 2020). The full text of the Final Rule and its extensive Preamble are available here: http://bit.ly/TitleIXReg

Haverford College ("the College") remains committed to addressing any violations of its policies, even those not meeting the narrow standards defined under the new Title IX Final Rule, and retains authority to investigate and adjudicate allegations under the policies and procedures defined within this the Haverford College Sexual Misconduct Policy.

## Bi-College Policy Development

Bryn Mawr and Haverford Colleges ("the Colleges") have a long-standing collaborative relationship which offers students comprehensive access to academics, student organizations, residence hall and dining facilities and social activities on both campuses. A free "Blue Bus" shuttle service makes regular stops at each campus every 30 minutes, providing easy and frequent access to all community members. Some academic programs and departments are provided only on one campus or structured to share resources between the two institutions. In 2016, the Colleges codified the Bi-College ("Bi-Co") relationship with a Memorandum of Understanding to provide a formalized framework for ongoing collaboration. Due to the complexity of the Title IX requirements, specific language in the Final Rule, and the sometimes overlapping nature of the Colleges' Education Program and Activities, Bryn Mawr and Haverford Colleges will implement Sexual Misconduct Policies which are substantially the same, effective August 14, 2020. The Colleges will jointly administer the procedures set forth in the Resolution Process of these Policies, as mutually agreed by the Colleges, if a Complainant is a student

1

or employee of one College and the Respondent is a student or employee of the other College, if the Complainant is a student or employee of one College and the location of the alleged Sexual Misconduct is the other College, or if other facts and circumstances set forth in a Formal Complaint or in the investigation of such Formal Complaint suggest the need for joint administration of the Resolution Process.

## Sexual Misconduct Policy

Haverford College is committed to ensuring that all members of the College community have a learning and working environment that is free from sexual misconduct. For purposes of this policy, the College defines **Sexual Misconduct** as acts described in one or both of the following broad categories:

1. **"Title IX Sexual Harassment,"** in accordance with the U.S. Department of Education Final Rule, includes any conduct on the basis of sex that is alleged to have occurred in a College Education Program or Activity, and is alleged to have been perpetrated against a person in the United States. The conduct alleged, if true, must satisfy one or more of the following conditions:

   a. A College employee conditions the provision of an aid, benefit, or service on an individual's participation in unwelcome sexual conduct;

   b. Unwelcome conduct a reasonable person would determine to be so severe, pervasive, and objectively offensive such that it effectively denies a person equal access to the College's Programs or Activities;

   c. **Sexual Assault**, as defined in 20 U.S.C. § 1092(f)(6)(A)(v), meaning any sexual act directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent (such as incapacitation, age, family relation to the other party, or intellectual or other disability). Sexual Assault can be committed by or against individuals of any sex or gender and can occur between individuals of the same sex/gender or different sexes/genders. As required by the Title IX Final Rule, the College will rely on the following definitions of Sexual Assault:

      i. sexual intercourse with another person, including oral or anal sexual intercourse, or the use of an object or instrument to unlawfully penetrate, however slightly, the genital or anal opening of the body of another person, without consent of the victim, including instances where the victim is incapable of giving consent because of their age or because of their temporary or permanent mental or physical incapacity;

      ii. touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the

victim is incapable of giving consent because of their age or because of their temporary or permanent mental or physical incapacity;

   iii.  sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law; or

   iv.  sexual intercourse with a person who is under the statutory age of consent.

d.  **Dating Violence**, as defined in 34 U.S.C. § 12291(a)(1)), meaning any act of violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim and where the existence of such a relationship is determined based on a consideration of the length, type, and frequency of interactions between the persons involved in the relationship.

e.  **Domestic Violence**, as defined in 34 U.S.C. § 12291(a)(8), meaning a felony or misdemeanor crime of violence committed by a current or former spouse or intimate partner of the victim, by a person with whom the victim shares a child in common, by a person who is cohabitating with or has cohabitated with the victim as a spouse or intimate partner, by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

f.  **Stalking**, as defined in 34 U.S.C. 12291(a)(30), meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress**.**

2.  **"Other Gender-Based Misconduct,"** defined as acts which do not meet the narrow definition of "Title IX Sexual Harassment," as defined above, but nevertheless could constitute discrimination on the basis of sex. Other Gender-Based Misconduct, which is alleged to have occurred by or against any member of the College community, regardless of the location of the alleged action, includes:

a.  Sexual Assault, Dating Violence, Domestic Violence, and Stalking as defined in 1c, d, e, and f (above).

b.  Unwelcome conduct of a sexual nature, including but not limited to unwelcome sexual advances, requests for sexual favors, or other verbal or nonverbal conduct of a sexual nature that is sufficiently serious, pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually offensive working, academic, residential, or social environment under both an objective and subjective standard.

3

   c.   Sexual exploitation, defined as occurring when a person abuses or exploits another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage, or any other non-legitimate purpose without that person's consent. The act or acts of sexual exploitation are prohibited even though the behavior does not constitute one of the other sexual misconduct offenses.

Examples of sexual exploitation include:

o   observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity in a place where that person would have a reasonable expectation of privacy, without that person's consent;
o   recording, and/or distributing (including streaming) of images, photography, video, or audio recording of sexual activity or nudity, or distribution of such without that person's consent;
o   prostituting another individual;
o   exposing one's genitals in non-consensual circumstances;
o   knowingly exposing another individual to a sexually transmitted disease or virus without that individual's knowledge; and
o   inducing incapacitation for the purpose of making another person vulnerable to non-consensual sexual activity.

## General Rules of Application

The above-referenced acts are considered sexual discrimination. Title IX of the Educational Amendments of 1972, 20 U.S.C. §§1681-1688 ("Title IX"), prohibits discrimination on the basis of sex in Education Programs and Activities operated by recipients of federal financial assistance, including Haverford College.   This Policy is intended to meet the College's obligations under Title IX; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), as amended by the Violence Against Women Reauthorization Act of 2013 ("VAWA"), with respect to its application to sex-based misconduct; and other applicable law and regulations.

Consistent with Title IX requirements, Haverford College does not discriminate on the basis of sex in its Education Programs or Activities (including in admissions and employment).  College community members have the right to be free from all forms of sexual harassment and violence. All College community members are expected to conduct themselves in a manner that does not infringe upon the rights of others. The College has zero tolerance for sexual misconduct, and this Policy applies to all employees and students. Non-members of the campus community who engage in discriminatory actions within College programs or on College property are not under the jurisdiction of this policy, but can be subject to actions that limit their access and/or involvement with College programs as the result of their misconduct.

Reports of Sexual Misconduct committed by any student or employee (including faculty and staff) of the Haverford community will be resolved according to the procedures outlined in this Policy, unless otherwise noted.

## Effective Date

This Sexual Misconduct Policy is effective on August 14, 2020 and will apply to Formal Complaints of Sexual Misconduct brought on or after August 14, 2020. Formal Complaints brought prior to August 14, 2020 will be investigated and adjudicated according to previous College policies.

