**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE | : **Civil Action No.: 23-299** |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| HAVERFORD COLLEGE | : |
| | : |
| Defendant. | : |
| | : |
| | : |

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION PURSUANT TO FED. R. CIV. P. 65**

Plaintiff John Doe hereby moves this Honorable Court pursuant to Federal Rule of Civil Procedure 65 for an Order temporarily restraining and preliminarily enjoining Defendant Haverford College ("Haverford" or the "College") from maintaining an athletic ban against Plaintiff in connection with allegations of sexual misconduct by Plaintiff that are completely false and unsubstantiated, as to which he was never charged or found responsible, and as to which no hearing was ever held by the College or anyone else. Specifically, Plaintiff moves for an Order directing Haverford to reverse its decision to remove Plaintiff, and to prevent his reinstatement, as captain and member of his varsity sports team and to fully reinstate him as a member of the team with all rights and privileges to compete on behalf of the College.

Counsel for Plaintiff notified Defendant of Plaintiff's intention to file this Motion, and provided it with a copy of this Motion, the supporting Memorandum of Law, and the Verified Complaint on January 23, 2023. Plaintiff agreed to Defendant's request to withhold the filing until January 25, 2023, to facilitate opposing counsel's ability to discuss the filing with his client.

In support of his Motion, Plaintiff incorporates by reference his Memorandum of Law and his Verified Complaint filed herewith.

WHEREFORE, Plaintiff respectfully requests that the Court grant his Motion for a Temporary Restraining Order and Preliminary Injunction as outlined in the attached proposed order, and for such other relief as the Court finds just and proper.

Dated:  January 25, 2023

Respectfully submitted,

 /s/ Patricia M. Hamill
Patricia M. Hamill (Pa. Id. No. 48416)
Andrew S. Gallinaro (Pa. Id. No. 201326)
CONRAD O'BRIEN PC
1500 Market Street
Centre Square – West Tower, 39th Fl
Philadelphia, PA 19102-1921
(t) (215) 864-9600
(f) (215) 864-9620
(e) phamill@conradobrien.com
    agallinaro@conradobrien.com

*Attorneys for Plaintiff John Doe*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE | : **Civil Action No.: 23-299** |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| HAVERFORD COLLEGE | : |
| | : |
| Defendant. | : |
| | : |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff John Doe ("John") has moved under Fed. R. Civ. P. 65 for a Temporary

Restraining Order and Preliminary Injunction against Defendant Haverford College

("Haverford" or the "College"). John has filed a Verified Complaint against the College seeking

damages and injunctive relief. While he is entitled to relief on all counts, he moves for

immediate relief only as to his claim for breach of contract. John asks this Court to order

Haverford to reinstate him as a member and captain of the varsity team from which the College

unlawfully and in breach of contract removed him and to which it repeatedly denied his

reinstatement.

In violation of its own policies, Haverford decided to sanction John for purported, but

fictitious, sexual misconduct even though the College never received a complaint against John,

never investigated any allegations against John, never held a hearing, and never made a

determination that John was responsible for any type of sexual misconduct whatsoever. John has

consistently denied engaging in any sexual misconduct. And since learning the identity of the

purported victim of the falsely rumored misconduct, John has consistently denied any sexual

contact at all, or indeed any physical contact whatsoever, with the purported victim.

Nevertheless, John, a varsity athlete and captain of a successful sports team at Haverford, was unceremoniously removed from his team by the College solely because of an unsupported—and false—*rumor* that he had raped a female student.  And the College repeatedly denied John's repeated requests for reinstatement, offering as justification only the false rumor itself—which is completely unsubstantiated and as to which the College knows no basis exists—and shifting pretextual explanations.

Upon learning of the rumor from John's teammates, John's coach, a mandatory reporter, instructed John to step away from the team until the allegation was resolved.  But after receiving a report of the rumored sexual assault from John's coach, Haverford's Title IX Coordinator determined that no evidence concerning the rumor existed (apart from unspecified text messages, presumably consisting of the text chain through which the rumor was spread), and that there was no basis to open an investigation into any potential sexual misconduct by John.  She confirmed that John was entitled to all the rights and privileges of his education as a student in good standing—a fact that she communicated to John and to John's coach.  Haverford's Title IX Office also reached out to the woman identified by the rumor as the purported victim, who confirmed that the rumor had no basis.

The coach nevertheless maintained that John should be excluded from his team, and the Athletic Director and senior College administrators have backed his decision.  The College did so simply because other members of John's team purportedly *believed* (without basis) that the rumor was true and that removing John was in the best interest of the team.  The problem with the College's decision is twofold: (1) Haverford's Sexual Misconduct Policy expressly prohibits the College from removing a student from a sports team as a sanction for alleged sexual

misconduct unless the sanctioned student is provided a hearing, found responsible at that hearing, and given a right to appeal; and (2) though it is not necessary for John to establish in order to prevail on his breach of contract claim, the College had actual knowledge that the rumor was false.  John was never charged with—much less provided a hearing or found responsible for—any sexual misconduct.  As a result, Haverford is in clear breach of its policies.  John has already missed more than one season as a result of the College's unwarranted sanction and has now missed the start of the current season.  Given that he is set to graduate in May, this motion represents his last opportunity to compete on his team.  Immediate injunctive relief is necessary to restore John's rights and his reputation.

John satisfies all the prerequisites for immediate injunctive relief.

First, John likely will succeed on the merits of his breach of contract claim.  Under Haverford's policies—by which the College is contractually bound—John was entitled to the process provided in those policies before the College could sanction him for alleged sexual misconduct.  Haverford's Sexual Misconduct Policy specifically states: "The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  And the policy specifically identifies removal from a sports team as a disciplinary sanction the College may impose *following* the required hearing and determination of sexual misconduct.  The policy plainly requires that the College hold a hearing and make a determination *before* imposing any disciplinary sanction, including removal from a sports team.  But in the case of the false rumor concerning John, the College never held a hearing—much less found John responsible at such a hearing or permitted any appeal.  As multiple meetings with his coach, his teammates, the Title IX Coordinator, the Athletic Director, and multiple senior administrators made clear, the sexual misconduct allegation against John was

the *only* basis for his removal from the team and the prevention of his reinstatement.  Because Haverford never charged John or even informed him of the specific allegation against him, or held any type of hearing, or found him responsible for sexual misconduct, or permitted any appeal, it was contractually prohibited from sanctioning him for alleged sexual misconduct.

