UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOHN DOE | : **Civil Action No.: 23-299** |
| Plaintiff, | : |
| v. | : |
| HAVERFORD COLLEGE | : |
| Defendant. | : |

**REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Haverford devotes the bulk of its opposition to the faulty proposition that the Sexual Misconduct Policy (the "Policy") does not cover the allegations against John, while its new addition to the Student-Athlete Handbook (the "Handbook Addition")[1] does. For the reasons that follow, it is wrong on both counts. Moreover, the purportedly neutral basis that Haverford asserts as the actual reason it removed John from the team—other unstated "offensive behaviors toward women"—is both false and pretextual. And Haverford's various other arguments—(i) that the harm to John of preventing his participation in varsity athletics is not irreparable; (ii) that John waited too long to file for injunctive relief; and (iii) that John should face a heightened injunction standard—are all unavailing. Finally, public policy and the balance of harms strongly favor John's reinstatement and the prevention of Haverford's undermining of its contractual obligations and the Title IX procedural framework.

---

[1] The Handbook Addition states: "ROSTER MANAGEMENT. Being a varsity athlete at Haverford College is a privilege and not a right. Varsity coaches have broad discretion in determining the individuals who make up his or her team's active roster. This discretion includes, but is not limited to, removal from the roster at any time. Should you feel that you were removed from the team unjustly, you can submit an appeal to the director of athletics." (Op. Br. Ex. C, p.3.)

**1. The Sexual Misconduct Policy Applies.**

As to the Sexual Misconduct Policy, Haverford first constructs a straw man by misstating John's explanation of the Policy's applicability to the alleged conduct. Without citing to John's motion papers, Haverford characterizes what it calls John's "mistaken" argument as being that the only way that Haverford could ever remove an athlete from a team is if the athlete is found to have violated the Policy.[2] Of course John makes no such argument. What John actually asserts is simply that the Policy *does* apply to allegations of sexual misconduct like the ones leveled against him, and therefore Haverford was required to follow it.

Haverford's misunderstanding appears to stem from its lack of comprehension of its own 31-page Sexual Misconduct Policy. The College confuses the applicability of the Policy as a whole with the applicability of the Policy's formal "Resolution Process," which is a subset of the Policy that is only triggered by the filing of a "Formal Complaint" by the alleged victim or by the College's Title IX Officer.[3] John carefully explained how the Policy operates in his opening

---

[2] Op. Br. 2 ("Plaintiff . . . cooks up a far-fetched and logically untenable breach of contract theory positing that because the College's Sexual Misconduct Policy contemplates removal from an athletic team as one of several potential sanctions that may be imposed upon individuals found to have violated that policy, he can only be removed from the team if he is found to have violated that policy. In other words, Plaintiff's mistaken argument is that because the College's Sexual Misconduct Policy *could* apply . . . it is the only policy that *can* apply."); Op. Br. 9 ("While Plaintiff points out that the Sexual Misconduct Policy includes certain sanctions that *may* be applied [following a violation of the Policy,] it does not follow that those listed actions are only to be applied in the context of sanctions for sexual misconduct cases, or that similar actions cannot be applied in the context of other aspects of student life at the College. . . . Plaintiff's mistaken theory is instead that students who have been the subject of sexual misconduct rumors are required to be immune from any adverse action not predicated on the Sexual Misconduct Policy, and cannot, *for any other reason*, be subject to any limitations on extra-curricular involvement.").

