### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DOE,** | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | **CIVIL ACTION** |
| **v.** | **:** | **No. 23-299** |
| | **:** | |
| **HAVERFORD COLLEGE,** | **:** | |
| **Defendant.** | **:** | |

**McHUGH, J.**                                                                                      **February 14, 2023**

### MEMORANDUM

This is an action brought by a college athlete who contends that he has been unfairly excluded from team membership because of unfounded allegations that he committed a sexual assault and exhibits misogynist attitudes. He contends that Haverford College's Sexual Misconduct Policy, created to meet the requirements of Title IX, constitutes an enforceable contract, and that his removal from the team violated procedural rights conferred by the Policy. Now in his final semester of eligibility, he has moved for a temporary restraining order reinstating him to the team. The record before me leaves no question that there has been a painful tear in the social fabric of Haverford College. But as to the specific legal question before me, I conclude that plaintiff has not met the demanding standard for preliminary relief, and his motion must therefore be denied.

I.      **Relevant Background**[1]

Plaintiff is a senior at Haverford College ("Haverford") and has been a member of a varsity

sports team since his first semester as a freshman.  Compl. ¶¶ 19, 25.  Plaintiff became a captain

of his team during his junior year.  The parties agree that Plaintiff had no issues with his coaches

and teammates during his first two and a half years on the team.  *Id.* ¶ 26.

During the spring semester in 2022, a rumor began to circulate that Plaintiff had sexually

assaulted an unnamed female student on the Haverford campus.  *Id.* ¶¶ 29-33.  According to

Plaintiff, the rumor contained no specific details about the alleged assault, and Plaintiff has

consistently denied any physical or sexual contact with the student identified as the victim of an

assault.  *Id.* ¶ 3. Two of John's co-captains reported the allegation to their coach in early February

of 2022.  *Id.* ¶ 4.  The coach advised John that he was required to report allegations of sexual

misconduct due to his position and notified Haverford's Title IX Office of the allegation.  *Id.* ¶¶

37-39.  The coach suggested to John that he step away from the team until it was resolved, and

that same day Plaintiff notified his teammates via email of his intention to briefly step away from

the team.  *Id.*

The Title IX Office reviewed the information provided by John's coach and considered

whether it would open a formal investigation into the allegation.  *Id.* ¶¶ 5, 42-44.  At some point,

the Office also communicated with the alleged victim, who stated that she did not intend to file

---

[1] On a motion for injunctive relief, a court may take the well-pleaded allegations in a complaint as true so long as the parties do not present sharply divergent versions of events such that the court must make credibility determinations.  *See Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995); *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).  The parties generally agree on the basic factual outline underlying this case, and I note that Plaintiff's Complaint is verified, but where relevant I also highlight material fact disputes.

.

any formal complaint against Plaintiff. *Id.* ¶ 81. After conducting this preliminary inquiry, the Title IX Office did not open a formal investigation and communicated to Plaintiff that he could continue his life at Haverford as normal. *Id.* ¶¶ 42-44.

Shortly thereafter, Plaintiff met with his coach, informed him of the Title IX Office's conclusion, and asked to rejoin the team. *Id.* ¶ 45. The coach, however, advised John that he was no longer welcome on the team, as the other captains did not want him to rejoin. *Id.* ¶ 46. At a follow-up meeting on March 15, the coach allegedly advised John that the other captains' position was driven by their belief in the veracity of the sexual assault allegation. *Id.* ¶ 50. One week later, on March 22, Plaintiff had another meeting with his coach, the Title IX Coordinator, the Athletic Director, and the co-captains. *Id.* ¶ 56. At this meeting, his co-captains emphasized that their opposition to Plaintiff returning to the team was driven by (1) the sexual assault allegation and (2) unspecified misogynist behavior by Plaintiff. *Id.* ¶ 58-61.[2] The coach, relying on these statements by the co-captains, stated at the meeting that Plaintiff would not be allowed to rejoin the team. *Id.* ¶ 61.

