## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE | : **Civil Action No.: 23-299** |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| HAVERFORD COLLEGE, | : |
| | : |
| COACH 1, | : |
| | : |
| CAPTAIN A, and | : |
| | : |
| STUDENT 1 | : |
| | : |
| Defendants. | : |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff John Doe ("John"), by his attorneys, files this first amended complaint

("Complaint") against Defendants Haverford College ("Haverford" or the "College"), Coach 1,

Captain A, and Student 1, and alleges as follows[1]:

## <u>THE NATURE OF THIS ACTION</u>

1.      Through this lawsuit, John attempts to remedy an injustice perpetrated against

him by Haverford, to wit, the College's illegal removal of him from the varsity team on which

he served as a captain, and its refusal to reinstate him, in violation of its own policies and of

Title IX of the Education Amendments of 1972.  He also seeks to halt the related gender-based

---

[1] This Court granted John Doe's motion to proceed under a pseudonym by Order dated January 26, 2023. (ECF. No. 6).  John Doe has identified three additional defendants by pseudonym in this First Amended Complaint (FAC) in order to preserve his own anonymity given that the identification of these individuals would allow others to associate John with a specific sports program and thereby identify him.  John Doe will serve each of these individuals with the complaint along with notification that they are the pseudonymously identified defendants.  John Doe will also supply the identities of these additional defendants to the Court.

harassment, defamation, and emotional distress to which he has been subjected, and to have the associated harm redressed. John also seeks to hold responsible individuals who initiated and spread a false and malicious rumor that he sexually assaulted multiple women, acts of *per se* defamation that have caused immeasurable damage to John's reputation.

2.      This case concerns Haverford's decision to sanction John for purported, but fictitious, sexual misconduct even though the College never received a complaint against John, never initiated an investigation into any allegations against John, never held a hearing, and never determined that John was responsible for any type of sexual misconduct whatsoever. Nevertheless, John, a varsity athlete and captain of a successful sports team at Haverford, was unceremoniously removed from his team by the College purely because of an unsupported—and false—*rumor* that he had sexually assaulted a female student on campus. And the College repeatedly denied John's multiple requests for reinstatement, offering as a basis only the false rumor and shifting pretextual explanations.

3.      From the outset, John has consistently denied engaging in any sexual misconduct. And since learning the identity of the purported victim of the falsely rumored misconduct, John has consistently denied any sexual or intimate contact at all, or indeed any physical contact whatsoever, with the purported victim.

4.      Some of the Haverford students who participated in spreading the false rumor also took action against other men at Haverford as part of a campaign of harassment intended to intimidate, bully, and punish certain male students due to their purported mistreatment of women. The gender-based harassment included online posts identifying John by name and calling on all Haverford students to "bully" him. Among the students spreading the false rumor was Captain A, one of John's co-captains, who reported the false allegation to their coach,

Coach 1.  Coach 1 notified Haverford's Title IX Office of the allegation and instructed John to step away from the team until it was resolved.

5.      Upon information and belief, Coach 1 discussed the rumor with and spread the rumor to members of the team and coaching staff.

6.      After receiving the report from Coach 1, the Title IX Office quickly concluded that the allegation was nothing more than an unsubstantiated rumor and confirmed that no purported victim had accused John of any wrongdoing.  The Title IX Office went so far as to affirmatively reach out to the student identified by the rumor mill as the purported victim, and that student confirmed that the rumor had no basis.

7.      Once the Title IX Office concluded that John was not the subject of any complaint and was a student in good standing with the College, entitled to all the rights and privileges provided by the school, John attempted to rejoin his team.

8.      Instead, Haverford informed John that because certain of his teammates continued to believe the (false and baseless) rumor, he was no longer welcome on a team for which Coach 1 had selected him as a captain just a few months prior.  By banning John from the team, the College and Coach 1 acceded to the demands of students who falsely identified John as a sexual predator, thereby depriving him—without the process required by law and by Haverford's own policies—of his final seasons of NCAA competition before he graduates in May 2023.

9.      Haverford's decision to ban John from participating in his sport and from representing Haverford as a captain on the field of play has only served to embolden the rumormongers and to exacerbate the spreading of the rumor within the student population that John is an adjudicated perpetrator of sexual violence against women.  Students now logically

assume that since John was punished, he must have been found responsible for sexual assault.

10.     Since his removal from the team, John has participated in multiple meetings with several College deans, Coach 1, his teammates, the Title IX Coordinator, and the Athletic Director, exhausting every possible avenue to resolve the unjust and untenable decision the College made to impose an athletic ban on John solely because of a rumor the College knew to be false.  John's parents have similarly corresponded with the College President and have spoken with the Dean of the College and John's Advising Dean in an attempt to resolve the unfair treatment of their son.  All to no avail—the College, through Coach 1 and with the support of the Athletic Director and senior administrators, remains steadfast in its decision to disqualify John from representing the College in his sport.

11.     The decision to remove John from his team and to prohibit his return—a decision communicated to John initially by Coach 1 and most recently by Haverford's Athletic Director and to John's parents by the Dean of the College—was an official sanction from the College imposed solely on the basis of a false rumor of sexual misconduct by John.

12.     But Haverford's policies—by which the College is contractually bound— expressly prohibit the College from imposing such a sanction for alleged sexual misconduct without a formal hearing and finding of responsibility, neither of which occurred.  The College's Sexual Misconduct Policy states in no uncertain terms: "The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  And the policy specifically identifies removal from a sports team as a disciplinary sanction the College may impose following the required hearing and determination of sexual misconduct.  The policy plainly requires that the College hold a hearing and make a determination *before* imposing any disciplinary sanction, including removal

from a sports team.  But in the case of the false rumor concerning John, the College never held

a hearing—much less found John responsible at such a hearing or permitted any appeal—

thereby breaching its contractual obligations to John as set forth in its written policies.

13.     Haverford also failed to protect John from the gender-based harassment he

experienced on campus.  John reported his harassment, including the online post calling on

students to "bully" him, to a College dean and asked Haverford to initiate a disciplinary

proceeding against those responsible.  John advised the College that he feared for his safety and

that he was being harassed and ostracized by his peers as a result of the false and malicious

rumor.  Haverford did nothing to discipline those responsible for the harassment.  Worse,

Haverford essentially ratified, and certainly fanned the flames of, the gender-based harassment

by kicking John off his team, refusing to reinstate him, and removing his name from the team

roster, thereby publicly, and falsely, portraying John as responsible for sexual misconduct—

indeed a heinous crime—that he never committed.

14.     John files this Complaint to recover the damages he experienced as a result of

the unlawful sanction that stripped him of the opportunity to compete in NCAA athletics for

two years and to compel Haverford to acknowledge and abide by its own policies.  John also

seeks to hold Haverford accountable for its deliberate indifference to, and active participation

in, the ongoing gender-based harassment John has experienced at the College and for its

defamation of him, which has effectively denied John access to the full rights and privileges of

his education and has caused John to experience severe emotional distress that has negatively

affected John's studies and required psychological counseling.  John also seeks to hold Coach 1,

Captain A, and Student 1 responsible for their defamatory statements, which have caused severe

harm to John's reputation and emotional well-being.

## THE PARTIES AND JURISDICTION

15.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a natural person, citizen of the United States, and resident of the state of New York. John is currently enrolled as a student at Haverford College.

16.     Defendant Haverford College is a private liberal arts college located in Haverford, Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania.

17.     Defendant Coach 1 is a long-time employee of Haverford College as coach of a successful varsity sports program, and a resident of the Commonwealth of Pennsylvania.

18.     Captain A is a male current student at Haverford College and a resident of the state of New Jersey.

19.     Student 1 is a female former student and recent graduate at Haverford College, and currently a resident of the Commonwealth of Pennsylvania.

20.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 because (i) the federal law claim arises under a statute of the United States, and (ii) John and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

21.     This Court has personal jurisdiction over Haverford because Haverford conducts business within the Commonwealth of Pennsylvania.

22.     This Court has personal jurisdiction of Coach 1 and Student 1 because they are residents of Pennsylvania. This Court also has personal jurisdiction over Coach 1, Captain A, and Student 1 because the conduct at issue in this Complaint occurred exclusively within Pennsylvania.

23.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because Haverford is located in this judicial district, and all of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

24.     John is a senior in good standing at Haverford who is in his final collegiate semester.  John is on course to graduate in May 2023 with a Bachelor of Arts degree.

25.     Coach 1 is an employee and agent of the College.  He is in a position of authority and influence at the College due to his long-tenured status.

26.     Haverford is a highly selective liberal arts institution, with a small close-knit community of fewer than 1500 students, all undergraduates.  Haverford is rooted in Quaker history and traditions and takes pride in the purported culture of trust and respect among its students.

27.     John chose to attend Haverford for several reasons, including both its academic rigor, with small classes and direct access to senior faculty, and its emphasis on inclusivity, respect, openness, and integrity, with fellow students who would largely share those same core values.

28.     John also wanted to continue a strong and longstanding family connection with the College.  His family has been attending Haverford since before the Civil War, and John is the fifth generation of his family to attend the College.  John first fell in love with Haverford when, as ninth-grader, he attended a Haverford reunion on campus.

