# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JOHN DOE | **:**  **Civil Action No.: 23-299** |
|  | **:** |
| Plaintiff, | **:** |
| v. | **:** |
|  | **:** |
| HAVERFORD COLLEGE, | **:** |
|  | **:** |
| COACH 1, | **:** |
|  | **:** |
| CAPTAIN A, and | **:** |
|  | **:** |
| STUDENT 1 | **:** |
|  | **:** |
| Defendants. | **:** |
|  | **:** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## THE HAVERFORD DEFENDANTS' MOTION TO DISMISS

Patricia M. Hamill (Pa. Id. No. 48416)
Andrew S. Gallinaro (Pa. Id. No. 201326)
Clark Hill
Two Commerce Square, 2001 Market Street,
Suite 2620, Philadelphia, PA 19103
(t) (215) 864-9600
(f) (215) 864-9620
(e) phamill@clarkhill.com
     agallinaro@clarkhill.com

Date:  May 11, 2023

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 3

      A.      Facts Related to John's Removal from His Team in Violation of the Sexual
             Misconduct Policy ................................................................................... 3

             1.      Haverford's Sexual Misconduct Policy—The Relevant Contract .............. 4

             2.      Haverford's Removal of John from the Team and Subsequent Denials of
                    His Requests for Reinstatement in Violation of the Sexual Misconduct
                    Policy ............................................................................................... 6

      B.      Further Facts Relevant to John's Title IX Claim .................................... 9

III.    LEGAL STANDARD ....................................................................................... 11

IV.     ARGUMENT ................................................................................................... 11

      A.      Haverford Impermissibly Disputes the Complaint's Well-Pleaded Factual
             Allegations. ........................................................................................ 11

      B.      The Complaint States a Claim for Breach of Contract. ......................... 13

             1.      John Plausibly Alleges that the Sexual Misconduct Policy Applies to the
                    False Allegation of Sexual Misconduct Against Him. ............................ 16

             2.      John Plausibly Alleges Haverford Breached the Sexual Misconduct Policy
                    by Removing Him from the Team. ......................................................... 18

             3.      John Plausibly Alleges that He Has Suffered Damages as a Result of
                    Haverford's Breach of the Sexual Misconduct Policy............................. 22

             4.      The Handbook Addition Does Not Apply, and Coach Discretion Does Not
                    Displace the Sexual Misconduct Policy.................................................. 23

      C.      The Complaint States a Title IX Claim.................................................. 25

             1.      John Has Adequately Asserted Prohibited Gender Bias by Haverford in
                    Violation of Title IX. ......................................................................... 26

                   (a)     Haverford's Failure to Address John's Complaint of Campus
                          Harassment Was Gender-Based and Violated Title IX. .............. 27

                 (b)     The Unrelenting Harassment and Bullying John Has Faced and
                            Continues to Face on Campus Is Sex-Based.............................. 31

             2.      The Amended Complaint Asserts Sufficiently Severe Harassment to
                      Withstand a Motion to Dismiss.................................................... 34

              3.      Haverford's Abject Failure to Respond to John's Complaint of
                    Harassment Was Clearly Unreasonable.................................................. 37

      D.      The Complaint States a Claim for False Light....................................... 38

             1.      The College Publicized John's Removal from The Team (Falsely
                    Implying He Committed Sexual Assault) to John's Teammates, the
                    College, the League, and the Public at Large. ........................................ 39

2.    Any Statements by Coach 1 that Support the False Assertion that John
Committed Sexual Assault or was Mentally Ill Cannot Be Privileged..... 42

E.    The Complaint States a Claim of Defamation Against Coach 1. ......................... 45

F.    The Complaint Alleges Sufficient Extreme and Outrageous Conduct to Survive a
Motion to Dismiss............................................................................................. 47

G.    The Complaint States a Claim for Declaratory Judgment. .................................. 49

V.    Conclusion ................................................................................................................. 50

ClarkHill\L7233\459349\271590039.v2-5/11/23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agriss v. Roadway Exp., Inc.*,
  483 A.2d 456 (Pa. Super. 1984).............................................................45

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................11

*Bhatti v. Republican Caucus of Pennsylvania House of Representatives*,
  2020 WL 3412661 (M.D. Pa. June 22, 2020)........................................41

*Bishop v. Okidata, Inc.*,
  864 F. Supp. 416 (D.N.J. 1994) ...........................................................47

*Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*,
  392 Pa. Super. 502, 573 A.2d 575 (1990).............................................16

*Byars v. Sch. Dist. Of Philadelphia*,
  942 F. Supp. 2d 552 (E.D. Pa. 2013) .........................................39, 41, 46

*Casselli v. City of Philadelphia*,
  54 F. Supp. 3d 368 (E.D. Pa. 2014) .....................................................42

*Chicarella v. Passant*,
  494 A.2d 1109 (Pa. Super. 1985)..........................................................46

*Constantakis v. Bryan Advisory Servs., LLC*,
  2022 PA Super 81, 275 A.3d 998 (2022)...............................................45

*Davis v. Wells Fargo*,
  824 F.3d 333 (3d Cir. 2016)...........................................................11, 15

*Dempsey v. Bucknell Univ.*,
  76 F. Supp. 3d 565 (M.D. Pa. 2015), *aff'd* 834 F.3d 457 (3d Cir. 2016)..........................42, 46

*Doe v. Brown Univ.*,
  43 F.4th 195 (1st Cir. 2022)...........................................................48, 49

*Doe v. Manor College*,
  479 F. Supp.3d 151 (E.D. Pa. 2020) .....................................................33

*Doe v. Princeton*,
    790 F. App'x 379 (3d Cir. 2019) ...........................................................................30

*Doe v. Princeton Univ.*,
    30 F.4th 335 (3d Cir. 2022) ...........................................................11, 28, 29, 30, 32

*Doe v. Purdue University*,
    928 F.3d 652 (7th Cir. 2019) ...............................................................................26

*Doe v. The Trustees of the Univ. of Pennsylvania*,
    270 F. Supp. 3d 799, 827 (E.D. Pa. 2017) ...........................................................48

*Doe v. Univ. of Cincinnati*,
    No. 1:15-CV-600, 2015 WL 5729328 (S.D. Ohio Sept. 30, 2015) .......................22

*Doe v. Univ. of Scis.*,
    961 F.3d 203 (3d Cir. 2020)........................................................................11, 26, 29

*Douglass v. Garden City Cmty. Coll.*
    2023 WL 34439 (D. Kan. Jan. 4, 2023)................................................................34

*Frazer v. Temple Univ.*,
    25 F. Supp. 3d 598 (E.D. Pa. 2014) .....................................................................36

*Ganden v. National Collegiate Athletic Association*,
    1996 WL 680000 (N.D. Ill. Nov. 21, 1996) .........................................................22

*Hoffman v. Davenport-Metcalf*,
    851 A.2d 1083 (R.I. 2004).....................................................................................48

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)...............................................................................................33

*Jane Doe v. Ohio University*,
    No. 2:21-CV-00858, 2023 WL 2652482 (S.D. Ohio Mar. 27, 2023).....................36

*Jane Doe v. Sch. Dist. No. 1, Denver, Colorado*,
    970 F.3d 1300 (10th Cir. 2020) ...........................................................33, 34, 35, 36

*Krajewski v. Gusoff*,
    53 A.3d 793 (Pa. Super 2012)...............................................................................38

*In re Lansaw*,
    424 B.R. 193 (Bankr. W.D. Pa. 2010) .................................................................41

*Maier v. Maretti*,
    671 A.2d 701 (Pa. Super. 1995).............................................................................44

ii

*Maxson v. YRC Inc.*,
   2015 U.S. Dist. Lexis 92451, 2015 WL 4394272 (D.N.J. July 16, 2015) ............................47

*McCafferty v. Newsweek Media Grp.*, Ltd.,
   955 F.3d 352, 360 (3d Cir. 2020) ...........................................................................................42

*McShea v. City of Phila.*,
   606 Pa. 88, 995 A.2d 334 (2010) ...........................................................................................16

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007).................................................................................................................49

*Musko v. Musko*,
   697 A.2d 255 (Pa. 1997) .........................................................................................................24

*Nemitz v. Reuben H. Donnelley Corp.*,
   310 A.2d 376 (Pa. Super 1973)...............................................................................................23

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
   38 F.3d 1380 (3d Cir. 1994)....................................................................................................11

*Pace v. Baker-White*,
   432 F. Supp. 3d 495 (E.D. Pa. 2020) .....................................................................................43

*Rankin v. Phillippe*,
   211 A.2d 56 (Pa. Super. 1965)................................................................................................45

*Reardon v. Allegheny College*,
   926 A.2d 477 (Pa. Super. 2007) .............................................................................................16

*Richmond v. Youngstown State Univ.*,
   2017 WL 6502833 (N.D. Ohio Sept. 14, 2017).......................................................................22

*Swartley v. Hoffner*,
   734 A.2d 915 (Pa. Super. 1999)..............................................................................................16

*T.W. v. Southern Columbia Area School District*,
   No. 4:20-CV-01688, 2020 WL 5751219 (M.D. Pa. Sept. 25, 2020).......................................22

*Umland v. PLANCO Fin. Servs., Inc.*,
   542 F.3d 59 (3d Cir. 2008)......................................................................................................11

## Statutes

20 U.S.C. § 1681(a) .......................................................................................................................25

28 U.S.C. § 2201(a) .......................................................................................................................49

**Rules**

34 C.F.R. § 106.45 ................................................................................................5

Fed. R. Civ. P. 8(a)(2)........................................................................................11

Fed. R. Civ. P. 12(b)(6)....................................................11, 12, 13, 15, 19, 25, 29, 38

## I.      INTRODUCTION

John Doe filed this case because he has been deeply wronged by a college that his family trusted and held in the highest regard.  John matriculated to Haverford because he believed, as did his family, in the Quaker values espoused by the College including community and integrity. Those values proved illusory, as Haverford appears to have abandoned them in favor of intolerance and bullying, a problem that its president and senior administrators not only ignore but foster.

John was railroaded by Haverford based on nothing more than false rumor and innuendo. He was falsely accused and defamed—through the College's rumor mill, not even by an actual complaint—of the rape of a student with whom John had never in his life had any sexual or physical contact of any kind.  Yet Haverford, despite finding no substance whatsoever to the false rumor, decided against following its own rules—rules Haverford established, and that the Department of Education mandates—to provide procedural fairness to the students whose lives are upended by allegations of sexual misconduct.

Instead of protecting and supporting John, Haverford immediately and continuously sided with his defamers, kicking him off the varsity sports team on which he served as a captain and repeatedly reaffirming his removal and pariah status.  He was verbally and physically bullied, shamed, ostracized, and labeled a sexual predator by former team members and other students who believed, or purported to believe, the rumor.  And the College not only did absolutely nothing to protect him or to stop or redress the bullying—despite his multiple explicit requests that it do so—but rather continued to affirmatively side with the rumormongers.  John's own coach repeatedly defamed John—based on nothing other than the false allegation that the coach

endorsed—stating that John not only had to be removed from the team but had mental problems and should be separated from the College until he could get well.

While Haverford calls it regrettable that John has turned to the legal system to stand up to his bullies and false accusers, John finds it more regrettable still that he has been forced to do so not only by Haverford's failure to protect him from them but by the College's active support of their conduct. John is not a rapist. John is not a misogynist. John is not mentally ill. And he is undeserving of the mistreatment to which he has been subjected by Haverford.

Without evident embarrassment, in its motion to dismiss John's complaint, Haverford describes the bullying and persecution to which John has been and continues to be subjected as no more than "social differences among members of its student body." It says that John or his persecutors, which include the College itself, may be "right or wrong." It describes its role solely as supporting students through their "academic" careers at Haverford. To address defamation and bullying and the unjust removal from a varsity sports team, Haverford expects the victim to participate in "discussions" with his bullies, whom it describes as "members of the community with whom he has faced discord" in a purported effort to restore the victim's "social standing with his peers." The absence of any moral, let alone legal, sense of responsibility by the College for John's treatment, not to mention the current climate of the College, is breathtaking.