## Non-Discrimination in Application

The requirements and protections of this Policy apply equally regardless of sex, sexual orientation, gender identity, gender expression, or other protected classes covered by federal or state law. All requirements and protections are equitably provided to individuals regardless of such status or status as a Complainant, Respondent, or Witness. Individuals who wish to file a complaint about this Policy or processes set forth herein may contact the Department of Education's Office for Civil Rights using contact information available at https://ocrcas.ed.gov/contact-ocr.

## Disability Accommodations

This Policy does not alter any College obligations under federal disability laws including the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973. Parties may request reasonable accommodations, that do not fundamentally alter the Resolution Process, for disclosed disabilities to the Title IX Coordinator at any point before or during the Process. The Title IX Coordinator will not affirmatively provide disability accommodations that have not been specifically requested by the Parties, even where the Parties may be receiving accommodations in other College programs and activities.

## Alcohol and Drug Use Amnesty

The health and safety of every student is of utmost importance. The College recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time Sexual Misconduct occurs may be hesitant to report such incidents due to fear of potential consequences for their own conduct. The College strongly encourages students to report incidents of Sexual Misconduct. An individual who experiences Sexual Misconduct, or a Witness to such Sexual Misconduct, acting in good faith, who discloses any incident of Sexual Misconduct to College officials or law enforcement will not be sanctioned under College codes of conduct for violations of alcohol and/or drug use policies occurring at or near the time of the incident(s) of Sexual Misconduct. The College may request that the individual attend an approved alcohol or drug education program, without assessing any charges for such program. This amnesty provision also applies to student groups making a report of Sexual Misconduct. Amnesty does not preclude or prevent action by police or other legal authorities pursuant to relevant state or federal criminal statutes.

## Policy Definitions

## Advisor

An Advisor is any individual who has been chosen by a Party or designated by the College to provide support and guidance during the resolution process. The specific role of the Advisor is explained under the Resolution Process section of the Policy.

## Complainant

A Complainant is any individual who has reported being or is alleged to be the victim of conduct that could constitute Sexual Misconduct as defined under this Policy.

## Confidential Resource

A Confidential Resource is a College employee who is not required to report notice of sexual harassment to the Title IX Coordinator.  References made to *confidentiality* refer to the ability of identified confidential resources to not report crimes and violations to law enforcement or College officials without permission, except for extreme circumstances, such as a health and/or safety emergency or child abuse. Lists of Confidential Resources are available on the Haverford College webpage.

## Consent

Consent to engage in sexual activity must be informed, knowing and voluntary; consent must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or actions that clearly indicate a willingness to engage freely in sexual activity. Consent is active, not passive.

**Guidance for Consent:**

- Prior to initiating a sexual encounter, one is expected to obtain consent to each act of sexual activity prior to initiating such activity. Consent to one form of sexual activity does not constitute consent to engage in all forms of sexual activity.
- Either party may withdraw consent at any time. Withdrawal of consent should be outwardly demonstrated by words or actions that clearly indicate a desire to end sexual activity. Once withdrawal of consent has been expressed, sexual activity must cease.
- Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication can lead to misunderstandings. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or orally refuse sexual activity is not necessarily giving consent.
- When consent is requested orally, absence of any explicit oral response constitutes lack of consent. An oral "no" constitutes lack of consent, even if it sounds insincere or indecisive.
- If at any time during the sexual activity, any confusion or ambiguity arises as to the willingness of the other individual to proceed, both parties should stop and clarify orally the other's willingness to continue before continuing such activity.
- Individuals with a previous or current intimate relationship do not automatically give either initial or continued consent to sexual activity. Even in the context of a relationship, there must be mutually understandable communication that clearly indicates a willingness to engage in each sexual activity.
- Consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another person.

6

- Consent is not effective if it results from the use or threat of physical force, intimidation, or coercion, or any other factor that would eliminate an individual's ability to exercise their own free will to choose whether or not to have sexual contact.
- An individual who is physically incapacitated from alcohol or other drug consumption (voluntarily or involuntarily) or is asleep, unconscious, unaware, or otherwise physically helpless is considered unable to give consent.
- In the Commonwealth of Pennsylvania, the age of majority is 18. Under state law, consent cannot be given by minors under the age of 13 and can only be given by a minor under the age of 16, if the other party is less than four (4) years older than the minor.

**Education Program or Activity** includes:
- Any Haverford College on-campus premises
- Any off-campus premises over which the College has substantial control over the Respondent and the context in which the Sexual Misconduct occurred. This includes buildings or property owned or controlled by a recognized student organization.
- Any activity occurring within computer and internet networks, digital platforms, and computer hardware or software owned or operated by, or used in the operations of College programs and activities over which the College has substantial control.

## Formal Complaint

A Formal Complaint is a document – including an electronic submission—filed by a Complainant with a signature or other indication that the Complainant is the person filing the Formal Complaint, or a document signed by the Title IX Coordinator, alleging Sexual Misconduct against a Respondent within the College's Education Program or Activity and requesting initiation of the College's Resolution procedures consistent with this Sexual Misconduct Policy to investigate the allegation of Sexual Misconduct.

## Hearing Panel

The Hearing Panel is the group of individuals appointed by the College with authority to determine responsibility and sanctioning (if applicable) for violation of this Sexual Misconduct Policy.

## Investigator

The Investigator is the individual or individuals appointed by the College to gather evidence and facts related to the allegation of Sexual Misconduct. The Investigator(s) will provide an investigative report summarizing all relevant evidence for review by both the Complainant and Respondent.

## Privacy

References made to privacy mean the actions of College employees, who cannot guarantee confidentiality, to maintain privacy to the greatest extent possible. Information disclosed will be relayed only as necessary to investigate and/or seek a resolution and to notify the Title IX Coordinator or designee, who is responsible for tracking patterns and spotting systemic issues. The College will limit disclosure as much as practicable, even if the Title IX Coordinator determines that a request for confidentiality cannot be honored.

The privacy of student education records will be protected in accordance with the Family Educational Rights and Privacy Act (FERPA), as outlined in the Haverford College FERPA policy. Employee privacy will be protected in accordance with Haverford College Employee Handbook.

## Resolution Process

The Resolution Process is a formal resolution process to address reported conduct that may be a violation of this Sexual Misconduct Policy.

## Respondent

A Respondent is any individual who has been reported to be the perpetrator of conduct that could constitute Sexual Misconduct as defined under this Policy.

# Reporting Sexual Misconduct to the College

Any person may report Sexual Misconduct in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's oral or written report.

Such a report may be made at any time (including during non-business hours) via the Haverford Online Reporting Form, or by mail to the office address listed for the Title IX Coordinator. The Online Reporting Form will provide a link to this Policy, as well as encourage individuals to review this Policy for more information about procedures and resources.

Individuals who report Sexual Misconduct in Pennsylvania will also be informed of their rights as a victim of crime under Pennsylvania law.

Once an individual provides a report of Sexual Misconduct, the report will be reviewed by the Title IX Coordinator. At this stage, only the Title IX Coordinator will have access to the report, and they will share the information on a limited basis as required to take the appropriate next steps. Using the information gathered through the Online Reporting Form, the College will promptly contact the Complainant to discuss appropriate Supportive Measures and to explain the process for filing a Formal Complaint and that Supportive Measures are available with or without the filing of a Formal Complaint. Complainants are not required to respond to outreach from the College and the College will respect this decision, with limited exceptions where it is obligated by law or to act in the safety interest of the community.