Second, John has suffered, and will continue to suffer, irreparable harm.  Multiple courts have recognized that the loss of athletic opportunities in college during the limited window an athlete is able to compete is an irreparable injury that cannot be compensated with money.

Third, the harm to John if the relief he requests is denied is far greater than any harm to the College that could result from granting that relief.  John is a senior set to graduate in four months.  He will never again have an opportunity to compete in NCAA athletics.  Conversely, no harm will come to the College in simply enforcing its own procedures and allowing one of its strongest athletes to represent Haverford in sport when he has no disciplinary record and is fully eligible to do so.

Fourth, the public has an undeniable interest in ensuring that the College's wrongful, inequitable, and discriminatory conduct is enjoined.  The public also has a compelling interest in preventing institutions of higher education from being so easily swayed by baseless demands for mob justice.  And the broader Haverford community specifically has in interest in ensuring that students are not arbitrarily sanctioned for speculative rumors that the College knows to be groundless.

Finally, although John seeks immediate injunctive relief—whether in the form of a Temporary Restraining Order or a Preliminary Injunction—he has not sought *ex parte* relief, which would trigger under Rule 65(b) an additional requirement to demonstrate that immediate and irreparable injury, loss, or damage will result to the movant "before the adverse party can be

4

heard in opposition." John's counsel provided the draft motion and draft verified complaint to Haverford's counsel on January 23, corresponded with counsel, spoke with counsel, and acquiesced to counsel's request for a day's delay before filing. Nevertheless, John is seeking expedited review because the timing of his irreparable injuries is imminent and ongoing. As set forth in more detail below and in the Verified Complaint, John participated in good faith in multiple rounds of meetings and mediation-like processes the College organized with Haverford administration, the Athletic Director, his coach, and his teammates over the course of many months to try to rectify his wrongful removal from the team, with Haverford always holding open the prospect of his reinstatement. Nevertheless, on December 19, Haverford's Athletic Director met with John and advised him that he would not be permitted to rejoin the team. On January 6, 2023, John's parents had a meeting with the Dean of the College (scheduled before John's December 19 meeting) in which they hoped to convince Haverford's senior administration to direct the Athletics Department to reinstate John. Only after their request was denied, and all other options foreclosed, did it become evident that John had no recourse other than through the courts. John and his counsel acted quickly following the January 6 meeting with Haverford to prepare and file this action. The season is now underway, and John has already missed several competitions. Unless Haverford is restrained or enjoined, John will miss several more over the next two weeks. Accordingly, John requests immediate relief to avoid further injury to his athletic career in his final year of eligibility.

I.       **FACTUAL BACKGROUND**

    A.       **Haverford's Violation of John's Contractual Rights**

        The facts of this case are set forth in detail in John's Verified Complaint. To avoid undue repetition, John will summarize the facts only briefly here and respectfully recommends that the Court review the Complaint in its entirety to understand fully the injustice visited upon John by

Haverford and the associated violations of John's contractual and legal rights.

John is a senior at Haverford and has been a member of his sports team since his first semester as a freshman.  Verified Compl. ¶¶ 19, 25.  He is one of the team's strongest competitors and was made a captain during his junior year in recognition of his athletic prowess and leadership skills.  John's coaches and teammates had no issues with John during his first two and a half years at Haverford.  *Id.* ¶ 26.

That changed early in 2022, during the spring semester of his junior year, when a false and malicious rumor began to circulate on campus that John had raped an unnamed female student.  *Id.* ¶¶ 29-33.  The rumor contained no specificity whatsoever with regard to the identity of the purported victim, the date, the timeframe, the place, the context, or any other detail.  John has consistently denied engaging in any sexual misconduct.  And after learning the identity of the purported victim, John has consistently denied any sexual contact at all, or indeed any physical contact whatsoever, with the purported victim.  *Id.* ¶ 3.  Among the students spreading the false rumor were two of John's co-captains, who reported the allegation to their coach in early February.  *Id.* ¶ 4.  The coach advised John that he was a mandatory reporter (required by the College by virtue of his position to report allegations of sexual misconduct), notified Haverford's Title IX Office of the allegation, and instructed John to step away from the team until it was resolved, which John, despite vehemently denying the false rumor, did in an e-mail message to his teammates.  *Id.* ¶¶ 37-39.

John later learned that some of the Haverford students who participated in spreading the false rumor also took action against other men at Haverford as part of a campaign of harassment intended to intimidate, bully, and punish certain male students due to their purported mistreatment of women.  *Id.* ¶¶ 4, 29-31, 73.  The gender-based harassment included online posts

identifying John by name and calling on all Haverford students to "bully" him.  *Id*. ¶ 4.

The Title IX Office reviewed the information provided by John's coach—which consisted of text messages that have never been disclosed to John but presumably show a chain through which the rumor was spread—and quickly concluded that the allegation was nothing more than an unsubstantiated rumor.  *Id.* ¶¶ 5, 42-44.  The Title IX Coordinator confirmed that no purported victim had accused John of any wrongdoing.  *Id.*  The Title IX Office went so far as to affirmatively reach out to the one student identified by the rumor mill as the purported victim, and that student confirmed that the rumor had no basis.  *Id.* ¶¶ 5, 80-81.

Once the Title IX Office concluded that John was not the subject of any complaint and was a student in good standing with the College, entitled to all the rights and privileges provided by the school, John properly assumed that he could rejoin his team and asked his coach to do so.  *Id*. ¶ 6, 43-45.  To his shock and dismay, John's coach advised John that because certain of his teammates continued to believe the rumor, John was no longer welcome on a team for which he had been selected as a captain just a few months prior.  *Id.* ¶ 7, 45-46.