[3] *See* Op. Br. 2 ("the College's Sexual Misconduct Policy *could apply had a formal complaint been filed*"); Op. Br. 3 ("The Sexual Misconduct Policy is irrelevant here because by its plain terms it does not apply . . . . It is not in dispute that Plaintiff is *not the subject of any formal complaint under that policy, an essential first step to triggering the policy*."); *id.* ("Plaintiff has latched onto a theory that the College violated a policy that was *never invoked and never applied* . . . ."); Op. Br. 9 ("In fact, the explicit language of the Sexual Misconduct Policy makes clear that the policy does not apply here, where Plaintiff was not and is *not the subject of a formal complaint or any investigation or adjudication. See id.* at 7 (defining a *'Formal Complaint' as a document which triggers 'initiation of the College's Resolution*

brief.  (Doe Br. 9-12, 14-19.)  Haverford's arguments to the contrary, the Policy does not suddenly spring into effect only following the filing of a Formal Complaint.  Rather, it is triggered by any "report" of sexual misconduct, which is something that can be made by an alleged victim, a friend of the victim, a mandatory Title IX reporter, or indeed by anyone at all, including anonymously—a process that Title IX and its implementing regulations require.  (Doe Br. 9 & Verified Compl. Ex. A at 1, 4) (noting that U.S. Department of Education issued a Final Rule under Title IX in 2020 that "[a]ddresses how an institution must respond to *reports* of misconduct falling within that definition of sexual harassment") (emphasis added).  The Policy further mandates that *reports*—not merely "Formal Complaints"—of sexual misconduct that are "committed by any student or employee" of Haverford "*will be* resolved" according to the procedures outlined in the Policy.  (*Id.*) (emphasis added).

      The parties agree that the Policy's Resolution Process was not triggered as to John because no purported victim ever filed a Formal Complaint, and Haverford's Title IX Officer *found no basis* to proceed with any Formal Complaint.  But the Policy itself certainly was triggered by the report of alleged sexual misconduct to the Title IX Office by the coach.  And, once triggered, the Policy provides certain procedural protections to students accused of sexual misconduct.  Among those protections is the requirement that the College hold a hearing, make a finding of responsibility, and grant permission to appeal before imposing a disciplinary sanction arising from the report.  (Doe Br. 9-12, 14-19.)

      Critically, these protections are not simply contractual in nature.  Rather, they are federally mandated by Title IX and its implementing regulations.  Indeed, Title IX's regulations

---

*procedures* consistent with this Sexual Misconduct Policy"); *id.* at 12 ('The timeframe for the College's *Resolution Process begins with the filing of a Formal Complaint*.')") (emphases added).

3

were reaffirmed and strengthened as recently as 2020 to require more robust procedural protections for accused students, including the right to a live hearing with cross examination. And Haverford's Sexual Misconduct Policy was updated in 2020 specifically to bring it into compliance with these updated regulatory requirements. (Verified Compl. Ex. A at 1) (noting that 2020 Final Rule "[m]andates a grievance process that an institution must follow to comply with the law in these specific covered cases before issuing a disciplinary sanction against a person accused of sexual harassment," including "forms of sex-based violence"). Moreover, these protections are undergirded by the basic legal principles of the presumption of innocence, due process of law, and fundamental fairness.

## 2. The Handbook Addition Does Not Apply.

As to the only policy that Haverford argues *does* apply, the Handbook Addition, it is both inapplicable and irrelevant. It is inapplicable because it only came into being, surreptitiously, on November 2, 2022, so it was not even in effect when Haverford removed John from the team nearly nine months earlier on February 4, 2022.[4] The only apparent change that Haverford made at that time was to insert the one paragraph that constitutes the Handbook Addition, the very paragraph that the College repeatedly cites as the basis for its decision to remove John (Op. Br. 1-3, 6, 8), quotes in full twice (Op. Br. 1, 8), and even repeatedly chides John for not bringing to the Court's attention.[5] Given Haverford's fundamental reliance on this paragraph in its

---

[4] Haverford failed to disclose to John or to the Court the fact that it secretly updated the Student-Athlete Handbook on November 2, 2022, *without* changing the name of the document (still "HC_STUDENT-ATHLETE_HANDBOOK_19-20") or updating the effective date of the policy (still September 1, 2019). (Op. Br. Ex. C)

[5] Op. Br. 1 ("Although *Plaintiff regrettably does not refer to it* anywhere in his submissions, Haverford has a written policy that addresses this situation precisely" and "To underscore the situation here, the parties and the Court have been *asked by Plaintiff to expend significant time and resources* to litigate a question that is answered squarely and unambiguously by a written Haverford policy."); Op. Br. 2 ("*Plaintiff . . . pretends no policy squarely addressing athletic participation exists* (and in so doing, fails

4

opposition, it appears likely that the very reason for the College's undisclosed policy change was its recognition of the indefensibility of its earlier decision to remove John under then-existing policies and its hope that no one would discover the change.