Since the March 22 meeting, Plaintiff – along with his parents, grandmother, and counsel – has engaged in numerous communications and meetings with staff and administrators at Haverford to seek reinstatement to the team. In early May, Plaintiff met with the Dean of Haverford and the Athletic Director to request that he be permitted to rejoin the team. *Id.* ¶ 85. But the Dean stood by the coach's actions, emphasizing that participation in athletics was a privilege for students, not a right, and stating that John's return would lead other team members

---

[2] The coach avers in his affidavit that the other captains raised concerns about Doe's presence on the team due to *both* the sexual assault allegation and general sexist behavior by Doe. *See* ECF 13-2 at ¶ 4.

and the coach to quit.  *Id.* ¶ 86.  In August and September, Plaintiff's parents and counsel reached out to Haverford officials in the hope of resolving the issue prior to the fall semester.[3]  *Id.* ¶¶ 95-97.  Plaintiff further proposed a plan through which Haverford would assign a senior administrator who would ensure that the coach allowed Plaintiff to return to the team.  *Id.* ¶ 99.

In response, the administration rejected Plaintiff's proposed plan and instead proposed a potential path to reinstatement that involved Plaintiff meeting with his coach and a co-captain to convince them to allow Plaintiff to rejoin the team.  *Id.* ¶¶ 95, 100.  Plaintiff subsequently met with his coach on October 24, 2022.  *Id.* ¶ 107.  During the meeting, the coach acknowledged that the allegation of sexual assault was not a proper basis to keep Plaintiff off the team, but that his teammates also raised other concerns with Plaintiff returning to the team that were unrelated to the assault allegation.  *Id.* ¶¶ 108-109.  The coach would not elaborate and insisted that Plaintiff discuss these concerns directly with his teammates.  *Id*.  Plaintiff was unable to meet with two co-captains of the team until several weeks later on December 2, after the winter season had commenced.  *Id.* ¶ 112.  During the meeting, one co-captain – Captain A – was steadfast in his belief that Plaintiff should not return to the team.  *Id.* ¶ 121.  When questioned on why, Captain A noted that he had general concerns with Plaintiff's treatment of women but did not identify any specific past event or occurrence demonstrating this behavior.  *Id.* ¶ 122.

After this meeting, Plaintiff again reached out to his coach and asked to be reinstated, based on his belief that the teammates' concerns were rooted in unfounded rumors.  *Id.* ¶ 124.  The coach did not respond, and Plaintiff instead received an email from the Athletic Director and Assistant

---

[3] In September and October, Plaintiff's father and grandmother also reached out to Haverford's president via letter and email, respectively, to advocate on Plaintiff's behalf.  Compl. ¶¶ 96-97.

Athletic Director scheduling a meeting with Plaintiff on December 19. *Id.* ¶ 126. At this meeting, the Athletic Director communicated that Plaintiff's reinstatement was not in the best interests of the team, and that the Athletic Director respected the coach's discretion and autonomy in managing his roster. *Id.* ¶¶ 126-27. On January 6, 2023, Plaintiff's parents met with the Dean of the College, who refused to alter the decision of Plaintiff's coach. *Id.* ¶ 130.

Plaintiff filed this lawsuit on January 25, 2023, alleging a variety of claims against Haverford, including breach of the contract arising from Haverford's alleged failure to follow its Sexual Misconduct Policy. *See id.* ¶¶ 137-61. That same day, Plaintiff filed a motion for a temporary restraining order and preliminary injunction reinstating him to the athletic team, as he has already missed half of the team's winter season. I held a hearing on February 3, 2023, at which Plaintiff testified, and during which I allowed Plaintiff to call Haverford's Title IX Director as on cross examination.

## II.    Legal Standard

A plaintiff seeking a preliminary injunction or temporary restraining order must establish that they are likely to succeed on the merits, that they will likely suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest. *Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 855 (E.D. Pa. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The first two factors must be established first, as they are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If both factors are established, however, the district court considers the two remaining factors" and assesses "whether the balance of all four factors warrants granting preliminary relief." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021).