29.     In addition to Haverford's strong academics and culture, and his family's close connection to the College, John was drawn to Haverford for the opportunity it presented for him to participate in intercollegiate athletics, a core reason that he selected the school.  John was a

multi-sport athlete in high school: captain of two varsity teams, all-league on another team, and a varsity letter winner in a fourth sport.  Because of Haverford's small size, John was confident that he would potentially be a competitive prospect for multiple varsity teams at the College.  In September 2018, a year before John matriculated at Haverford, when he was still considering various colleges, John reached out to his (prospective) coach, stated his interest in Haverford and his desire to join the team, and attempted to arrange an in-person meeting when John visited the College's campus.  Although their schedules did not align at that time, they corresponded, and John sought out Coach 1 when he arrived on campus in September 2019.

30.     John's confidence in his ability to make a team at Haverford was well-founded. Starting in the first semester of his freshman year, 2019, John has been a top competitor in his chosen sport at Haverford.  In the fall of his junior year, 2021, he was selected by the coaching staff as a co-captain.  John is a disciplined and dedicated athlete, a tireless worker, and an engaged and supportive teammate.  He is also a member of the Centennial Conference Academic Honor Roll.

31.     John earned his spot on the roster through his talent and dedication, and he meets all criteria established by the team, the College, and the NCAA to participate fully in intercollegiate varsity athletics.  Prior to the incidents described in this complaint, John never had an issue with any of his coaches or teammates, never had been accused of being disruptive to the team, and never had a disciplinary issue with Haverford of any kind.

32.     John's status as a varsity athlete and co-captain is a central part of his identity at school and is tangible representation of the countless hours of his life, starting at a young age, that he has dedicated to becoming the strongest athlete he can be.  John earned the right to compete for his school and to represent Haverford on the field of play.

33.     John's position on the team also has been an essential source of friendship and camaraderie for him at the College.  Team members train together and compete together, and frequently have meals together, study together, and socialize together.  The friendships he formed and the support those friendships provided have been an important part of his identity and his experience of college at Haverford.

**The Haverford Strike**

34.     In late October 2020, Haverford's senior administration issued a response to the October 26 shooting death of an African-American man by Philadelphia police that was received poorly and criticized by many Haverford students and others.  *See, e.g.,* http://haverfordclerk.com/as-black-philadelphians-are-terrorized-im-ashamed-of-what-haverford-has-to-say/.  As a result of the administration's response as well as pre-existing concerns relating to racial justice and related issues, student protests and marches took place on and near the Haverford campus, leading to a well-publicized campus-wide strike, which included the shutting down of classes and many campus activities and services.  The strike lasted approximately from October 29 through November 10.  *See, e.g.,* https://www.inquirer.com/education/haverford-college-campus-strike-students-racial-justice-20201111.html; https://bicollegenews.com/2020/11/11/haverford-strikers-declare-victory-after-final-negotiations/; https://www.hc-strike.com/index.html#about.  Captain A (before he was made a co-captain the following year) was one of the leaders of the strike.

35.     The strike and the demands by strike organizers were supported by many but not uniformly by all Haverford students and other members of the Haverford community.  *See, e.g.,* https://pols.sites.haverford.edu/studentvoices/why-i-oppose-the-strike/; https://bicollegenews.com/2020/11/06/the-strikes-lack-of-open-discussion-undermines-

community-trust/.  And students who were, or were perceived as being, less than fully aligned with all of the strike's objectives and methods, or who took actions that were perceived as "crossing the picket line," such as using certain college services or even simply studying, were at times targeted by organizers and supporters of the strike.  Students of color who opposed the strike or who (like John) were considered insufficiently supportive of it were themselves accused by strike proponents of being racist or not authentic.

36.     As a result of disagreements and tensions with respect to the strike, an atmosphere of intolerance and retaliation developed on Haverford's campus, including on some of its athletic teams.  Certain supporters of the strike refused to be on the same team as teammates who had opposed, or were seen to have opposed, aspects of the strike.

37.     One of John's friends, with whom John was closely associated, was a public and vocal opponent of the strike.  John also supported an editorial in the student newspaper that favored material change to address systemic racism but opposed the silencing of dissenting voices and *ad hominem* attacks on those who did not agree with all of the strike's methods.  As a result, despite being supportive of aspects of the strike even if not fully aligned with all of its aims and tactics, John (as well as others) became a target of strike organizers and supporters. Consequently, in late October 2020, John was summarily removed from a text stream originated by organizers of the strike and was offered no explanation when asked to be provided with a reason for his removal.

38.     In early November, John shared with a friend, who approached him with the express purpose of determining his position, that he had concerns about aspects of the strike. That individual informed him that choosing to associate with students who did not support the strike would have negative social consequences.  That friend later informed John of their

10

intention to no longer remain friends.

39.     On November 19, 2020, following the conclusion of the strike, Coach 1 sent an e-mail message to the team in which he praised Captain A's "great leadership role" in the strike, which he said would make Haverford stronger as a community and result in a better Haverford and a better team.  Coach 1 and Captain A were vocal, public supporters of the strike and clearly aligned.

40.     On April 12, 2021, Haverford campus safety found an African-American man sleeping in a campus trailer designated for Covid quarantine and alerted local police, who arrested the man, who was charged with trespass.  That same day, students in a campus text thread consisting largely of strike supporters, criticized Haverford and the police for arresting the man, accusing both of racism.  When John expressed the view that the College's call to the police did not establish racism, John himself was accused of racism and of supporting over-aggressive policing and was removed from the group discussion.

41.     On information and belief, the false and defamatory rumor directed at John, and the resulting successful removal of him from his captaincy and from the team, is a consequence of his association with opponents of the strike and the perception of his own less than unqualified support for the strike and other perceived positions inconsistent with the beliefs of strike organizers, including Captain A, and strike supporters, including Student 1.

**The False Rumor About John**

42.     In January or February 2022, unbeknownst to John, a false and vicious rumor began to circulate on campus that John had raped a female student.

43.     This rumor was entirely false—indeed fabricated out of whole cloth.  John had had no sexual or intimate contact of any kind, or any physical contact at all, with the woman

whom he later came to understand was the purported victim in the rumor as well as an originator of the rumor.

44.      John subsequently learned that he was the target of a specific campaign of gender-based harassment, which began with the invention of the rumor and continued with its circulation and propagation among the student population through both in-person communication and social media.

### Haverford's Improper Removal Of John From The Team Based On The False Rumor

45.      In late January or early February 2022, Captain A repeated the rumor to various members of the team as well as to John's other co-captains and asserted that he knew the rumor to be true.

46.      Captain A was among the original propagators of the false rumor and took direct action to ostracize John from his peers.  Captain A had purportedly received the rumor from another student and had no independent basis to believe or repeat the false rumor. Nevertheless, he took it upon himself to enlist the help of several teammates to approach Coach 1 to share the false rumor and to seek John's removal from the team.

47.      On the evening of February 3, Captain A contacted John to inform him of a captains' meeting that he had scheduled to take place in 15 minutes.  At the meeting, Captain A and the other captains confronted John with the rumor, which consisted solely of the bare allegation that he had raped an unnamed female student.  They provided no specificity whatsoever with regard to the identity of the purported victim, the date, the timeframe, the place, the context, or any other detail.  Knowing, even without receiving any associated context, that the rumor was utterly false and baseless, John denied it.

48.      On February 4, the following morning, Captain A, on behalf of himself and the

other co-captains, sent an e-mail message to John stating: "[W]e do not think it is in the best interest of the team for you to be a part of this team anymore."

49.     John did not respond to the e-mail message and instead reached out to Coach 1 to discuss the matter.

50.     Midday on February 4, John met with Coach 1.  Coach 1 advised John that Captain A had spoken with him already, that he (Coach 1) was a mandatory Title IX reporter (someone required by the College by virtue of their position to report allegations of sexual misconduct), and that he would be providing the information from Captain A to the Title IX office for further investigation.  Coach 1 shared no other information with John concerning the false rumor.

51.     During the meeting, Coach 1 instructed John to step away from the team until the Title IX process was resolved.

52.     Although John vehemently denied the false and defamatory rumor, he followed the instruction of his coach.  That afternoon, he sent an e-mail message to his teammates stating that due to "serious rumors" brought to him by the co-captains he was resigning from the team "until further notice."

53.     That evening, Captain A and the other co-captains held an athletes-only team meeting in which Captain A informed John's teammates—falsely—that John had been kicked off the team for committing sexual assault.

**Haverford's Improper Denial Of John's Reinstatement To The Team**

54.     Based on his discussion with Coach 1, John expected to hear from the College's Title IX Office, even though he knew that he had assaulted no one and had had no sexual contact with anyone that could possibly form the basis for such a claim.  After hearing nothing

for more than a week, on February 13, 2022, John e-mailed Haverford's Title IX Coordinator to request a meeting.  John wanted to learn the nature of the allegation against him, including the identity of the purported victim, and to learn whether a sexual misconduct complaint had been made against him.