As set forth at length below, Haverford's effort to dismiss John's entire case relies on contesting John's allegations with preliminary factual determinations made in the absence of discovery and based on limited testimony, which John is confident he will overcome on a full record. But on this motion to dismiss, the well-pleaded facts that John alleges must be taken as true, and all reasonable inferences from them drawn in his favor. John alleges that his coach removed him from his varsity sports team because of the false allegation of sexual assault. That

decision violates Haverford's Sexual Misconduct Policy.  John alleges that the College ignored and failed to protect him from sex-based harassment when he requested help at the same time it bent over backward to identify the rumored victim of that fictitious assault and, without her even asking for help, encouraged her to make use of the College's complaint procedures.  That violates Title IX.  John alleges that the College and his coach removed him from the team under circumstances that led to only one inescapable conclusion—that he was responsible for sexual assault—which had immediate real-world consequences for John as the calls for his bullying and exclusion flowed immediately from that decision.  That is false light and defamation.  And the College engaged in this conduct knowing the allegation against him is false.  That is intentional infliction of emotional distress.  For the reasons that follow, John's Amended Complaint presents a viable case as to each of the counts he has asserted, and Haverford's motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Facts Related to John's Removal from His Team in Violation of the Sexual Misconduct Policy

John is a senior at Haverford and was a member of a varsity sports team starting in his first semester as a freshman.  (Am. Compl. ¶¶ 24, 30.)  He was one of the team's strongest competitors and was made a captain during his junior year in recognition of his athletic prowess and leadership skills.  John's coaches had no issues with John during his first two and a half years at Haverford.  (*Id.* ¶ 31.)

That changed early in 2022, during the spring semester of his junior year, when a false and malicious rumor began to circulate on campus that John had raped an unnamed female student.  (*Id.* ¶¶ 42-44.)  The rumor contained no specificity whatsoever with regard to the identity of the purported victim, the date, the timeframe, the place, the context, or any other detail.  John has consistently denied engaging in any sexual misconduct.  And after learning the

3

identity of the purported victim, John has consistently denied any sexual contact at all, or indeed any physical contact whatsoever, with her.  (*Id.* ¶ 3.)  As explained below, on February 4, 2022, the rumor was reported to John's coach, Coach 1, who, later that same day, instructed John to leave the team until the allegation was resolved.  (*Id.* ¶¶ 50-51.)  Coach 1 reported the allegation to the Title IX Office.  (*Id.* ¶ 4.)  The receipt by Coach 1, a mandatory Title IX reporter, of a rape allegation triggered the College's Sexual Misconduct Policy.

### 1.      **Haverford's Sexual Misconduct Policy—The Relevant Contract**

Haverford has adopted a published, publicly available 31-page "Sexual Misconduct Policy" (the "Policy"), that covers the relevant timeframe of the rumor against John.  (Am. Compl. Ex. A at 5.)  The first page of the Policy states that Haverford "remains committed to addressing any violations of its policies, even those not meeting the narrow standards defined under the new Title IX Final Rule, and retains authority to investigate and adjudicate allegations under the policies and procedures defined within this the Haverford College Sexual Misconduct Policy."  (*Id.* at 4.)  As to the scope of its coverage, the Policy "applies to all employees and students" and explicitly states: "*Reports of Sexual Misconduct* committed by any student or employee (including faculty and staff) of the Haverford community *will be resolved according to the procedures outlined in this Policy* unless otherwise noted."  (*Id.* at 4) (emphasis added). Under the Policy, "[a]ny person may report Sexual Misconduct in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's oral or written report." (*Id.* at 8-9.)  The person reporting Sexual Misconduct need not be the victim of that sexual misconduct, and the victim may remain anonymous.  (*Id.* at 9.)  Once a report is made, the Policy

describes how the next steps are to unfold.  (*Id.* at 8.)  If the Complainant[1] elects to pursue a formal complaint, the Policy defines the investigation and hearing procedures that must apply.  If the Complainant does not elect to pursue a formal complaint (which is what occurred here), the Policy provides for two options: (1) no further action; or (2) "the Title IX Coordinator may, in their discretion, determine a Formal Complaint is necessary and sign the Formal Complaint." (*Id.* at 12.)  If the College pursues a Formal Complaint Under the Policy, the Policy sets forth a detailed set of procedures for investigating and adjudicating the complaint.  (*Id.* at 14-15.)

According to the Policy, the "College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  (*Id.* at 19.)  The Policy contains a non-exhaustive list of fifteen disciplinary sanctions that may be imposed for Policy violations, including "Removal from organization, team and/or committee" and "Revocation of leadership or supervisory position."  (*Id.* at 24.)  Though not a defined term under the Policy, the term "Hearing" is used to refer to a formal process designed to reach a determination as to the responsibility of the alleged perpetrator with regard to the allegation and to issue a decision.  (*Id.* at 19-22.)  Its procedures are tightly circumscribed and designed to comply with mandatory federal regulations that prohibit sanctioning a student with a "grievance process" that provides minimum procedural fairness requirements.  34 C.F.R. § 106.45 ("[A] recipient's grievance process must comply with the requirements of this section . . . .").

As set forth below, the Sexual Misconduct Policy procedures were triggered on February 4, 2022, when Coach 1, a mandated Title IX reporter, received a report of an allegation of sexual misconduct against John.  Coach 1 in turn reported the allegation to the Title IX Coordinator,

---

[1] "Complainant" is a defined term under the Policy and does not refer only to someone who has filed a Formal Complaint.  Rather, "[a] Complainant is any individual who has reported being or is alleged to be the victim of conduct that could constitute Sexual Misconduct as defined under this Policy."  (*Id.* at 6.)

who investigated and reached out to the Complainant.  The Complainant declined to pursue a Formal Complaint.  The Title IX Coordinator then exercised her discretion to decline to pursue a Formal Complaint in the absence of the Complainant.  Because the Policy promises (i) to resolve all allegations of Sexual Misconduct and (ii) that there will be no sanctions without a hearing and an appeal, when the Title IX Coordinator declined to pursue further action against John, that decision should have fully resolved in the negative the question of whether John could be removed from the team based on the false sexual assault rumor.  Unfortunately, that is not what happened, as John had already been removed from the team on February 4 based on the false allegation.  Independently, his subsequent requests for reinstatement were denied or ignored also based on the false allegation.

> ### 2. Haverford's Removal of John from the Team and Subsequent Denials of His Requests for Reinstatement in Violation of the Sexual Misconduct Policy

Captain A and another co-captain of John's team were among the initial spreaders of the false rumor that John had sexually assaulted a female Haverford student.  They reported the allegation to Coach 1 on February 4, 2022.  (Am. Compl. ¶ 50.)  When John met with Coach 1 later that same day, Coach 1 advised John that he was a mandatory Title IX reporter (required by the College by virtue of his position to report allegations of sexual misconduct) and was notifying Haverford's Title IX Office of the allegation.  (*Id.* ¶¶ 50-52.)  He instructed John to step away from the team until the allegation was resolved, which John, despite vehemently denying the false rumor, did in an e-mail message to his teammates.  (*Id.*)

The Title IX Office reviewed the information provided by Coach 1—which consisted of text messages that have never been disclosed to John but presumably show a chain through which the rumor was spread—and quickly concluded that the allegation was nothing more than an unsubstantiated rumor.  (*Id.* ¶¶ 6, 55-57.)  The Title IX Coordinator confirmed that no

purported victim had accused John of any wrongdoing.  (*Id.*)  The Title IX Office reached out to the one student identified by the rumor mill as the purported victim, and that student confirmed that the rumor had no basis.  (*Id.* ¶¶ 6, 96-97.)

After the Title IX Office advised John on February 16, 2022, that he was not the subject of any complaint and was a student in good standing with the College, entitled to all the rights and privileges provided by the school, John properly assumed that he could rejoin his team and in the few days following asked Coach 1 to do so.  (*Id.* ¶ 7, 58-59.)  To his shock and dismay, John's coach denied the request for reinstatement, advising John that because certain of his teammates continued to believe the rumor, John was no longer welcome on a team for which he had been selected as a captain just a few months prior.  (*Id.* ¶ 8, 59.)

When John continued to press his right to rejoin the team based on the lack of any complaint and his clearance by the Title IX Office, instead of restoring John's position to the team, Haverford instead convened a meeting on March 22, 2022, involving: (i) the Title IX Coordinator; (ii) the Athletic Director; (iii) a Senior Associate Dean of the College; (iv) Coach 1; and (v) the co-captains to discuss whether John would be permitted to rejoin the team.  (*Id.* ¶ 69.)  The meeting was entirely focused on the false sexual assault allegation, and John's Complaint describes in detail the 90 minutes of accusations John endured.  But for the utterance of a single vague allegation by one of John's co-captains remarking that John was a misogynist, the focus of the meeting was clear—John's teammates and Coach 1 believed the rumors and did not want an alleged sexual assaulter on the team.  (*Id.* ¶¶ 70-74.)  Coach 1 again denied John's request for reinstatement and even asserted that John was in need of psychological help and that he should leave the College immediately to get treatment.  (*Id.* ¶¶ 76, 84.)

7

As set forth in more detail in the Verified Complaint, John made repeated efforts to have the College rectify his improper removal from the team and the improper denial of his reinstatement, including submitting in the fall 2022 semester to a sham plan designed by Haverford purportedly to reintegrate him onto the team but that was never actually intended to do so.  (*Id.* ¶¶ 109-145.)  Indeed, as alleged in the complaint, Haverford was intentionally drawing out the sham process to buy time while it was surreptitiously amending its athletic handbook (the "Student-Athlete Handbook" or the "Handbook") to attempt to give John's coach a contractual basis to do what the Sexual Misconduct Policy promised it could not do: remove John from the team for sexual assault without a hearing.  (*Id.* ¶¶127 – 131.)  And that is exactly what happened.  On November 2, 2022, Haverford updated the Handbook without any announcement, surreptitiously backdating it to make it appear as though it remained the 2019 version, in order to add a clause (the "Handbook Addition") that for the first time stated that a coach has the discretion to remove a player "from the roster at any time" but does not say "for any reason."  (*Id.* ¶¶ 128-129.)

Once the policy was changed, the College allowed the sham process to move forward to determine John's reinstatement.  As properly alleged in the Amended Complaint, John's separate meetings with Coach 1 and his co-captains again made clear that the only basis for the decision to deny John's reinstatement to the team was the false sexual assault allegation.  (*Id.* ¶¶ 141-142.)  When tested, any purported other bases for denying John's request for reinstatement— including purported "other concerns" as to John's treatment of women—proved to be fact-free, vague generalities that were contrived in attempt to create alternative explanations both for John's removal and, independently, for the denial of his requests for reinstatement.  (*Id.* ¶¶ 132-142.)

B.      **Further Facts Relevant to John's Title IX Claim**

John alleges that he was subjected to bullying, harassment, ostracism, and a physical

assault on campus by Haverford students who targeted John because of the false rumor that he

had committed sexual assault.  Specifically, John alleges that a few days after the March 22,

2022, meeting in which Haverford refused to reinstate John to his team, a Haverford student,

Student 1, published on social media John's name, as first in a list of six male students, and

called on all Haverford students to bully the identified men.  (*Id.* ¶ 88.)  John's complaint

explains how he provided his advising dean with a copy of the social media post and, on April 7,

2022, specifically requested in writing to his advising dean that Haverford convene a disciplinary

panel, specifically a Dean's Disciplinary Panel, to address it.[2]  (*Id.* ¶¶ 88-91.)  Haverford ignored

John's request, performed no investigation to determine whether a disciplinary panel was

warranted and did nothing to discipline Student 1 or to protect John.  (*Id.* ¶ 93.)  John's

Complaint further explains that because Haverford chose to do nothing to address the calls for

his bullying, the harassment he experienced continued to escalate.  He was physically assaulted

during a Haverford social event, socially shunned, and was and continues to be ostracized by his

peers.  (*Id.* ¶¶ 104-108.)  Finally, John's Complaint alleges that he met with his advising dean

*eight times* to discuss the harassment he experienced from his peers.  (*Id.* at 89.)  The Amended

---

[2] A "Dean's Disciplinary Panel" refers to a specific procedure published by Haverford's Dean's Office, which provides: "In cases of violence or threat of violence, or other violations committed by Haverford College students that are deemed to potentially compromise the safety of the community or any individual, a Dean's Disciplinary Panel may be convened after an investigation."  Its general procedures are as follows: "When an allegation against a student is brought to the attention of the Dean of the College or her designee, the College will conduct an investigation, and present to that individual (hereinafter referred to as "the Convening Dean") the findings.  These findings may include a recommendation as to whether a suspicion of violation, and thus a Dean's Disciplinary Panel, is warranted, although the final decision is at the discretion of the Convening Dean.  At the conclusion of the investigation, the involved parties will be notified of the outcome of the investigation, and whether a Dean's Disciplinary Panel is being convened."  <https://www.haverford.edu/deans-office-student-life/policies-students-guide/deans-disciplinary-panel-guidelines>

9

Complaint makes clear that during those meetings and separately in writing John asked both for support and for Haverford to take disciplinary action against those responsible. (*Id.* at ¶¶ 89-93.) Haverford did neither.