Only individuals authorized by the College may enter, update, access, share, or disseminate the electronic data collected, created, or maintained from the Online Reporting Form.

## Anonymous Reports

An individual may make a report of Sexual Misconduct to the Title IX Coordinator, and if preferred, may do so without disclosing one's name using the online reporting form listed above and here:

Haverford Online Reporting Form

Depending on the level of information available about the incident or the individuals involved, the College's ability to respond to an anonymous report may be limited. The College will, however, take whatever steps it deems appropriate and in the best interest of the overall College community, consistent with the information available. The College will never refuse to respond on the grounds that a report was made anonymously.

Information collected through the anonymous reporting line will be shared only with necessary College officials in order to respond to the reported concern. Information is kept confidential and no personally identifiable information is shared, except as necessary to follow this Policy, without the reporting party's consent.

## Title IX Coordinator

The Title IX Coordinator provides supervision and management of the College's efforts to address and resolve incidents of sexual and gender-based discrimination.  The Bi-College Title IX Coordinator is:

**Kimberly F. Taylor**
Bi-Co Title IX Coordinator
Haverford & Bryn Mawr Colleges
ktaylor4@haverford.edu
**Haverford College**
Office location: Founders 027; Phone: 610-896-1234

At Haverford College, the Title IX Coordinator has reporting responsibilities to:

**Joyce Bylander**
Interim Dean of the College
Haverford College
jbylander@haverford.edu

## Support and Resources

## Supportive Measures

Supportive Measures are non-disciplinary, non-punitive, and individualized services that the College offers and may put in place, without fee or charge, after receiving notice of possible violations of this Policy.  Supportive Measures are designed to restore or preserve access to the College's Education

Program and Activity, protect the safety of all Parties and the College's educational environment, and/or deter Sexual Misconduct, while not being punitive in nature or unreasonably burdening any Party.

Both Complainants and Respondents have the right to receive Supportive Measures from the College regardless of whether a Formal Complaint has been filed.  The Title IX Coordinator will contact a Complainant after receiving notice of possible violation of this Policy (1) to discuss the availability of Supportive Measures and (2) to explain that Supportive Measures are available with or without the filing of a Formal Complaint of Title IX Sexual Harassment.  The Title IX Coordinator will consider the Complainant's wishes with respect to implementation of Supportive Measures.

To determine the appropriate Supportive Measure(s) to be implemented, the College will conduct an individualized assessment based on the unique facts and circumstances of a situation.   Whether a possible Supportive Measure would unreasonably burden the other Party is a fact-specific determination made by the College in its discretion that takes into account the nature of the Education Program and Activity, opportunities and benefits in which an individual is participating.

 Examples of Supportive Measures may include, as appropriate and as reasonably available:

- referral to counseling or medical services
- extensions of deadlines or other course-related adjustments
- modifications of work or class schedules
- campus escort services
- restrictions on contact between the Parties (no contact orders)
- changes in work or housing locations
- leaves of absence
- increased security and monitoring of certain areas of the campus

Supportive Measures will remain private to the extent possible. Some College officials will be notified of Supportive Measures as needed for implementation.

The Title IX Coordinator will ultimately serve as the point of contact for any individual requesting Supportive Measures.

## Supportive Resources

### On-Campus Resources

- **Counseling and Psychological Services (CAPS)**
  610-896-1089 (M-F, 9am-5pm)

- **Campus Safety**
  610-896-1111

- **Center for Gender Resources and Sexual Education (GRASE)**
  Email: hc-grase@haverford.edu

- **Dean's Office Staff**
  Email: sklewis@haverford.edu

**Regional Resources**

- **Victims Services Center of Montgomery County**
  888-521-0983
  www.victimservicescenter.org

- **The Crime Victims' Center of Chester County**
  610-692-7273
  www.cvcofcc.org

- **Delaware County Women Against Rape**
  610-566-4342
  www.delcowar.org

- **Network of Victim Assistance (Bucks County)**
  1-800-675-6900
  www.novabucks.org

- **Berks Women in Crisis (Berks County)**
  610-372-9540
  www.berkswomenincrisis.org

- **Women Against Abuse (Philadelphia)**
  866-723-3014
  www.womenagainstabuse.org

- **Women Organized Against Rape (Philadelphia)**
  215-985-3333
  www.woar.org

**National Resources**

- **RAINN (Rape, Abuse & Incest National Network)**
  800-656-HOPE (4673)

  Online chat:
  - English: online.rainn.org
  - Española: rain.org/es
  www.rainn.org/

- **National Sexual Violence Resource Center**
  www.nsvrc.org/

# Emergency Removal

The College may remove a Respondent from the College's Education Program or Activity on an emergency basis, where the College (1) undertakes an individualized safety and risk analysis and (2) determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of Sexual Misconduct justifies a removal.

If a College official determines such removal is necessary, the Respondent will be provided notice and an opportunity to appeal the decision immediately following the removal.

## Administrative Leave

The College retains the authority to place a non-student employee Respondent on administrative leave during the pendency of the Resolution Process, consistent with Haverford College Employee Handbooks.  An employee will not be placed on administrative leave unless and until a Formal Complaint of Sexual Misconduct has been filed with the College.

# Resolution Process

## Filing a Formal Complaint

The timeframe for the College's Resolution Process begins with the filing of a Formal Complaint. The Resolution Process will be concluded within a reasonably prompt manner, and in ordinary cases no longer than ninety (90) business days after the filing of the Formal Complaint. The phrase "business days" shall refer to those days ordinarily recognized by the College's administrative calendar as workdays.  The Process may be extended for a good reason, including but not limited to the absence of a Party, a Party's advisor, or a Witness; concurrent law enforcement activity; or the need for language assistance or accommodation of disabilities. Parties may submit a written request for an extension to the Title IX Coordinator.

To file a Formal Complaint, a Complainant must provide the Title IX Coordinator a written, signed complaint describing the facts alleged. If a Complainant does not wish to make a Formal Complaint in connection with a report of Sexual Misconduct, the Title IX Coordinator may, in their discretion, determine a Formal Complaint is necessary and sign the Formal Complaint.  When the Title IX Coordinator signs a Formal Complaint, the Title IX Coordinator is not the Complainant or otherwise a Party.  The Title IX Coordinator will inform the Complainant of this decision in writing, and the Complainant need not participate in the process further, but the Complainant will still be treated as a Party entitled to inspect and review evidence and to receive all notices, including the notice of allegations, the notice of Hearing, and the notice of outcome. At no time will the College coerce or retaliate against a Complainant or any Party or Witness in order to convince the Complainant or any Party or Witness to participate in the Resolution Process.

Nothing in this Sexual Misconduct Policy prevents a Complainant from seeking the assistance of state or local law enforcement alongside the appropriate on-campus process.

A Complainant who files a Formal Complaint may elect (if all Parties and the College agree), at any time, to address the matter through an Alternative Resolution Process.