As set forth in more detail in the Verified Complaint, John made every effort to have the College rectify his improper removal from the team and the improper denial of his reinstatement without resorting to litigation, including, as detailed in the Complaint, submitting last semester to a sham plan designed by Haverford purportedly to reintegrate him onto the team but that was never actually intended to do so.  And until January 6, 2023, when the Dean of the College informed John's parents that he supported the coach's decision and would not reinstate John to the team, the College continued to dangle the possibility—indeed the likelihood—of John's reinstatement.  Over the course of months, John, at first on his own, and then through his parents, and then finally through counsel, engaged in numerous communications and meetings with

various Haverford administrators and representatives in an effort to convince the College to fix

its mistake and have John properly restored to his place on the team.  *Id.* ¶¶ 48-62, 73-85.  In

both last spring semester and this past fall semester, John participated in mediations the College

facilitated among John, his coach, and two co-captains in an attempt to resolve their

misconceptions.  *Id.* ¶¶ 56-62, 93-129.  At each of the mediations (called "facilitated

discussions" by the College), the co-captains made clear that their only basis for not wanting

John on the team was the false rumored sexual assault that the Title IX Office had deemed was

not only meritless but unworthy even of investigation.

Realizing the indefensibility of their position, John's co-captains resorted to equally false

and even less specific gender-based smears concerning purported misogynistic behavior by John

toward women.  But neither they nor anyone else ever identified a single example of improper

behavior by John.[1]  *Id.*  Nevertheless, the coach consistently sided with the co-captains, who

continued to credit the baseless rumor, and declared he would not allow John back on the team.

*Id.*  The College's administration has backed the coach's ability to exclude John based on the

coach's desire to appease students who continue to believe, or purport to believe, the false rumor

and personal smears that have been leveled against John.  *Id.* ¶¶ 128-129.  By banning John from

the team, the College acceded to the demands of students who have falsely identified John as a

sexual predator, thereby depriving him—without the process required by Haverford's own

policies, and by law—of his final seasons of NCAA competition before he graduates in May

2023.

Haverford's decision to ban John from participating in his sport and from representing

---

[1] Of course, even if these smears were the actual, not the pretextual, basis for John's dismissal and the denial of his reinstatement by the College, the nonexistent process—no formal complaint, no investigation, no hearing, no finding of violation, and no notice of right to appeal—would itself violate Haverford's Sexual Misconduct Policy.

Haverford as a captain on the field of play has only served to embolden the rumormongers and to exacerbate the spreading of the rumor within the student population that John is an adjudicated perpetrator of sexual violence against women. *Id.* ¶¶ 8, 66. The longer John is banned from his team, the more John's teammates and other Haverford students are likely to believe that where there is smoke, there must be fire. Students now logically assume that since John was punished, he must have been found responsible for sexual assault. As set forth in the Verified Complaint, John has endured ostracism, bullying, and a physical assault, and he has been made a social pariah on campus because of the College's conduct. *Id.* ¶¶ 63-72, 86-92, 130-134.

### B.     Haverford's Sexual Misconduct Policy

Haverford has adopted a published, publicly available 31-page "Sexual Misconduct Policy" (the "Policy"), effective as of August 14, 2020, and still in effect, that covers the relevant timeframe of the rumor against John. (Verified Compl. Ex. A at 5.) As to the scope of its coverage, the Policy "applies to all employees and students" and explicitly states: "Reports of Sexual Misconduct committed by any student or employee (including faculty and staff) of the Haverford community will be resolved according to the procedures outlined in this Policy unless otherwise noted." (*Id.* at 4.) The first page of the Policy states that Haverford "remains committed to addressing any violations of its policies, even those not meeting the narrow standards defined under the new Title IX Final Rule, and retains authority to investigate and adjudicate allegations under the policies and procedures defined within this the Haverford College Sexual Misconduct Policy." (*Id.* at 4.) Under the Policy, "[a]ny person may report Sexual Misconduct" by communicating to the Title IX Coordinator," including anonymously. (*Id.* at 8-9.) The person reporting Sexual Misconduct need not be the victim of that sexual misconduct.

Defined terms in the Policy include:

- Complainant: "A Complainant is any individual who has reported being or is alleged to be the victim of conduct that could constitute Sexual Misconduct as defined under this Policy." (*Id.* at 6.)

- Formal Complaint: "A Formal Complaint is a document . . . filed by a Complainant . . ., or a document signed by the Title IX Coordinator, . . . alleging Sexual Misconduct against a Respondent . . . and requesting initiation of the College's Resolution procedures . . . to investigate the allegation of Sexual Misconduct." (*Id.* at 7.)  Notably: "If a Complainant does not wish to make a Formal Complaint in connection with a report of Sexual Misconduct, the Title IX Coordinator may, in their discretion, determine a Formal Complaint is necessary and sign the Formal Complaint." (*Id.* at 12)

- Hearing Panel: "The Hearing Panel is the group of individuals appointed by the College with authority to determine responsibility and sanctioning (if applicable) for violation of this Sexual Misconduct Policy." (*Id.* at 7.)

- Investigator: "The Investigator is the individual . . . appointed by the College to gather evidence and facts related to the allegation of Sexual Misconduct.  The Investigator(s) will provide an investigative report summarizing all relevant evidence for review by both the Complainant and Respondent." (*Id.*)

- Resolution Process: "The Resolution Process is a formal resolution process to address reported conduct that may be a violation of this Sexual Misconduct Policy." (*Id.* at 8.)