Ironically, the hidden insertion of a new provision into the Student-Athlete Handbook on which the College evidently thinks its legal argument depends actually provides no protection for its improper removal of John from his team. The Handbook Addition certainly does not displace the Sexual Misconduct Policy. Rather, this new policy is simply a written statement of the unremarkable proposition that coaches have the general—but not absolute—authority to manage their rosters.[6] John does not dispute that point, or even the notion that a coach's discretion is reasonably wide and can take into account factors beyond athletic performance, or that a coach can remove members of the team. But that discretion is not unfettered. A coach cannot exercise that authority for an improper or illegal purpose. Coach discretion does not trump law or other specifically applicable College policies, including the Sexual Misconduct Policy and many other nondiscrimination policies.[7] (Doe Br. 18) (noting "the Policy contains no 'coach discretion' exception that would permit the coach to act as unilateral judge, jury, and executioner with respect to rumored sexual misconduct"). As a result, no conflict exists between the Policy and

---

to present it to the Court) . . . ."); Op. Br. 3 ("*Plaintiff . . . wholly ignor[es] the impact of contractual terms* that do apply here and explicitly permit the coach's decision.") (emphases added).

[6] One brand new feature of the Handbook Addition that does not relate to coach discretion is the complaint procedure: "Should you feel that you were removed from the team unjustly, you can submit an appeal to the director of athletics." (Op. Br. Ex. C, p.3.) This process is not one that existed before the Handbook was revised, not one about which John was ever advised, and not one that Haverford argues that John did not follow, in further implicit recognition of the fact that the Handbook Addition did not apply to his removal from the team.

[7] For example, if a majority or even virtually all of the members of a team wanted to exclude from the team someone on the basis of that person's race or religion, or another impermissible basis, the coach would nevertheless be prohibited by Haverford's non-discrimination policy from barring that person.

the Handbook Addition.

Nevertheless, to the extent that any perceived policy conflict exists, it is a basic principle of contract law that the more specific on-point contractual provision, particularly one that is mandatory, controls over the more general provision, particularly one that is discretionary. *Musko v. Musko*, 697 A.2d 255, 256 (Pa. 1997) (noting that "when specific or exact provisions seem to conflict with broader or more general terms, the specific provisions are more likely to reflect the intent of the parties than the general provisions."); Restatement (Second) of Contracts § 203 (1981) (explaining that "specific terms and exact terms are given greater weight than general language."); *see also In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 306 (3d Cir. 2010), as amended (May 7, 2010) ("It is a well-settled maxim that specific statutory provisions prevail over more general provisions.") (*citing In re Combustion Eng'g*, 391 F.3d 190, 237 n.49 (3d Cir.2004)). Here, the two competing policies must be read to afford coaches wide discretion in roster management, except in the instance where a student is accused of sexual misconduct. In that instance, the coach—just like all other College employees—is bound by the Policy to afford accused students certain procedural protections before imposing a sanction. So to the extent that a conflict between the policies does exist, the Sexual Misconduct Policy controls, particularly over a policy that was not even in existence at the time of the relevant conduct.

### 3. **Haverford's Asserted Basis for Removing John from the Team Is False and Pretextual.**

Haverford also offers a false and transparently pretextual explanation for its removal of John from the team, through which it attempts to assert that John was removed not due to the rape allegation but rather due to John's purportedly "offensive behaviors toward women."[8] (Op.