### III.     Discussion

####   A. **Plaintiff has not demonstrated that he is likely to prevail on the merits of his contract claim.**

To establish a likelihood of success on the merits, Doe must demonstrate that he has a reasonable chance of prevailing on his breach of contract claim.[4]  *See Mallet & Co,* 16 F.4th at 380.  This standard does not require a plaintiff to show that they are more likely to win than defendant, but "does require the plaintiff to 'demonstrate that it *can* win on the merits,' which involves a showing that its chances of establishing each of the elements of the claim are 'significantly better than negligible.'"  *Id.* (emphasis in original) (quoting *In re Revel AC*, 802 F.3d 558, 568 (3d Cir. 2015)).  Thus, Plaintiff must demonstrate a reasonable chance of establishing the following elements of a breach of contract claim: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010).

The Sexual Misconduct Policy likely represents a contract between Haverford and John Doe.  Under Pennsylvania law, "the relationship between a private educational institution and an enrolled student is contractual in nature," and a student can bring a breach of contract action when the institution "ignores or violates portions of the written contract."  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  This includes situations where an institution fails to follow established disciplinary procedures for adjudicating student misconduct.  *See, e.g.*, *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007); *Boehm v. Univ. of Pa. Sch. of Veterinary*

---

[4] My reasoning should not be taken as judgment on Doe's remaining three claims, as Doe does not address their likelihood of success in his Motion – and indeed, all three do not bear as directly on his removal from his athletic team as does his breach of contract claim.

*Med.*, 573 A.2d 575, 579 (Pa. Super. Ct. 1990).  Here, the Sexual Misconduct Policy, by its terms, applies to all students and requires that reports of sexual misconduct committed by any student "be resolved according to the procedures outlined in this Policy unless otherwise noted."  Compl. Ex. A at 4.

Under the Policy, Haverford "will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal, unless otherwise resolved through an Alternative Resolution Process."  *Id.* at 19.  The Policy does not exhaustively list all disciplinary sanctions that may be imposed, but the list of included sanctions nonetheless includes removal from an "organization, team and/or committee."  *Id.* at 24.  Here, Doe alleges that his coach sanctioned him for an allegation of sexual misconduct without a hearing and without an appeal, in clear breach of Haverford's commitments under the Policy.[5]

There is no question that Doe stepped away from the team after conferring with the Coach. I accept Doe's representation that the Coach advised him that this was the best course until the allegations were resolved and assume for these purposes that an athlete in Doe's position would accede to the wishes of his Coach.  But Doe's email to his teammates, Ex. P-2, sent shortly after his meeting with the Coach acknowledges that such a course "is in the best interest of the program," even as he expressed his "hope" to be in a position to contribute in the future.  In this context, I am hard-pressed to accept the view that the Coach dismissed Doe as a penalty, because the record

---

[5] At argument, counsel for Doe conceded that her argument is not grounded in a violation of federal policy as established by Title IX, but only in breach of contract principles.

before me supports the conclusion that Doe's status was considered temporary pending the outcome of any investigation triggered by the Coach's report.[6]

As events transpired, only a limited Title IX investigation took place because no formal complaint was filed.  From a Title IX perspective, there was no impediment to Doe returning to the team. But when he asked the Coach for reinstatement, the Coach replied that Doe's teammates objected and had raised concerns unrelated to the assault accusation, and the Coach advised Doe to pursue the matter with them.  This prompted the March 22 meeting between Doe, the Coach, the team co-captains, the Title IX Coordinator, and the Director of Athletics, at which a co-captain conveyed general concerns about Doe's attitudes toward women beyond the allegation of assault. Faced with resistance from the co-captains of the team, who purportedly represented the views of team members generally, the Coach refused to allow Doe to rejoin the team.  The attempt at dialogue did not end there.  As Doe pleads, there were further meetings with the College and another meeting between Doe and the co-captains in the Fall of 2022, without yielding any change in the co-captains' opposition to Doe rejoining the team.