55.     On February 16, John met with the Title IX Coordinator in a Zoom conference. The Title IX Coordinator advised John that Coach 1 had informed her of the rumored allegation that John's teammates had relayed to Coach 1.  She confirmed that her office had not received any formal complaint against John and further confirmed that no evidence concerning the rumor existed apart from unspecified text messages (presumably consisting of the text chain through which the rumor was spread).  John asked to review the text messages, but the Title IX Coordinator denied his request.  She also refused to describe, even generally, what the texts stated or who had sent and/or received them.

56.     The Title IX Coordinator explicitly advised John that she had seen nothing that warranted an investigation and confirmed that there was no complaint against him. Accordingly, Haverford's Title IX Office, through the Title IX Coordinator, confirmed that the College had no basis to impose any sanctions or interim restrictions of any kind against John.

57.     The Title IX Coordinator advised John during their meeting that he was, as far as the College was concerned, a student in good standing and that he should continue with his life at Haverford as normal.

58.     John then met with Coach 1, informed Coach 1 that there was no Title IX complaint pending against him and no investigation of him of any kind, said that he had been advised that he should resume his regular activities, and asked to rejoin the team.

59.     To John's shock and dismay, Coach 1 was not willing to permit John to rejoin

14

the team despite the fact that the allegation against him consisted of nothing but an unsubstantiated rumor—which John categorically denied—and the fact that John was a student in good standing with the College.  Coach 1 said only that the co-captains did not want him on the team but failed to offer any justification for their sentiment or for his acquiescence to it. Coach 1 instead stated that they should all meet to discuss the matter after the upcoming spring break.

60.     Haverford has no written policy that gives varsity student athletes the authority to make decisions regarding team roster or membership.  Coach 1 had full authority to restore John's membership to the team, and he did not need permission from or agreement by any students to do so.  Moreover, allowing students to impose sanctions for alleged or even actual sexual misconduct is contrary to Haverford's Sexual Misconduct Policy.

61.     Nevertheless, in an attempt to be cooperative and to quell the false rumor that had so badly maligned John and his reputation, on March 14, the first day after spring break, John sent an e-mail message to Coach 1 and his co-captains asking to schedule the meeting prior to his rejoining the team.

62.     The next morning, on March 15, Coach 1 responded directly to John only and requested that the two of them meet alone before any meeting with the co-captains.  John met Coach 1 in his office later that day.

63.     Coach 1 advised John that he had discussed the sexual assault allegations with John's co-captains, who were adamant that John not be allowed back on the team because of their belief in the rumors spread by Captain A and others, which John knew to be false and of which he had been cleared by the Title IX Office.  John pointed out that the players had no authority to dictate the team roster, which Coach 1 did not dispute.

64.     Nevertheless, Coach 1 proposed to schedule a larger meeting with not only the co-captains, but also Haverford's Athletic Director and the Title IX Coordinator.

65.     Again, attempting to be cooperative, John agreed.  John particularly hoped that hearing directly from the Title IX Coordinator would alleviate the concerns of his coach and teammates.

66.     Upon information and belief, Coach 1 had no intention of allowing John to rejoin the team when he suggested the meeting.

67.     In an apparent effort to find some other, pretextual, basis to exclude John from the team, Coach 1 requested that John meet him for a training session on March 18 so that he could assess John's fitness level.  John complied with the request, met with Coach 1, and demonstrated that he was athletically fit to compete.

68.     On the day of the purported fitness test, before actually starting the test, Coach 1 reiterated to John that he had spoken with John's teammates about the rumors and confirmed that the team members did not want John back because of their belief in the rumor.  John again denied that there was any truth to the rumor and reiterated his desire to resume his position as a co-captain of the team.  The exchange with Coach 1 during the fitness test was distressing to John given that Coach 1 continued to give credence to the false rumor, despite his denials and the lack of an actual complaint or even a shred of factual support.

69.     On March 22, John participated in the in-person group meeting that his coach had scheduled, with: (i) the Title IX Coordinator; (ii) the Athletic Director; (iii) a Senior Associate Dean of the College; (iv) Coach 1; and (v) the co-captains.

70.     During the meeting, the Title IX Coordinator confirmed for all in attendance that no complaint had ever been filed against John and that no Title IX investigation was ongoing or

contemplated.

71.     Despite this confirmation, Captain A spoke at length during the meeting, accusing John of sexually assaulting multiple women and stating that John should not only be kept off the team but prohibited from otherwise using College athletic and other facilities. Captain A stated that he did not care about the lack of a Title IX complaint because, in his view, victims do not trust the Title IX process.  Captain A stated, in words or substance, that he believed the rumor and that the lack of a Title IX complaint was not an indication of the absence of an underlying issue, but rather the absence of faith by the purported victim in reporting it.

72.     During the meeting, Captain A read aloud the text message he said he had received from another Haverford student and through which he had purportedly learned of the rumor.[2]  In that message, the other student said that they had already sent the rumor to two of John's friends and intended to spread it as broadly as possible across campus.

73.     The meeting lasted roughly 90 minutes, and nearly all of it focused on the (false) sexual assault allegations Captain A had made against John and how those presumptively true allegations made other members of the team—to whom Captain A repeated the allegations— feel, John's lack of repentance for something that he did not do, and whether it was possible to change Haverford's policies to make it *easier* to remove individuals from varsity sports teams simply based on a rumor or allegation of sexual misconduct.

74.     During the meeting, Captain A also made a groundless and generalized smear against John's character, specifically calling John a misogynist.  He and one other co-captain for the first time raised the vague notion of additional unspecified instances of other purportedly

---

[2] John understood the text message that Captain A read was from someone other than the purported victim, so that Captain A was relying on second-hand, whisper-down-the-lane allegations.

offensive behavior toward women, despite pointing to no actual instances of improper conduct. Because they were unable to provide a single example of any specific conduct John had engaged in that formed the basis of their attacks, and none existed, it became apparent to John that the smears were simply designed to offer a pretextual basis to keep him off the team given the lack of substance to the false sexual assault rumor.

75.     Despite the inability of John's co-captains to identify anything to support their untenable position other than the false rumor and the pretextual false smears, Coach 1 sided with John's co-captains in the March 22 meeting.

76.     Coach 1 stated repeatedly during the meeting that John had mental health problems and should leave school to get serious psychological help—clearly and unmistakably indicating his firm belief that the rumor was true.  Coach 1 also declared that John would not be permitted to rejoin the team.  Coach 1 made this decision unilaterally, despite the absence of a complaint or anything other than a fact-free rumor to suggest that an actual victim ever existed.

77.     The Title IX Coordinator, the Athletic Director, and the Associate Dean said nothing in response to Coach 1's decision, but their silence ratified the decision to sanction John based on the rumor and to ban him from participating in his sport.

78.     John was visibly shaken and traumatized by the personal attacks he experienced during the meeting, so much so that the Associate Dean in attendance pulled him aside at the conclusion of the meeting to ask if he was OK and subsequently contacted John's Advising Dean to check in on him.

**The Fallout From Haverford's Improper Decisions**

79.     As a result of Haverford's removal of John from the team and rejection of his request for reinstatement, John was exiled from the sport he loves and from a team on which he

had been selected as a captain just months prior.  The College imposed this sanction based on a student-led campaign of harassment.

80.    John's separation from the team was already known by team members, and the denial of his reinstatement also quickly became known.

81.    Haverford removed John's name from the team roster published on its website, effectively publicizing even beyond the membership of the team itself the fact that John had been punished by the College.

82.    Given Haverford's small size and tightly intertwined community, the College's decision to ban John from his sport, to strip his title of co-captain, and to remove him from the team website had the immediate impact of legitimizing, both to team members and to students across the campus, the otherwise threadbare allegation rumored to exist against John.  The sanction effectively ratified the false notion that John had committed a sexual assault and only intensified the harassment and ostracism to which John had been subjected following his removal from the team.

83.    Following his removal from the team, John was immediately rendered persona non grata by his former teammates.  Teammates with whom he had formerly trained and competed, with whom he shared meals and socialized, immediately started ignoring him, isolating him on Haverford's campus.  That treatment has continued to date.  And not only has John been socially shunned generally, he has been told both by former teammates and by non-team friends that they can no longer associate with him as a result of the rumor.

84.    On March 23, 2022, the day after the meeting in which he denied John's reinstatement to the team, John's coach added insult to injury by sending an e-mail message to John repeating the same defamatory statements he made during the meeting that John had

psychological problems or some form of mental illness that he should address by withdrawing

from Haverford and seeking counseling.  In his message, Coach 1 stated:

> I strongly feel that you will benefit greatly by getting out of here,
> NOW, and getting some really good psychological therapy. . . .  I
> think that is your best chance of getting well.  Even if you can't
> continue classes I think you would be better off leaving. . . .  You
> also . . . need to confront some issues that are keeping you from
> fulfilling your potential.  Get that help now, as soon as you can and
> start moving towards a brighter future.

85.     John forwarded Coach 1's e-mail message to his Advising Dean the next day.

86.     On March 25, John happened upon the Dean of the College and introduced

himself.  The Dean had received Coach 1's March 23 e-mail message from the Advising Dean,

and he told John that the message was inappropriate and that Coach 1 was in no position to

suggest that John should leave Haverford.