Notably, the Amended Complaint provides an important comparator to the way Haverford responded—or failed to respond—to John's reports of harassment by classmates. Specifically, the Amended Complaint asserts that Coach 1 reported the rumor that John had sexually assaulted an unnamed female student to Haverford's Title IX Coordinator and that the Title IX Coordinator acknowledged to John that the rumor itself was unsubstantiated and that she had no information that would warrant initiating a formal proceeding. (*Id.* ¶¶ 54-56.) Nevertheless, Haverford's Title IX Coordinator investigated, identified the purported victim, and affirmatively reached out to her to determine if she wanted to pursue a formal complaint. (*Id.* ¶¶ 96-97.) By comparison, no one from the College offered John *any* assistance with his complaints of harassment and bullying: the Title IX Office did not reach out to explain his options or to see if he wanted to pursue a formal complaint; nor did anyone else reach out to John to see if he needed support during this difficult time. In other words, for a female student who did not even report sexual misconduct to the College, Haverford's Title IX Office was willing to seek out the student, explain the Sexual Misconduct Policy complaint procedures, and inquire whether it was something she wanted to pursue. But for John, a male student complaining of harassment that Haverford acknowledges also falls within the Sexual Misconduct Policy, Haverford had a different standard. Despite having received actual notice of the harassment John suffered, Haverford did nothing. When John asked for a disciplinary panel to address the wrongdoing, Haverford never told him that it considered this process to be the wrong

10

policy to address his harassment.  Instead, it ignored him.  John received silence because he used, in the view of the College, the wrong words when asking for help.

## III.    LEGAL STANDARD

"On a motion to dismiss, a court must 'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022) (quoting *Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008)) ("Following that rule, we recount only the facts described in the Complaint.")  To survive a motion to dismiss, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  That requires "plausibly suggesting" facts sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must accept the plaintiff's factual allegations as true and consider those facts in the light most favorable to the nonmoving party. *See USciences*, 961 F.3d at 208, 210 n.3.  But the court should "disregard legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016).

Under this standard, John's claims easily survive Haverford's motion.

## IV.    ARGUMENT

### A.    Haverford Impermissibly Disputes the Complaint's Well-Pleaded Factual Allegations.

When evaluating a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the district court "must accept all facts pleaded as true and draw all reasonable inferences in favor of the plaintiff." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).  Haverford ignores this standard, implicitly admitting the strength of

11

John's claims and the weakness of its motion, choosing instead to propose its own facts, not the undisputed facts, within its Motion to Dismiss.  The College relies on preliminary factual determinations by the Court in its decision on John's motion for preliminary injunctive relief in which the Court was required to make an assessment of the likelihood of success of John's claims.  It relies as well on affidavits it used to support its opposition to that same motion.  It also relies on assertions as to which there is no foundation whatsoever.  The result is a purported factual recitation that depicts a version of events that John did not plead in the Complaint.  This recitation—in particular, the notion that the College removed John from the team on February 4, 2022, and, independently, denied John's multiple subsequent requests for reinstatement for reasons *other than* the sexual assault allegation—reflects nothing other than the existence of genuine issues of material fact, the standard basis for denying a Rule 12(b)(6) motion.

In fact, John's Complaint pleads the opposite, that on the morning of February 4, 2022, Coach 1 learned of the sexual assault allegation, and by mid-day the same day, he had met with John and instructed John to step away from the team *because of that allegation*, which instruction John dutifully followed.  (Am. Compl. ¶¶4, 50-51.)  Independently, with respect to the various subsequent denials of John's reinstatement, the Complaint pleads that the sole articulated basis was, again, the false allegation.  The Complaint provides significant specificity and detail describing how on every occasion that John was denied reinstatement the only asserted basis was, again, the false allegation.  And despite John's repeatedly denied requests for reinstatement, no coach, player, or administrator ever provided any specific reason or personal observation with respect to any other basis.  He further alleges that any other vague purported concerns were pretextual and designed to attempt to avoid the requirements of the Sexual

Misconduct Policy.[3]  (*Id.* ¶¶ 2, 74, 75, 124, 132, 148.)  This conclusion is all the more plausible given John's allegations that during the meetings in which John participated to address any particular concerns and thereby to be reinstated, the College was simultaneously and secretly drafting and incorporating the Handbook Addition in an attempt to shore up the Coach's authority to rely on such concerns to deny John's request for reinstatement. (*Id.* ¶¶ 128-131.)

> **B.    The Complaint States a Claim for Breach of Contract.**

In opposition to John's claim for breach of contract, Haverford raises nothing more than a dispute over material facts, the classic basis for a *denial* of a motion to dismiss under Rule 12(b)(6).  John plausibly and credibly claims that Haverford failed to abide by its Sexual Misconduct Policy by (i) removing him on February 4, 2022, from the varsity sports team on which he served as captain and, independently, by (ii) denying his subsequent requests for reinstatement, in both cases based on a false allegation that John committed sexual misconduct. Haverford simply disagrees, asserting that John is wrong about both the basis for his removal and the bases for the College's repeated refusal of his reinstatement and that he has asserted a breach of the wrong College policy.[4]

---

[3] To the extent that the Court, in its decision denying John's motion for preliminary injunctive relief, concluded that John pleads that "the Coach does not currently invoke the assault allegation as the basis for excluding Doe from the ongoing season" and that "the Coach invokes the team's negative reaction to the prospect of Doe's return," citing Compl. ¶¶ 126-27, John respectfully submits that it has misread the Complaint.  (Feb. 14, 2023 Op. at 8-9.)  Those paragraphs of the Complaint make no mention of Coach 1's thinking.  Regardless, to the extent that the Coach anywhere asserts or has asserted that the basis for his denying John's request for reinstatement to, or for removing John from, the team, John plausibly alleges that those purported bases were pretextual, not bona fide.

[4] As a consequence, Haverford moves to dismiss as to an allegation that only the College, not John, ever made: that Coach 1 removed John from the team for some reason *other than* the false allegation of sexual misconduct itself.

Resolution of this factual dispute is properly the province of the jury at trial. Haverford does not get to pick and choose the facts that John alleges or the policies that he asserts the College breached. On a motion to dismiss, as Haverford acknowledges, the Court must assume the truth of John's well-pleaded factual allegations, including reasonable inferences therefrom. (Memo at 12.) Haverford's repeated invocation of this Court's decision on John's motion for preliminary injunctive relief is similarly inapt. Despite recognizing that the doctrine of law of the case has no bearing on its motion (Memo at 1), Haverford nevertheless seeks to elide the distinction between this Court's role on a motion for preliminary injunctive relief and on a motion to dismiss. (*Id.* ("[T]he Court is . . . being presented with the same facts and being asked by Plaintiff to make a different decision.").)[5]

In deciding whether to grant preliminary injunctive relief, this Court had to make a preliminary factual assessment as to the likelihood of success of John's claims. As a factual matter, this Court decided only that preliminary injunctive relief was not available because of the possibility that the basis for John's removal from the team was *not* the false sexual assault allegation.[6] This question—the reasons for the College's actions against John—is the central

---

[5] Haverford's assertion is misplaced because a complaint does not ask the Court to make any decision. Nevertheless, it goes without saying that on a motion for preliminary injunctive relief, a court must make a preliminary estimate of the claim's ultimate likelihood of success, which includes a preliminary factual assessment. On a motion to dismiss, by contrast, a court's factfinding role is much more limited, as all of the plaintiff's properly alleged factual pleadings and reasonable inferences therefrom are taken as true, and the only question is whether those facts support a claim.

[6] The Court, in its decision denying John's request for preliminary injunctive relief, made a preliminary determination, for the purposes of that motion, that Coach 1's removal of John from the team on February 4, 2022, was "considered temporary." (Feb. 14, 2023 Op. at 8.) It also expressed doubt as to whether Coach 1's removal of John was "a penalty," "a sanction ***under*** the Policy," or "punishment," and more generally mused that whether an action constitutes a sanction "is more likely to turn on the intent of the official in taking that action." (*Id.* at 7-8 & n.6.) John points out that the resolution of these factual questions is not before the Court on this motion to dismiss. More generally, John has never alleged that his removal was a penalty or punishment. And he respectfully submits that such a determination is not relevant to the claim that he has alleged, which is simply that the basis for his

14

disputed material fact and therefore a basis to *deny* the College's motion.  John credibly and plausibly alleges he was removed and denied reinstatement due to the false allegation, whereas the College contends he was not.  The ultimate decision as to the reason for John's removal, and for the denials of his reinstatement, is for the jury to decide.  The existence of this key factual dispute is the quintessential reason to deny the College's Rule 12(b)(6) motion.

With respect to John's claim for breach of contract, the College moves to dismiss while misstating John's claim, the underlying facts he alleges, and the policy breach that entitles him to relief.[7]  As detailed below, John has properly alleged each of the elements for a claim of breach of contract under Pennsylvania law: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *Davis v. Wells Fargo*,

---

removal by Coach 1, whether permanent or temporary and given whatever motivating concerns, was the false allegation.

John plausibly alleges that Coach 1 both believed the false rumor and removed John from the team based on the false rumor.  But John need not establish the former allegation to win his breach of contract claim, let alone for that claim simply to survive a motion to dismiss.  John submits that whatever motivating concerns were in Coach 1's mind when he removed John—whether or not he thought the rumor was or might be true, whether or not he thought he was imposing a penalty, a punishment, or a sanction, whether or not he was concerned that having an alleged rapist on the team would harm the team's reputation or disrupt team cohesion, or any other thoughts or concerns he may have harbored in isolation or in combination—is irrelevant for John's claim, and certainly as to the viability of John's claim on a Rule 12(b)(6) motion.  The protections of the Policy are designed to preserve the status quo and to prevent the need for an inquiry into such various and potentially conflicting internal motivations.  If the basis for John's removal from the team was the allegation of sexual misconduct (whether due to its possible truth, its consequences to the team's reputation or cohesion, or otherwise), which is what John plausibly alleges, then his removal—whether permanent or even temporary, and for whatever internal reasoning— absent a determination or admission of responsibility, violates the Policy.  The decisionmaker's internal state of mind and various concerns about an allegation of sexual misconduct have no bearing on the applicability of the Policy and the protections it provides to a Respondent like John.

[7] *E.g.*, Memo. at 14-15 ("Under Plaintiff's proposed interpretation of Haverford's policies, once a student has been the subject of allegations of sexual misconduct at any time, that individual could not be voted out of a leadership position, assigned community service or attendance at a program for academic or extracurricular purposes, issued a written or oral warning of any nature, or be beholden to routine diploma or transcript requirements, absent a full adjudication and finding of responsibility under the Sexual Misconduct Policy.")

15

824 F.3d 333, 351 (3d Cir. 2016); *McShea v. City of Phila.*, 606 Pa. 88, 995 A.2d 334, 340 (2010).

> ### 1.     John Plausibly Alleges that the Sexual Misconduct Policy Applies to the False Allegation of Sexual Misconduct Against Him.

As to the *first element*, Haverford agrees that a college has a contractual obligation to its students to abide by its own stated policies, and the college's failure to do so can give rise to a claim of breach of contract by an affected student.  *Reardon v. Allegheny College*, 926 A.2d 477, 480 (Pa. Super. 2007) (Pennsylvania courts "review the agreement between the parties concerning disciplinary procedures[] contained within a portion of the student handbook . . . as we would any other agreement between two private parties."); *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999) ("[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract.").  If a college has adopted disciplinary procedures for adjudicating student misconduct, it must follow them.  *Boehm v. Univ. of Pennsylvania Sch. of Veterinary Med.*, 392 Pa. Super. 502, 510, 573 A.2d 575, 579 (1990) ("The general rule . . . has been that where a private university or college establishes procedures for the suspension or expulsion of its students, substantial compliance with those established procedures must be had before a student can be suspended or expelled.").