## Multi-Party or Multi-Allegation Situations

In its discretion, the College may consolidate Formal Complaints alleging Sexual Misconduct against more than one Respondent, or by more than one Complainant against one or more Respondents, or by one Party against the other Party, where the allegations arise out of the same facts or circumstances. In addition, the College has discretion to consolidate allegations of other forms of misconduct should they

12

occur in the same incident.  If Formal Complaints involving multiple Complainants, multiple Respondents, or multiple allegations are consolidated, each Party will have access to all of the information being considered including as provided by all involved Complainants, all involved Respondents, and all involved Witnesses. The decision to consolidate Formal Complaints is not subject to appeal.

## Determining Jurisdiction and Mandatory Title IX Dismissal

The Resolution Process will apply to a Formal Complaint if, in the reasonable determination of the Title IX Coordinator, the alleged conduct fits the definition of Sexual Misconduct as defined in this Policy, i.e., the alleged conduct is "Title IX Sexual Harassment" and/or "Other Gender-Based Misconduct," as defined herein. In addition, a Complainant filing a Formal Complaint of Title IX Sexual Harassment must be participating, or attempting to participate, in the College's Education Programs and Activities at the time the Formal Complaint is filed in order for the Formal Complaint to be considered Title IX Sexual Harassment for purposes of the Resolution Process. If the Complainant is not participating or attempting to participate in a College Education Program or Activity, the College will dismiss the Complaint for Title IX purposes and treat the Formal Complaint as one of Other Gender-Based Misconduct.

If the alleged conduct does not meet these definitions, the Title IX Coordinator will, in consultation with the Dean of the Undergraduate College (for student-related Complaints) or the Director of Human Resources (for employee-related Complaints) determine the appropriate process for resolution.

## Discretionary Title IX Dismissal of Complaint

The Title IX Coordinator may, in their discretion, dismiss a Formal Complaint brought under this Sexual Misconduct Policy, or any specific allegations raised within that Formal Complaint, at any time during the Investigation or Hearing, if:

- A Complainant notifies the Title IX Coordinator in writing that they would like to withdraw the Formal Complaint, or any allegations raised in the Formal Complaint;
- The respondent is no longer enrolled or employed by Haverford College or,
- If specific circumstances prevent the College from gathering evidence sufficient to reach a determination regarding the Formal Complaint or allegations within the Formal Complaint.

The College retains discretion on a case-by-case basis to dismiss a Formal Complaint based on any of the above reasons.  Just because one or all of the conditions above are satisfied, does not mean the College will automatically dismiss the Formal Complaint.  Instead, the College will determine if such a decision is appropriate under the circumstances.

### Notice of Dismissal

Upon reaching a decision that the Formal Complaint will be dismissed, the College will promptly send written notice of the dismissal of the Formal Complaint or any specific allegation within the Formal Complaint, and the reason for the dismissal, simultaneously to the Parties through their College email accounts if they are a student or employee, and by other reasonable means if they are neither. It is the responsibility of Parties to regularly check their email accounts.

Any Party may appeal a dismissal determination using the process set forth in "Appeals" section of this Policy.

**Withdrawal or Resignation While Charges are Pending**

Should a student withdraw from the College or refuse to participate in the Resolution Process, the College reserves the right to continue with the Formal Complaint in the student's absence. A determination of responsibility that results in a student's suspension or expulsion will be noted on that student's official transcript.

Should an employee resign with unresolved allegations pending, Human Resources records will reflect that status, and the College reserves the right to continue with a Formal Complaint in the employee's absence.


## Notice of Allegations

The Title IX Coordinator will draft and provide the Notice of Allegations to any Party to the allegations of Sexual Misconduct. Such notice will occur as soon as practicable after the College receives a Formal Complaint of the allegations if there are no extenuating circumstances.

The Parties will be notified simultaneously by their College email accounts if they are a student or employee, and by other reasonable means if they are neither. The College will provide sufficient time for the Parties to review the Notice of Allegations and prepare a response before any initial interview.

**Contents of Notice**

The Notice of Allegations will include the following:

- Notice of the College's Sexual Misconduct Policy and a hyperlink to a copy of the Policy.
- Notice of the allegations potentially constituting Sexual Misconduct, and sufficient details known at the time the Notice is issued, such as the identities of the Parties involved in the incident, if known, including the Complainant, the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident, if known.
- A statement that the Respondent is presumed not responsible for the alleged conduct and that a Determination Regarding Responsibility will be made at the conclusion of the Resolution Process.
- A statement that the Parties may have an Advisor of their choice, who may be, but is not required to be, an attorney.
- A statement that before the conclusion of the Investigation, the Parties may inspect and review evidence obtained as part of the Investigation that is directly related to the allegations raised in the Formal Complaint, including the evidence upon which the College does not intend to rely in reaching a Determination Regarding Responsibility, and evidence that both tends to prove or disprove the allegations, whether obtained from a Party or other source.
- Information regarding the availability of support and assistance through College resources and the opportunity to meet with the Title IX Coordinator in person to discuss resources, rights, and options.

- A statement that the College explicitly prohibits Retaliation by or against the Complainant, the Respondent, and Witnesses, that the College will take prompt action if Retaliation is reported, and instructions regarding how to report acts of alleged Retaliation.

## Advisors

Parties participating in the Formal Resolution Process as a Complainant or Respondent may be accompanied by an Advisor to any meeting or hearing to which they are required or are eligible to attend. The Advisor is not an advocate. Except where explicitly stated in this Policy, as consistent with the Department of Education's Final Rule, Advisors shall not participate directly in the process.

The College will reasonably attempt to accommodate meetings and hearings on dates when Advisors are available, provided that an Advisor acts reasonably in providing available dates and works collegially to find dates and times that meet all schedules.

The College's obligation to investigate and adjudicate in a prompt timeframe under Title IX and other College policies apply to matters governed by this Policy, and the College cannot agree to extensive delays solely to accommodate the schedule of an Advisor. The determination of what is reasonable shall be made by the Title IX Coordinator or designee. The College will not be obligated to delay a meeting or Hearing under this process more than five (5) days due to the unavailability of an Advisor, and may offer the Party the opportunity to obtain a different Advisor or utilize one provided by the College.

The College will provide the Parties equal access to Advisors and support persons; any restrictions on Advisor participation will be applied equally.

## Alternative Resolution

Parties who do not wish to proceed with an Investigation and live Hearing, and instead seek the College's assistance to resolve allegations of Sexual Misconduct, may elect to enter the Alternative Resolution Process. Generally speaking, these resolution options are less time intensive than an Investigation and Hearing, while still affording an opportunity to actively participate in a process for resolution of Complaints.

Parties may elect to enter an Alternative Resolution Process at any time after the filing of the Formal Complaint and prior to a Determination Regarding Responsibility through an informed written consent. This informed written consent will include all terms of the elected alternative process, including a statement that any agreement reached through the process is binding on the Parties.