- Respondent: "A Respondent is any individual who has been reported to be the perpetrator of conduct that could constitute Sexual Misconduct as defined under this Policy." (*Id.*)

According to the Policy, the "College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal," unless otherwise resolved through an "Alternative Resolution Process." (*Id.* at 19.)  The Policy defines "Sexual Misconduct" as consisting either of "Title IX Sexual Harassment" or "Other Gender-Based Misconduct." (*Id.* at 2-3.)  "Title IX Sexual Harassment" encompasses, among other

10

things, (1) "Sexual Assault," defined under federal law and "meaning any sexual act directed against another person, without the consent of the victim" and (2) "unwelcome conduct a reasonable person would determine to be . . . severe, pervasive, and objectively offensive." (*Id.*) "Other Gender-Based Misconduct," in turn, is defined as "acts which do not meet the narrow definition of 'Title IX Sexual Harassment,' . . . but nevertheless could constitute discrimination on the basis of sex." (*Id.* at 3.)

Though not a defined term under the Policy, the term "Hearing" is used to refer to a formal process designed to reach a determination as to the responsibility of the alleged perpetrator with regard to the allegation and to issue a decision. (*Id.* at 19-22.) Its procedures are tightly circumscribed and require, among other things: a "Hearing Panel" consisting of three trained decision-makers (a chair and two members) that is empowered to hear testimony and receive documents and to issue a written decision, the right of the alleged perpetrator to have an advisor who may be a lawyer, and the right to examine witnesses. (*Id.*) The hearing must be recorded and transcribed, and the determination of the panel is subject to appeal. (*Id.* at 19-25.) The term "Investigation" also is not defined in the Policy but refers to the process in which the Investigator gathers evidence and facts related to the allegation of Sexual Misconduct and produces the investigative report. (*Id.* at 7, 17-19.)

Under the Policy, the Title IX Coordinator is required to "draft and provide" a "Notice of Allegations" to "any Party [Claimant or Respondent] to the allegations of Sexual Misconduct." (*Id.* at 14.) The Notice of Allegations is required to contain, among other things: (1) details concerning the allegation, including "the identities of the Parties involved in the incident, if known, including the Complainant, the conduct allegedly constituting Sexual Misconduct, and the date and location of the alleged incident, if known"; (2) a "statement that the Respondent is

presumed not responsible for the alleged conduct"; (3) a "statement that the Parties may have an

Advisor of their choice, who may be, but is not required to be, an attorney"; and (4) a "statement

that the College explicitly prohibits Retaliation by or against . . . the Respondent, . . . that the

College will take prompt action if Retaliation is reported, and instructions regarding how to

report acts of alleged Retaliation."  (*Id.* at 14-15.)

        The filing of a Formal Complaint by a Complainant or by the Title IX Coordinator

triggers the College's formal "Resolution Process," which in turn mandates a detailed set of

procedures for the investigation, hearing, determination, and appeal processes that must be

followed.  (*Id.* at 14, 17 – 25.)  Certain of these processes, including the provision of a Notice of

Allegations, the conducting of an Investigation, the holding of a Hearing, and the permitting of

an appeal, also are required before the College can impose any disciplinary sanction for sexual

misconduct, regardless of whether a Formal Complaint has been filed.  The Policy contains a

non-exhaustive list of fifteen disciplinary sanctions that may be imposed for Policy violations,

including "Removal from organization, team and/or committee" and "Revocation of leadership

or supervisory position." (*Id.* at 24.)

        The "Alternative Resolution Process" is only available to "Parties [Complainants and

Respondents] who do not wish to proceed with an Investigation and live Hearing," and is an

option available only with the participation of a purported victim of sexual misconduct and only

after the filing of a Formal Complaint by that person.  (*Id.* at 15-16.)

## II.     ARGUMENT

        John plainly meets the standard for the issuance of a temporary restraining order

("TRO"), and he urges the Court to issue one forthwith.  Under Rule 65, the standards for

granting a TRO are the same as those for a preliminary injunction.  The movant must

demonstrate the following four elements: (1) a likelihood of success on the merits; (2) the

probability of irreparable harm if the relief is not granted; (3) that granting injunctive relief will not result in even greater harm to the other party; and (4) that granting relief will be in the public interest. *Citibank N.A. v. Kyle*, No. 15-cv-3298, 2015 U.S. Dist. LEXIS 77504, at *6-7 (E.D. Pa. June 16, 2015) (Kelly, J.) (granting TRO).[2]

As set forth in more detail below, John likely will succeed on his breach of contract claim, as Haverford has failed to follow any preexisting process whatsoever, let alone the specific provisions of the Policy.  John has suffered, and will continue to suffer, irreparable harm through the loss of his hard-won opportunity to compete in NCAA athletics, and, at this point, heading into the heart of the season over the course of the coming month, every week matters. The harm to John from being kept off the team is far greater than any harm to the College that could result from his reinstatement.  And the public, including in particular the Haverford community, has an undeniable interest in ensuring that the College's wrongful, unfair, and discriminatory conduct is enjoined.

A.      **John Is Likely to Succeed on His Claim for Breach of Contract**

Because Haverford has a detailed policy—the "Sexual Misconduct Policy"—that specifies the procedures that the College must follow to address allegations of sexual misconduct against a student, and it failed to abide by that policy before imposing a disciplinary sanction on John for sexual misconduct, the College has breached its contractual obligations to John.

A successful claim for breach of contract under Pennsylvania law requires: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *Davis v. Wells Fargo*, 824 F.3d 333, 351 (3d Cir. 2016)

---

[2] Plaintiff's counsel provided notice by e-mailing the Motion for a Temporary Restraining Order and supporting Memorandum, and the Verified Complaint, to Haverford's outside counsel on January 23, 2023.

(applying Pennsylvania law); *McShea v. City of Phila.*, 606 Pa. 88, 995 A.2d 334, 340 (2010).

The case law is clear that a college has a contractual obligation to its students to abide by its own

stated policies, and the college's failure to do so can give rise to a claim of breach of contract by

an affected student.  *Reardon v. Allegheny College*, 926 A.2d 477, 480 (Pa. Super. 2007)

(Pennsylvania courts "review the agreement between the parties concerning disciplinary

procedures[] contained within a portion of the student handbook . . . as we would any other

agreement between two private parties."); *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super.