---

[8] The College seems to have abandoned its alternative pretextual explanation that John voluntarily quit the team of his own accord. (*See* Doe Br. 15, n.3.) Indeed, Haverford itself was never really committed to this false and implausible explanation. The College's counsel represented to the Court in conference

6

Br. 4; Op. Br. Ex. A, Donnelly Aff. at ¶ 4; Op. Br. Ex. B.)  This smear is backed by no evidence whatsoever, or even the prospect of any supporting evidence.  Despite the opportunity to do so, Haverford has failed to introduce any evidence of, or even to point to any possible non-evidentiary instance of, purportedly offensive behavior toward women by John.[9]  Nor could it.  None exists.  John has never engaged in any misogynistic conduct, whether at Haverford or anywhere else.  He unreservedly denies the smear campaign that he has faced.

That failure is consistent with the College's past inability to present even the barest details of any purportedly improper conduct by John, notwithstanding John's repeated attempts to receive some kind of explanation as to them.[10]  To date, no team member, other student, college employee, or anyone else has specified a single instance of purportedly improper or offensive conduct by John toward women or anyone else.  (Testimony of Jon Doe at February 3, 2023, hearing; Verified Compl. ¶¶ 102, 122, 124.)

---

on January 30, 2023, that John's coach suggested that John step away from the team, and John's coach himself states in his affidavit that John "agreed" to step away following their February 4, 2022, meeting, clearly indicating that he had made a proposition to which John had agreed.  (Op. Br. Ex. A, ¶ 6.)  Neither of these statements is accurate, as John's coach instructed John to step away from the team, but either would be sufficient for a determination that John did not voluntarily resign.

[9] Haverford called no witnesses to testify at the February 3, 2023, hearing.  Notably absent was the coach, who instead furnished a sworn affidavit that misstated even basic facts.  E.g., he asserts that John was on the roster for the track and field team "for the 2020 and 2021 seasons" (Op. Br. Ex. A at ¶ 3), when in fact John was on the team for the 2019-20, 2020-21, and 2021-22 seasons (until Haverford removed him on February 4, 2022).  (Verified Compl. ¶ 25.)  He asserts that John requested to rejoin the team during "the Spring 2022 season," (Op. Br. Ex. A ¶ 8) when in fact John's request was during the winter 2022 season, within a couple of weeks of his improper removal.  (Verified Compl. ¶¶ 42-45.)

[10] As stated in John's opening brief and the Verified Complaint, these smears are even more inchoate than the vague rumor.  John's co-captains were never able to identify any conduct by John to support this innuendo even though they had the opportunity to do so during two mediations presided over by College officials on March 22 and December 2, 2022.  When pressured for specifics at both meetings, John's co-captains could only identify the false rumor as the basis for their desire to keep John off the team.  Nor was John's coach or any other member of Haverford's staff or administration able to identify any other improper conduct in meetings on March 22, October 24, and December 19, 2022 and on January 6, 2023.  *Id.* ¶¶ 56-62, 93-129-131.

7

Apart from the smear's falsity and the lack of any supporting evidence for it, the existing evidence and common sense establish that the smear is transparently pretextual. As the timeline of events indicates, any concerns that John's teammates had were due to the false rape rumor, which was implicitly ratified by the College less than 24 hours after the rumor surfaced. John, who had been made a captain in November 2021, had had no problems, negative interactions, or any other issues with any teammates or coaches until he was approached with the rumored rape allegation on the night of February 3, 2022. The next day, February 4, he was instructed by his coach to step away from the team until the allegation was resolved through the Title IX Office, to which it had been reported by the coach.

To give credence to the notion that these other concerns were the deciding factor in John's removal from the team, one would have to believe that at the same time that John's co-captains presented the rape allegation to the coach, they also presented the coach with other concerns of "offensive behaviors toward women" that were egregious enough that the coach had to remove John that very day, without even considering the rape allegation (which had to go through the Title IX process). That fiction is belied by the fact that the coach never reported those purported other allegations to the Title IX Office as a possible violation of the Policy. And as both John and Haverford's Title IX Coordinator confirmed at the February 3 Court hearing, the overwhelmingly predominant focus of the 90-minute meeting on March 22, 2022, in which John's teammates aired their grievances and John's coach denied John's reinstatement, was the rape allegation.