For the reasons noted, I struggle to see how the Coach's actions in winter and spring of 2022 constitute a breach of the Sexual Misconduct Policy.  Even if I were to accept Doe's characterization of the Coach's actions as a penalty under the Sexual Misconduct Policy, however, subsequent events weaken Doe's claim.  As Doe pleads the case, the Coach does not currently

---

[6] I also struggle to see how the Coach's action was a sanction **under** the Policy.  Doe appears to assume that whenever a sanction listed in the Policy is imposed it can only be imposed for violation of the Policy. But many of the actions listed as potential sanctions may occur in other circumstances beyond a violation of the Policy.  Whether an official's action is a sanction under the Policy is more likely to turn on the intent of the official in taking that action.  Here, it appears likely that the Coach's statement to Doe was not meant as punishment for any of Doe's actions or behavior but was meant to preserve team cohesion while the Title IX report was addressed.

invoke the assault accusation as the basis for excluding Doe from the ongoing season.  Rather, the

Coach invokes the team's negative reaction to the prospect of Doe's return.  *See* Compl. ¶¶ 126-

27.  Indeed, in his affidavit, the Coach represents that his decision not to reinstate Doe to the team

was aimed at preventing disruption.  Specifically, the Coach avers that:

> A significant number of Doe's former teammates told me that they were deeply
> uncomfortable with Doe rejoining the team.  Many said they would quit if Doe were
> re-instated.  I decided that Doe's participation on the team would negatively impact
> the team atmosphere and severely hinder or eliminate the team's ability to perform
> to their fullest potential . . .
>
> Based on my discussion with Doe, my discussions with the co-captains and team
> members, and my own personal observations regarding the team's dynamics, I
> determined that it was in the best interest of all involved to decline Doe's request
> to rejoin the team . . .
>
> My decision was not meant to be punitive to Doe, but instead was a necessary
> operational decision to pursue optimal team performance.  My decision was not
> based on any assessment of whether Doe had, or had not, engaged in conduct which,
> if true, would have violated Haverford's Sexual Misconduct Policy.  It was based
> entirely upon my deep and sincere concern that allowing Doe to rejoin the team
> would negatively impact team performance and become a untenable distraction.

ECF 13-2, ¶¶ 10-11, 15, 17-18.  Any causal link between the Coach's initial action based on the

sexual misconduct rumor and his more recent decision is therefore highly attenuated.

Moreover, I am persuaded by Haverford's argument that the Coach's actions throughout

the process constitute a reasonable exercise of the broad discretion that team sports vest in coaches

to manage their teams.[7]  Coaches must generally consider a variety of factors – both objective and

---

[7] During Doe's effort to be reinstated to his team, Haverford amended its Student-Athlete Handbook to
emphasize the authority of a coach over a team roster, explicitly stating that participation "is a privilege
and not a right."  ECF 13-4 at 4.  I agree with Doe that Haverford was less than forthcoming in its
submissions to the Court about when the Handbook was amended, and the College's action likely represents
a *post-hoc* attempt to buttress its defense here. But having acknowledged Haverford's sleight of hand, I
view the amendment as a restatement of a generally understood principle of team sports.

subjective – in managing a team, and these factors include concerns about distractions, team cohesion, and morale. The dearth of precedent in this area could suggest that this is a proposition not seriously subject to dispute. There is, however, some guidance from case law. In a case where a coach took away a student athlete's scholarship, a *per curiam* panel of the Sixth Circuit affirmed a district court's dismissal of the action, observing that decisions as to "whether a player remains part of the team at the end of a season are, by their nature, based on a vast array of subjective, individualized assessments," and that "broad discretion . . . typically characterizes the coach-player relationship." *Heike v. Guevara,* 519 F. App'x 911, 922 (6th Cir. 2013) (cleaned up). In the context of a defamation action against a coach brought by a student-athlete whom the coach had publicly criticized, the Michigan Court of Appeals held that a coach has a duty "to act in a fashion which would promote the maximum team effort." *Iacco v. Bohannon,* 245 N.W.2d 791, 793 (Mich. Ct. App. 1976). And one district court has noted "irrational results" would follow if college disciplinary rules were "triggered any time a player was cut from a team, benched, suspended, dismissed, or otherwise suffered a material adverse change in circumstances as the result of a coach's determination that some form of discipline for the player was warranted." *Knelman v. Middlebury Coll.,* 898 F. Supp. 2d 697, 712 (D. Vt. 2012), *aff'd,* 570 F. App'x 66 (2d Cir. 2014).