87.     Separately, John's Advising Dean confirmed later that day that she, the Athletic

Director, and the Dean of the College were all in agreement that Coach 1's March 23 e-mail

message was improper—a conclusion that they also communicated in a telephone call with

John's mother on April 15—and that Coach 1 had no basis for suggesting that John should

leave Haverford.  Yet they did nothing to correct the improper sanction that Coach 1 had

imposed against John, banning him from the team.

88.     In late March 2022, John learned that the campaign of gender-based harassment

extended to social media, and that he was not the only target.  On March 27, Student 1, while

still a Haverford student, authored two Instagram posts accessible to hundreds, possibly

thousands, of people, which identified John by name as first in a list of six male Haverford

students Student 1 accused of being sexual predators.  The post identified the group of male

students, including John, as sexual assaulters and called on all Haverford students to harass and

intimate them, stating specifically: "everyone should also bully them."  The post questioned how these six male students were permitted to remain at the school and stated that any students who remain friends with them "sicken me."  The posts were not only false but encouraged harassment and violence against John.  John showed these posts to his Advising Dean the next day, and, at her request, sent them to her on April 1.

### Haverford's Refusal To Reconsider Its Improper Decisions And Failure To Address The Campaign Of Harassment

89.     Between March 23 and May 5, 2022, John met with his Advising Dean *eight times* to discuss the unfair sanction imposed by the school, as well as the ongoing gender-based harassment he was experiencing and the impact it was having on his studies and emotional well-being.  They also discussed the unfairness of the process to which John had been subjected and the generally toxic social climate on campus.[3]

90.     On April 7, John formally requested in writing that Haverford convene a disciplinary panel to investigate the actions of the students, including Student 1, involved in the gender-based harassment he had experienced since early February that had resulted in his removal from the team, the denial of his reinstatement, the destruction of his reputation, and the public call to bully him and five other men based on purported sexual assaults.  John's message identified the students, including Captain A, he believed were responsible for initiating and continuing the harassment.

91.     In his request, John wrote: "I went from being a respected leader on a team that I

---

[3] For example, Haverford's honor code, which is written by students and ratified annually by the student body, expressly provides that a student's expression of political beliefs that are not in keeping with "community standards" may violate the honor code.  *See* https://www.thefire.org/news/july-2021-speech-code-month-haverford-college.  Students face disciplinary action up to and including separation from the College for infractions of the honor code.  The Foundation for Individual Rights and Expression (FIRE) ranks Haverford College in the bottom 30% of colleges in the country for its restrictions on free speech. *Id.*

have been a part of since my first semester on campus to a persona non grata amongst my

teammates. . . . I have been unable to practice or participate . . . and I have been menaced by

coaching staff, teammates, and individuals on campus."

92.     Two days later, on April 9, John requested in writing, in an e-mail message to his

Advising Dean, that the College restore him to the team and asked for a plan of action to do so.

93.     The College ignored John's requests.  John's Advising Dean said only that she

would see what she and others might be able to do to "support" John but did not convene a

disciplinary panel or otherwise respond to his request to discipline the students responsible for

his ongoing gender-based harassment.  And the College provided no tangible support to him.

94.     On April 15, at John's request, John's Advising Dean and the Dean of the

College spoke with John's mother by telephone to discuss the treatment John had experienced

from the students and Coach 1.  During the call, both deans acknowledged that Coach 1 had

failed to handle the rumor appropriately and had otherwise behaved inappropriately.  They

agreed that Coach 1 should have contacted the administration regarding the rumor rather than

taking matters into his own hands.  They further acknowledged that Coach 1's March 23 e-mail

message was improper.

95.     During the conversation, John's Advising Dean and the Dean of the College also

said that they had spoken with Captain A, whom they described as a powerful social figure on

campus, and told him that it was not appropriate for him to be involved in this issue—spreading

rumors and getting John kicked off the team.  They said that the Athletic Director would speak

to Coach 1 and led John's mother to believe that they would handle the situation and have John

reinstated onto the team.

96.     Both deans also disclosed during the call that the Title IX Office had reached out

to the student who had initiated the rumor—the purported victim of the fictitious sexual assault—and that, as part of an otherwise confidential communication, she had confirmed that she would not be filing a complaint against John and had never intended to file a complaint against him.

97.     John believes he knows the identity of the female student who was contacted by Haverford's Title IX Office and who was rumored to be a potential victim.  John has never had sexual relations or intimate contact of any kind—or indeed any physical contact whatsoever at any point in time—with this person.  Therefore, John avers upon information and belief that the female student did not just advise Haverford that she would not be filing a complaint, but also advised Haverford that she would have no basis to do so because she had never had sexual contact with John.

98.     Upon information and belief, Haverford has actual knowledge that the only identifiable rumored "victim" of sexual assault has denied the rumor.

99.     Several weeks later, on May 4, John had a follow-up meeting with the Title IX Coordinator.  During this meeting, the Title IX Coordinator told John that she had spoken with the two students involved in the initial spreading of the false rumor, Captain A and the female student who purportedly told Captain A that John had assaulted one of her friends.  The Title IX coordinator told John that she had told both of them that her office was available to assist someone in making a Title IX complaint, not to entertain rumors, and that no complaint existed against John.  She reiterated to John that there was no complaint against him and redirected him to the Dean's Office for any further assistance.

100.     The next day, May 5, John met with the Dean of the College and the Athletic Director to again pointedly request reinstatement to the team and to discuss the ongoing

mistreatment to which John was subject, in part due to the misperception among the student population that John had been sanctioned and disqualified from his sport for committing sexual assault.

101.    The Dean of the College and the Athletic Director did not agree to John's request to be reinstated.  The Dean said that the situation between John, Coach 1 and his co-captains was too contentious, that John's return would only aggravate the situation, and that John's desire to rejoin the team would lead other team members and Coach 1 to quit.  He said that the best solution was for John to remain excluded from the team.  The Dean and the Athletic Director, who is also the Athletics *Diversity & Inclusion* Designee, justified their decision to exclude John by stating that his ability to participate in athletics was a privilege, not a right, and that Coach 1 did not want to have him on the team.  As a result, the semester and school year ended with no resolution.

102.    Apart from being unjustly kicked of the team and denied reinstatement, John suffered from, and has continue to suffer from, a diminished ability to perform his academic work both in and outside of the classroom as a result of the abuse and ostracism to which he was and has been subjected.  He needed multiple extensions during the spring 2022 semester to complete his academic work, and, as a result, was forced to take an incomplete in one of his courses, which he was required to make up over the course of the summer.

103.    John's mood, confidence, and overall mental health also suffered and have continued to suffer.  And as the 2022 fall semester approached, he dreaded his return to a campus on which he felt unwelcome and where he feared further bullying and intimidation.

**Haverford's Continued Failure To Address The Campaign Of Harassment In The Fall 2022 Semester**

104.    John's fears were well-founded.  During the fall 2022 semester, John continued

to experience harassment and ostracism.  For example, in early September, shortly after returning to campus, John was physically assaulted during an outdoor Haverford social event. Specifically, he was intentionally body-checked by a student whom he did not know but whom he believes to be a friend of one of the individuals spreading the false rumor.

105.    Also in early September, John walked up to greet a friend whom he had not seen since the end of the preceding (2021) fall term.  She told him that she had heard the rumor spread by Captain A and Student 1 about John and informed John that she could not be friends with him any longer.  She has not spoken to John and has ignored him since.

106.    And John continues to be shunned by his former teammates.  Early in the semester, hoping that their treatment of him might be different following the summer break, John attempted to engage in the dining center with former teammates with whom he used to be friends, and they completely ignored him.  With one or two exceptions, all of his teammates have all continued to ignore him since.

107.    In early November, John encountered one of his former teammates in the weight room.  The teammate said that he believed the rumor that had been circulated by Captain A about John because it was not the kind of rumor that people made up.  John told the teammate that what he was hearing was untrue, but the teammate did not believe him.

108.    As a result of these kinds of experiences, John felt, and has continued to feel, compelled to limit his interactions with other students and spent, and has continued to spend, most of his time studying in his dormitory room unless going to class, getting meals, or working out, with very little campus social interaction.

**Haverford's Sham Plan To Reintegrate John Onto The Team**

109.    As detailed above, Haverford not only has failed to protect John from a

campaign of gender-based harassment and abuse, but also has in fact endorsed that treatment by ratifying an unjust punishment for rumored, but nonexistent, sexual misconduct. Worse still, throughout the fall 2022 semester, the College held out to John the carrot of reinstatement to the team while simultaneously leading John down a dead-end path—a path that continued to vest in John's teammates, in particular Captain A, the power to maintain his exclusion from the team based on the false rumor of sexual misconduct.

110.     John reached out to Haverford through his parents and through counsel prior to the start of the fall 2022 semester, in August and September 2022, again to request that Haverford permit John to rejoin the team and address the ongoing gender-based mistreatment John was experiencing on campus. But rather than affirmatively fixing the situation— reinstating John on the team and taking steps to stop the mistreatment he had received and was still receiving—the College instead endorsed fact-free innuendo against John that attempted to justify that mistreatment. It also proposed a sham path to "reintegration" that effectively required John to convince Coach 1 and Captain A—both of whom had caused his unjust removal in the first place and blocked his reinstatement at every turn—that they should permit him to rejoin the team. Needless to say, they did not.