Haverford's Sexual Misconduct Policy constituted a contract between Haverford and John.  The Policy is explicitly designed to cover all allegations of sexual misconduct by students. "Reports of Sexual Misconduct committed by any student . . . of the Haverford community will be resolved according to the procedures outlined in this Policy unless otherwise noted." (Amended Complaint Ex. A at 4.)  The Policy applies to all Haverford students and employees

16

and guarantees that all reports of sexual misconduct committed will be resolved according to its terms.  (*Id.*)

There is no dispute that the Sexual Misconduct Policy was triggered when Captain A and the co-captains reported[8] the false allegation of sexual misconduct by John to Coach 1, a mandatory Title IX reporter, on February 4, 2022.[9]  Nor is there any dispute that Coach 1 reported the false allegation to Haverford's Title IX Office.  So the parties agree that the Policy covered John when the coach removed him on February 4.  And the parties also agree that Haverford did not adjudicate the sexual assault allegation under the Policy.

---

[8] Haverford asserts that Captain A and the two other co-captains approached John with the false rumor in the spirit of peaceful dialogue and engagement.  (Memo. at 3 n.2.)  Quite the opposite.  Captain A, with the agreement of the other captains, decided not to engage in restorative dialogue but instead simply to inform John of the rumor and then, despite John's denials, to assume the role of judge, jury, and executioner by telling John to leave the team.  By contrast, John received the allegation against him in the spirit of restorative dialogue and engagement, actively listening to the rumor as told to him by Captain A despite knowing its falsity.  And although he denied that the rumor had any truth, John recognized that his co-captains did not necessarily have independent knowledge of its falsity and so sought guidance from Coach 1, who sided with the co-captains with whom he had previously spoken and instructed John to leave the team.  This also provides the context for the same-day resignation e-mail message John sent to his teammates, which the Court quoted in its decision denying John's motion for preliminary injunctive relief as stating that it "is in the best interest of the program" for John to no longer be a member of the team.  (Feb 14, 2023 Op. at 7.)  Captain A's e-mail message to John earlier that day had stated: "we do not think it is in the best interest of the team for you to be a part of this team anymore."  (Am. Compl. ¶ 48.)  John wrote his message both following the instruction by his coach to step away from the team and in ignorance of his rights as a Respondent under the Policy, of which his coach had not informed him.  Having been told that he was an alleged rapist, and having been instructed to step away from the team, he simply wanted to do so in a manner that both respected his teammates' (uninformed) concerns and did not in any way communicate to the team that he was admitting that there was any truth to the rumor.

[9] Significantly, the Policy does not suddenly spring into effect only following the filing of a Formal Complaint by a purported victim.  Rather, it is triggered by any "report" of sexual misconduct, which is something that can be made by an alleged victim, a friend of the victim, or indeed by anyone at all, including anonymously—a process that Title IX and its implementing regulations require.  (Am. Compl. Ex. A at 1, 4) (noting that U.S. Department of Education issued a Final Rule under Title IX in 2020 that "[a]ddresses how an institution must respond to *reports* of misconduct falling within that definition of sexual harassment") (emphasis added).

<h3 style="text-align:center">2.   <u>John Plausibly Alleges Haverford Breached the Sexual Misconduct</u><br><u>Policy by Removing Him from the Team.</u></h3>

As to the *second element*, John properly alleges that Haverford breached its duty to him under the Policy by removing[10] him from his team on February 4, 2022, and, independently, repeatedly denying his subsequent requests for reinstatement due to the false allegation.

The Policy mandates that *reports*—not merely formal complaints—of sexual misconduct that are "committed by any student or employee" of Haverford "*will be* resolved" according to the procedures outlined in the Policy. (*Id.*) (emphasis added). No exceptions. No discretion. The Policy affords various protections to "any individual who has been *reported* to be the perpetrator of conduct that could constitute Sexual Misconduct as defined under [the] Policy." Such an individual, like John, is defined under the Policy as a "Respondent." Among its other protections, the Policy prohibits the College from imposing on such individuals "a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal." *Id.* at 19.[11] The College breached these and other provisions by failing

---

[10] Haverford persists in the notion that John *voluntarily* quit the team. At best, this contention simply raises another dispute as to a material fact and so if anything serves only as a basis to *deny* the College's motion. But the facts, and certainly John's well-pleaded allegations that Coach 1 instructed John to step away from the team, nevertheless contradict that fantasy. (Am. Compl. ¶¶ 4, 51.) Nor does John's resignation e-mail message—which John sent following the coach's instruction that he step away to explain his forthcoming absence from team practices and meets—indicate otherwise. (*Id.* ¶ 52.) The College's explanation also defies common sense. Haverford's assertion that John—a committed athlete, a team co-captain, someone for whom his sport and his membership on the team meant everything, and someone who absolutely rejected the false rumor without reservation—would choose of his own accord to quit the team flies in the face of reality and ignores the power dynamic between coach and student. John's coach himself states in his affidavit that John "agreed" to step away following their February 4, 2022, meeting, clearly indicating that he had made a proposition to which John had agreed. (Doc. No. 13-2 ¶ 6.) Neither of these statements is accurate, as John's coach instructed John to step away from the team, but either is sufficient to establish the sufficiency of John's allegation that he did not voluntarily resign.

[11] Haverford's misstatement of John's argument that "[according to John] once a student has been the subject of allegations of sexual misconduct at any time, that individual could not be voted out of a leadership position" continues to misunderstand the protections the Policy affords. (Memo. at 14.) Whether a removal is proper or improper is not based on the length of time since the allegation, or where

18

to grant John the protections of the Policy before removing him from the team on February 4, 2022, and, independently, by denying his subsequent requests for reinstatement.

Haverford does not dispute the content of the Policy, or the fact that the none of the procedural protections afforded by the Policy was granted to John.  Rather, it argues that John's allegation is factually incorrect—that the basis for John's removal, and the denial of his reinstatement, was something other than the false allegation of sexual misconduct—so he is not entitled to the protections of the Policy.  Haverford does this by Conflating Coach 1's removal of John from the team on February 4 with the coach's subsequent and independent denials of John's reinstatement, proposing various alternative justifications for Coach 1's decisions.[12]  None of these alternative justifications is relevant on a Rule 12(b)(6) motion, as all of them represent disputes as to material facts.[13]  To give credence to the notion that these other concerns were the deciding factor in John's removal from the team, one would have to believe that at the same time

---

the disciplinary process stands within the Title IX Office, but rather the *basis* for the removal.  The Policy always prevents the College from imposing a sanction *based on a report of alleged sexual misconduct* unless the procedures of the Policy (e.g., a hearing, a finding, and a potential appeal) are followed.  Those protections continue even after the conclusion of any process conducted by the Title IX office that does not result in a finding of sexual misconduct (whether it declines to pursue a formal complaint or at the conclusion of hearing and appeal or otherwise).  Similarly, nothing prohibits a coach from removing an athlete for reasons that do not violate Haverford's policies or the law, even during the pendency of a disciplinary process within the Title IX Office to determine whether sexual misconduct took place, *as long as the purported reason is bona fide*, not, as here, pretextual cover for an improper removal.

[12] Haverford points to statements by John's teammates expressing concern for "Plaintiff's behavior that were independent of any concerns relating to the alleged instance of sexual assault, including the captains' assessment that Plaintiff was a misogynist and their personal observations of Plaintiff's offensive behavior toward women" (Memo. at 5) notwithstanding that John's complaint asserts that these vague assertions were pretextual.

[13] John nevertheless notes that those explanations (i) are not even applicable to Coach 1's removal of John from the team on February 4, the same day the coach learned of the false allegation of sexual misconduct against John; (ii) do not refute John's allegation that the basis for his removal was the false allegation; and/or (iii) are otherwise false and pretextual.

19

that Captain A and the other co-captains presented the rape allegation to Coach 1, they also presented the coach with other concerns—whether of "offensive behaviors toward women" (Op. Br. Ex. A, Donnelly Aff. at ¶ 4) or otherwise—that were egregious enough that the coach had to remove John that very day, without even considering the rape allegation (which had to go through the Title IX process).

The College also argues that, because of the lack of a Formal Complaint by a purported victim, John was not entitled to any of the protections afforded by the Policy.[14]  But that position is contravened by the scope of the Policy as quoted above, which, explicitly states that "*Reports of Sexual Misconduct committed by any student . . . of the Haverford community will be* resolved according to the procedures outlined in this Policy unless otherwise noted" (*Id.* at 4) (emphases added).  It also reflects the College's confusion between the applicability of the Policy as a whole and the applicability of the Policy's formal "Resolution Process," which is a subset of the Policy that is only triggered by the filing of a "Formal Complaint" by the alleged

---

[14] In a similar vein, Haverford argues that, because it believes that none of those protections applied to John, the removal of John from the team (and the denials of his requests for reinstatement) was not a sanction resulting from the allegation of sexual misconduct against him.  (Memo. at 20-21.)  At best, this assertion is just another version of the disputed material fact as to whether the basis for John's removal was the false allegation of sexual misconduct.  So it is a reason to deny Haverford's motion.  This assertion also misunderstands John's argument as being that because removal from a sports team was listed a potential sanction in the Policy, a determination of sexual misconduct is the only way that Haverford could ever remove an athlete from a team.  (*Id.*)  What John actually alleges is simply that the Policy does apply to allegations of sexual misconduct like the ones leveled against him, and therefore Haverford was required to follow the Policy and could not remove him from his team *based on that allegation* without a hearing and determination.  (Similarly, in its decision denying John's motion for preliminary injunctive relief, the Court stated: "Doe appears to assume that whenever a sanction listed in the Policy is imposed it can only be imposed for violation of the Policy."  (Feb. 14, 2023 Op. at 8 & n.6.) Respectfully, that is not and has never been John's contention or assumption.  Such listed sanctions could be imposed for all kinds of reasons.  John simply asserts that if the basis for Coach 1's decision to remove him from the team was the allegation of sexual misconduct—which John plausibly alleges is the case—then that decision violated the Policy.)

victim or by the College's Title IX Officer.[15]  John carefully explained how the Policy operates in his briefing on his motion for preliminary injunctive relief.  (Doc. No. 4, Doe Br. 9-12, 14-19.)

The parties agree that the Policy's Resolution Process was not triggered as to John because no purported victim ever filed a Formal Complaint, and Haverford's Title IX Officer *found no basis* to proceed with any Formal Complaint.  But the parties also agree that the Policy itself was triggered on February 4, 2022, by the reporting by Captain A and the other co-captains of alleged sexual misconduct by John to Coach 1, a mandated Title IX reporter.  And once triggered, the Policy provides procedural protections to all students—like John—accused of sexual misconduct, not only to students who are the subject of a Formal Complaint.[16]  Among those protections, none of which was extended to John but all of which were required to be, is the requirement that the College hold a hearing, make a finding of responsibility, and grant permission to appeal before imposing a sanction—such as the removal from a sports team— arising from the allegation.  (Doe Br. 9-12, 14-19.)[17]  Haverford of course can and does argue

---

[15] *See* Memo. at 14 ("Per the terms of the Sexual Misconduct Policy, a formal complaint is a prerequisite to the College's resolution process (including potential sanctions) under that policy.  Further, the text of the policy contemplates instances, like here, where students may be subject to actions that are listed as possible 'sanctions' under the Sexual Misconduct Policy under circumstances entirely separate from the Title IX Office. . . .  Plaintiff's allegation that he was somehow sanctioned under the Sexual Misconduct Policy despite never being subject to a formal complaint or investigation under that policy fails to meet the plausibility requirement necessary to survive a motion to dismiss.").

[16] The College's argument is refuted by the plain language of the Policy provisions that are not limited to the Resolution Process following the filing of a Formal Complaint, such as the Notice of Allegations (covering "any Party [Complainant or Respondent] *to the allegations* of Sexual Misconduct"); Investigations (covering conduct "*alleged* to constitute Sexual Misconduct"); and Hearings (covering "*an allegation* of Sexual Misconduct") (emphases added).  None of these provisions is limited exclusively to a Resolution Process following the filing of a Formal Complaint.

[17] These protections are not simply contractual in nature.  Rather, they are federally mandated by Title IX and its implementing regulations.  Indeed, Title IX's regulations were reaffirmed and strengthened as recently as 2020 to require more robust procedural protections for accused students, including the right to a live hearing with cross examination.  And Haverford's Sexual Misconduct Policy was updated in 2020 specifically to bring it into compliance with these updated regulatory requirements.  (Am. Compl. Ex. A at 1) (noting that 2020 Final Rule "[m]andates a grievance process that an institution must follow to

21

that John was removed for some reason other than the report of alleged sexual misconduct, but,

again, resolution of that genuine issue of material fact awaits consideration by the jury.