All Parties must agree on the form of Alternative Resolution, and the Title IX Coordinator or designee must approve the decision to commence an Alternative Resolution Process and may determine that Alternative Resolution is not appropriate under the circumstances. Factors in considering the appropriateness of the Alternative Resolution Process include, but are not limited to, the gravity of the allegations, whether there is an ongoing threat of harm or safety to the campus, whether the Respondent is a repeat offender, and whether the Parties are participating in good faith. This determination is not subject to appeal.

Alternative Resolution is only permitted to address allegations of student-on-student sexual harassment and is never allowed as an option to resolve allegations that an employee sexually harassed a student.

At any time after the commencement of the Alternative Resolution Process, the College may determine that the Alternative Resolution Process is not an appropriate method for resolving the matter and may require that the matter be resolved through the Formal Process. This determination is not subject to appeal. In addition, either Party may elect to leave the Alternative Resolution Process at any point prior to reaching a resolution. If a Party elects to leave the Alternative Resolution Process, the Formal Resolution Process may recommence, if necessary.

## Role of the Alternative Resolution Facilitator

Alternative Resolution Processes are managed by Facilitators, who must not have a conflict of interest or bias in favor for or against Complainants or Respondents generally or regarding the specific Parties in the matter.

Facilitators have training in the definitions of Sexual Misconduct, the scope of the College's Education Program or Activity, how to conduct Alternative Resolution Processes, and how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, or bias.

## Confidentiality

In entering the Alternative Resolution Process, the Parties agree that any testimony and evidence (including admissions of responsibility) they share or receive during the Alternative Resolution Process concerning the allegations of the Formal Complaint is confidential. No evidence concerning the allegations obtained within the Alternative Resolution Process may be disseminated to any person, provided that any Party to the Alternative Resolution Process may generally discuss the allegations under investigation with a parent, friend, advisor, or other source of emotional support, or with an advocacy organization. As a condition of entering the Alternative Resolution Process, any evidence shared or received during the Alternative Resolution Process may not be used in any subsequent Formal Resolution Process or College Appeal.

## Alternative Resolution Options

The College offers the following Alternative Resolution options for addressing Formal Complaints of Sexual Misconduct:

### Administrative Resolution

Should the Parties mutually determine to enter the Alternative Resolution Process, and the Respondent elects to accept responsibility for the allegations of the Formal Complaint at any point during the Alternative Resolution Process, the College may administratively resolve the Formal Complaint.

Where the Respondent admits responsibility, the Parties will receive simultaneous written notification of the acceptance of responsibility, and a Hearing Panel will convene to determine the Respondent's sanction and other remedies, as appropriate and consistent with College policy. The Parties will be given an opportunity to be heard at a sanctions hearing, including but not limited to the submission of impact statements. Parties may be accompanied by their Advisor but questioning of Parties or Witnesses will not be permitted. The Parties will receive simultaneous written notification of the decision regarding sanctions and remedies, which may be appealed according to the Appeal Process.

16

**Facilitated Resolution**

The purpose of Facilitated Resolution is for the Parties who are in conflict to identify the implications of a student's actions and, with the assistance of a trained Facilitator, identify points of agreement and appropriate remedies to address them. Either Party can request Facilitated Resolution to seek resolution; however, Facilitated Resolution will be used only with the consent of both Parties.  The Parties will be instructed not to contact one another during the process. The Title IX Coordinator will review any request for Facilitated Resolution and may, in their discretion, decline to mediate based on the facts and circumstances of the particular case. Either Party has the right to terminate the Facilitated Resolution process and choose or resume another option for resolution at any time.

During Facilitated Resolution, any potential Investigation will halt, and calculations for time frames will be stayed. If the Facilitated Resolution results in a resolution, the disciplinary process will be concluded, and the matter will be closed. If a resolution cannot be reached, the matter will be referred back to the Title IX Coordinator to re-evaluate other options for resolution, including Investigation.

During Facilitated Resolution, a Facilitator will guide a discussion between the Parties.  In circumstances in which the Parties do not wish to meet face-to-face, either Party can request "caucus" Facilitated Resolution, and the Facilitator will conduct separate meetings. Whether or not the Parties agree to meet face-to-face, each Party will be permitted to bring an Advisor of their choice to any meetings. The Advisor may provide private guidance during the Facilitated Resolution but may not actively participate in the discussion between the Complainant and Respondent.

At the conclusion of the Facilitated Resolution, the Facilitator will memorialize the agreement that was reached between the Parties.  The Title IX Coordinator maintains records of any resolution that is reached, and failure to abide by the resolution can result in appropriate enforcement actions.

## Formal Resolution Process

### Notice of Meetings and Interviews

The College will provide, to a Party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all Hearings, investigative interviews, or other meetings with a Party, with sufficient time for the Party to prepare to participate.

### Request for Delay

Each Party may request a one-time delay in the Resolution Process of up to five (5) days for good cause (granted or denied in the judgment of the Title IX Coordinator, in consultation with the Dean of the College or Director of Human Resources, as appropriate), provided that the requestor provides reasonable notice and the delay does not overly inconvenience other Parties.

The Title IX Coordinator shall have sole judgment to grant further pauses in the Process.

### Investigation

### General Rules of Investigations

The Investigator(s) will perform an Investigation under a reasonably prompt timeframe of the conduct alleged to constitute Sexual Misconduct after issuing the Notice of Allegations.

The College, and not the Parties, bears the burden of proof and the burden of gathering evidence, (i.e., the responsibility of showing a violation of this Policy has occurred). This burden does not rest with either Party, and either Party may decide not to share their account of what occurred or may decide not to participate in an Investigation or Hearing. This does not shift the burden of proof away from the College and does not indicate responsibility.

The College cannot access, consider, or disclose medical records without a waiver from the Party (or parent, if applicable) to whom the records belong or of whom the records include information. The College will provide an equal opportunity for the Parties to present Witnesses, including fact and expert Witnesses, and other inculpatory and/or exculpatory evidence (i.e., evidence that tends to prove or disprove the allegations, respectively), as described below.

**Ongoing Notice**

If, in the course of an Investigation, the College decides to investigate allegations about the Complainant or Respondent that are not included in the original Notice of Allegations and otherwise fall within this Sexual Misconduct Policy, the College will notify the Parties whose identities are known of the additional allegations by their College email accounts or other reasonable means.

The Parties will be provided sufficient time to review the additional allegations to prepare a response before any initial interview regarding those additional charges.

**Review of Evidence**

Prior to the completion of the Investigative Report, the Parties and their Advisors will have an equal opportunity to inspect and review the evidence obtained through the Investigation. The purpose of the inspection and review process is to allow each Party the equal opportunity to meaningfully respond to the evidence prior to conclusion of the Investigation.

Evidence that will be available for inspection and review by the Parties will be any evidence that is directly related to the allegations raised in the Formal Complaint. It will include any:

1. Evidence that is directly related to the allegations in the Formal Complaint, even if that evidence does not end up being relied upon by the College in determining responsibility;
2. Inculpatory or exculpatory evidence that is directly related to the allegations, whether obtained from a Party or other source.

All Parties must submit any evidence they would like the Investigator to consider prior to when the Parties' time to inspect and review evidence begins.

The College will send the evidence made available for each Party and their Advisors to inspect and review. The College is not under an obligation to use any specific process or technology to provide the evidence and shall have the sole discretion in terms of determining format and any restrictions or limitations on access.