1999) ("[T]he relationship between a private educational institution and an enrolled student is

contractual in nature; therefore, a student can bring a cause of action against said institution for

breach of contract where the institution ignores or violates portions of the written contract.").  If

a college has adopted disciplinary procedures for adjudicating student misconduct, it must follow

them.  *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 392 Pa. Super. 502, 510, 573

A.2d 575, 579 (1990) ("The general rule . . . has been that where a private university or college

establishes procedures for the suspension or expulsion of its students, substantial compliance

with those established procedures must be had before a student can be suspended or expelled.").

Haverford's Sexual Misconduct Policy constituted a contract between Haverford and

John.  The Policy, which the College adopted in 2020, is explicitly designed to cover all

allegations of sexual misconduct by students.  "Reports of Sexual Misconduct committed by any

student . . . of the Haverford community will be resolved according to the procedures outlined in

this Policy unless otherwise noted."  (Verified Compl. Ex. A at 4.)  The Policy applies to all

Haverford students and guarantees that all reports of sexual misconduct committed by a student

will be resolved according to its terms.  (*Id.*)

14

Haverford breached the Policy by removing John from his team and preventing his reinstatement due to an allegation of sexual misconduct contained in an utterly false and malicious rumor that John has consistently completely denied.[3]  These actions specifically breached the Policy's provision that prohibits the College from imposing "a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  *Id.* at 19.  The Policy defines "Sexual Misconduct" specifically to include sexual assault, which is the allegation against John that the rumor contained.  (*Id.* at 2-3.)  John's coach reported that allegation—as he was required to do—to Haverford's Title IX Office.  But he also removed John from the team and repeatedly blocked John's reinstatement—as he was prohibited from doing—even after learning that no formal complaint existed against John, no investigation of John was underway, and the Title IX Office considered John a student in good standing who was entitled to all the rights and privileges provided by the College.  And over the course of months, the coach's improper and unjust decision was repeatedly ratified by the College.

Critically, in plain violation of the Policy, Haverford never held any hearing whatsoever with respect to whether John actually committed any sexual assault, let alone made any determination at such a hearing that he had in fact done so.  Rather, it completely abdicated its responsibility to follow its own procedures, and nevertheless improperly imposed sanctions that the Policy specifically permits only *after* a finding of violation, to wit, "[r]emoval from organization, team and/or committee" and "[r]evocation of leadership or supervisory position."

---

[3] Haverford has floated the notion, counter to all facts, that John *voluntarily* quit the team and, what's more, that he was *never denied* reinstatement by the coach or anyone at the College.  The facts contradict that fantasy, which is both nonsensical and betrays the College's justifiable concern that it has no real defense to its complete failure to follow its own policies and its ongoing mistreatment of John.  Haverford's assertion that John—a committed athlete, a team co-captain, someone for whom his sport and his membership on the team meant everything, and someone who absolutely rejected the false rumor without reservation—would choose of his own accord to step away from the team flies in the face of reality and ignores the power dynamic between coach and student.

(*Id.* at 24.)  Indeed, the Policy permits sanctions at all only when "a Respondent accepts or is found responsible for violating this Sexual Misconduct Policy."  (*Id.*)  The College unjustly punished John without a finding, or even an investigation, as to whether he had engaged in the sexual misconduct alleged, thereby breaching its contractual obligations to him.

Nor did Haverford follow various other required procedures under the Policy before imposing the disciplinary sanction on John for sexual misconduct.  For example, it failed to provide John with a Notice of Allegations, which the Policy requires that it provide to "any Party [Claimant or Respondent] to the allegations of Sexual Misconduct."  (*Id.* at 14.)  Nor did it appoint an Investigator, conduct an Investigation, or produce an Investigative Report, all in contravention of the Policy, which states that an Investigator is "appointed by the College to gather evidence and facts related to the allegation of Sexual Misconduct," and "will perform an Investigation under a reasonably prompt timeframe of the conduct alleged to constitute Sexual Misconduct" (after issuance of the Notice of Allegations), and will produce "an investigative report summarizing all relevant evidence."  (*Id.* at 7, 17-19.)  As a Respondent facing an allegation of Sexual Misconduct, under the Policy John was entitled to the protections of these provisions before the imposition of any sanction.

Indeed, the procedures followed as to John were so threadbare—truly nonexistent—and inconsistent with the approach and specific requirements of the Policy that it is hard to imagine that Haverford can contend that it actually followed that Policy.[4]  If the College were to argue

_____

[4] Moreover, no Alternative Resolution Process under the Policy was followed as to John.  Indeed, that process is only available to "Parties who do not wish to proceed with an Investigation and live Hearing," an option the College never provided to John and one that is available only with the participation of a purported victim of sexual misconduct and only after the filing of a "Formal Complaint" by that person. (*Id.* at 15-16.)  No Formal Complaint was ever filed against John—indeed, he was never provided with any information concerning the rumored allegation other than the fact of its existence—and any discussions in which John participated did not have as their focus the truth or falsity of the rumored allegation but rather his return to the team.  Nor did those discussions include the purported victim.  And

that, because of the lack of a Formal Complaint by a purported victim, it could do whatever it

wanted, and follow any procedures or no procedures at all, such a position would contravene the

scope of the Policy, which explicitly states that "*Reports* of Sexual Misconduct committed by

any student . . . of the Haverford community *will be* resolved according to the procedures

outlined in this Policy unless otherwise noted" (*Id.* at 4) (emphases added).[5]  The Policy does *not*

say that only "Formal Complaints" will be resolved according to its terms.

And such a position would turn the purpose and mechanics of the Policy (not to mention

Title IX) on its head, ensuring greater procedural protections for better supported allegations and

granting no procedural protections whatsoever for false rumors and other content-free

allegations.  Following the coach's report of the allegation, the Title IX Coordinator reviewed the

text messages and other information, and she learned that the purported victim did not intend and

had never intended to file a Formal Complaint.  The Title IX Coordinator then herself declined to

exercise her discretion to proceed with a Formal Complaint.[6]  Given that the Title IX Office had

---

they were not offered to John in place of a process involving an investigation and live hearing as to the
allegation, or any other process, but rather as his only purported pathway to rejoin the team.