Even if the purported allegations of "offensive behaviors toward women" (which Haverford asserts as the post-hoc reason that it removed John from the team) were true, supportable, and bona fide—and they are not—those allegations themselves would trigger the

8

coach's mandatory Title IX reporting obligation.  As Haverford's Title IX Coordinator conceded at the February 3 Court hearing, even if there were any substance to the "other concerns," those allegations too would be considered reports of sexual misconduct that the College would be required to resolve under the Policy.  "Sexual Misconduct" at Haverford is defined to include: "Unwelcome conduct of a sexual nature, including but not limited to unwelcome sexual advances, requests for sexual favors, or other verbal or nonverbal conduct of a sexual nature that is sufficiently serious, pervasive, or persistent as to create [a] . . . sexually offensive working, academic, residential, or social environment . . . ."  (Verified Compl. Ex. A at 3.)  In prior correspondence with John's counsel, Haverford described the team's other concerns as "misogynistic conduct toward women."  Now realizing that description may have strayed too close to the line of the College's broad definition of Sexual Misconduct, it has purposefully watered down the accusations in its responsive brief to "offensive conduct toward women."  Regardless, it is clear that to the extent any concerns other than rape were raised at any time throughout the underlying saga, those allegations were pretextual, and nevertheless would still have been covered by the Policy.

### 4. Haverford's Argument that Its Denial of John's Participation in Intercollegiate Athletics Does Not Cause Irreparable Harm Is Unsupported by the Case Law.

Haverford's assertion that its continued prevention of John from participating and competing in his final semester of intercollegiate varsity athletics will not cause him to suffer irreparable harm is both factually wrong and based on inapposite authority.  Factually, Haverford mischaracterizes John's request for relief as limited to the remaining few weeks of the winter season, ignoring the fact that John would miss the entirety of the spring season if the Court were to deny his motion.  The case law relied on by Haverford is similarly inapposite.  With one exception, Haverford relies on decisions holding only that *high school students* who lose the

ability to compete under league eligibility requirements do not suffer an irreparable injury. None of those interscholastic cases involves a school sanction imposed on an athlete for misconduct. And there is a clear distinction in the case law between the significant harm caused by the denial of intercollegiate athletics—which far fewer people will ever experience—and the lesser harm caused by the denial of interscholastic athletics.

Of the cases Haverford cites, only *Mattison v. E. Stroudsburg Univ.*, 2013 WL 1563656, at *5 (M.D. Pa. Apr. 12, 2013) involved a college athlete, and in that case the court rejected only the plaintiff's argument that a year-long suspension would cost the plaintiff the chance of being recruited for a major league baseball ("MLB") team. The plaintiff made no other argument, and the court considered no other argument concerning irreparable harm. And because the plaintiff provided no evidence to demonstrate that any MLB team had ever expressed interest in him as an MLB prospect, the court determined the articulated harm was too speculative to warrant relief.

By contrast, the district court's decision in *Richmond v. Youngstown State Univ.*, 2017 WL 6502833 at *1 (N.D. Ohio Sept. 14, 2017) involved closely analogous facts to those present here. In *Richmond*, a football player was, like John Doe, the target of a group of students who demanded that the school remove him from a team due to a juvenile offense he had committed years before enrolling at the school. The university, like Haverford, yielded to the pressure and removed the player without conducting the disciplinary proceeding its policies required. The court found that the university's failure to afford the athlete a fair process warranted relief. Haverford attempts to distinguish *Richmond* on the basis that the football player in that case was on the active roster at the time of his removal. (Op. Br. 16.) Of course, that fact is not a distinction, as John was not only on the active roster but was a team captain actively competing at the time of his removal. (Testimony of John Doe at February 3, 2023, hearing.) Indeed, the

10

facts here closely parallel the facts of *Richmond*, and the Court should be guided by the reasoning set forth in the decision.