Doe argues that even in the absence of another student pressing a formal Title IX complaint, he was entitled to a hearing before initial dismissal from the team and emphasizes that coaches cannot exercise their discretion in manner that violates College policy. But, as set forth above, I reject his contention that the Coach's initial action constituted the imposition of a penalty under Title IX.

Perhaps out of recognition that the Coach's actions arising from the sexual misconduct allegation are no longer the critical issue, Doe separately argues that the Coach improperly based

his current position on his teammates' more nebulous concerns over purported sexist or misogynist conduct. Doe pleads that claims by his co-captains that Doe engaged in offensive behaviors toward women also "fall within the Policy's definition of 'Other Gender-Based Misconduct,'" and therefore the Coach cannot remove Doe from the team based on these allegations without a formal investigation by the College.

Under the Policy, "Other Gender-Based Misconduct" extends to "unwelcome conduct of a sexual nature" and "sexual exploitation." *See* Compl. Ex. A at 3-4. I am not persuaded that this section of the Policy was designed or intended to address the situation which Doe now confronts. First, on the face of the Policy, allegations of general sexist or misogynist behavior do not seem to fall within this language. The Title IX Coordinator, Kimberly Taylor, conceded while testifying that if such conduct was of a sufficiently serious nature she may conduct some inquiry, but made clear that such reports do not necessarily lead to a Title IX complaint or investigation. *See* Hrg. Tr. at 82-83 (noting that the Title IX office "will look at" any report received, but "it's not always the case" that such reports "rise to the level of violating . . . our college policy"). The policy only focuses on conduct that is "pervasive . . . in creating some kind of hostile environment." *Id.* Second, it is unclear how exactly a Title IX investigation would even proceed for this type of allegation. How could the Title IX Office investigate the basis for his teammates' statements, when the record suggests that they are based more on hunches and general feelings than on any specific actions by Doe? Perhaps because such behavior does not fit within the Policy's framework, the Title IX Office never received nor investigated any complaint about Doe related to misogynistic comments. *See id.* at 83. Third and most critically, although Doe implies that such a process would result in some form of exoneration, his teammates' views appear to be unmoored from any conclusions of the Title IX process. When they were previously advised that the Title IX

coordinator found no basis for pursuing an accusation of sexual assault against Doe in the March

22 meeting, this did nothing to alter their strongly held belief that Doe had a disruptive and harmful

impact on the team.   Doe contends that in failing to reinstate him, the Coach is necessarily

communicating some form of negative judgment.  But I find it credible that the Coach's decision

is not based on any assessment of the legitimacy of the team's views but based instead on the

Coach's conclusion that Doe's presence will be disruptive and reduce team morale.  Doe himself

confirmed while testifying that at this juncture, "[t]he captains do not want me to return to the

team."  *Id.* at 62.  In short, I do not see the Title IX procedures Doe invokes as operating here to

require his continued membership on the team.

Many of the arguments Doe raises are equitable in nature, condemning "mob justice" and

stressing how unfair it is that he lacks a process through which to defend his reputation.  But the

claim on which Doe seeks injunctive relief sounds in law, not equity, and my role is not to decide

what comports with the traditional values of Haverford College or what is the appropriate course

for a coach to follow when confronted with a mismatch between one of his athletes and his team.

The specific legal question before me is whether Doe has established a reasonable chance of

success on his breach of contract claim, and I conclude that he has not.

**B.  Plaintiff cannot show irreparable harm if he does not return to his team.**

To justify a preliminary injunction, Doe must also establish that he will suffer irreparable

harm if an injunction is not issued.  *H. v. Easton Area Sch. Dist.*, 827 F. Supp. 2d 392, 409 (E.D.