111.     On September 2, John's father sent a detailed letter to Haverford's president describing the campaign of bullying, harassment, intimidation, and ostracism by fellow students based on the false rumor, and the ratification of that rumor by Haverford through its unwarranted and unjust removal of John from the team. That letter received no response.

112.     On October 6, John's grandmother sent an e-mail message to Haverford's president attempting to appeal to her and the College's integrity and values, asking that the College not accept unfounded rumors as evidence of guilt and instead choose to support a

young man who had done nothing wrong but had experienced the consequences of a culture of bullying. That e-mail message received no response.

113.    The only response that was forthcoming from the College came through its lawyer, who initially spun a yarn, counter to all facts, that John had *voluntarily* quit the team and, what's more, that he was *never denied* reinstatement by Coach 1 or anyone at the College. Indeed, according to counsel, John was, and had always been, welcome to rejoin the team and needed only to ask, completely ignoring the litany of requests John had made and meetings in which he had participated that were designed to do just that.

114.    Nevertheless, taking the College at its word, on September 9, John proposed a plan through which Haverford would assign a senior administrator to oversee his reintegration onto the team and to support and protect him. The monitor would meet with Coach 1 to convey that John would be welcomed back as a co-captain of the team. Coach 1, in turn, would hold a team meeting to convey that John had been the subject of a rumor but that no complaint against him ever existed and that, regardless, Haverford policy is that he would be entitled to the presumption of innocence, the same presumption anyone is afforded when accused of misconduct. Coach 1 also would convey that it is antithetical to Haverford's principles to exclude someone from a College activity based on an uncorroborated rumor and that any attempt by team members to exclude or shun John would not be tolerated.

115.    Haverford rejected John's proposal. On September 20, Haverford sent a letter stating that John "can return to the team" but that first he had to reach out to Coach 1 to discuss "how he intends to play his own role in contributing to a positive team environment" and then he also would have to participate in a meeting with Coach 1, Captain A, and the other new co-captains (none of whom had been captains in March 2022).

27

116.    The letter also raised again the vague smears, first leveled in the March 22 meeting, which it falsely described as "personal observations" of what the co-captains deemed to be "offensive behaviors toward women."

117.    The co-captains raised no personal observations of purportedly offensive conduct toward women or anyone else by John in the March 22 meeting or any other time. Indeed, to this date, neither Captain A nor any other captain, team member, other student, or college employee has specified a single instance of purportedly improper or offensive conduct by John toward women or anyone else.

118.    As John pointed out in a responsive letter on September 30, Haverford's proposal was designed to fail.  It required John, the victim of false rumor and subsequent innuendo, again to plead with Coach 1, who on four previous occasions had denied or refused to reinstate him and who repeatedly had told him that the other co-captains did not want him on the team.

119.    John's September 30 letter noted that further discussions with Captain A and other co-captains would be pointless.  Those conversations had already taken place and consisted of little more than a verbal attack on John and an unwillingness by his attackers to believe that the rumor that John had committed sexual assault was untrue.  Captain A had previously made clear his belief at the March 22 meeting that despite the lack of a complaint he continued to believe the rumor and would act to make sure that John stayed off the team regardless.

120.    John's September 30 letter also noted that despite the denials by John, and the lack of any complaint or evidence of misconduct whatsoever—or even a specific allegation as to any time, place, or manner of any purported assault—the College appeared still to credit the

vicious false rumor and the subsequent smears rather than to believe John, the victim of that

false rumor.  John had identified significant and ongoing harm to himself through bullying,

shunning, and a rush to judgment based on nothing more than a false rumor, to which he had

been subjected by Coach 1, Captain A, Student 1, and other students.  And the bullying and

ostracism of John was continuing, with no protection by the College.  This harm remained

unaddressed, indeed unacknowledged, by the College.

121.    Nevertheless, despite his misgivings with the College's proposed approach, and

recognizing that no other path existed, short of filing a lawsuit, that could lead him back onto

the team, John agreed to attend the meetings in good faith in an attempt to be cooperative and to

rebuild his relationship with his teammates and to rejoin the team.

122.    John met first with Coach 1, on October 24, 2022.  The meeting was also

attended by a dean who acted as facilitator for the discussion.  John and Coach 1 also each had a

"support" person present, in John's case his Advising Dean.  Both support people were

Haverford administrators who said nothing during the meeting and, in John's case, said nothing

before or after the meeting either.

123.    In the meeting, Coach 1 acknowledged to John that the rumor of a sexual

assault—which was unsubstantiated, unalleged through any complaint from any purported

victim, and unequivocally denied by John—was not a proper basis to keep John from rejoining

the team.

124.    But Coach 1 also raised the pretextual specter of the smears as a basis to keep

John off the team, stating that John's teammates had concerns other than the rumored sexual

assault.  He said that those purported "other concerns" formed the basis for the desire of those

teammates to prevent John from being permitted to rejoin the team, although he did not know

what they were.

125.    John asked Coach 1 to describe the other teammates' concerns.  Not only did Coach 1 not know what these purported "other concerns" were, he evidently had no interest in learning what they were.  Coach 1 said that he would not participate in John's ensuing meeting with Captain A and the other (new) co-captains.  Instead, John should meet with the co-captains alone.

126.    Recognizing that he had been the target not only of the false rumor but of subsequent false innuendo, John immediately after the meeting with his coach asked the dean facilitator to reconvene the meeting so that he could get clarification from his coach as to the co-captains' (purported) "other concerns," asking specifically what those concerns were so that John could address them.  But Coach 1 refused to reconvene the discussion and told the dean facilitator that the co-captains were the ones from whom John should obtain clarification regarding their (purported) other concerns.

127.    Despite John's expressed willingness to make himself available to meet at any time, Haverford did not schedule John's meeting with the co-captains until December 2, five and a half weeks later, after the start of the team's season.

128.    John subsequently learned that between the time he met with Coach 1 on October 24 and with his teammates on December 2, the College was in the process of surreptitiously amending its athletic policy to attempt to provide it with a post-hoc policy-based justification for its foregone but improper decision that John would not be permitted to rejoin the team.  In November 2022, Haverford secretly updated its Student-Athlete Handbook (the "Handbook"), without providing notice to John or to anyone else, and without changing the name of the document (still "HC_STUDENT-ATHLETE_HANDBOOK_19-20") or updating

on its cover the effective date of the policy (still September 1, 2019).

129.    The only apparent change that the College made to the Handbook was the

insertion of the following paragraph:

> ROSTER MANAGEMENT.  Being a varsity athlete at
> Haverford College is a privilege and not a right.  Varsity
> coaches have broad discretion in determining the individuals
> who make up his or her team's active roster.  This discretion
> includes, but is not limited to, removal from the roster at any
> time.  Should you feel that you were removed from the team
> unjustly, you can submit an appeal to the director of athletics.

130.    Prior to the surreptitious insertion of this language, the Handbook was silent on

the issue of removing students from team rosters.  However, while John was in good faith going

through the process the College designed ostensibly to provide him with a path back to team

membership, Haverford deliberately delayed that process while secretly changing the Handbook

in an attempt to provide a policy-based justification for keeping him off the team.  The College

then used this backdated, secretly-inserted provision as the principal basis for its legal argument

that both its removal of John from the team back on February 4, 2022, and its ongoing denial of

his reinstatement later in February 2022 and subsequently, were proper under Haverford's

policies.  (Doc. No. 13 at pp. 1, 8, 11.)

131.    Once Haverford had changed its policy and finally allowed John to meet with his

teammates to discuss his reintegration, not all four captains chose to participate—only Captain

A and one other (new) co-captain decided to do so.  Haverford appointed the same dean to act

as facilitator for the meeting and to guide the discussion.

132.    In the protracted lead-up to that meeting, John continued to engage with the

College in good faith but also continued to express his reservations.  Anticipating that Captain

A would raise the pretextual smears and innuendo as a basis for his purported unwillingness to

permit John to rejoin the team, John sent an e-mail message to the dean facilitator on October

26 in which he stated:

> As you know, I was asked to step away from the team, and
> prevented from returning at the insistence of [Captain A] (as well
> as a previous captain), based on a false rumor, which was the only
> concern raised at the time.  After I confirmed that no actual
> complaint against me existed (and not having had intimate contact
> with anyone that could even form the basis for a complaint), I
> repeatedly met with [Coach 1] and, on each occasion, was told that
> the other co-captains did not want me on the team.  In the last
> meeting, on March 22 (with [Coach 1], the co-captains, and
> others), [Captain A] for the first time, raised the vague notion of
> other unspecified "concerns," but when asked for more detail so
> that I could respond, was not able to provide any (other than
> generally saying, without providing a single example, that I made
> misogynistic comments, which is something that I do not do).
> So, I remain concerned that the current process will require me
> once again to defend myself against false and vague rumors that
> attack my character.  I am also worried that I will be at the mercy
> of other students, one of whom initially confronted me with the
> rumor and ever since has insisted on my removal from the team
> and blocked my reinstatement.  At the March 22 meeting, he was
> unwilling even to consider that the rumor was untrue, stating that
> just because there wasn't a Title IX complaint did not mean the
> rumor was untrue.
>
> Even though I have these concerns, I have agreed to participate in
> this process in good faith, and will continue to participate even
> though it feels to me like the goalposts have shifted from a
> decision which I understood would be made by [Coach 1] to a
> decision heavily influenced by (even if not formally made by) the
> other co-captains.