Haverford established the Policy as the exclusive means of reviewing, investigating,

adjudicating, and sanctioning sexual misconduct allegations, and John's allegation that the

College failed to observe the requirements of that Policy by removing him from the team due to

a sexual misconduct allegation is a clear breach of contract.

### 3.    John Plausibly Alleges that He Has Suffered Damages as a Result of Haverford's Breach of the Sexual Misconduct Policy.

As to the *third element*, John alleges that Haverford's breach of contract caused him to

lose the opportunity to compete in the majority of his junior year and the entirety of his senior

year of varsity NCAA athletics, an opportunity that he will never enjoy again.  He also alleges

that the College's breach caused him to endure the stigma and reputational damage of having

been kicked off of his team and removed as captain, and to have his name stripped from the team

roster, based on a false allegation that is perceived to be true by virtue of his removal by the

College.[18]

Regardless of the dollar amount of damages that John is able to establish, and even he

were not able to establish any, dismissal would still be improper because Pennsylvania law

permits a plaintiff to recover nominal damages when a breach is proven even without

---

comply with the law in these specific covered cases before issuing a disciplinary sanction against a person accused of sexual harassment," including "forms of sex-based violence").  Moreover, these protections are undergirded by the basic legal principles of the presumption of innocence, due process of law, and fundamental fairness.

[18] Multiple courts have found that lost athletic opportunities cause significant, even irreparable, harm. *E.g.*, *T.W. v. Southern Columbia Area School District*, No. 4:20-CV-01688, 2020 WL 5751219 (M.D. Pa. Sept. 25, 2020); *Richmond v. Youngstown State Univ.*, 2017 WL 6502833 at *1 (N.D. Ohio Sept. 14, 2017); *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015); *Ganden v. National Collegiate Athletic Association*, 1996 WL 680000, at *6–7 (N.D. Ill. Nov. 21, 1996).

quantifiable harm.  *See, e.g.*, *Nemitz v. Reuben H. Donnelley Corp.*, 310 A.2d 376, 379 (Pa. Super 1973) (citing *Williston on Contracts*, Section 1345, p. 3776); *see also* Pennsylvania Standard Jury Instructions, PA-JICIV 19.250 (defining breach of contract damages: "Even if [name of party claiming breach] does not prove any damages as a result of the breach, [name of party claiming breach] is entitled to recover nominal damages.  Under the law, nominal damages are $1.").

### 4.     The Handbook Addition Does Not Apply, and Coach Discretion Does Not Displace the Sexual Misconduct Policy.

Haverford spills a lot of ink discussing the policy that it thinks should apply—its new addition to the Student-Athlete Handbook concerning roster management (the "Handbook Addition")—most of which is wasted.  The Handbook Addition is both inapplicable and irrelevant, but most importantly it is not the policy as to which John asserts a breach.

The fact that Haverford seems to think that John chose the wrong policy as to which to claim breach[19] is irrelevant, as it is John's well-pleaded allegations, not the College's disputed facts, that control.  The College does not get to choose which of its policies John claims was breached.  Moreover, the Handbook Addition is inapplicable because it only came into being, surreptitiously, on November 2, 2022, so it was not even in effect when Haverford removed John from the team nearly nine months earlier on February 4, 2022 or when it refused his reinstatement on March 22, 2022.  It is otherwise irrelevant because it does not supersede the Sexual Misconduct Policy.

---

[19] *E.g.*, Memo. at 9 (asserting the Handbook Addition "directly addresses this situation and controls Plaintiff's contractual relationship with Haverford here").

Taking as true John's allegation that the basis for his removal from the team, as well as the subsequent denials of his reinstatement, was the false allegation, the Handbook Addition provides no protection for the original removal or the subsequent denials.  The Handbook Addition certainly does not trump the Sexual Misconduct Policy.  Rather, this new policy is simply a written statement of the unremarkable proposition that coaches have the general—but not the absolute—authority to manage their rosters.  John does not dispute and has never disputed that point.  But that discretion is not unfettered, as the Handbook addition itself implicitly recognizes.[20]  A coach cannot exercise that authority for an improper purpose or in violation of other contractual duties owed to its student-athletes, including the Sexual Misconduct Policy and many other nondiscrimination policies.[21]  The Policy contains no "coach discretion" exception—nor could it contain any such exception—that would permit the coach to act as unilateral judge, jury, and executioner with respect to allegations of sexual misconduct. As a result, no conflict exists between the Policy and the Handbook Addition.[22]

---

[20] The provision imbues varsity coaches with "broad discretion," not absolute discretion, in determining the roster.

[21] For example, if a majority or even virtually all of the members of a team wanted to exclude from the team someone on the basis of that person's race or religion, or another impermissible basis, the coach would nevertheless be prohibited by Haverford's non-discrimination policy from barring that person.

[22] Nevertheless, to the extent that any perceived policy conflict exists, it is a basic principle of contract law that the more specific on-point contractual provision, particularly one that is mandatory, controls over the more general provision, particularly one that is discretionary.  *Musko v. Musko*, 697 A.2d 255, 256 (Pa. 1997) (noting that "when specific or exact provisions seem to conflict with broader or more general terms, the specific provisions are more likely to reflect the intent of the parties than the general provisions."); Restatement (Second) of Contracts § 203 (1981) (explaining that "specific terms and exact terms are given greater weight than general language").  Here, the two competing policies must be read to afford coaches wide discretion in roster management, except when a student is accused of sexual misconduct.  In that instance, the coach—just like all other College employees—is bound by the Policy to afford accused students certain procedural protections.  So to the extent that a conflict between the policies does exist, the Sexual Misconduct Policy controls.

24

Indeed, the only way in which coach discretion in roster management could even conceivably be relevant is if the bona fide basis for the coach's exercise of discretion to remove a student-athlete is *not* an allegation of sexual misconduct.[23]  But John's well-pleaded complaint alleges otherwise—that the allegation of sexual misconduct against him *was* the basis for his removal.  Thus, Haverford's argument for the applicability of coach discretion turns, again, on the reason for the College's removal of John from his team, which is a disputed issue of material fact that requires the denial of the College's Rule 12(b)(6) motion.

All of Haverford's argument with respect to John's claim for breach of contract boil down to its factual assertion that John "was not sanctioned at all by the College or Coach 1, let alone for alleged sexual misconduct."  (Memo. at 23.)  John alleges otherwise.  This core disputed question of material fact requires the denial of the College's motion.  For this reason, and the other reasons set forth above, John has properly alleged a claim for breach of contract.

### C.    The Complaint States a Title IX Claim.

Title IX of the Education Amendments of 1972 protects against sex-based discrimination in an educational setting, stating, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

---

[23] Haverford incorrectly asserts that John concedes that Haverford's policy was that "athletic coaches have 'full discretion and autonomy' in making roster decisions."  (Memo. at 16-17 (citing Am. Compl. ¶¶ 146, 100-01, 150, 60).)  Nowhere does John make such a concession, not that it should matter given the plain applicability of the Policy.  Paragraph 60 states simply that Coach 1 had the authority *to restore* John to the team without permission from or agreement by any students.  (Am. Compl. ¶ 60.)  And the other cited paragraphs state the occasions on which John or his parents *were told* by senior Haverford administrators that coaches had such discretion.  Notably, all of these occasions took place after Haverford had cooked up and secretly inserted the Handbook Addition, which purported to give the College such discretion.

To state a claim under Title IX, "the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex." *Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020). To establish the bias requirement of a Title IX claim, the Third Circuit has made clear that it does not follow doctrinal tests established in certain other circuits that vary based on the specific Title IX theory alleged. Rather, the Third Circuit has adopted the approach first articulated by the Seventh Circuit in *Doe v. Purdue University,* 928 F.3d 652 (7th Cir. 2019), which simplified the analysis to the following question: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?" *Id.* at 667–68. In adopting this approach, the Third Circuit noted:

> We agree with the Seventh Circuit and see no need to superimpose doctrinal tests on the [Title IX] statute. Thus, we adopt the Seventh Circuit's straightforward pleading standard and hold that, to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex. Although parties are free to characterize their claims however they wish, this standard hews most closely to the text of Title IX.

*Univ. of Scis.*, 961 F.3d at 209 (internal citation and quotation omitted).

### 1.    John Has Adequately Asserted Prohibited Gender Bias by Haverford in Violation of Title IX.

John's Amended Complaint asserts two separate and independently sufficient ways in which Haverford discriminated against John based on his sex in violation of Title IX. *First*, the Complaint alleges that Haverford provided dramatically different and discriminatory responses to the substantiated complaint of a man—John Doe—which the College ignored, and the unsubstantiated and rumored allegation of a woman purported to be the victim of sexual misconduct, whom the College ensured had every opportunity to pursue a formal complaint.

26

*Second*, the Complaint alleges the College failed to address at all the sex-based harassment and bullying that John endured from other students, despite its knowledge of that harassment and John's direct written request that it do so.  Indeed, the College admits, as it must, that it both knew of the ongoing harassment and bullying of John and that it neither addressed that conduct nor responded to John's direct written request for protection and redress.  The College is left only with the embarrassing response that it simply ignored the harassment and John's request because, according to Haverford, he complained to the wrong people—which included his advising dean, the dean of the college, and the athletic director—in the wrong way. What he should have done if he had really wanted help and protection, Haverford says, was to file a formal complaint under the Sexual Misconduct Policy, a step not actually required to trigger application of the Policy, a step not required of the purported victim in the false allegation against John, and a step that *acknowledges that John was making out a credible plausible claim of gender-based harassment and discrimination*.

In arguing that John fails to state a claim under Title IX, Haverford makes three arguments.  *First*, it asserts that its failure to respond to John's complaint was not based on his status as a male and that the student-on-student harassment John experienced was not sex-based. *Second*, it asserts that the extensive bullying and social stigmatization of John was not severe or pervasive enough to be actionable.  *Third*, it asserts that, taking the facts alleged by John as true, its response to John's complaint was reasonable.  Haverford is wrong on each point.

### (a)     Haverford's Failure to Address John's Complaint of Campus Harassment Was Gender-Based and Violated Title IX.

The Amended Complaint alleges facts sufficient to support a plausible inference that Haverford's failure to respond to John's complaints of bullying and harassment was because of his sex.  The alacrity and initiative with which Haverford responded upon learning of an

27

unsubstantiated and false *rumor* that one of its female students, who never reported or complained of any misconduct, may have been sexually assaulted stands in stark contrast to the way Haverford ignored John, a male student, when he made a specific, substantiated complaint and specifically sought and requested protection and a disciplinary process.  Binding Third Circuit precedent addressing remarkably similar conduct establishes that this type of selective response to male and female complaints is sufficient to demonstrate gender bias.

In *Doe v. Princeton University,* the Third Circuit reversed a district court's decision granting a motion to dismiss a student's Title IX Claim, holding that a male student plaintiff, Doe, adequately pleaded gender bias by pointing to differential treatment of male and female complainants.  *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).  The case involved Doe's challenge to a disciplinary investigation by Princeton that found him responsible for sexual misconduct.  In addressing whether Doe adequately pleaded facts to support an inference of gender bias, the Third Circuit determined that Doe's allegation that a female student's "report of misconduct was treated with greater urgency and seriousness than his own" was sufficient.  *Id.* at 343.  Specifically, Doe complained to the university that a female student, Roe, "began spreading rumors about Doe on campus" including that "Doe was physically abusive" and that Princeton failed to address this harassing behavior.  *Id.* at 340.  Doe alleged that Princeton "steered Doe towards mental health services" when he first complained of the rumors, but that Princeton encouraged Roe to file a formal complaint when she reported those same rumors to the University's Title IX office.  *Id.* at 344.  Notably, the Third Circuit rejected the district court's reliance on the fact that Doe did not file a formal complaint related to his harassment to find a non-discriminatory basis for the university's conduct, reasoning "[t]hat might be a plausible and nondiscriminatory reason for treating Doe's Complaint differently.  But on a motion to dismiss,

28

we must construe the complaint in the light most favorable to the plaintiff. . . .  Indeed, though anti-male bias is not the only plausible explanation for the university's conduct, or even the most plausible[,] . . . alternative explanations are not fatal to Doe's ability to survive a Rule 12(b)(6) motion to dismiss." *Id.* (internal quotation and citation omitted).