The Parties will have ten (10) business days to inspect and review the evidence and submit a written response by email to the Investigator. The Investigator will consider the Parties' written responses before completing the Investigative Report.

Any evidence subject to inspection and review will be available at any Hearing, including for purposes of questioning.

The Parties and their Advisors must sign an agreement not to disseminate any of the evidence subject to inspection and review or use such evidence for any purpose unrelated to the Resolution Process.

Evidence obtained in the Investigation that is determined in the reasoned judgment of the Investigator not to be directly related to the allegations in the Formal Complaint will be included in the appendices to the Investigative Report and may be appropriately redacted before the Parties' inspection to avoid disclosure of personally identifiable information of a student.

**Investigative Report**
The Investigator will create an Investigative Report that accurately summarizes relevant evidence. The Investigative Report is not intended to catalog all evidence obtained by the Investigator, but only to provide an accurate summary of the relevant evidence.

Only relevant evidence (including both inculpatory and exculpatory) will be referenced in the Investigative Report.

The Investigator may redact irrelevant information from the Investigative Report when that information is contained in documents or evidence that is/are otherwise relevant.

## Hearing

**General Rules of Hearings**
The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal, unless otherwise resolved through an Alternative Resolution Process.

The Hearing may be conducted with all Parties physically present in the same geographic location, or, at the College's discretion, any or all Parties, Witnesses, and other participants may appear at the Hearing virtually through video conference. This technology will enable participants simultaneously to see and hear each other. At its discretion, the College may delay or adjourn a Hearing based on technological errors not within a Party's control.

**Continuances or Granting Extensions**
The College may determine that multiple sessions or a continuance (i.e., a pause on the continuation of the Hearing until a later date or time) is needed to complete a Hearing. If so, the College will notify all participants and endeavor to accommodate all participants' schedules and complete the Hearing as promptly as practicable.

**Participants in the Hearing**
Hearings are not public, and only the following individuals are permitted to participate:

*Complainant and Respondent ("the Parties")*
- The Parties cannot waive the right to a Hearing except by participating in an Alternative Resolution.

- The College may still proceed with the Hearing in the absence of a Party and may reach a Determination Regarding Responsibility in their absence, including through any evidence gathered that does not constitute a "statement" by that Party.
  - For example, an oral or written statement constituting part or all of the Sexual Misconduct itself is not a "prior statement" that must be excluded if the maker of the statement does not submit to questioning about that statement. In other words, a prior statement would not include a document, audio recording, audiovisual reading, and digital media, including but not limited to text messages, emails, and social media postings, that constitute the conduct alleged to have been the act of sexual harassment under the Formal Complaint.
- The decision-maker cannot draw an inference about the Determination Regarding Responsibility based solely on a Party's absence from the Hearing or refusal to answer questions.
- Advisors shall be subject to this Policy's Rules of Decorum and may be removed in the discretion of the Hearing Panel upon violation of those Rules.

*The Hearing Panel*
- The Hearing Panel will consist of three (3) trained decision-makers, a Panel Chair and two Panel members. The Panel Chair may be a College administrator or an outside consultant, contracted by the College. Panel members will be appointed administrators or faculty members.
- No member of the Hearing Panel will also have served as the Title IX Coordinator, Title IX Investigator, Advisor to or Witness for any Party in the case.
- No member of the Hearing Panel may serve on the Appeals body in the case.
- No member of the Hearing Panel will have a conflict of interest or bias in favor of or against Complainants or Respondents generally, or in favor or against the Parties to the case.
- The Hearing Panel will be trained on topics including how to serve impartially, issues of relevance, how to apply the rape shield protections provided for Complainants, and any technology to be used at the Hearing.
- The Parties will have an opportunity to raise any objections regarding a Hearing Panel member's actual or perceived conflicts of interest or bias at the commencement of the Hearing.

*Advisors*
- The Parties have the right to select an Advisor of their choice, who may be, but does not have to be, an attorney.
- The Parties' Advisors may accompany the Parties to any meeting or hearing they are permitted to attend, but may not speak for the Party, except for the purpose of questioning during a Hearing, where appropriate. (See Questioning Procedure #1).
- If a Party does not select an Advisor, the College will select an Advisor to serve in this role at the Hearing at no fee or charge to the Party.
- The Advisor is not prohibited from having a conflict of interest or bias in favor of or against Complainants or Respondents generally, or in favor or against the Parties to the case.
- If a Party does not attend the Hearing, the Party's Advisor may appear and ask questions on their behalf.

- If neither a Party nor their Advisor appears at the Hearing, the College will provide an Advisor to appear on behalf of the non-appearing Party.
- Advisors shall be subject to this Policy's Rules of Decorum and may be removed upon violation of those Rules.

*Witnesses*
- Witnesses cannot be compelled to participate in the Hearing and have the right not to participate in the Hearing, free from retaliation.
- If a Witness does not submit to questioning, as described below, the Hearing Panel cannot rely on any statements made by that Witness in reaching a Determination Regarding Responsibility, including any statement relayed by the absent Witness to a Witness or Party who testifies at the Hearing.
- Witnesses shall be subject to this Policy's Rules of Decorum and may be removed upon violation of those Rules.

**Hearing Procedures**
Any Hearing conducted under this Resolution Process will follow the procedure below:

- The Panel Chair will open and establish rules and expectations for the Hearing.
- The Parties will each be given the opportunity to provide opening statements.
- Panel members will ask questions of the Parties and Witnesses.
- Parties or their Advisors, as applicable, will be given the opportunity to ask questions of the other Party and Witnesses after the Panel members conduct their initial round of questioning.
- During the Parties' questioning, the Panel Chair will have the authority to pause at any time for the established Rules of Decorum.
- Should a Party or the Party's Advisor choose not to question the other Party or any Witness, that Party shall affirmatively waive their right to questioning through a written or oral statement to the Panel Chair. A Party's waiver of questioning does not eliminate the ability of the Hearing Panel to use statements made by the Party.


**Questioning Procedure**
The questioning procedure may differ according to the allegations presented at the Hearing.

*Procedure #1*
At a Hearing convened to resolve allegations of "Title IX Sexual Harassment," as defined above in this Policy, each Party's Advisor will conduct questioning of the other Party or Parties and Witnesses. During this questioning, the Advisor may ask the other Party or Parties and Witnesses relevant questions and follow-up questions, including those that challenge credibility directly, orally, and in real time. Parties are not permitted to ask questions of the other Party or Witnesses in Hearings convened under this Procedure #1.

Before any question is answered, the Panel Chair will determine if the question is relevant. The Panel Chair retains the discretion to determine what constitutes a "relevant" question. For example, questions

21

that are duplicative of those already asked may be deemed irrelevant if they have been asked and answered.

If a Party does not submit to questioning during Procedure #1, the Hearing Panel cannot rely on any prior statements made by that Party in reaching a Determination Regarding Responsibility, but may reach a Determination Regarding Responsibility based on evidence that does not constitute a "statement" by that Party.