[5] Such a position also would violate the plain language of the Policy provisions that explicitly apply to,
for example, the Notice of Allegations (covering "any Party [Complainant or Respondent] *to the
allegations* of Sexual Misconduct"); Investigations (covering conduct "*alleged* to constitute Sexual
Misconduct"); and Hearings (covering "*an allegation* of Sexual Misconduct") (emphases added).  None
of these provisions is limited exclusively to a Resolution Process following the filing of a Formal
Complaint, though all of them could have been had Haverford drafted those provisions as it specifically
did elsewhere to make that limitation clear.

[6] Apart from the fact that the plain language of the Policy makes clear that resolution of the allegation
against John, including the imposition of any sanction, was covered by the procedures detailed in the
Policy, Haverford's own conduct establishes that the College well understood that the allegation was
covered by the Policy.  On first hearing the rumored allegation, the coach recognized that he was required
as a mandatory reporter to report it to the College's Title IX Office—the office specifically charged with
enforcing the Policy.  The Title IX Coordinator reached out to the purported victim to determine if she
wanted to pursue a Formal Complaint under the Policy.  The Title IX Coordinator considered the
allegation, reviewed the information the coach provided, and communicated with the purported victim
before determining that she would not exercise her discretion under the Policy to proceed with a Formal
Complaint.  (*Id.* at 12.)  And the Title IX Coordinator communicated to John that, given that he was not

reviewed the allegation and evidence (such as it was) against John and determined not to pursue a Formal Complaint, it would defy reason and logic for the College then to allow the coach to impose, with no procedural guiderails or protections of any kind, his own sanction against John. Permitting such an undermining of the Policy would lead to the absurd result of the College having *more* flexibility to sanction students in cases that it determines are too weak even to justify the invocation of (let alone a finding of responsibility under) its formal process—as was the case here.  Having established the Policy as the exclusive means of reviewing, investigating, adjudicating, and sanctioning sexual misconduct allegations, Haverford's failure to observe its requirements is a clear breach of contract.

In the most recent discussions that Haverford has had with John and his family, the College—through its Athletic Director and the Dean of the College—has emphasized what it views as the absolute discretion that coaches have to manage their rosters.  But the Policy contains no "coach discretion" exception that would permit the coach to act as unilateral judge, jury, and executioner with respect to rumored sexual misconduct.  Rather, the Policy unquestionably covers the allegations of sexual assault against John, is the sole source of procedures following an allegation of sexual misconduct, and provides the important procedural protections—which the coach and the College completely ignored—that John was entitled to receive from Haverford before the imposition of any disciplinary sanction, including the sanction of removal from a sports team.

Likely recognizing that a false, vague, and unsupported rumor is an insufficient basis to prevent John's reinstatement to the team, the College also has raised the notion that some of John's teammates had other unspecified concerns about John's sexist treatment of or conduct

---

subject to a Formal Complaint under the Policy, he was a student in good standing and should continue his life at Haverford as normal.

18

toward women that prompted their desire to keep John off the team.  These pretextual false smears are even more inchoate than the vague rumor.  As set forth above and in the Verified Complaint, John's co-captains were never able to identify any conduct by John to support this innuendo even though they had the opportunity to do so during two mediations presided over by College officials.  When pressured for specifics at both meetings, John's co-captains could only identify the false and baseless rumor as the cause for their desire to keep John off the team.  Nor were any Haverford staff or administrators able to identify any other improper conduct, despite citing it as a basis to deny John's reinstatement.  Regardless, even if misogynistic comments or conduct were properly alleged—and they were not, and they did not exist—those allegations too would be subject to the Policy under Haverford's broad definition of "Other Gender-Based Misconduct," which covers "acts which do not meet the narrow definition of 'Title IX Sexual Harassment,'" but "nevertheless could constitute discrimination on the basis of sex."  (Compl. Ex. A, p. 3).  Haverford has failed to follow the Policy with respect to these smears just as much as it has with respect to the allegation contained in the false sexual assault rumor.

The College's breach has caused and will continue to cause damage to John as set forth in greater detail in his Verified Complaint.  As matters currently stand, John has lost the ability to compete in his final year of NCAA athletics, an opportunity that, unless the College is restrained and enjoined, he will never enjoy again.  This Court has the authority to grant equitable relief as well as damages for the College's breach of contract.  *Strank v. Mercy Hospital of Johnstown*, 383 Pa. 54, 57 (1955) (holding court may equitably enforce obligations "whether arising under express contracts, written or oral, or implied contracts, including those . . . between an educational institution and its students").  It should exercise that authority to correct the immediate harm that John now faces.

When colleges have failed to follow their own policies in student disciplinary matters involving sexual misconduct, courts have readily found a likelihood of success on claims of breach of contract and granted injunctive relief.  *See*, *e.g.*, *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at *9-11 (N.D. Ind. May 8, 2017), *vacated per settlement* (finding likelihood of success on breach of contract claim when university failed to provide "prompt, fair and impartial investigation and resolution" promised by sexual misconduct policy); *Ritter v. State of Oklahoma*, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) (finding likelihood of success on breach of contract claim when college failed to comply with promises to provide "an equitable resolution"); *Doe v. Brown Univ.*, No. 1:16-cv-00017-WES-PAS (D.R.I. Apr. 25, 2016) (finding likely success on claim that university breached contract with student by applying definition of consent from policy that was not in effect at time of conduct at issue) (Ex. 1); *Middlebury Coll.*, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015) (finding likelihood of success on breach of contract claim when college violated its policies by holding second investigation of plaintiff for sexual misconduct after he was found not responsible in prior proceeding conducted by sponsor of study abroad program); *King v. DePauw Univ.*, 2014 WL 4197507, at *12-13 (S.D. Ind. Aug. 22, 2014) (finding likely success on implied contract claims when university failed to apply its policy's definition of "incapacitated" in student disciplinary matter involving sexual misconduct).