### 5. Haverford's Procedural Arguments Are Unavailing.

Haverford also argues that John waited too long to seek injunctive relief, citing the time between John's meeting with the Athletic Director on December 19, 2022, and the filing of his Verified Complaint and motion on January 25, 2023. (Op. Br. 17-18.) This argument completely ignores the previously scheduled discussion that John's parents had—as a follow-up meeting—with the Dean of the College at Haverford, the number two administrator beneath the College's president, on January 6, 2023, during which he denied John's reinstatement. (Doe Br. 4-5.) It also ignores the fact that John did not seek *ex parte* relief. (Doe Br. 4-5.) And it ignores the months that Haverford wasted in a sham process of purported reintegration through which it continuously dangled the likelihood of John's reinstatement to the team while letting the clock run. (Doe Br. 7-8 (citing Verified Compl. ¶¶ 48-62, 73-85, 93-129).) And finally, it ignores completely, as noted above, the entirety of the spring competition schedule that lasts until late April. In fact, during the two-and-a-half-week period (two days of which were to provide notice to Haverford's counsel and for an extension at counsel's request) before the January 25, 2023, filing of the Verified Complaint and motion, there were only two days of athletic competition.

Haverford also asserts that John must meet a higher threshold of proof on the likelihood-of-success prong because he is seeking a mandatory injunction. (Op. Br. 10.) Not so. The injunction that John seeks is prohibitory, not mandatory. Courts determine whether a preliminary injunction is mandatory or prohibitory based on the last uncontested status of the parties, which here is February 3, 2022, when John was still a member and captain of the team. Consequently, John is a seeking a prohibitory injunction to place him in the position he occupied prior to the dispute. *Doe v. Siena Coll.*, 2023 WL 197461, at *12 (N.D.N.Y. Jan. 17, 2023)

11

("Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it.  The status quo is the last actual, peaceable uncontested status which preceded the pending controversy. . . . The relief sought would maintain the last actual, peaceable uncontested status" between the parties: Plaintiff would maintain his status as an active student enrolled at Siena College.) (internal citation and quotation omitted); *Doe v. Texas Christian Univ.*, 601 F. Supp. 3d 78, 95-96 (N.D. Tex. 2022) ("TCU argues that the status quo is Doe's status as a suspended student, and so the Court must favor preserving Doe's suspension.  But a more accurate description of the status quo is the last uncontested status of parties.  At bottom, [t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.  In this case, preserving the status quo requires lifting the suspension so that the Court may consider the merits with minimal harm to both parties.") (internal citation and quotation omitted).  As described below, Haverford has asserted no cognizable harm to John's reinstatement to the team (Op. Br. 18-19), whereas John has provided evidence of significant and ongoing harm that will continue if unremedied.  The purpose of the preliminary injunction is to prevent further harm to John, which fortunately also would impose no harm on the College.

**6. The Balance of Harms and Public Policy Strongly Support John's Reinstatement.**

Haverford asserts that forcing the Athletic Department to abide by the College's Sexual Misconduct Policy constitutes an unworkable burden without limiting principle on coach discretion. (Op. Br. 19.)  Quite the opposite.  If this Court were to fail to limit coach discretion through the Sexual Misconduct Policy, the result would be, essentially, that the Athletic Department would become a Title-IX-free zone, which evidently is what Haverford seeks.  Allowing that state of affairs would vitiate not only the contractual obligations of the Policy but

12

the entire Title IX framework.  If John is not reinstated, the resulting rule of law would be that Haverford, or any other college or university, could remove from a team any student-athlete facing a report of sexual misconduct, like John, pending resolution of the allegation through the Title IX process.  But it would not stop there.  If no formal complaint is filed, as was the case with John, there would be no requirement to reinstate the accused student athlete, which is the position that Haverford advocates here, asserting a combination of coach discretion and team harmony/disruption.  But so too, if a formal complaint is filed, that step certainly would not suddenly mandate the reinstatement of the student-athlete; to the contrary, the reinstatement of such a student-athlete would be even more disruptive and less harmonious than one as to which there was no formal complaint at all.[11]  Nor would it stop there.  If the accused student-athlete goes through the formal Title IX resolution process and is ultimately vindicated at the conclusion of that process, there still would be no requirement to reinstate, as the College could always assert the same combination of coach discretion and team harmony/disruption.