Pa. 2011).[8]

---

[8] Haverford argues that Doe must meet a higher standard because he seeks to alter the status quo, citing *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).  The status quo is generally regarded as "the last peaceable, non-contested status" between the parties.  *Kos Pharms.,*

Courts are split on whether denial of athletic opportunity constitutes irreparable harm. *Compare D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019), *and Richmond v. Youngstown State Univ*., No. 4:17CV1927, 2017 WL 6502833, at \*1 (N.D. Ohio Sept. 14, 2017) (cases finding irreparable harm), *with Revesz ex rel. Revesz v. PIAA*, 798 A.2d 830, 837 (Pa. Commw. Ct. 2002), *and T.W. by & through Waltman v. S. Columbia Area Sch. Dist*., No. 4:20-CV-01688, 2020 WL 5751219, at \*8 (M.D. Pa. Sept. 25, 2020), *and Sharon City Sch. Dist. v. PIAA*, No. CIV.A. 9-213, 2009 WL 427373, at \*2 (W.D. Pa. Feb. 20, 2009) (Ambrose, J.) (opining that "it is well established that ineligibility for participation in interscholastic athletic competitions alone does not constitute irreparable harm").

If I were persuaded that Doe's absence from the team directly resulted from Haverford's failure to follow its Title IX procedures, a finding of irreparable procedural harm would readily follow.  But the record here does not strongly  support such a conclusion.  Doe's college career is quickly approaching an end, and in that respect, it can be said that the opportunity to compete for Haverford will be irretrievably lost.  But Doe points to no future consequences flowing from his ineligibility, such as loss of future opportunities as an athlete,[9] and even at this stage he could compete as an unaffiliated athlete in certain competitions, as his Coach pointed out in an email. *See* Ex. P-5.

---

*Inc. v. Andrx Corp*., 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted), but cases applying that definition often devolve into somewhat ephemeral discussions about the nature of injunctive relief.  I see no need to pursue such an analysis, as Doe has not met his burden even under the more lenient standard.

[9] Some courts have even held that this type of loss is too speculative to constitute irreparable harm. *See Revesz.,* 798 A.2d 830 at 836; *Mattison v. E. Stroudsburg Univ*., No. 3:12-CV-2557, 2013 WL 1563656, at \*5-6 (M.D. Pa. Apr. 12, 2013).

Ultimately, the harm Doe most seeks to address is reputational, and it is unclear that an injunction would provide such relief.  In addressing the controlling standard in *Reilly,* 858 F.3d at 179, the Third Circuit held that "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  It is difficult to see how an order of this Court inserting itself into the affairs of a college athletic team will provide such relief, as teammates can still express their views in a variety of ways well beyond the control of the Court.

### C.  The balance of harms weighs against granting emergency relief.

Under the controlling Third Circuit standard, the remaining two factors are of far less relevance given that Plaintiff has failed to establish the first two factors.  Nonetheless, the third and the fourth factors only strengthen my determination that preliminary relief is not warranted.

Because Plaintiff's breach of contract claim is weak and he struggles to establish that he will face irreparable harm absent a court order, Plaintiff bears a significant burden in showing that the harm he faces without an injunction outweighs the harm that Haverford will face if I enter one. He cannot meet this burden here.  There have been multiple attempts to reconcile Doe with his teammates, without success.  As noted above, the reputational benefit Doe hopes to reap would likely be minimal, and ample evidence from the record and the hearing demonstrates that ordering Haverford to reinstate Plaintiff to his former team will create substantial disruption.  Consequently, this factor weighs against granting preliminary relief.

### D.  Public interest does not weigh in favor of either party.

The last factor does not tip the scale in either direction.  Plaintiff argues that case law firmly establishes that it serves the public interest for students to receive fair treatment and adequate process before being disciplined.  *See Ritter v. State of Oklahoma,* No. CIV-16-0438-HE, 2016

WL 2659620, at *3 (W.D. Okla. May 6, 2016); *Richmond*, 2017 WL 6502833, at *1.  Haverford

marshals a different body of case law to argue that there is significant public interest in allowing

colleges to govern their internal affairs.  *See Swartley*, 734 A.2d at 921; *T.W.*, 2020 WL 5751219,

at *9.  Both parties make compelling points, and I find that these offsetting interests render this

factor neutral.

**IV.     Conclusion**

        For the reasons set forth above, Plaintiff's Motion will be denied.  An appropriate order

follows.


                                                       /s/ Gerald Austin McHugh
                                                       United States District Judge