133.    John's message went on to express his concern that the meeting with Captain A

and another co-captain not be a repeat of the "group pile-on" that happened at the March 22

meeting, and to make two requests: (i) separate meetings with each co-captain to reduce peer

pressure and (ii) that the dean facilitator push the co-captains to provide specific examples of

any complaints they or others had regarding his behavior.

134.    Both of John's requests were refused.  The dean facilitator wrote back to John to

say that he would not push the co-captains to answer any specific questions and that John would

have to ask individuals to state their specific concerns and then ask clarifying questions.

135. The next day, October 27, John wrote back to the facilitating Dean:

> I was expressing my concern that these meetings not be a repeat of what happened last spring, where vague accusations were made against me that I had a great deal of difficulty responding to, other than to say they were not true. And [Coach 1] again mentioned that the co-captains might have concerns, but he didn't know exactly what they were. So if any of them has specific concerns to share with me, I simply wanted to know what they were.

136. In early November, John came to learn that his coach was spreading lies to team members that John was trying, through his lawyers, to have Coach 1 fired.

137. So, on November 13, John again wrote to the dean facilitator to express his concerns both regarding Captain A's influence in a group setting and with respect to Coach 1's continued lack of open-mindedness to his reinstatement:

> Even though I am agreeing to a group meeting, that does not lessen my reservations about a group meeting, given my experience with the pile-on at the March 22 meeting. I'm also not convinced that a group meeting will allow each captain, individually, a chance to speak openly and to hear my experience without the group pressure. I say all of this given the history of one captain [Captain A], who has a lot of influence, having persistently sought to keep me off the team. Another told me as recently as a week ago that he still believes the false rumor . . . [I also learned] that [Coach 1] said I was trying, through my lawyers, to have him fired. This is not true, but it is the kind of false accusation and group pressure I've been dealing with and am concerned about. I wanted you to have this background as the person whose role it is to facilitate a civil dialogue.

138. In the days leading up to the meeting, the dean facilitator e-mailed John and the two co-captains (which included Captain A) to set the ground rules. Among the goals he laid out were to "[c]onfront past misunderstandings" and to "discuss potential of [John] returning to the team." The facilitator's e-mail message also asked the students to be "as specific as possible" when discussing any grievance that they had with one another.

139.    The meeting took place on December 2, 2022.  The facilitator, John, Captain A, and a new co-captain attended.  John was again accompanied by his Advising Dean, who acted as his "support person" but who again said nothing before, during, or after the meeting.

140.    During the facilitated discussion, Captain A repeated the allegation that John has committed sexual assault and indicated that he was steadfast in his view that John should not be permitted back on the team.  Notably, the new co-captain, who had not been part of any prior discussions, admitted having only attenuated knowledge of the rumor and its promulgation.  In other words, the new co-captain had only third-hand information of the second-hand information on which Captain A relied to malign John's character.

141.    Despite the facilitator's instruction to be specific in identifying issues, Captain A only generally said that he (purportedly) had issues with John's treatment of women.  Neither he nor the new co-captain did or could identify any event or occurrence that concerned them, nor could they provide a specific example of anything John had ever said or done toward women or otherwise to substantiate their statements about John's character.  Captain A expressed his concern that it would be difficult to explain John's prospective return to the team to other teammates and that John's return would make team leadership look bad.

142.    As John pressed Captain A and the new co-captain for the basis of their purported concerns, it became clear that the two co-captains were still crediting, or at least purporting to credit, the false rumor and that their belief that John had committed sexual assault was the only basis for their statements about John.  John reiterated to his two teammates that the rumor was false and baseless and that false allegations were not a reason to exclude him from the team.

143.    Following the meeting with the two co-captains, and having heard nothing from

his coach or the College in the immediate wake of the meeting, John e-mailed his coach again

on December 14 to request that he be reinstated.  His message described the meeting with the

two co-captains and asked Coach 1 to put him back on the team:

> As I am sure you know, I had my meeting with two of the captains
> at the end of the week before last. . . .  As I have repeatedly
> expressed, I would like to be back on the team, and I hope that you
> see that I have taken this process seriously and participated fully.
>
> I assume that you have been informed that any concerns that the
> captains may have had are based only on the one unsubstantiated
> rumor that I have repeatedly stated is not true.  I also understood
> you to recognize in our meeting that it was not a basis for my
> continuing to be kept off the team.  I know you were under the
> impression that the captains may have had additional information
> beyond that false rumor, but they confirmed at the meeting that
> they do not.
>
> It would seem that these two meetings have served to resolve any
> remaining doubts that may have existed concerning the original
> basis for my stepping away from the team or any other
> concerns.  So I believe that I should be able to rejoin the team, and
> am ready to do so.

144.    John's coach did not respond to the e-mail message.  Instead, John received an e-

mail message the following day from the Athletic Director asking John for a meeting.  The

Athletic Director informed John that the Assistant Athletic Director (a lawyer) also would be

present and that the purpose of the meeting was to inform John of the status of his membership

on the team.

145.    On December 19, John met with the Athletic Director and the Assistant Athletic

Director in a Zoom conference.  The meeting was extremely brief, lasting less than ten minutes.

The Athletic Director told John simply that Coach 1 had decided that "it was not in the best

interest of the team" for John to rejoin.

146.    When John asked the Athletic Director why Coach 1 felt this way, she read a

prepared statement from Coach 1 stating that his decision was based on unspecified "feedback"

following his meetings with John and John's meeting with the two co-captains.  When John asked for the reasoning behind the decision, the Athletic Director said that Coach 1 had full discretion and autonomy with respect to managing the roster.  John asked if the decision was fair to him, which the Athletic Director deliberately misinterpreted, answering only that it was fair for coaches to manage their rosters.

147.    John asked pointedly whether the false rumor was the basis for Coach 1's decision to exclude him, to which the Athletic Director responded (falsely) that she did not have any information about the rumor or whether it was the basis for the decision.  John finally asked why Coach 1 was not present to explain his decision, to which the Athletic Director had no response.

148.    In fact, just as in the spring 2022 semester, Coach 1 was never open to John's return to the team in the fall 2022 semester and did not participate in good faith in the College's purported attempt to have John reintegrated onto the team.  Recognizing that the rumor was not a sound basis to keep John off the team, he instead relied on equally unsound pretextual innuendo involving unspecified generalized concerns about John's behavior—about which he admittedly had no knowledge—thereby effectively turning the reinstatement decision over to Captain A.  Meantime, he poisoned the well by spreading lies to the captains about what John was purportedly doing to have him fired, in an attempt to corrupt the College's already deeply flawed sham plan that was (purportedly) designed for John's reinstatement.

149.    On January 6, 2023, John's parents had a conference with the Dean of the College both to try to understand the bewildering and manifestly unjust treatment their son had received, and continued to receive, by Haverford and its agents over the course of nearly a year and in an attempt to convince the College to correct course.  Neither goal was successful.  The

36

Dean refused to alter the decision excluding John from the team.

150.    Like Coach 1, and like Captain A, the Dean raised the bogeyman of the purported existence of other unspecified concerns within the team, none of which by his own admission he actually knew or could state but all of which he purportedly thought were a valid reason to keep John off the team.  Like the Athletic Director, he emphasized the unfettered discretion that coaches have to manage their rosters, emphasizing that this discretion represented a change in policy that had been communicated to all varsity team members the previous semester.  He also cited "team disruption," by which he meant that the very teammates who watched Haverford unjustly and illegally kick John off the team and repeatedly refuse his reinstatement, and who consequently had spent months ostracizing and harassing John as a Haverford-branded sexual predator, might be disturbed by the unexplained return of such a person to the team and so might want to quit the team.

**Haverford Has Inflicted And Continues To Inflict Harm On John**

151.    As a result of Haverford's actions, John was excluded from participating on his team between February and May 2022.  He has already missed the start of the current season and, without judicial relief, will lose the ability to participate in the final season of his collegiate career.

152.    Even though John has a completely clean disciplinary history and is a student in good standing with the College, his reputation at Haverford has been destroyed by the false rumor and successful smear campaign carried out by several students with the assistance of Haverford's coaching staff and ratified by Haverford's administration.  Haverford's administrative staff, including the Athletic Director, several deans, and the Title IX Coordinator have all supported the decision of John's coach to ban him from sport for arbitrary, capricious

*and false* reasons.  The false rumor against John now bears the imprimatur of an official college sanction, further entrenching the misconceptions held by John's peers.