The same result is warranted here.  As set forth above, John complained repeatedly to a Haverford dean that he was being harassed and bullied by the spreading of false rumors and through social media postings, which he substantiated by providing printouts of those postings, and he specifically requested in writing that the College intervene to protect him and to discipline his abusers.  Haverford ignored and did nothing in response to John's report.  Haverford (like Princeton) asserts in its brief that it did not respond because John did not file a formal complaint under its Sexual Misconduct Policy.  And while Princeton encouraged the rumored female victim to file a Title IX complaint only after she on her own sought out advice from the university's Title IX office, Haverford went even further to demonstrate its preference for female complainants.  Rather than wait for the female purported victim to come to the Title IX Office of her own accord (like Princeton), Haverford affirmatively sought her out to determine if she wanted to pursue a formal complaint against John.  As the Third Circuit in *Princeton* succinctly stated: "Doe has plausibly alleged that he reported a violation that was not investigated by the University.  And that, in turn, plausibly supports the inference that sex was a motivating factor in Princeton's investigation."  *Id.* at 344 (3d Cir. 2022); *see also Doe v. Univ. of the Sciences*, 961 F.3d 203, 210-211 (3d Circ. 2020) (finding that a male student plausibly alleged sex discrimination by alleging that his university "investigated him but chose not to investigate three female students who allegedly violated the Policy," despite his not filing a formal complaint, because university was on notice of the female students' conduct).

Haverford's reliance on *Doe v. Princeton*, 790 F. App'x 379, 383 (3d Cir. 2019) (a different and earlier case involving Princeton), is misplaced because John's allegations are far more specific, and illustrative of the disparate treatment between male and female complainants at Haverford, than the generalized and conclusory allegations held to be insufficient in that case. The 2019 *Princeton* decision involved two male students who asserted competing allegations of sexual misconduct against one another in which the university found both students not responsible.  *Id.* at 382.  The Court held that the plaintiff did not plead facts showing Princeton treated him differently because of his sex, noting the complaint asserted no facts to demonstrate that the disciplinary process and results for female complainants were different than those for male complainants.  *Id.* at 384 ("[W]hile Doe lists many grievances about how the process was conducted and how he was treated, he does not plead facts indicating that any of this alleged unfavorable treatment was due to his sex.")  By contrast, John has demonstrated disparate treatment in his own case, demonstrating Haverford's very different responses to a female complainant who had not even reported misconduct to the College—proactively seeking her out to see if she wanted to file a formal complaint—as compared to a male student, John, whose multiple reports of harassment and bullying and direct written request for disciplinary action to address the substantiated harassment was completely ignored.

Accordingly, this Court should reject Haverford's mistaken assertion that John's claim is supported "only by the conclusory allegation that the College failed to respond to the alleged harassment because his alleged harasser was a woman standing up for women."  (Memo. at 18.) As set forth above, The Third Circuit has consistently held that if a male student alleges in a complaint that a college or university failed to address his reports of harassment or other policy violations by female students, and further alleges that the university was more responsive to

complaints made by female students, such allegations are sufficient to raise a plausible inference of gender bias.

> **(b)     The Unrelenting Harassment and Bullying John Has Faced and Continues to Face on Campus Is Sex-Based.**

Haverford wants to argue that the harassment John experienced was not gender-based and therefore not actionable under a Title IX deliberate indifference claim.  (Memo at 18-19) ("[John] merely alleges he was the target of 'harassment' because he was believed to have committed sexual assault, not because he identifies as a male.")  But it simultaneously argues that he should have filed a formal complaint under Haverford's Sexual Misconduct Policy, and if he had only done so the College could have addressed the problem.  (Memo. 20-21) (asserting that John has no basis to complain that Haverford failed to convene a disciplinary panel at his request because he is not "entitled to dictate the disciplinary processes of the College, *which clearly provide that allegations of sexual harassment are addressed under its Sexual Misconduct Policy*") (emphasis in original); *see also* Memo at 8, FN 6 (noting John "does not allege that he filed a formal complaint" and that his "allegations of harassment based on sex are addressed by the College in accordance with the Sexual Misconduct Policy").  Of course, the very reason the Policy exists is to protect against and address sexual misconduct and other gender-based forms of harassment and discrimination proscribed by Title IX.  The College's instruction that the proper path was for John to complain under that Policy is an admission that John was asserting a plausible claim of gender-based harassment and bullying in potential violation of Title IX.  That admission alone is dispositive as to Haverford's objection to his claim.

But there's more.  Haverford's admission that it did not address the harassment of John, purportedly because he complained through the wrong channels—by seeking a disciplinary panel—not, as the College says it would have preferred, by filing a formal complaint under its

31

Sexual Misconduct Policy, also reflects the College's mistaken belief that the Policy was never triggered.  But, as discussed above in the section discussing John's claim for breach of contract, that Policy does not require the filing of a formal complaint to be triggered.  Rather, it is triggered by *any* report of sexual misconduct received by the Title IX Office or by a mandatory Title IX reporter, which can be made not only by an alleged victim but by a friend of the victim or indeed by anyone at all, including anonymously, a process that Title IX and its implementing regulations require.  And the Policy guarantees that *all* reports of sexual misconduct will be resolved according to its procedures.  (Amended Complaint Ex. A at 4.)  John not only specifically requested in a writing on April 7, 2022, that the College convene a disciplinary panel to address the harassment and bullying, he separately reported such conduct on eight different occasions to his advising dean.  Needless to say, the purported victim in the false allegation of sexual misconduct against John, who never complained to a single Haverford employee or administrator, was never required to file a formal complaint to receive the protections of the Policy or denied those protections based on any failure to complain in the College's chosen manner or in any manner whatsoever.

Haverford also asks the Court to ignore the fact John was one of six exclusively male students who were simultaneously targeted for harassment and bullying on campus.  (Am. Compl. ¶88.)  On a motion to dismiss, all reasonable inferences must be drawn in John's favor, and all that is required at this stage is that John's pleading supports a determination that male bias is a "plausible explanation" for the conduct, even if other explanations are also possible. *Doe v. Princeton Univ.*, 30 F.4th at 344.  The fact that only male students were targeted in a student-led campaign to harass perceived sexual assaulters, none of whom was ever found to have assaulted anyone, is sufficient to permit John to proceed to discovery.

Moreover, at least one court in this district, and multiple district courts in other jurisdictions, has found that harassment connected to a rumored sexual assault is, by definition, gender-based and sufficient to support a deliberate indifference Title IX claim.  For example, in *Doe v. Manor College*, 479 F. Supp.3d 151 (E.D. Pa. 2020) a student asserted deliberate indifference based in part on allegations that she was harassed and bullied by students after her complaint of sexual assault was determined by the college not to be credible.  The court denied summary judgment, finding that the plaintiff had provided sufficient evidence of the college's failure to respond to the student's safety concerns in connection with the bullying.  It specifically concluded that harassing a student because of a meritless report of sexual assault is sex-based. *Id.* at 168.  The court considered and rejected the college's assertion that "the harassment had nothing to do with Jane Doe's sex or gender."  *Id.*  It reasoned that:

> [w]hen a student reports a sexual assault, or she experiences harassment because of her report of a sexual assault, it is sex-based.  A factfinder could determine that in the context of Ms. Doe's assault allegation, she was harassed, by way of incident reports for instance, because of her report of sexual assault. . . .  As a matter of law, the Court cannot say, under these circumstances, that the contacts and alleged hostility from Ms. Doe's peers failed to amount to sexual harassment.

*Id.* (internal quotation omitted).

If bullying and harassment against someone because they made a sexual assault claim is sex-based harassment, then bullying and harassment against someone because they were reported to have committed sexual assault is also sex-based.  *See also Jane Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300 (10th Cir. 2020) (finding gender-based harassment when students harassed another student for bringing a sexual assault allegation, reasoning "retaliation for reporting sex discrimination comes within the meaning of the statutory language prohibiting discrimination 'on the basis of sex.'") (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S.

33

167, 173-174 (2005) (holding "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint'")); *Douglass v. Garden City Cmty. Coll.* 2023 WL 34439, at *10 (D. Kan. Jan. 4, 2023) (denying college's request for summary judgment on deliberate indifference claim based on harassment directed by students to another student who reported sexual assault when plaintiff "established a genuine issue of material fact whether [the college] reasonably responded to known reports of ongoing bullying toward her and other Title IX reporters and whether [the college] reasonably believed that it had been successful in stopping the retaliatory harassment.").

### 2. The Amended Complaint Asserts Sufficiently Severe Harassment to Withstand a Motion to Dismiss.

Haverford's argument that the harassment and bullying to which John has been subjected over nearly the past year and a half is insufficiently severe or pervasive to support his claim both ignores the specific allegations John pleads in his Amended Complaint and relies on inapposite authority.[24]

As an initial matter, the severity element of a deliberate indifference claim is particularly ill-suited for a determination on the pleadings. *Jane Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1312 (10th Cir. 2020) ("Thus, we have observed that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact . . . and it is even less suited for dismissal on the pleadings. . . . The complaint need not provide details of the time, place, offender, and precise statement for

---

[24] Haverford's belief that the harassment and bullying of John is not severe reveals a disturbing indifference to the well-documented effects of social isolation, let alone harassment and ostracism, on a young person. As Haverford is well aware, the effect of similar bullying—in particular based on a false rape allegation—has at times caused young people to take their own lives, and also caused educational institutions to take responsibility for their part in failing to protect the student, as in a recent similar case involving a high school student at the Lawrenceville School in New Jersey. *See* https://www.nytimes.com/2023/04/30/nyregion/lawrenceville-school-suicide.html

every incident.").  Moreover, when considering the allegations in support of severity and pervasiveness, the Court should consider the impact on the harassed student as pleaded.  *Id.* ("Adding to the evidence that the harassment was severe and pervasive are the allegations regarding the impact of the harassment on Ms. Doe and the evaluations of third parties.").  Here, John has included ample allegations establishing that the physical and verbal harassment as well as the ostracism he experienced from his fellow Haverford students was severe, had a major effect on his daily life on campus, and had a significant adverse effect on his studies.

For example, in addition to claiming that a student published John's name on social media to falsely identify him as a sex-offender and call for him to be bullied, the Amended Complaint alleges:

- "John was visibly shaken and traumatized by the personal attacks he experienced during the meeting, so much so that the Associate Dean in attendance pulled him aside at the conclusion of the meeting to ask if he was OK and subsequently contacted John's Advising Dean to check in on him."  (Am. Compl. ¶ 78.)

- "[N]ot only has John been socially shunned generally, he has been told both by former teammates and by non-team friends that they can no longer associate with him as a result of the rumor."  (*Id.* at ¶ 83.)

- "John met with his Advising Dean *eight times* to discuss . . . the ongoing gender-based harassment he was experiencing and the impact it was having on his studies and emotional well-being."  (*Id.* at ¶ 89.)

- John reported to the College that he had been "menaced by coaching staff, teammates, and individuals on campus."  (*Id.* at ¶ 91.)

- "John suffered from, and has continue to suffer from, a diminished ability to perform his academic work both in and outside of the classroom as a result of the abuse and ostracism to which he was and has been subjected.  He needed multiple extensions during the spring 2022 semester to complete his academic work, and, as a result, was forced to take an incomplete in one of his courses, which he was required to make up over the course of the summer. John's mood, confidence, and overall mental health also suffered and have continued to suffer."  (*Id.* at ¶¶ 102-103.)

- "During the fall 2022 semester, John continued to experience harassment and ostracism. For example, in early September, shortly after returning to campus, John was physically assaulted during an outdoor Haverford social event."  (*Id* at ¶ 104.)

35

- "As a result of these kinds of experiences, John felt, and has continued to feel, compelled to limit his interactions with other students and spent, and has continued to spend, most of his time studying in his dormitory room unless going to class, getting meals, or working out, with very little campus social interaction." (*Id.* at ¶ 105-108.)

- "John continues to be the target of unchecked gender-based harassment and ostracism by his peers at Haverford.  His college experience has been devasted by the false and malicious rumor and its mishandling by the College, which senselessly allowed it to form the basis of an official College sanction."  (*Id.* at ¶ 154.)

- "John has received and continues to receive psychological counseling to help him cope with the stress and anguish he has experienced and continues to experience through harassment, bullying, and ostracism by his peers . . . ." (*Id.* at ¶ 155.)