*Procedure #2*

For all other Hearings, Parties, and not their Advisors, must conduct any questioning of Witnesses. With respect to questioning of the other party, the Panel Chair will conduct the questioning based upon written questions submitted by the Party. The Panel Chair will only ask the written questions submitted by the other party if they determine, in their discretion, that the question is deemed "relevant." Irrelevant questions will not be asked at the Hearing.

**Hearing Recording & Transcript**

All Hearings will be recorded, and a transcript will be available to the Parties for inspection and review. Requests to review the recording and/or transcript must be made in writing to the Title IX Coordinator. Prior to obtaining access to a Hearing transcript, the Parties and their Advisors must sign an Agreement not to disseminate any of the testimony heard or evidence obtained in the Hearing or use such testimony or evidence for any purpose unrelated to the Resolution Process. Once signed, this Agreement may not be withdrawn. Hearing transcripts will be available within 7 business days of the conclusion of the Hearing unless there are extenuating circumstances.

## Determination Regarding Responsibility

**Standard of Proof**

The College will use a "preponderance of the evidence" standard in deriving conclusions for its Determination Regarding Responsibility for Formal Complaints brought under this Policy. This standard means that the facts uncovered during the Investigation and Hearing determine whether it is more likely than not that a violation of the Policy occurred.

**Considerations for Evaluating Testimony and Evidence**

Determinations Regarding Responsibility for an allegation of Sexual Misconduct may be based in part, or entirely, on documentary, oral, audiovisual, and digital evidence, as warranted in the reasoned judgment of the Panel Chair.

Hearing Panel members shall not draw inferences regarding a Party's or Witness' credibility based on the Party's or Witness' status as a Complainant, Respondent, or Witness, nor shall they base their judgments in stereotypes about how a Party or Witness would or should act under the circumstances.

Generally, credibility judgments will rest on the demeanor of the Party or Witness, the plausibility of their testimony, the consistency of their testimony, and the reliability of the testimony considering corroborating or conflicting testimony or evidence.

Conversely, credibility judgments will not rest on whether a Party's or Witness' testimony is non-linear or incomplete, or if the Party or Witness is displaying stress or anxiety.

Decision-makers will afford the highest weight relative to other testimony to first-hand testimony by Parties and Witnesses regarding their own memory of specific facts that occurred. Both inculpatory and exculpatory evidence will be weighed in equal fashion.

Except where specifically barred by the Title IX Final Rule, a Witness' testimony regarding third-party knowledge of the facts at issue will be permitted, but generally will be accorded lower weight than testimony regarding direct knowledge of specific facts that occurred.

Parties may call "expert witnesses." While the expert witness will be permitted to testify and be questioned, the Hearing Panel will be instructed to afford lower weight to non-factual testimony of the expert relative to fact witnesses, and any expert testimony that is not directed to the specific facts that occurred in the case will be afforded lower weight than testimony of fact witnesses, regardless of whether the expert witness testimony is the subject of questioning and regardless of whether both Parties present experts as Witnesses.

Parties may call character witnesses to speak on their behalf. While the character witness may testify and be questioned, the Hearing Panel will be instructed to afford very low weight to any non-factual character testimony of any Witness.

Where a Party's or Witness' conduct or statements demonstrate that the Party or Witness is engaging in retaliatory conduct, including but not limited to Witness tampering and intimidation, the Hearing Panel may draw an adverse inference as to that Party's or Witness' credibility.

**Written Determination Regarding Responsibility**
The written Determination Regarding Responsibility ("the Determination") will be issued simultaneously to all Parties through their College email account, or other reasonable means, as necessary. The Determination will include:

1. Summary of the allegations of Sexual Misconduct.
2. A description of the procedural steps taken from the receipt of the Formal Complaint through the Determination, including any notifications to the Parties, interviews with Parties and Witnesses, site visits, methods used to gather other evidence, and Hearings held.
3. Findings of fact supporting the Determination.
4. Conclusions regarding which section of the Sexual Misconduct Policy, if any, the Respondent has or has not been found to have violated.
5. For each allegation:
   a. A statement of, and rationale for, the Determination Regarding Responsibility.
   b. A statement of, and rationale for, any disciplinary sanctions the College imposes on the Respondent; and
   c. A statement of, and rationale for, whether remedies designed to restore or preserve equal access to the College's Education Program or Activity will be provided to the Complainant; and

6. The College's procedures and the permitted reasons for the Complainant and Respondent to appeal the Determination (described below in "Appeal").

**Timeline of Determination Regarding Responsibility**

If there are no extenuating circumstances, the Determination Regarding Responsibility will be issued by the College within ten (10) business days of the completion of the Hearing.

The Determination becomes final either on the date that the College provides the Parties with the result of any Appeal, if such Appeal is filed consistent with the procedures and timeline outlined in "Appeals," below, or if an Appeal is not filed, the date on which the opportunity to file an Appeal expires.

## Sanctions

When a Respondent accepts or is found responsible for violating this Sexual Misconduct Policy, factors considered when determining a sanction/responsive action may include, but are not limited to:

- The nature of, severity of, and circumstances surrounding the violation(s)
- The Respondent's conduct history
- Previous allegations against or allegations involving similar conduct by the Respondent
- The impact on the Parties
- Any other information deemed relevant by the Hearing Panel

The sanctions will be implemented as soon as feasible, either upon the outcome of any Appeal or the expiration of the Appeal window. Possible sanctions described in this Policy are not exclusive of, and may be in addition to, other actions taken, or sanctions imposed by external authorities.

The following sanctions may be imposed upon any member of the College community found to have violated the Sexual Misconduct Policy:

- Permanent separation
- Time-limited separation
- Deferred separation
- Performance improvement plan
- Loss of campus housing or other privileges
- Removal from organization, team and/or committee
- Revocation of leadership or supervisory position
- Disciplinary probation
- Community service or other work assignments
- Writing assignment
- External program attendance or facilitation
- Warning – Written or oral
- Revocation of degree
- Withholding of diploma and/or transcripts
- Prohibition from participation in Commencement and/or Senior Week activities

## Appeals

Each Party may appeal (1) the Dismissal of a Formal Complaint or any included allegations and/or (2) a Determination Regarding Responsibility. A Party must submit a written Appeal within five (5) business

days of being notified of the Dismissal of a Formal Complaint or Determination Regarding Responsibility, indicating the grounds for the Appeal.

The grounds for Appeal are limited to:

- Procedural irregularity that affected the outcome of the matter (i.e., a failure to follow the College's own procedures).
- New evidence that was not reasonably available at the time the Determination Regarding Responsibility or dismissal was made, that could affect the outcome of the matter.
- The Title IX Coordinator, Investigator(s), or decision-maker(s) had a conflict of interest or bias for or against an individual Party, or for or against Complainants or Respondents in general, that affected the outcome of the matter.

The submission of an Appeal stays any sanctions for the pendency of the Appeal. Supportive Measures and remote learning opportunities remain available during the pendency of the Appeal.

If a Party appeals, the College will as soon as practicable notify the other Party in writing of the Appeal; however, the time for Appeal shall be offered equitably to all Parties and shall not be extended for any Party solely because the other Party filed an Appeal.