For the reasons detailed above, John is likely to succeed on his breach of contract claim.

### B.     Without Judicial Intervention, John Will Suffer Irreparable Harm

If the Court fails to grant the relief that John requests—specifically, his immediate reinstatement onto his team as co-captain—he is all but certain to suffer irreparable harm that will not be compensable with monetary damages.  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000) ("The irreparable harm requirement is met if a plaintiff demonstrates

a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."). John is a varsity athlete and a college senior in his final semester of eligibility to compete in collegiate athletics. In less than four months, after he graduates, his opportunity to compete at the college level will be over. Without judicial intervention, he will never be able to recover the opportunity that Haverford has unjustly taken from him. Moreover, the damage caused to his reputation on campus by his public removal from his team and the repeated denial of his reinstatement—which has destroyed his collegiate experience and will follow him for life—is impossible to quantify and is only (partially) redressable through a public reinstatement. Constrained by his pseudonymity, John cannot detail the exact upcoming competition schedule without revealing his team, but, as alluded to above, the heart of the season is taking place over the course of the coming month.

Multiple courts have found that lost athletic opportunities represent irreparable harm. *See, e.g.*, *T.W. v. Southern Columbia Area School District*, No. 4:20-CV-01688, 2020 WL 5751219 (M.D. Pa. Sept. 25, 2020) ("Being unable to participate in athletics for a year is a 'temporally isolated opportunity' and is, the Court agrees, precisely the type of injury that preliminary injunctive relief is intended to prevent."); *Richmond v. Youngstown State Univ.*, 2017 WL 6502833 at *1 (N.D. Ohio Sept. 14, 2017) (finding irreparable harm "due, in part, to the public nature of being banned from playing football due to past behavior . . . without notice or process."); *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) (finding that suspension of football player, depriving him of "opportunity to participate in sports on a continuous and uninterrupted basis," constituted irreparable harm); *Ganden v. National Collegiate Athletic Association*, 1996 WL 680000, at *6–7 (N.D. Ill. Nov. 21, 1996) (noting that because collegiate athletes have only limited span of competitiveness,

21

losing a year of competition would irreparably inhibit their development as athletes).

    **C.**    **The Harm to John Outweighs Any Potential Harm to the College**

The significant and irreparable harm that John has been suffering and will continue to suffer if this Court does not issue a TRO and injunction significantly outweighs the potential harm to Haverford if it does.  Without relief, John will lose his final opportunity in life to compete in collegiate athletics, which represents the culmination of a lifetime of dedication and commitment to competitive sport.

By contrast, the College will suffer no harm if it is simply required to enforce its own policies and allow an eligible and capable athlete in good standing to resume his position on the team and compete for the College.  In the last meeting that John, through his parents, had with the Dean of the College, on January 6, 2023, the Dean cited "team disruption" as the revised pretextual basis for keeping John off the team, by which he meant that the very teammates who watched Haverford unjustly and illegally kick John off the team and repeatedly refuse his reinstatement, and who consequently had spent months ostracizing and harassing him as a Haverford-branded sexual predator, might be disturbed by the unexplained return of such a person to the team and so might want to quit the team.  And that might affect team morale and negatively impact the camaraderie and cohesiveness between the other athletes.  But it is unsurprising that some of them might be disturbed.  They have been misled by the College to believe that John is guilty of various (though content-free and false) offenses.

Of course, Haverford never should have removed John from the team and prevented his reinstatement in the first place and instead should have taken the first opportunity to correct its earlier mistake.  So the prospect of any fallout among misinformed teammates at John's reinstatement is a problem of Haverford's own making, borne out of its own decision to violate its own policies and unjustly vilify John, and therefore not a proper basis to argue

22

counterbalancing harm.  *See MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (granting preliminary injunction in trademark infringement case and finding that any harm to defendant was at least partly self-inflicted due to its failure to abide by its contractual obligations); *Youngstown State Univ.*, 2017 WL 6502833 at *1 (granting preliminary injunction preventing athletic ban imposed without due process and finding that "[t]o the extent there is any harm to Defendant, that harm is self-inflicted").  Haverford ratified and amplified a false rumor by sanctioning John in the absence of any evidence, or even a formal complaint.  And by permitting John's coach to defer to the wishes of two co-captains, Haverford improperly allowed John's teammates to dictate John's fate.  Any ill-will created by John's presence on the team could have been avoided if Haverford had simply followed its Policy and not given undue airtime to rumors it knew had no basis in fact.

Moreover, any team members who Haverford purportedly fears will quit the team if John is reinstated, are implicitly arguing that the Policy (if not Title IX itself) should be replaced by a form of mob justice, in which their uninformed view of the truth of a rumor replaces the Policy as the mechanism for meting out punishment.  Particularly given that the only leverage these students have is to threaten to quit the team, the College could well choose to resist such extortion.  It could choose instead to explain to these students that even at Haverford accused students are presumed innocent until proven guilty, and the College is not in the business of acceding to threats that would require it to violate its own policies and the law by presuming otherwise.  Sadly, Haverford chose instead to sacrifice its contractual obligations and integrity by yielding to mob rule over procedural fairness and justice, at the further cost of vilifying, punishing, and branding a young man who has done no wrong.  Any speculative disruption that may flow from the correction of that choice is hardly a cognizable harm.

**D.      The Public Has an Interest in the Enforcement of Contracts and the Fair and Non-Discriminatory Treatment of College Students**

The public interest plainly favors the granting the TRO and injunction to require John's immediate reinstatement.  John has been and continues to be subjected to an ongoing unrepentant campaign of bullying, harassment, intimidation, and ostracism by fellow students—ratified by Haverford's senior staff and senior administrators—based on an entirely false rumor that contains not a germ of truth.  And rather than provide any corrective action to restore John to his position on the team from which he never should have been even temporarily separated and protect John from bullying, Haverford has instead not merely turned a blind eye and further isolated him but has chosen instead to exacerbate the original harm by ratifying the unwarranted and unjust removal of John from the team, thereby validating the false rumor.