Now the College may protest that it would never exercise its discretion in this way, but no limiting principle would stop it from having the power to do so.  If it is willing to punish John based on nothing more than a completely false and baseless rumor that certain students believe or purport to believe, why would it not punish an alleged perpetrator facing credible allegations and substantial evidence of sexual violence who is nevertheless able to successfully fend off those allegations in a formal resolution process?  The question answers itself—it would not hesitate to punish such a person, particularly if uninformed student mobs called for the

---

[11] The College could choose to limit its ability to blacklist students to those accused of sexual misconduct for whom complainants did not wish to go forward, denying any such student access to basic privileges afforded to all other students.  Paradoxically, if a formal complaint were ever filed against a blacklisted student, Haverford would then need to restore any privileges it took away.  This interpretation of the policy is, of course, equally absurd, and would, according to the logic of Haverford's argument, be subject to overrule by coach discretion in any event.

13

perpetrator's head. This Court should not condone Haverford's attempt to thoroughly undermine not just of its contractual promises but key protections mandated by federal law.

In its two-paragraph discussion of the prospective harm to Haverford of a decision in John's favor (Op. Br. 18-19), Haverford mentions only that it would "impugn the College's ability to self-govern" and "undermine coaches' ability to do their jobs."[12] (Op. Br. 18-19.) But colleges are not owed deference when it comes to specific promises of student disciplinary processes. *See McCarty v. Yale Univ.*, No. CV166063796S, 2017 WL 4508771, at *4 (Conn. Super. Ct. Aug. 29, 2017) ("[Plaintiff's] claims fall squarely within the second exception to the judicial deference rule, i.e., failure to fulfil a specific contractual term that is distinct from the university's general obligation to provide an education . . . . [Plaintiff's] expulsion was not grounded in academic, but disciplinary reasons, and therefore, the court need not confer upon Yale the type of deference that is appropriate within the context of an academic, rather than a contractual dispute, which falls squarely within the court's competency."); *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2021 WL 664010, at *6 (D. Conn. Feb. 19, 2021) (noting that although courts will not hear "contract claims challenging the overall quality of educational programs," they will entertain claims that "the educational institution failed to fulfill a specific contractual promise distinct from any overall promise to offer a reasonable program" or that it acted "arbitrarily, capriciously, or in bad faith"); *see also Doe v. The Trustees of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 822 (E.D. Pa. 2017) (recognizing that colleges are held to specific contractual promises contained within university's disciplinary procedures).

In considering the relative harms, the Court also should bear in mind that Haverford does

---

[12] As described above on pp. 5-6 & n.8, requiring coaches to abide by the Policy would in no way undermine their ability to do their jobs; rather, it would simply require that they not use their broad discretion in a way that violates Haverford policies or federal law.

14

not assert, and John fully denies, that he has done *anything* to warrant his removal from the team. (Op. Br. 7.)[13] In other words, no party to this lawsuit thinks that John has done anything wrong. Yet somehow Haverford thinks that John should continue to be prohibited from competing in the sport he loves and forced to wear the scarlet letter with which it has branded him and to bear the ignominy, ostracism, and shame of being viewed on campus as a convicted rapist. (See testimony of John Doe at February 3, 2023, hearing; Verified Compl. ¶¶ 8, 12, 63, 64, 67-69, 73, 76, 85, 87-94, 132-136.) The Court should put a prompt stop to this ongoing unjust punishment.