153.    The way Haverford has chosen to manage this situation is antithetical to the Quaker values of civil confrontation and community restoration that the College purports to endorse as a central aspect of its unique identity.  Rather than foster a fair and just solution to a situation that Haverford knows was created by lies spread by students, the College has cast aside its values and prostrated itself to the demands of a small group of students whose assertions about John are false and malicious.

154.    John continues to be the target of unchecked gender-based harassment and ostracism by his peers at Haverford.  His college experience has been devasted by the false and malicious rumor and its mishandling by the College, which senselessly allowed it to form the basis of an official College sanction.

155.    John has received and continues to receive psychological counseling to help him cope with the stress and anguish he has experienced and continues to experience through harassment, bullying, and ostracism by his peers, as well as by the College's explicit acceptance and even tacit endorsement of this treatment.  Haverford not only has done nothing to protect John from the harassment, but also has acceded to the demands of the harassing students by imposing an unjustified, character-impugning sanction against John.

**COUNT I**
**Breach of Contract**
**Against Haverford College**

156.    John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

157.    Haverford maintains a Sexual Misconduct Policy (hereafter "the Policy") that

prohibits "Sexual Harassment" as that term is defined by Title IX of the Educational

Amendments of 1972 and its implementing regulations.  The Policy was promulgated in 2020

pursuant to and in compliance with the May 6, 2020 amended Title IX Regulations issued by

the Department of Education and codified in the Code of Federal Regulations at 34 CFR Part

106.  The Policy specifically prohibits "any conduct on the basis of sex that is alleged to have

occurred in a College Education Program or Activity," which "a reasonable person would

determine to be so severe, pervasive, and objectively offensive such that it effectively denies a

person equal access to the College's Programs or Activities."  (A true and correct copy of the

Policy is attached hereto as **Exhibit A**).

158.    The Policy prohibits Sexual Assault among other types of sexual misconduct.

159.    The Policy also prohibits "unwelcome conduct of a sexual nature, including but

not limited to . . . verbal or nonverbal conduct of a sexual nature that is sufficiently serious,

pervasive, or persistent as to create an intimidating, hostile, humiliating, demeaning, or sexually

offensive working, academic, residential, or social environment under both an objective and

subjective standard" (Ex. A at p. 3).

160.    The Policy establishes Haverford's exclusive procedures for addressing alleged

sexual misconduct violations.  It states that "[r]eports of Sexual Misconduct committed by any

student or employee (including faculty and staff) of the Haverford community **will be resolved

according to the procedures outlined in this Policy**, unless otherwise noted." (Ex. A at p. 4)

(emphasis added).

161.    The Policy promises its students that "**[t]he College will not issue a

disciplinary sanction arising from an allegation of Sexual Misconduct without holding a

Hearing and permitting an Appeal**, unless otherwise resolved through an Alternative

39

Resolution Process."  (*Id.* at p. 19) (emphasis added).

162.    The Policy allows the College to address formal complaints from individuals

alleging to be the victim of sexual harassment, as well as anonymous reports of violative

conduct.  (*Id.* at p. 9).

163.    The Policy makes clear that "[a]ny person may report Sexual Misconduct in

person, by mail, by telephone, or by electronic mail, using the contact information listed for the

Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving

the person's oral or written report."

164.    The Policy further provides that "[o]nce an individual provides a report of

Sexual Misconduct, the report will be reviewed by the Title IX Coordinator. . . .  Using the

information gathered through the Online Reporting Form, the College will promptly contact the

Complainant to discuss appropriate Supportive Measures and to explain the process for filing a

Formal Complaint. . . .  Complainants are not required to respond to outreach from the College

and the College will respect this decision, with limited exceptions where it is obligated by law

or to act in the safety interest of the community."  (*Id.* at p. 8).

165.    Upon receipt of a formal complaint, the Policy sets forth detailed procedures for

resolving the allegations through either an "Alternative Resolution Process" or a formal

"Resolution Process."  (*Id.* at pp. 15-26).

166.    Under the Alternative Resolution Process, the College may reach an

"Administrative Resolution" whereby the responding student admits responsibility.  In that case

the parties will be given the opportunity to attend a "sanctions hearing" with an advisor, and to

submit impact statements for the panel's consideration in determining an appropriate sanction.

The College must issue a written decision regarding the sanction imposed.  (*Id.* at p. 16).

167.    Pursuant to the Alternative Resolution Process, the College may also initiate a Facilitated Resolution.  The Policy provides that "Parties may elect to enter an Alternative Resolution Process at any time after the filing of the Formal Complaint and prior to a Determination Regarding Responsibility if both the complainant and the respondent provide informed written consent."  In that case a trained facilitator will attempt to mediate a negotiated resolution between the parties that must be memorialized in a written agreement. (*Id.* at p. 17).

168.    The filing of a Formal Complaint by a Complainant or by the Title IX Coordinator triggers the College's formal Resolution Process, which in turn mandates a detailed set of procedures for the investigation, hearing, determination, and appeal processes that must be followed.  (*Id.* at pp. 14, 17 – 25).  Certain of these processes, including the provision of a Notice of Allegations, the conducting of an Investigation, the holding of a Hearing, and the permitting of an appeal, also are required before the College can impose any disciplinary sanction for sexual misconduct, regardless of whether a Formal Complaint has been filed.

169.    Either party may appeal the responsibility and/or sanction determination, and the College must issue a written decision detailing the rationale for either granting or denying the appeal.

170.    Upon a determination of responsibility, the Policy permits Haverford to impose a range of sanctions on the responsible student, including "**Removal from** organization, **team** and/or committee;" "**Revocation of leadership** or supervisory **position**;" and "loss of campus housing **or other privileges.**"  (*Id*. at p. 24) (emphases added).

171.    The Policy prohibits the College from disciplining students facing allegations of sexual misconduct without a formal determination of responsibility.  (*Id.* At p. 19) ("The College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct

41

without holding a Hearing and permitting an Appeal, unless otherwise resolved through an Alternative Resolution Process.")

172.    The Policy makes only one exception for removing students from a College program or activity in the absence of a formal determination of responsibility.  Under a section titled "Emergency Removal," the Policy provides: "The College may remove a Respondent from the College's Education Program or Activity on an emergency basis, where the College (1) undertakes an individualized safety and risk analysis and (2) determines that an immediate threat to the physical health or safety of any student or other individual arising from the allegations of Sexual Misconduct justifies a removal."

173.    Haverford did not conduct an individualized safety and risk analysis nor did it determine John posed an immediate threat to anyone before removing John from the Haverford varsity athletics program.  Nor did any such threat exist.

174.    By reporting to the Title IX Coordinator the allegation that John had sexually assaulted a female student, John's coach invoked and initiated the Policy.

175.    Consistent with the Policy, the Title IX Coordinator contacted the alleged victim to determine if she would like to pursue a formal complaint and determined that she did not.  In fact, the alleged victim confirmed that she was not assaulted by John.

176.    Consistent with the Policy and based on the facts and information available to her, the Title IX Coordinator determined that the safety interests of the community did not justify any action by Haverford with respect to sexual misconduct allegedly committed by John.

177.    The College did not pursue its Formal Resolution Process, or its Alternative Dispute Resolution Process with regard to any allegations that it received concerning John's purported sexual misconduct.

178.    The College made no determination of responsibility finding that John had actually committed any sexual misconduct.  Nor did the College hold any hearing to determine whether John had committed any sexual misconduct.

179.    Accordingly, the College was prohibited under the Policy from imposing any sanction against John for any reported alleged sexual misconduct.

180.    Similarly, to the extent John's coach, Captain A, and/or any of John's other co-captains reported that John had engaged in misogynistic and/or sexist behavior toward women—despite their inability to point to any examples of John's conduct to support that allegation—such allegations also fall within the Policy's definition of "Other Gender-Based Misconduct – unwelcome conduct of a sexual nature."

181.    As such, John was entitled to the procedural protections promised by the Policy before the College could sanction him with removal from his team and loss of his leadership position as co-captain for those allegations as well.

182.    By permitting John's coach, as an agent of the College, to sanction John with removal from the team based on John's reported sexual misconduct, Haverford breached the procedural protections promised to John under the Policy and violated its promise not to impose sanctions associated with sexual misconduct without a formal hearing and a finding of responsibility.

**<u>COUNT II</u>**
**Violation of Title IX Deliberate Indifference to Sex/Gender Discrimination 20 U.S.C. §§ 1681, et seq.**
**Against Haverford College**

183.    John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

184.    Title IX provides in relevant part that "[n]o person in the United States shall, on

the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

185.    Haverford College is a recipient of federal funds and is therefore bound by Title IX and its regulations.

186.    As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from sexual harassment and assault, discrimination based on gender, and retaliation for having exercised rights protected by Title IX.

187.    A federally-funded educational institution violates Title IX if it has actual knowledge that a student is being subjected to gender-based harassment and fails to reasonably respond to protect the student.

188.    Haverford had actual knowledge that John was the target of gender-based harassment, which included students and coaching staff spreading false and defamatory allegations that John had committed sexual assault and engaged in other purported misogynistic behavior.