As the Tenth Circuit's decision in *Jane Doe v. Sch. Dist. No. 1, Denver, Colorado* made clear, a plaintiff is not required to list every single incident of harassment in the complaint to establish the severity requirement of a deliberate indifference claim.  Here, John has pleaded more than enough to satisfy the severity element.  *See Jane Doe v. Ohio University*, No. 2:21-CV-00858, 2023 WL 2652482 at *6 (S.D. Ohio Mar. 27, 2023) (denying university's motion for summary judgment on deliberate indifference claim and finding sufficiently severe harassment when evidence showed that "she was called a liar, was the target of a social media group, was subject to mean comments, experienced unwanted poking, was triggered by [the presence of her alleged assaulter (whom the university found not responsible)], was called a racist, and that these incidents took place over the course of months").

Haverford's reliance on *Frazer v. Temple Univ.*, 25 F. Supp. 3d 598 (E.D. Pa. 2014) is misplaced because it involves allegations of conduct far less severe than the conduct John describes in his Amended Complaint.  The *Frazer* complaint alleged merely that the plaintiff's ex-boyfriend followed her around campus and stood beside her in the cafeteria and "stared at her while she was having a conversation with a fellow student."  *Id.* at 614.  Those allegations, which the court described as the conduct of a "jilted boyfriend," are simply not comparable to John's allegations.

**3.**   **Haverford's Abject Failure to Respond to John's Complaint of Harassment Was Clearly Unreasonable.**

John alleges that Haverford ignored his repeated complaints to Haverford administrators that he was being targeted for harassment and bullying, his written request to his advising dean on April 7, 2022, that Haverford convene a disciplinary panel to address that conduct, and his specific request that the College discipline Student 1 for her social media posting calling on all students to bully him.

Ignoring and doing nothing in response to credible complaints of harassment is *per se* unreasonable.  Haverford attempts to sidestep this obvious problem by marshalling irrelevant steps it took in response to John's repeated requests to rejoin his varsity sports team.  (Memo at 20.)  For example, Haverford points to John's assertion that the Title IX Coordinator spoke with Captain A and another student in connection with the false rumors that John had committed a sexual assault.  (*Id.*)  This conversation has no bearing on John's deliberate indifference claim.  As is clear from the Complaint, the Title IX Coordinator did not speak to Captain A in response to John's request for action to be taken against Student 1, who posted John's name on social media and called on others to bully him.  Rather, the College met with Captain A not to help John, but to ascertain the identity of John's alleged victim and to make clear that the Title IX Office "was available to assist someone in making a Title IX complaint" against John.  (Am. Compl. ¶ 99.)  Simply stated, the action Haverford took in connection with John's efforts to be reinstated as a varsity athlete, including speaking with his teammates, is irrelevant to John's deliberate indifference claim, which focuses on his specific request for discipline against Student 1 and for appropriate action to be taken to stop the bullying and harassment John experienced on campus from other students.  Haverford's only response to this failure is to attempt to blame John for not filing a formal complaint under its Sexual Misconduct Policy, a response that, as

37

discussed above, both admits the substance of his allegations and ignores the fact that no one advised him to do so, that his doing so was not required to trigger the Policy, and that refusing to respond at all to his written request for a disciplinary panel for this reason is patently unreasonable.

Finally, Haverford mistakenly asserts that it "offered to provide John with supportive measures," citing to paragraph 93 of the Amended Complaint.  (Memo at 20.)  However, that paragraph actually asserts:

> John's Advising Dean said only that she *would see* what she and others might be able to do to "support" John but did not convene a disciplinary panel or otherwise respond to his request to discipline the students responsible for his ongoing gender-based harassment. *And the College provided no tangible support to him.*

(Am. Compl. ¶ 93) (emphasis added).  John's Amended Complaint controls the facts on a Rule 12(b)(6) motion.  Regardless, it is undisputed, indeed admitted by the College, that John was suffering months of harassment and bullying, that the College knew about it directly from John, and that John sought protection and support, not to mention redress, and that the College ignored his entreaties and provided none.

### D.     The Complaint States a Claim for False Light.

To adequately plead a claim of false light, John must allege that Haverford gave "publicity to a matter concerning [John] that places [John] before the public in a false light" and that "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) [Haverford] had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [John] would be placed."  *Krajewski v. Gusoff*, 53 A.3d 793, 805–06 (Pa. Super 2012) (citing Restatement (Second) Torts, § 652E.)

Haverford does not challenge, and therefore concedes, that any communication by it suggesting John was responsible for sexual assault would place John in a highly offensive false

light.  Nevertheless, Haverford asserts that John's complaint fails for two reasons, neither of which is correct.  First, the College argues that John does not allege that Coach 1 and Haverford published to enough people the College's *de facto* determination that John was removed from the team for a rumored sexual assault.  Second, the College argues that the communications by Coach 1 identified in the complaint are non-defamatory statements of opinion and that Coach 1 held a conditional privilege to repeat those allegations to John's teammates.  Neither argument has merit.

### 1.    The College Publicized John's Removal from The Team (Falsely Implying He Committed Sexual Assault) to John's Teammates, the College, the League, and the Public at Large.

A false light claim requires proof that an offensive and misleading message was communicated by the defendant to a large number of people.  *Byars v. Sch. Dist. Of Philadelphia*, 942 F. Supp. 2d 552 (E.D. Pa. 2013).  John's complaint meets this requirement in multiple ways.

John alleges that Coach 1 communicated the false allegation of sexual assault to John's teammates and assistant coaches, consisting of approximately fifty individuals.[25]  John is entitled to a reasonable inference that Coach 1's communications of the false allegation to John's teammates and staff, given the context of John's separation from the team as well as Coach 1's position of authority, reasonably led members of the team and the larger Haverford community to believe, erroneously, that the false rumor was true.  That inference is all the more appropriate given John's plausible allegation that Coach 1 actually believed the false allegation of sexual assault.  As discussed above, John alleges that Coach 1 improperly removed him from the team on February 4, 2022, because of the false allegation that Coach 1 had learned of earlier that same

---

[25] John did not cite to the specific team roster or allege the exact number of members in his Complaint to preserve his anonymity, but Haverford is obviously aware of this information.

day.  (Am. Compl. ¶¶ 4, 51-52.)  Moreover, "Coach 1 continued to give credence to the false rumor, despite his denials and the lack of an actual complaint or even a shred of factual support." (Am. Compl. ¶¶ 5, 68.)   John further alleges that Coach 1 made public and private written and oral statements to John, commenting directly in response to the alleged sexual assault rumors, that John needed serious psychological help and should leave the College immediately.  (*Id.* ¶¶ 76, 84.)  Coach 1 also threatened to quit if John were reinstated to the team—further supporting the inference (which must be drawn in John's favor) that Coach 1 believed John committed sexual assault and communicated that belief to others.  (*Id.* ¶ 101.)

Second, Coach 1 and Haverford's athletic department publicized John's removal from the team—in the context of a rumor that John had raped another student—not just to the Haverford Community (including its roughly 1500 students), but to the entire athletic conference (made up of hundreds of athletes) when it removed John's name from the roster and banned him from competing in a Haverford uniform.[26]  John alleges that it was only after he was removed from the team that calls for him to be bullied appeared on social media, and that it caused the harassment he experienced on campus—leading to the reasonable inference that the removal placed John in the false light of an adjudicated sex offender at Haverford.  (*See Id.* ¶ 88.)  John's complaint also alleges that two Haverford deans admitted that "Coach 1 had failed to handle the rumor appropriately and had otherwise behaved inappropriately" when "taking matters into his own hands."  (*Id.* ¶ 94.)

---

[26] The publication of the removal of John from the team roster on Haverford's website, a generally accessible public-facing website designed for unrestricted public consumption and not behind any firewall, published that information to the public at large.  Anyone who learned of the rumor that John had raped another student who did not know the rumor's falsity would naturally conclude, given his public removal from the team roster on Haverford's website, that the rumor was true.

Haverford's reliance on *Byars* for the proposition that John's allegations are legally insufficient to establish publicity is misplaced.  In *Byars*, the plaintiff's sole allegation concerning publicity was that he was escorted out of the building "in the presence of others." Notably, the court found that act *was* sufficient for a standard defamation claim (and denied the defendant's motion to dismiss it).  *Byars* 942 F. Supp. 2d at 565.  But in concluding that being escorted from the building was insufficient for false light purposes, the court reasoned: "While Plaintiff has alleged that he was escorted out of the building 'in the presence of others,' he has not plausibly pled that the number of individuals was so large as to constitute publicity. . . . Plaintiff has not alleged that [defendants] communicated the suspension to . . . a large audience." *Id.* at 568.

John has done far more than allege that Haverford communicated its decision to remove John from the team for sexual assault "to others."  The direct message that John was responsible for sexual assault was expressly communicated by Haverford's coaching staff and Athletic Department to John's entire team.  And the indirect message that John was an adjudicated rapist was communicated by Haverford's removal of John's name from the team roster published on Haverford's website contemporaneously with the circulation of a false rumor that John was a rapist.  This publication was made to the entire athletic conference, the 1500+ members of Haverford's student population plus all faculty and staff, as well as to the public at large.  These allegations are more than sufficient to establish publicity.[27]  *See In re Lansaw*, 424 B.R. 193, 199–200 (Bankr. W.D. Pa. 2010) (denying defendant's motion for summary judgment and finding sufficient evidence of publicity when defendant placed a sign containing false message

---

[27] Haverford's reliance on *Bhatti v. Republican Caucus of Pennsylvania House of Representatives*, 2020 WL 3412661 (M.D. Pa. June 22, 2020) fails for the same reason.  *See id.* at *7 ("[T]he sole basis of Bhatti's false light claim continues to be his physical removal from the Capital in the presence of others.").

41

that was seen by between fifty and two-hundred people.); *see also Casselli v. City of Philadelphia*, 54 F. Supp. 3d 368, 381 (E.D. Pa. 2014) (denying motion to dismiss on publicity element based on false facts communicated to plaintiffs' co-workers and union members, but not to the public at large).

### 2. Any Statements by Coach 1 that Support the False Assertion that John Committed Sexual Assault or was Mentally Ill Cannot Be Privileged.

Haverford contends that any defamatory statements attributable to Coach 1 are simply statements of opinion that are not capable of defamatory meaning and that Coach 1 was privileged to discuss the false allegations with John's teammates because they had a common interest in ascertaining whether John was a sexual predator.  Neither argument has any merit.  As an initial matter, any statement insinuating that John committed sexual assault is per se defamatory, which is what John alleges.  Haverford cannot hide behind the notion that Coach 1 was only repeating conjecture or providing personal opinion, which at best would give rise to another dispute as to material facts and provide cause to deny Haverford's motion.  *Dempsey v. Bucknell Univ.*, 76 F. Supp. 3d 565, 580 (M.D. Pa. 2015), *aff'd* 834 F.3d 457 (3d Cir. 2016) (recognizing under Pennsylvania law that an action involving "words imputing a criminal offense, a loathsome disease, business misconduct, or serious sexual misconduct is considered slander per se").   Moreover, statements of opinion are only non-defamatory when they are based on true, disclosed facts.  *McCafferty v. Newsweek Media Grp.*, Ltd., 955 F.3d 352, 360 (3d Cir. 2020) ("Opinions based on true, disclosed facts cannot support a false-light claim unless they create a false impression.")  John alleges there was no truth to the rumored sexual assault or to Coach 1's suggestion that John was mentally ill, which the Court must accept as true in deciding the College's motion.  And by removing John from the team based on the rumor, Coach 1 created the false impression that the rumor was true.

42

Haverford points out that "[c]ases in which challenged statements feature equivocal or cautionary language are routinely dismissed because the statements are non-actionable opinion." (Memo at 24 (citing *Pace v. Baker-White*, 432 F. Supp. 3d 495, 512 (E.D. Pa. 2020)).)  Notably, *Pace* and the cases it cites all involve what the court described as "hedging language" which made clear that the declarant was not attempting to assert a true fact.  *Id.* (citing the use of phrases such as "might have," "seemingly," "we do not know," etc.).  By arguing that whatever Coach 1 said to John's teammates should be viewed in this light (without stating what he did say), Haverford is asking the Court to draw an inference *in its favor*.  Of course, this request flies in the face of the standard the Court must apply to Haverford's motion, and nothing John alleges in his Complaint warrants such an inference.  It is John who is entitled to have inferences drawn in his favor, and here the only inference to be drawn is that Coach 1 communicated his belief in the rumor to others.