Appeals should be submitted in electronic form to the President of the College (of the campus on which the hearing was held).

The outcome of an Appeal will be provided in writing simultaneously to both Parties and will include the rationale for the decision.  The Appeal decision is final, and no subsequent Appeals are permitted.

## Retaliation

The College will keep the identity of any individual who has made a report or complaint of Sexual Misconduct confidential, including the identity of any individual who has made a report or filed a Formal Complaint of Sexual Harassment under this Sexual Misconduct Policy, any Complainant, any individual who has been reported to be the perpetrator of Sexual Misconduct under this Policy, any Respondent, and any Witness, except as permitted by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99, or as required by law, or to carry out the purposes of 34 CFR Part 106, including the conduct of any Investigation, Hearing, or judicial proceeding under this Sexual Misconduct Policy.

No person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Title IX of the Education Amendments of 1972 or its implementing regulations.

No person may intimidate, threaten, coerce, or discriminate against any individual because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an Investigation, proceeding or Hearing under this Sexual Misconduct Policy.

Any intimidation, threats, coercion, or discrimination, for the purpose of interfering with any right or privilege secured by Title IX or its implementing regulations, constitutes retaliation. This includes any

charges filed against an individual for code of conduct violations that do not involve Sexual Misconduct under this Policy, but that arise from the same facts or circumstances as a report or complaint of Sexual Misconduct under this Policy.

## Record Retention

The College shall retain for a period of seven years after the date of case closure: the official file relating to a formal resolution, including any Investigation, Hearing, Determination Regarding Responsibility, sanctioning, and/or Appeal processes involving allegations of Sexual Misconduct.  In cases in which a Respondent was found to have violated the Policy and was separated from the College, the College may retain such official case files indefinitely.

This page intentionally left blank

# Appendix I: Rules of Decorum for Resolution Process Hearings

Purpose of the Rules of Decorum

Title IX Hearings are not civil or criminal proceedings and are not designed to mimic formal trial proceedings. They are primarily educational in nature, and the U.S. Department of Education ("the Department"), writing about Title IX in the Final Rule, "purposefully designed these final regulations to allow recipients to retain flexibility to adopt rules of decorum that prohibit any party advisor or Hearing Panel Chair from questioning witnesses in an abusive, intimidating, or disrespectful manner." 85 Fed. Reg. 30026, 30319 (May 19, 2020). The Department has determined that institutions "are in a better position than the Department to craft rules of decorum best suited to their educational environment" and build a hearing process that will reassure the Parties that the institution "is not throwing a party to the proverbial wolves." *Id.*

To achieve this purpose, Colleges may provide for reasonable rules of order and decorum, which may be enforced through the removal of an Advisor who refuses to comply with the rules. *Id.*, at 30320. As the Department explains, the removal process "incentivizes a party to work with an advisor of choice in a manner that complies with a recipient's rules that govern the conduct of a hearing, and incentivizes colleges and universities to appoint advisors who also will comply with such rules, so that hearings are conducted with respect for all participants." *Id.*

At base, these Rules of Decorum require that all Parties, Advisors, and College staff treat others who are engaged in the process with respect.

The Rules of Decorum and processes set forth herein apply equally to all Parties and their Advisors regardless of sex, gender, or other protected class, and regardless of whether they are in the role of Complainant or Respondent.

Rules of Decorum

The following Rules of Decorum ("the Rules") are to be observed in the Hearing and applied equally to the Parties (meaning the Complainant and Respondent) and Advisors:

1.  Questions must be conveyed in a neutral tone.
2.  Parties and Advisors will refer to other Parties, Witnesses, Advisors, and College staff using the name and gender used by the person and shall not intentionally mis-name or mis-gender that person in communication or questioning.
3.  No Party may act abusively or disrespectfully during the Hearing toward any other Party or to Witnesses, Advisors, or Hearing Panel members.
4.  The Advisor may not yell, scream, badger, or physically "lean in" to a Party or Witness' personal space. Advisors may not approach the other Party or Witnesses without obtaining permission from the Hearing Panel Chair.

28

5. The Advisor may not use profanity or make *ad hominem* attacks upon a Party or Witness. Questions must be interrogative statements used to test knowledge or understand a fact; they may not include accusations within the text of the question.

6. The Advisor may not ask repetitive questions. When the Hearing Panel Chair determines a question has been "asked and answered" or is otherwise not relevant, the Advisor must move on.

7. Parties and Advisors may take no action at the Hearing that a reasonable person in the shoes of the affected Party would see as intended to intimidate that person (whether Party, Witness, or official) into not participating in the process or meaningfully modifying their participation in the process.

Warning and Removal Process

The Hearing Panel Chair shall have sole discretion to determine if the Rules have been violated. The Chair will notify the offending person of any violation of the Rules.

Upon a second or further violation of the Rules, the Hearing Panel Chair shall have discretion to remove the offending person or allow them to continue participating in the hearing or other part of the process.

Where the Chair removes a Party's Advisor, the Party may choose a different Advisor, or (in cases involving Title IX Sexual Harassment) accept an Advisor provided by the College for the limited purpose of questioning at the Hearing. Reasonable delays, including temporary adjournment of the Hearing, may be anticipated should an Advisor be removed. A Party cannot serve as their own Advisor in this circumstance.

The Hearing Panel Chair shall document any decision to remove an Advisor in the Determination Regarding Responsibility.

For flagrant, multiple, or continual violations of the Rules, in one or more proceedings, Advisors may be prohibited from participating in future proceedings at the College in the Advisor role, on a temporary or permanent basis. Evidence of violation(s) of the Rules will be gathered by the Title IX Coordinator and presented to the Dean of the College for proceedings involving students or to the Director of Human Resources for cases involving employees. The Advisor in question may provide an explanation or alternative evidence in writing to appeal the prohibition from participation.  This appeal must be submitted to the appropriate Dean or Director within fifteen (15) calendar days of receipt. There shall be no right to a hearing, oral testimony, or questioning.

The Dean of the College or Director of Human Resources shall consider the evidence, using a preponderance of the evidence standard, and issue a finding in writing regarding removal. The finding shall be issued in writing to all Parties and Advisors (if there is a current case pending) within thirty (30) days, unless extended for good cause. There is no appeal of this finding.

Relevant Questions Asked in Violation of the Rules of Decorum

Should an Advisor ask a relevant question in a manner that violates the Rules, such as yelling, screaming, badgering, or leaning-in to the Witness' or Party's personal space, the question will not be deemed irrelevant by the Hearing Panel Chair simply because of the manner in which it was delivered. Under that circumstance, the Hearing Panel Chair will notify the Advisor of the violation of the Rules, and, if the question is relevant, will allow the question to be re-asked in a respectful, non-abusive manner by the Advisor (or a replacement Advisor, should the Advisor be removed for violation of the Rules).

# Acknowledgement

Policy adapted from the *Model Grievance Policy for Addressing Formal Complaints of Sexual Harassment Under the Title IX Regulations* provided by:

**SUNY Student Conduct Institute**
The State University of New York
State University Plaza
Albany, NY 12246

Created: August 14, 2020

Revised: August 25, 2020