The College's Kafkaesque actions, in which the punishment precedes not merely the verdict but the trial, and even the formal complaint, and in which completely baseless student-invented rumors rule the day, are beyond bewildering.  John is not seeking corrective action after being vindicated in a Title IX hearing in which a complainant made an unfounded allegation of improper sexual contact.  That would be bad enough.  Here, there was no Title IX complaint.  Nor was there any underlying sexual or intimate contact with anyone that could even form the theoretical basis for such a complaint.  All that exists is a damaging false rumor, based on no underlying facts whatsoever, fabricated out of whole cloth, that the College itself—through the actions of the coach and senior administrators—not only failed to dispel or even tamp down but have credited, and thereby amplified.

It stretches the bounds of understatement to say that John has been treated unfairly by Haverford, and "it is always in the public's interest that a student be treated fairly before being disciplined."  *Ritter*, 2016 WL 2659620, at *3; *Youngstown State Univ.*, 2017 WL 6502833 at *1

24

("[T]he public has great interest in its public institutions meeting reasonable expectations, and keeping promises that rise to the level of an agreement, and honoring its contracts."); *see also King*, 2014 WL 4197507, at *14 (noting public interest in applying policies fairly in disciplinary matters).

Moreover, when a plaintiff has already demonstrated likely success on the merits and irreparable harm, "it almost always will be the case that the public interest will favor the plaintiff." *AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). And this motion is based on Haverford's breach of a contract with its student, and "the public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife*, 759 F. Supp. 2d at 563 (granting injunction).

In addition to the general public interest in fair play, given the indefensible and mean-spirited treatment to which John has been subjected by Haverford, the Haverford community has a specific interest in seeing that the College's disciplinary procedures for sexual misconduct allegations are fairly applied and that student rumormongering is not allowed to become a substitute for procedural fairness and justice.

## III.   CONCLUSION

John respectfully submits that the Court should enter a temporary restraining order and order Haverford to show cause why a preliminary injunction should not issue.  Specifically, John asks this Court to order Haverford to reverse the sanction precluding John from participating in practices and competitions as a full member of his team, and allow him to resume his position as a team captain.

Dated:  January 25, 2023                              Respectfully submitted,


                                                       */s/ Patricia M. Hamill*
                                                      Patricia M. Hamill (Pa. Id. No. 48416)
                                                      Andrew S. Gallinaro (Pa. Id. No. 201326)
                                                      CONRAD O'BRIEN PC
                                                      1500 Market Street
                                                      Centre Square – West Tower, 39th Fl
                                                      Philadelphia, PA 19102-1921
                                                      (t) (215) 864-9600
                                                      (f) (215) 864-9620
                                                      (e) phamill@conradobrien.com
                                                          agallinaro@conradobrien.com

                                                      *Counsel for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the Haverford

College through its attorney, Joshua W.B. Richards, on January 25, 2023, at the following

address via electronic mail:

Saul Ewing
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Office: (215) 972-7777
Fax: (215) 972-772
Joshua.richards@saul.com

*/s/ Patricia M. Hamill*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Case No.: 2016-cv-17-S |
| BROWN UNIVERSITY IN PROVIDENCE | ) |
| IN THE STATE OF RHODE ISLAND AND | ) |
| PROVIDENCE PLANTATIONS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>TEMPORARY RESTRAINING ORDER</u>

Before the Court is the Motion of Plaintiff John Doe ("John") for entry of a temporary restraining order on an emergency basis to restrain and enjoin the Defendant, Brown University, from enforcing its decision of April 20, 2016 immediately removing John from campus after he was found responsible for sexual misconduct as alleged in the Title IX complaint of student Ann Roe. The Court has carefully considered the memorandum and documents that John has filed, and convened a chamber's conference on the matter on April 22, 2016 at 9:30 AM at which counsel for both parties were present.

<u>Basis for Issuance of Injunctive Relief</u>

1.      John has a reasonable likelihood of success on the merits of his claim that Brown University breached its contract with him by applying the definition of consent set forth in the *Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy,* adopted on or about September 3, 2015, ten months after the conduct at issue.

2.    John has been suspended until the Fall of 2018 and ordered off campus. Unless a temporary restraining order is granted, John will suffer irreparable harm for which an award of monetary damages would not be sufficient.

3.    The balance of the equities tilts in John's favor. The encounter at issue occurred approximately one and a half years ago, only one month remains of this academic year, and no-contact orders are in place.  Brown University's proffered interest in immediately removing John from campus pursuant its *Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy* does not outweigh the potential damages John stands to suffer.

4.    A temporary restraining order is necessary to maintain the status quo. Accordingly, it is hereby:

ORDERED:

1.    John Doe's motion for a temporary restraining order is <u>GRANTED</u>;

2.    Brown University is enjoined and restrained from enforcing its decision of April 20, 2016 decision requiring him to move out of his residence hall and off campus;

3.    This Order shall not affect any existing no-contact orders concerning John; and

4.    This Order is entered at 12:00 PM on April 22, 2016, and shall not exceed 14 days in duration unless before that time the court, for good cause, extends it for a like period or the adverse party consents to its extension.

It is so ordered.

/s/*William E. Smith*

_____
William E. Smith
Chief Judge
Date: 25 April 2016

Presented on April 25, 2016 by:        The Plaintiff, John Doe,
                                        By his Attorneys,

_____

J. Richard Ratcliffe, #2603
Jeffrey Biolchini, # 7320
Ratcliffe Harten Burke & Galamaga, LLP
40 Westminster Street, Suite 700
Providence, RI  02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhbglaw.com
jbiolchini@rhbglaw.com

## CERTIFICATION

I, J. Richard Ratcliffe, pursuant to LR Cv 58, hereby certify that:

a) On <u>April 22, 2016</u>, I served a copy of this proposed order on all counsel of record; and

b) To the best of my knowledge, opposing counsel does not object to the form of this order.

_____

J. Richard Ratcliffe, #2603