The Court also should acknowledge that Haverford bears both legal and moral culpability for unlawfully removing John from the team. As John set forth in his opening brief, the College breached its contract with John by abjectly capitulating to student pressure to ignore its own policies and willingly sacrificing John rather than protecting him. At the outset, the College instead should have met with the team co-captains, who were spreading the false rumors about John through the team and the community. It should have explained to them the importance of procedural fairness and the legal protections designed, with good reason, to provide accused students with a fair process before imposing sanctions. But in an effort to pacify student rumormongers, Haverford instead ignored the opportunity to teach the most basic notions of due process and fundamental fairness, which for more than two centuries have been a cornerstone of our system of justice, not to mention principles that the Title IX regulations require to be

---

[13] Haverford asserts: "To make things perfectly clear, the College is agnostic with respect to whether Doe actually engaged in the conduct that his teammates found offensive and inappropriate. His teammates' conclusions about his character may be fair and they may be unfair." As described above on pp. 3-4 and n.8, such a hands-off approach by the College as to decisions that it agrees remain within the authority of the coach and the College would give license to discrimination on the basis of race, religion, and other legally protected classes, not to mention permit the rampant bullying of students based on rumormongering, something to which John has been subjected (as have other students) over the course of the past year. *See* Verified Compl. ¶ 73 & *passim*.

implemented in higher education disciplinary regimes.

Still opposed to upholding these principles, Haverford speculates (though not in its discussion of potential harm to the College) that reinstating John may prompt certain team members to quit—a harm that, if it were to happen at all, would flow directly from Haverford's decision to violate its policies and unjustly vilify John. Moreover, as John pointed out in his opening brief, any team members who would quit the team if John is reinstated are implicitly arguing that the procedural protections of federal law should give way to mob justice, in which their uninformed view of the truth of a rumor replaces the Policy as the mechanism for determining punishment. (Doe Br. 22-23.) The Court should afford this speculative consequence no weight, particularly when doing otherwise would require further trampling the rights of an innocent student. As John has explained, any purported disruption to the team from his reinstatement would be entirely self-inflicted, a result of the lie implicitly endorsed by the College that John is a sexual predator, would be speculative at best, and would result from the notion that the views of uninformed disgruntled students should prevail over federal law. (Doe Br. 22-23.)

Moreover, to the extent that reinstating John may make other students uncomfortable, the same can be said for virtually all cases challenging wrongfully imposed sanctions arising from alleged sexual misconduct in a college disciplinary proceeding. Since 2011, there has been a deluge of such cases challenging improper suspensions and expulsions related to sexual misconduct, and federal courts have not hesitated to grant equitable relief to students whose rights have been violated either by breach of contract or breach of Title IX.[14] A raft of judicial

---

[14] For example, https://titleixforall.com/title-ix-legal-database/ is website that maintains a database tracking since 2013 over 902 judicial decisions involving Title IX lawsuits brought against colleges and universities in sexual misconduct matters.

16

decisions too lengthy to cite has granted injunctive relief to scores of such plaintiffs and ordered colleges and universities to reinstate aggrieved students whose colleges and universities did not provide a fair process.[15]  In all of those cases, there are inevitably students that will be burdened by an injunction overturning a suspension or expulsion, most notably the complaining student in the underlying disciplinary process.  Nevertheless, courts have not hesitated to hold schools to their contractual promises and to the requirements of the law.  This Court should do the same.

Dated:  February 6, 2023                                      Respectfully submitted,

            /s/ Patricia M. Hamill
Patricia M. Hamill (Pa. Id. No. 48416)
Andrew S. Gallinaro (Pa. Id. No. 201326)
Clark Hill
Two Commerce Square, 2001 Market Street, Suite 2620, Philadelphia, PA 19103
(t) (215) 864-9600
(f) (215) 864-9620
(e) phamill@clarkhill.com
    agallinaro@clarkhill.com

*Counsel for Plaintiff John Doe*

---

[15] Unlike most cases, which involve allegations of procedural defects in an existing process, Haverford does not even pretend to have afforded John any process at all, let alone a fair one.  It acknowledges that no policy was applied, no process followed, no finding of responsibility for any offense made.  Just a coach's discretionary decision to summarily remove John, with no inquiry at all as to whether that removal was proper or legal.

17
Active\003700\00001\9888878.v4-2/6/23

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was filed on February 6, 2023 via the Court's electronic case filing system (ECF) and is available for downloading and viewing by all counsel of record.

                                                                                */s/ Patricia M. Hamill*