189.    The harassment John experienced was part of a larger campaign against a group of male students who had been identified as sexual assaulters by a contingent of students.  The group of men, including John, were subjected to cyber-bullying, verbal harassment, as well as exclusion from social and collegiate groups and organizations.

190.    Haverford had actual knowledge of the sex-based harassment John experienced because John reported it to his Advising Dean and provided her with evidence in the form of a copy of the social media posts from a female Haverford student calling on the community to

bully John and five other male students.

191.    John requested that disciplinary action be taken against the students who were responsible for spreading the false allegations about John and for attempting to incite harassment and potential violence against John and the other male students identified in the post.

192.    Haverford took no action to discipline any of the students involved and permitted the campaign of harassment to continue unchecked.  With regard to Student 1 and her public social media posts calling on students to bully John, Haverford likely ignored John's request to initiate a disciplinary proceeding against her both because she was a woman and also because she was ostensibly, though wrongfully, standing up for women by spreading accusations concerning men she may have believed (incorrectly and without basis in the case of John and likely others) had assaulted women on campus.

193.    Haverford participated in the campaign of harassment by publicly removing John from his sports team at the request of his harassers, without any legitimate basis to do so, thereby creating and reinforcing a misperception that John had committed sexual misconduct.

194.    Haverford's improper sanction against John created a false impression that the College had found him responsible for sexual assault, which it had not, and only served to intensify the harassment John experienced on campus—all of which John reported to the College.

195.    John was subjected to a hostile educational environment and excluded from the rights and privileges he had earned as a student-athlete in good standing with the College.

196.    At all relevant times, Haverford exercised substantial control over the students and employees that participated in the harassment.

197.     Haverford acted with deliberate indifference to the acts of sex/gender-based harassment by failing to take any action to prevent them, deter the students and/or employees responsible, and/or protect John from sex-based harassment.

198.     Haverford also acted with deliberate indifference to acts of sexual harassment by failing to take immediate, effective remedial steps to resolve John's allegations of sex/gender-based harassment.

199.     Haverford's repeated failure to respond promptly and appropriately to the harassment caused John, on the basis of his sex, to be denied from receiving the benefits of Haverford's educational programs and activities in violation of Title IX.

200.     Haverford acted intentionally and with deliberate indifference to the repeated denial of John's access to educational opportunities or benefits.

201.     John is entitled to an injunction requiring Haverford to take substantial steps to remedy its deliberate indifference to John's reports of harassment and sex-based discrimination and to restore the rights and privileges it wrongfully stripped from John.

## COUNT III
### False Light – Defamation
### Against Haverford College and Coach 1

202.     John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

203.     Haverford and Coach 1 were aware that John's teammates had accused him of sexual misconduct, including but not limited to sexual assault and sexual harassment of women on campus.

204.     Haverford and Coach 1 were aware that John's teammates had no evidence to support their allegation and that the allegation that John had committed sexual assault were

literally false.

205.    Despite Haverford's and Coach 1's knowledge of the falsity of the claims against John, Haverford and Coach 1 imposed an official sanction against John based solely on those allegations.

206.    Haverford's and Coach 1's decision to sanction John by publicly stripping John of his leadership position as captain, removing him from the sports team, and deleting his name and information from the team website was done in the context of rumored sexual misconduct allegations and created the appearance that John had been found responsible for sexual assault.

207.    Haverford and Coach 1 were aware of and recklessly disregarded the risk that their actions would place John in a false light among the student, faculty, and staff population at Haverford as well as across the athletic league in which John competes.

208.    Haverford and Coach 1 are well aware of the significant social stigma attached to allegations of sexual assault, that reasonable people would take serious offense to such a label, and were indifferent to the harm its actions caused to John.

209.    John experienced threats, harassment and humiliation as a result of being mislabeled by Haverford and Coach 1 through the unlawful sexual misconduct sanction they imposed against him.

## COUNT IV
### Intentional Infliction of Emotional Distress
### Against All Defendants

210.    John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

211.    As detailed in this Complaint, Defendants' conduct in knowingly participating in a false campaign of harassment against John was extreme and outrageous.

212.     Captain A and Student 1 knew or should have known that the allegations they made against John and repeated to others throughout campus were false.

213.     Haverford had actual knowledge that the female student John was rumored to have assaulted affirmatively denied the veracity of the allegation.  Haverford also had knowledge that the other allegations being leveled against John by other students and the College's own coaching staff were completely without basis.

214.     Despite this knowledge, Coach 1 and Haverford's Athletic Director sanctioned John for an unsubstantiated and false rumor that John committed sexual assault.

215.     Coach 1 and Haverford's Athletic Director intended their conduct to inflict severe emotional distress, or knew there was at least a high probability that their conduct would cause severe emotional distress to John.

216.     As a result of the above-described conduct, John has suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including shame, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

### COUNT V
**Defamation**
**Against Coach 1, Captain A, and Student 1**

217.     John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

218.     At all times relevant to this complaint, Plaintiff John Doe has been a private figure.

219.    Prior to the acts by Defendants as set forth above, Plaintiff was well-regarded in the Haverford community and known to be a person of good name and reputation.

220.    Defendants each communicated to multiple third parties that John Doe committed sexual assault and did so with knowledge of the falsity of the allegation or with reckless indifference as to whether the allegation was true or false.

221.    Captain A made false allegations to at least John's classmates, teammates, coaches, and several administrators at Haverford in an attempt to pressure Haverford to remove John from his team and to prevent his reinstatement after Haverford's Title IX Office confirmed that no complaint against John existed.

222.    Student 1 published social media posts identifying John by name and accusing John of sexually assaulting women.  Her posts called on others to bully John with the intent of harming his reputation in the Haverford community and of deterring third parties from associating with him.

223.    Upon information and belief, Coach 1 repeated the allegation that John sexually assaulted women to at least his assistant coaches and student team members.  Coach 1 also stated during a March 22, 2022 meeting attended by several team members and Haverford administrators, in direct response to the sexual assault allegations being leveled against John, that John needed serious psychological help and should leave the Haverford campus, thereby indicating that John had committed the heinous acts of which he was accused.

224.    The defamatory statements were defamation per se in that the communications contain words accusing Plaintiff of sexual misconduct and/or criminal conduct.

225.    Defendants did not have a privilege to make the defamatory statements about Plaintiff.

226.     As a result of the above-described conduct, John has suffered and continues to suffer severe reputational harm, great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress including shame, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

<u>COUNT VI</u>
**Tortious Interference with Contract**
**Against Captain A and Student 1**

227.     John Doe repeats and re-avers each and every paragraph above as if fully set forth herein.

228.     A contract exists between Haverford and John Doe.  Haverford offered John Doe enrollment in December 2018, and John Doe accepted that offer by paying tuition and enrolling in the Class of 2023.  As part of his enrollment, Haverford required John Doe to comply with the Policy.

229.     Pursuant to Pennsylvania law, the Policy forms the basis of a contractual relationship between Haverford and John Doe.

230.     Under the Policy, Haverford was required to provide John Doe with a hearing and make a determination of responsibility before removing him from a sports team for sexual misconduct.

231.     Captain A and Student 1 knew of the Policy but pressured the school and the larger community to act against John despite the lack of any complaint, hearing, or finding of responsibility against John.

50

232.     During the March 22, 2022, group meeting involving the Title IX Coordinator, the Athletic Director, the Senior Associate Dean, Coach 1, the co-captains, and John, Captain A advocated for a change in College policy to permit the continued exclusion of John from the team, as well as his exclusion from the College's athletic facilities more generally and from certain other College services, despite the absence of a determination, or even a formal complaint, of sexual misconduct.

233.     By interfering in the manner described above, Captain A and Student 1 prevented Haverford from following the process outlined in the Policy designed to afford procedural protections to John before the imposition of a sanction.

234.     The interference by Captain A and Student 1 with the contract between Haverford and John Doe was improper, unprivileged, and lacked any legal justification. Captain A and Student 1 intended to deprive John Doe of the fair treatment that the Policy afforded him.

235.     As a result of the conduct described above, John Doe has suffered and continues to suffer great pain of mind and body, shock, emotional distress, and physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliations, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from obtaining the full enjoyment of life and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, John Doe demands the following relief:

a.     An award of compensatory damages in an amount exceeding $75,000 to be determined at trial;

b.     The issuance of an injunction ordering Haverford to restore John Doe's name to the team roster reflecting his membership for the 2021/2022 and 2022/2023 seasons and to reverse the sanction removing John from the team;

c.     An award of nominal damages as well as the costs and expenses of suit;

d.     Attorneys' fees; and

e.     Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff John Doe demands a trial by jury on all issues so triable.

Dated:  March 21, 2023

                                           */s/ Patricia M. Hamill*
                                           Patricia M. Hamill (Pa. Id. No. 48416)
                                           Andrew S. Gallinaro (Pa. Id. No. 201326)
                                           Clark Hill
                                           Two Commerce Square, 2001 Market Street,
                                           Suite 2620, Philadelphia, PA 19103
                                           (t) (215) 864-9600
                                           (f) (215) 864-9620
                                           (e) phamill@clarkhill.com
                                               agallinaro@clarkhill.com

                                           *Counsel for Plaintiff John Doe*