John was not present for the team meetings between Coach 1, the assistant coaches, and John's teammates and therefore cannot recite precisely what was said.  But the Amended Complaint asserts sufficient facts to give rise to the plausible inference that Coach 1 both believed and made statements suggesting that John was responsible for sexual assault.  As noted above, John alleges that Coach 1 instructed John to step away from the team due to the false allegation when he removed John from the team on February 4, 2022, the same day Coach 1 learned of the false allegation.  That decision itself communicated not only Coach 1's belief in the false allegation but the incorrect factual proposition that the allegation was true.  John alleges that Coach 1's repeated subsequent denials of John's requests for reinstatement also communicated both Coach 1's belief in the false allegation and the incorrect proposition that the allegation was true.  So too for Coach 1's threat to quit the team if John were reinstated over his

objection and Coach 1's repeated oral and written statements that John had psychological problems and should leave Haverford—all within the context of the March 22 meeting that focused entirely on the allegations the John had committed sexual assault.  Based on these facts, John should be permitted to take discovery on the specific statements made by Coach 1 to his teammates.

With regard to the notion that Coach 1's statements to team members are somehow privileged and thereby not capable of being defamatory is fantastical.  Haverford points to no authority that would suggest Coach 1 and John's undergraduate teammates shared a common interest in ascertaining whether John was responsible for sexual assault.  Moreover, Coach 1, a mandatory Title IX reporter who received a report of sexual misconduct and reported it to the Title Office, has an obligation of confidentiality and is prohibited from disclosing information about the purported assault to students.[28]

The case Haverford cites, *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. 1995), is inapposite.  In *Maier* the court dismissed an employee's defamation action against her supervisor for reporting that she was crude and vulgar to a branch manager in part because the court determined the communication was privileged.  It reasoned "[a]s a supervisor, appellee correctly believed the branch manager had a right to know about incidents involving appellant."  *Id.* at 706.  The Court further noted that "communications among management-level persons concerning employee's job performance were necessary for the operation of the department and therefore privileged."  *Id.*  There is simply no comparison between a report from an employee to

---

[28] The Policy states: "**Privacy**. References made to privacy mean *the actions of College employees*, who cannot guarantee confidentiality, *to maintain privacy to the greatest extent possible.*  Information disclosed will be relayed only as necessary to investigate and/or seek a resolution and to notify the Title IX Coordinator or designee, who is responsible for tracking patterns and spotting systemic issues.  The College will limit disclosure as much as practicable, even if the Title IX Coordinator determines that a request for confidentiality cannot be honored."  (Am. Compl. Ex. A at p. 7) (emphasis added).

44

a person in a supervisory capacity concerning another employee's on-the-job conduct and what happened here.  Coach 1, who, according to the College, has complete discretion over team roster management, had no business, academic, or any other need to discuss sexual assault allegations concerning John—allegations that had nothing to do with any member of the team— with John's teammates.  Haverford cannot simply claim privilege because Coach 1 and his athletes were part of a team.  *See Rankin v. Phillippe*, 211 A.2d 56, 58 (Pa. Super. 1965) ("One relying on the rule of privilege for uttering defamatory statements must establish all facts necessary to bring himself within the rule, that is, that the communication was one made on a proper occasion, from a proper motive, in a proper manner, and based on reasonable or probable cause.")  There is no justification for Coach 1 to entertain wild speculation concerning whether John was responsible for sexual assault with his undergraduate athletes.[29]

### E.        The Complaint States a Claim of Defamation Against Coach 1.

Haverford objects that the Complaint fails to state a claim of Defamation against Coach 1, again arguing that any statements he made concerning John's alleged sexual assault were non-actionable opinion and privileged, incorporating by reference those same arguments with respect to John's false light claims.  Accordingly, John incorporates his prior responses to those arguments as set forth above.

---

[29] Even if Coach 1 had a conditional privilege under the law to discuss the allegation against John with John's teammates—which he does not—John would still be entitled to discovery to determine whether that privilege was abused.  *See Agriss v. Roadway Exp., Inc.*, 483 A.2d 456, 463 (Pa. Super. 1984) ("It is a question of law whether privilege applies in a given case, but a question of fact for the jury whether a privilege has been abused."); *see also Constantakis v. Bryan Advisory Servs., LLC*, 2022 PA Super 81, 275 A.3d 998, 1025 (2022) ("Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.") (internal quotation and citation omitted).

45

The only separate argument Haverford makes as to defamation is that because certain of John's team members had already discussed the rumor that John may have assaulted someone, Coach 1 could not harm John's reputation no matter what he said about those rumors.  (Memo at 27.)  John is aware of no rule of law that would permit a defendant to make false defamatory statements, and be insulated from liability as to those statement, as long as all recipients of the communication had already heard similar statements from another source, and Haverford cites no such rule.  Such a rule would fly in the face of the doctrine of defamation per se, which provides that some accusations are so heinous—such as falsely stating that someone is a rapist—that no analysis of the reputational impact is required.  *E.g., Dempsey*, 76 F. Supp. 3d at 580; *Chicarella v. Passant*, 494 A.2d 1109, 1115 n.5 (Pa. Super. 1985).

Moreover, Haverford's argument is premature, as discovery is necessary to determine exactly what Coach 1 said to John's teammates, and what they knew or believed at the time. Again, at this point John is aware and has alleged that Coach 1 agreed with the accusations of Captain A, and that Coach 1 declared openly and repeatedly in response to Captain A's accusations at the March 22 meeting that John Doe had mental problems and needed serious psychological help, which John should leave the College to receive.  These false statements are themselves defamatory and plausibly and reasonably communicate that John was a sexual assaulter of women.  Given these statements, John has articulated a reasonable basis to infer that Coach 1 contributed to the erroneous belief held by many other of John's teammates that John had committed sexual assault.

Moreover, the *Byars* decision, relied on by Haverford in its False Light argument, makes clear that the Coach's February 4, 2022, removal of John from the team itself had defamatory meaning and supports a defamation claim.  *Byars* 942 F. Supp. 2d at 565 (holding that

employee's termination in front of co-workers "could certainly imply that Plaintiff acted improperly, and thus could reflect negatively on his integrity" and that the presence of others "as he was escorted out of the building" was "sufficient to state that the conduct was communicated to others" such that he "plausibly stated a claim of defamation"). As discussed above, John plausibly pleads that Coach 1 removed him from the team based on the sexual assault allegation. Coach 1's conduct in removing John from the team on February 4, as pleaded by John in the Amended Complaint (which must be accepted as true) constitutes defamation.

### F. The Complaint Alleges Sufficient Extreme and Outrageous Conduct to Survive a Motion to Dismiss.

As an initial matter, in determining the sufficiency of John's pleadings with respect to his claim for intentional infliction of emotional distress (IIED), the Court should bear in mind that "rare is the dismissal of an intentional infliction of emotional distress claim on a motion to dismiss." *Maxson v. YRC Inc.*, 2015 U.S. Dist. Lexis 92451, 2015 WL 4394272, at *7 (D.N.J. July 16, 2015) (quotations and citation omitted); *see also Bishop v. Okidata, Inc.*, 864 F. Supp. 416, 428 (D.N.J. 1994) (refusing to dismiss plaintiff's claim related to alleged disability discrimination at the motion to dismiss stage even though the "court [was] skeptical of [plaintiff's] ability to meet the extremely high standard for an employment-related intentional infliction of emotional distress claim"). Discovery likely will establish facts to conclusively demonstrate what John already reasonably alleged upon information and belief: that Haverford knew the sexual assault allegation against John was false[30] but did nothing to protect him from

---

[30] Haverford correctly points out in a footnote the obvious fact that, without having taken discovery, John does not yet have access to the actual communications between the College's Title IX Office and the purported victim. (Memo at 5 n.4.) But it mistakenly concludes that, therefore, John has no basis for this allegation. *Id.* Not so. John properly alleges that (i) he had no sexual conduct—or any physical contact whatsoever—with the purported victim (Am. Compl. ¶¶ 3, 97); (ii) the College told John both that it had communicated with the purported victim and that she had decided not to file a complaint (*Id.* ¶ 96); (iii) Haverford's Title IX Office itself declined to file a complaint, which it is empowered to do if

47

punishment by his teammates and coaches and, further, did nothing to stop the harassment directed at John by others based on the rumor.  (Am. Compl. ¶ 6.)  Actual knowledge of the falsity of the rumor would indeed set this case apart from the facts of *Doe v. The Trustees of the Univ. of Pennsylvania*, on which Haverford relies.  There, the court noted that an allegation that a university used unreasonable procedures to determine that a student was responsible for sexual assault was not extreme and outrageous.  270 F. Supp. 3d 799, 827 (E.D. Pa. 2017).  Here, by contrast, the procedures that Haverford used before sanctioning John for purported sexual misconduct were not merely unreasonable but nonexistent.  And John credibly alleges that Haverford did so with knowledge that there was no factual basis to the false allegation of sexual assault.

In a factually analogous case, the First Circuit, applying Rhode Island law (which if anything sets a higher bar for an IIED claim than Pennsylvania law[31]), found sufficient facts to reverse a summary judgment decision in favor of a university on a student's IIED claim.  *Doe v. Brown Univ.*, 43 F.4th 195, 209 (1st Cir. 2022).  In *Brown*, the university had disciplined a student for a purported violation of a no-contact order maintained by the university during the investigative phase of a sexual misconduct proceeding without first investigating the claim.  The First Circuit held that the student had developed sufficient evidence to support an IIED claim based on that failure.  Citing to Restatement principles, the court noted that a university is under

---

the facts warrant (*Id.* ¶ 176); and (iv) the Title IX Officer told John that her job was to "assist someone in making a Title IX complaint, not to entertain rumors."  (*Id.* ¶ 99.)  Based on these well-pleaded facts, it is reasonable for John to believe, and for the Court to accept the inference, that the purported victim confirmed the falsity of the rumor.

[31] The conduct required to state an IIED claim in Rhode Island must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004).

48

a heightened duty of care to its students given its position of authority, observing that a student "stands in a particularly vulnerable relationship vis-à-vis the university, the administration, and the faculty." *Id*. at 210.  The court also pointed to the university's knowledge that the student was in a vulnerable state of mind when it threatened discipline based on "unconfirmed, dubious allegations." *Id.* at 211.

In this case, through John's eight meetings with his advising dean, as well as through John's emotional breakdown at the March 22 meeting, Haverford was keenly aware of the impact the false rumors were having on John as well as the impact of the administration's tacit support for the individuals responsible for the rumors and harassment.  It is outrageous enough that Haverford failed to protect John from vicious harassment and bullying stemming from a false rumor, but its decision to side with the bullies and remove John from his team based on that same rumor, which the College knew to be false, is beyond the pale.

### G.    The Complaint States a Claim for Declaratory Judgment.

The Declaratory Judgment Act requires an actual controversy between the parties before a federal court may exercise jurisdiction.  28 U.S.C. § 2201(a).  An actual controversy exists when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant relief." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 118 (2007).  The Complaint makes that actual controversy clear.  Because Haverford's motion to dismiss John's other well-pleaded claims is without merit, so too is its motion to dismiss his claim for declaratory judgment. John's request for retroactive reinstatement to the team that was a central to his collegiate life and existence, even if primarily symbolic, is a proper component of an award if John's other claims are successful, and it is one well within the Court's equitable powers to provide.

ClarkHill\L7233\459349\271590039.v2-5/11/23

## V.      CONCLUSION

For the foregoing reasons, Plaintiff John Doe respectfully requests that the Court deny

Defendant's Motion to Dismiss.


Dated:  May 11, 2023                                    Respectfully submitted,


                                                         */s/ Patricia M. Hamill*
                                                        Patricia M. Hamill (Pa. Id. No. 48416)
                                                        Andrew S. Gallinaro (Pa. Id. No. 201326)
                                                        Clark Hill
                                                        Two Commerce Square, 2001 Market Street,
                                                        Suite 2620, Philadelphia, PA 19103
                                                        (t) (215) 864-9600
                                                        (f) (215) 864-9620
                                                        (e) phamill@clarkhill.com
                                                             agallinaro@clarkhill.com

                                                        *Counsel for Plaintiff John Doe*

50

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was filed on May 11, 2023 via the Court's electronic case filing system (ECF) and is available for downloading and viewing by all counsel of record.


_/s/ Patricia M. Hamill_____