**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **JOHN DOE,** | | : | |
| | **Plaintiff,** | : | |
| | | : | **CIVIL ACTION** |
| | **v.** | : | **No. 23-299** |
| | | : | |
| **HAVERFORD COLLEGE et al.,** | | : | |
| | **Defendants.** | : | |

**McHUGH, J.**                                                                          **August 7, 2023**

### MEMORANDUM

This is an action brought by a former student athlete at Haverford College who contends that he was unfairly excluded from team membership because of unfounded allegations that he committed sexual assault. Plaintiff John Doe[1] contends that Haverford's Sexual Misconduct Policy constitutes a contract, which it breached. He also advances common law tort claims and alleges discrimination in violation of Title IX. Doe alleges a plausible breach of contract claim, and marginally pleads a defamation claim against his coach. But the facts alleged are otherwise a poor fit for the remaining claims Doe presents, and those claims will be dismissed.

## I.      Relevant Background

Plaintiff John Doe recently completed his senior year at Defendant Haverford College ("Haverford" or "the College").[2] For much of Doe's time at Haverford, he was a member of a varsity sports team at the College and was selected as a co-captain of his team in the fall of 2021.

---

[1] I previously granted Plaintiff's request to proceed anonymously. ECF 6. To preserve his anonymity, Plaintiff also refers to the three individual defendants by pseudonym.

[2] Per Doe's complaint, he was on track to graduate from Haverford in May 2023 with a Bachelor of Arts degree. Am. Compl. ¶ 24. I previously denied his motion for injunctive relief.

Am. Compl. ¶ 30.  Prior to the events at issue in this case, Doe alleges that he had no conflicts with his teammates or coaches.  *Id.* ¶ 31.  Doe asserts that he was always a student in good standing with the College and had a "completely clean" disciplinary history.  *Id.* ¶¶ 31, 152.

### A.  Allegations as to campus activism at Haverford

In October 2020, during Doe's sophomore year, student-led protests for racial justice emerged on Haverford's campus.  *Id.* ¶ 34.  The immediate impetus for these protests was a statement from the Haverford administration regarding a police shooting in Philadelphia, but the protests were also spurred by pre-existing concerns among the student body regarding racial justice on campus.  *Id.*  The protests ultimately led to a two-week campus-wide strike, during which students refused to attend classes, participate in campus activities, or work at campus jobs.  *Id.* Defendant Captain A, one of Doe's co-captains on his athletic team, was one of the leaders of this strike, and Defendant Coach 1, the head coach of Doe's athletic team, was publicly supportive of Captain A's "great leadership role" in the strike.  *Id.* ¶¶ 34, 39.

Although the strike and its demands were supported by many in the Haverford community, Doe alleges that this support was not universal, and disagreements over the strike became extremely divisive.  *Id.* ¶ 35.  Students who were less than fully aligned with the strike's objectives and methods, or who took actions that were perceived as "crossing the picket line," were sometimes harassed by organizers and supporters of the strike.  *Id.*  This atmosphere extended to campus athletic teams, and certain supporters of the strike refused to be on the same team as teammates who opposed, or appeared to oppose, aspects of the strike.  *Id.* ¶ 36.  After Doe supported an editorial in the student newspaper in late October expressing support for some aspects of the strike and its demands but criticizing attempts to silence dissent, he was removed from a message thread organized by the leaders of the strike.  *Id.* ¶ 37.

Several months later, in April 2021, Haverford campus safety found an African American man sleeping in a campus trailer and alerted local police, who arrested the man and charged him with criminal trespass. *Id.* ¶ 40. Students in a different campus text thread of strike supporters, which included Doe, criticized Haverford's response and accused the College of continuing to engage in racist behavior. *Id.* After Doe expressed his view that calling the police in these circumstances was insufficient to establish that Haverford was racist, Doe himself was accused of racism and removed from the group. *Id.*

**B. Allegations as to the sexual misconduct rumor and Doe's removal from his athletic team**

A year later, in early 2022, an allegedly false rumor began to circulate on campus that Doe had sexually assaulted an unnamed female student at Haverford. *Id.* ¶¶ 42-43. The rumor contained no specific details about the alleged assault, and Doe has consistently denied any physical or sexual contact with the student identified as the victim of the assault. *Id.* ¶¶ 3, 42-44. According to Doe, the false rumor was created to penalize Doe for his less than absolute support for the campus strike, his opinions that did not fully align with those of strike organizers, and his association with individuals who opposed the strike. *Id.* ¶ 41.

Captain A and another of Doe's co-captains reported the allegation to Coach 1 in early February of 2022. *Id.* ¶ 4. The coach advised Doe that he was required to report allegations of sexual misconduct due to his position and notified Haverford's Title IX Office of the allegation. *Id.* ¶¶ 50-51. The coach directed Doe to step away from the team until it was resolved, and that same day Doe notified his teammates via email of his intention to briefly step away from the team. *Id.*

3

The Title IX Office reviewed the information provided by Coach 1 and considered whether it would open a formal investigation into the allegation. *Id.* ¶¶ 6, 55-57. At some point, the Office also communicated with the alleged victim, who stated that she did not intend to file any formal complaint against Plaintiff. *Id.* ¶¶ 96-97. After conducting this preliminary inquiry, the Title IX Office did not open a formal investigation and communicated to Plaintiff that he could continue his life at Haverford as normal. *Id.* ¶¶ 55-57.

Shortly thereafter, Doe met with his coach, informed him of the Title IX Office's conclusion, and asked to rejoin the team. *Id.* ¶ 58. The coach, however, advised Doe that he was no longer welcome on the team, as the other captains did not want him to rejoin. *Id.* ¶ 59. At a follow-up meeting on March 15, 2022, the coach advised Doe that the other captains' position was driven by the sexual assault allegation against him. *Id.* ¶ 63.

One week later, on March 22, Doe had another meeting with his coach, the Title IX Coordinator, the Athletic Director, a Senior Associate Dean of the College, and the team co-captains. *Id.* ¶ 69. The meeting focused on the sexual assault allegation against Doe and his co-captains' strong desire to prevent Doe from returning to the team due to the allegation, though the Title IX coordinator emphasized that Doe faced no existing or potential Title IX investigation. *Id.* ¶¶ 70-75. Doe's co-captains also briefly discussed more general concerns about Doe's misogynistic behavior. *Id.* During the meeting, Coach 1 confirmed that Doe would not be permitted to rejoin the team and stated repeatedly that Doe had mental health issues and should leave the school to seek psychological treatment. *Id.* ¶¶ 75-76. Sometime after this meeting, Haverford finalized Doe's separation from the team by removing his name from the team roster published on the College's athletics website. *Id.* ¶ 81.

4

### C. Allegations as to Doe's continuing attempts to rejoin his athletic team

Since March 2022, Doe – along with his parents, grandmother, and counsel – has engaged in numerous communications and meetings with staff and administrators at Haverford to seek reinstatement to the team.  In early May, Doe met with the Dean of Haverford and the Athletic Director to request that he be permitted to rejoin the team.  *Id.* ¶ 100.  But the Dean stood by the coach's actions, emphasizing that participation in athletics was a privilege for students, not a right, and stating that Doe's return would lead other team members and the coach to quit.  *Id.*  In August and September, Doe's family and counsel reached out to Haverford officials in the hope of resolving the issue prior to the fall semester.  *Id.* ¶¶ 110-12.  And on September 9, Doe proposed a plan to Haverford administrators whereby the administration would require Coach 1 to reinstate Doe, and further require Coach 1 to state to the team that Doe was entitled to a "presumption of innocence" and that no player could be excluded from a Haverford athletic team based on a rumor. *Id.* ¶ 114.

In response, the administration rejected Doe's plan and proposed a path to reinstatement that involved Doe meeting with his coach and a co-captain to convince them to allow Doe to rejoin the team.  *Id.* ¶¶ 115.  Doe subsequently met with Coach 1 on October 24, 2022.  *Id.* ¶ 122.  During the meeting, Coach 1 acknowledged that the allegation of sexual assault was not a proper basis to keep Doe off the team, but stated that team members had raised other concerns with Doe returning to the team that were unrelated to the assault allegation.  *Id.* ¶¶ 123-25.  The coach would not elaborate on what these concerns entailed and insisted that Plaintiff discuss these issues directly with his teammates.  *Id.*  Doe was unable to meet with two co-captains of the team until several weeks later, on December 2.  *Id.* ¶¶ 127, 139.  During the meeting, Captain A was steadfast in his belief that Doe should not return to the team.  *Id.* ¶ 140.  When asked to explain why, Captain A

stated that he had general concerns with Plaintiff's treatment of women but did not identify any specific examples of such behavior. *Id.* ¶¶ 141-42.

After this meeting, Doe again reached out to his coach and asked to be reinstated, based on his belief that the teammates' concerns were improperly rooted in unfounded rumors. *Id.* ¶ 143. The coach did not respond, but Doe subsequently received an email from the Athletic Director and Assistant Athletic Director scheduling a meeting for December 19. *Id.* ¶¶ 144-45. At this meeting, the Athletic Director communicated Coach 1's position that Doe's reinstatement was not in the best interests of the team, though the Athletic Director had no knowledge of whether the rumor played any role in Coach 1's decision. *Id.* ¶¶ 146-47. On January 6, 2023, Doe's parents met with the Dean of the College, who refused to alter the decision of Coach 1 based on a coach's discretion to manage his roster and in deference to his concerns regarding team cohesion. *Id.* ¶¶ 149-50.

**D. Allegations as to social impacts of the rumor and Haverford's response**

News of Doe's removal from his athletic team spread quickly within Haverford's small and tight-knit campus community. *Id.* ¶¶ 80-82. The rumor of his sexual assault was allegedly spread even more widely after two social media posts were published on Instagram in late March 2022, in which Defendant Student 1 accused Doe (along with five other male students) of sexual assault and called on Haverford students to harass Doe and the other individuals. *Id.* ¶¶ 82, 88.

Doe presented these posts to his Advising Dean and formally requested in writing that Haverford convene a disciplinary panel to investigate the students, including Captain A and Student 1, who he believed were behind the false rumor that he sexually assaulted someone. *Id.* ¶¶ 88-90. His Advising Dean declined to convene an investigatory panel or otherwise respond to his request to discipline students regarding the rumor, though she communicated to Doe that she would work to find a way to support Doe. *Id.* ¶ 93. At some point around this time, the Title IX

Coordinator also met with Captain A and the student who initially communicated the rumor to Captain A and informed them that "her office was available to assist someone in making a Title IX complaint, not to entertain rumors, and that no complaint existed against [Doe]." *Id.* ¶ 99.

Amid these efforts, Doe claims that his removal from his team, coupled with the rumor circulating on campus, gave the impression that he was guilty of sexual assault and led to a wide range of social consequences. *Id.* ¶ 82. He was socially shunned by former teammates and non-team friends, who told him that they could no longer associate with him due to the sexual assault allegation. *Id.* ¶ 83. His former teammates and friends continued to refuse to associate with Doe during his senior year, and at one point during the Fall 2022 semester another student, who Doe believes was friends with one of the individuals behind the assault rumor, intentionally "body-checked" him at an outdoor campus social event. *Id.* ¶¶ 104-107. As a result of this environment, his mental health and academic performance suffered significantly. *Id.* ¶¶ 102-103.

### E. Allegations as to relevant college policies regarding sexual misconduct and roster management

During the relevant period outlined above, Haverford had a campus "Sexual Misconduct Policy" (the "Policy") that governed reports and allegations of sexual harassment and sexual misconduct on campus. Am. Compl. Ex. A at 5, ECF 27. The Policy "applies to all employees and students" and states: "Reports of Sexual Misconduct committed by any student or employee (including faculty and staff) of the Haverford community will be resolved according to the procedures outlined in this Policy unless otherwise noted." *Id.* at 4. Once a report of sexual misconduct is made, the Policy describes a specific procedure that will be followed. *Id.* at 8. If a Formal Complaint is made under the Policy, the Policy sets forth a detailed set of procedures for investigating and adjudicating the complaint, which include holding a hearing and permitting an

appeal of any findings at that hearing.  *Id*. at 14-15, 19, 24.  According to the Policy, the "College will not issue a disciplinary sanction arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal."  *Id*. at 19.  The Policy contains a non-exhaustive list of fifteen disciplinary sanctions that may be issued after a hearing and appeal, including "Removal from organization, team and/or committee" and "Revocation of leadership or supervisory position."  *Id*. at 24.

Haverford also had a set of athletic policies promulgated in a Student-Athlete Handbook ("the Handbook") during the relevant period.  Am. Compl. ¶ 128.  Prior to November 2022, the Handbook did not discuss an athletic coach's discretion to manage their roster.  *Id.*  In November 2022, however, Haverford updated the Handbook to include the following provision:

> ROSTER MANAGEMENT. Being a varsity athlete at Haverford College is a privilege and not a right. Varsity coaches have broad discretion in determining the individuals who make up his or her team's active roster. This discretion includes, but is not limited to, removal from the roster at any time. Should you feel that you were removed from the team unjustly, you can submit an appeal to the director of athletics.

*Id.*  Although this addition "represented a change in policy" that was "communicated to all varsity team members," this change in language was made with little notice to Doe and the Haverford community at large.  *Id.* ¶¶ 128, 150.

### F.  Procedural history

Doe filed this lawsuit in January 2023 and moved for a temporary restraining order or preliminary injunction reinstating him to the athletic team. After holding an evidentiary hearing, I denied the motion.  ECF 22.

Doe then filed this amended complaint adding claims against Coach 1, Captain A, and Student 1, ECF 26, which Haverford and Coach 1 now move to dismiss.

II.     **Standard of Review**

In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

III.    **Discussion**

### A.  Breach of contract (Count I)

Count I of the Amended Complaint asserts that by removing Doe from his athletic team for sexual misconduct and refusing to reinstate him to the team, Haverford breached its obligations to Doe under the College's Sexual Misconduct Policy.   To plead the elements of a breach of contract claim under Pennsylvania law, Doe must set forth facts regarding (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010).

The Sexual Misconduct Policy likely constitutes a contract between Haverford and John Doe.  Under Pennsylvania law, "the relationship between a private educational institution and an enrolled student is contractual in nature," and a student can bring a breach of contract action when the institution "ignores or violates portions of the written contract."  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  This includes situations where an institution fails to follow established disciplinary procedures for adjudicating student misconduct.  *See, e.g.*, *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480-83 (Pa. Super. Ct. 2007).  Here, the Sexual Misconduct Policy, by its terms, applies to all students and requires that reports of sexual misconduct committed by any student "be resolved according to the procedures outlined in this Policy unless otherwise noted."  Am. Compl. Ex. A at 4, ECF 27.

Doe also presents a plausible argument that the College's actions constituted a breach of the Policy if a jury were to conclude that Doe was removed from the team as a sanction.  Under the Policy, Haverford "will not issue a disciplinary sanction" – including removal from a team – "arising from an allegation of Sexual Misconduct without holding a Hearing and permitting an Appeal, unless otherwise resolved through an Alternative Resolution Process."  *Id.* at 19, 24. Given this language, Doe asserts that his removal from his athletic team violates the Policy. Specifically, Doe alleges that his coach instructed him to step away from the team and refused to reinstate him to the team due to sexual assault allegations – even though the coach was allegedly prohibited from imposing discipline for sexual misconduct without following the process laid out in the Policy.  Haverford disputes this characterization, arguing that the coach's roster management decisions fall outside the purview of the Policy, but I view that as a factual dispute.  At this stage, Doe has pled sufficient facts to plausibly suggest that the College breached its obligations to him under the Policy.[3]

### B.  Title IX (Count II)

Count II alleges that Haverford discriminated against Doe based on his sex, in violation of Title IX of the Education Amendments of 1972 ("Title IX").  Title IX protects against sex-based discrimination in an educational setting, stating, in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has deemed sexual harassment to be a form

---

[3] In denying Doe's prior motion for preliminary relief, I concluded that it was unlikely Doe would prevail on his contract claim.  That conclusion was based on my impression of the evidentiary record.  In ruling on a motion to dismiss, I must take the facts alleged in a complaint as true.

of discrimination actionable under Title IX.  Harassment was first recognized as actionable Title IX discrimination in cases arising out of conduct directed toward students by staff.  *See Franklin v. Gwinnett Cnty. Pub. Sch*., 503 U.S. 60, 76 (1992).  Then, in *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Court concluded that an educational institution can be liable for "student-on-student sexual harassment, if sufficiently severe."  *Id.* at 648-50.  To prevail under *Davis,* a plaintiff must allege that they experienced *sexual* harassment that was "so severe, pervasive, and objectively offensive" that it deprived the plaintiff "of access to the educational opportunities or benefits provided by the school," and that the defendant's response to the harassment was "clearly unreasonable" based on what it knew at the time.  *Id*.  As to pleading, the Third Circuit has held that "to state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."  *Doe v. Univ. of Scis*., 961 F.3d 203, 209 (3d Cir. 2020) ("*USciences*").  But the adequacy of the pleading must be tested against the substantive standard established by *Davis*.[4]

Put simply, Doe fails to present sufficient facts to support a plausible inference that Haverford discriminated against him on the basis of sex.  He primarily argues that the College discriminated against him by failing to address his complaints of gender-based harassment and bullying by other students, but this argument fails because Doe was not subjected to any sex-based harassment as it is understood by the courts.  And while Doe tries to buttress his claim by arguing that the College treated his complaint about bullying different from the rumor that a female student

---

[4] Courts in this Circuit have continued to apply *Davis* to Title IX claims alleging that a college or university was deliberately indifferent to student harassment.  *See, e.g., Doe v. Univ. of Scranton*, No. 3:19-cv-01486, 2020 WL 5993766, at *4 (M.D. Pa. Oct. 9, 2020); *Handley v. Rowan Univ.*, No. 21-cv-16889, 2022 WL 4115730, at *7 (D.N.J. Sept. 9, 2022); *Simonetta v. Allegheny Coll.*, No. 20-cv-32, 2021 WL 927534, at *3 (W.D. Pa. Mar. 11, 2021).

was sexually assaulted by Doe, which the Coach was required to report, these two situations are sufficiently different that no reasonable inference may be drawn from Haverford's differing responses to each.

>    1. *Haverford cannot be held liable under Title IX for failure to address non-sexual harassment.*

Doe's main argument in support of his Title IX claim is that Haverford was deliberately indifferent to the "sex-based harassment" and bullying that Doe endured from other students, despite its knowledge of that harassment and Doe's direct written request that the College address the harassment.

The Complaint certainly pleads a pattern of harassment by other students on campus that might be considered severe and pervasive. A fellow student allegedly authored two social media posts that accused Doe of being a sexual predator and explicitly called on other Haverford students to harass and bully Doe. Am. Compl. ¶ 88. After these posts, and after his removal from his team, Doe alleges that he was socially shunned on campus. *Id.* ¶ 83. His former teammates refused to associate with him, and at one campus event he was even "physically assaulted" by another student. *Id.* ¶ 104. His educational performance and mental health subsequently declined. *Id.* ¶¶ 102-03.

But Doe does not establish that the harassment he experienced was *sexual* harassment, as required to hold an institution liable for student harassment under Title IX. *See Davis*, 526 U.S. at 650. A false accusation of sexual assault is simply not, by its nature, harassment based on sex, even though the underlying conduct alleged is obviously sexual in nature. *See Eilenfeldt v. United C.U.S.D. # 304 Bd. of Educ.*, 84 F. Supp. 3d 834, 839, 842 (C.D. Ill. 2015) (finding that allegations that a male student was called "a rapist, pedophile, and child molester" were insufficient to state a

12

claim that the student was harassed because of his gender); *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 365 (S.D.N.Y. 2016) (rejecting the assertion that calling someone a rapist is inherently gendered); *Doe v. Univ. of Mass.-Amherst*, No. 14-cv-30143, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (dismissing complaint where plaintiff failed to give any examples of conduct that targeted him based on gender rather than his status as a student accused of sexual assault).   Indeed, "[p]ersons of any gender may be perpetrators, or victims, of sexual assault." *Nungesser*, 169 F. Supp. 3d at 365 n.8 (citing Lara Stemple and Ilan H. Meyer, *The Sexual Victimization of Men in America: New Data Challenge Old Assumptions*, Am. J. of Pub. Health, June 1, 2014, at e19).[5]

Doe argues that the campaign of harassment he experienced was nonetheless sex-based given that the other alleged sexual predators identified in Student 1's social media posts were exclusively men.   But this argument is undercut by Doe's allegations that Student 1, Captain A, and others circulated the false rumor about Doe because he was not sufficiently supportive of the ongoing campus strike at Haverford, rather than any sort of antagonism towards men.   *See* Am. Compl. ¶ 41 ("On information and belief, the false and defamatory rumor directed at John . . . is a consequence of his association with opponents of the strike and the perception of his own less than unqualified support for the strike and other perceived positions inconsistent with the beliefs of strike organizers, including Captain A, and strike supporters, including Student 1.").   When harassment is motivated by personal animus unrelated to sex, it falls outside the scope of Title IX's

---

[5] The research of Stemple and Meyer has triggered further study of traditional assumptions about sexual harassment and assault, including on colleges and university campuses.  *See, e.g.*, Kristen M. Budd et al., *Deconstructing Incidents of Campus Sexual Assault: Comparing Male and Female Victimizations*, 31 Sexual Abuse 296 (2019).

protections. *See Davis*, 526 U.S. at 650 (educational institution may only be held liable for harassment by other students under Title IX when the harassment is sexual in nature); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist*., 647 F.3d 156, 165 (5th Cir. 2011) (dismissing Title IX claim where "nothing in the record" suggested that the harasser "was motivated by anything other than personal animus").[6]

> ### 2. *Doe has not presented a plausible argument that Haverford's response to his complaint was rooted in anti-male bias.*

More broadly, Doe argues that Haverford treated his complaint less seriously due to anti-male bias, which constitutes sex discrimination under Title IX.   As evidence of this, Doe points to the purported contrast between Haverford's response to his complaint, which he characterizes as rooted in fact, and Haverford's proactive response to the rumored allegation that Doe had sexually assaulted a female student.  *See* Pl.'s Opp. at 27-28, ECF 39.  Doe further suggests that Haverford was hesitant to discipline Student A because she was a female student who was "standing up for women" by alerting them to potential perpetrators of sexual assault.  Am. Compl. ¶ 192.  Neither of these provides compelling evidence that Haverford discriminated against him based on his sex, however.

As pleaded, Haverford was put on notice about two different kinds of harassment – sexual harassment and social harassment.  The fact that they treated them in different ways does not suggest discrimination based on sex. Significantly, this is not a case of differential treatment of male and female complainants *within* the Title IX disciplinary process, as occurred in *Doe v.*

---

[6] In support of his argument that the harassment he received *was* sexual harassment under Title IX, Doe points to an array of cases where courts have found that retaliatory harassment against a student who made a Title IX report is cognizable harassment under the statute.  But retaliation for reporting conduct sanctionable under Title IX is fundamentally different from the rumor mongering at issue here.

*Princeton University*, 30 F.4th 335 (3d Cir. 2022).   There, a male and female student had been in a steady but volatile relationship.   *Id.* at 340.   After they separated, the students experienced dramatically different responses from university officials when they *both* reported sexual misconduct by their ex-partner – one official told the male student to seek mental health services, while another official told the female student to press charges.   *Id.*   The Court of Appeals held that these facts were sufficient to plead a Title IX claim.   *Id.* at 344-45. But the two types of conduct at issue here – sexual assault and engaging in a campaign of social harassment – are simply too different to serve as appropriate comparators.   Any disparate treatment of the two complaints therefore cannot support a plausible inference of anti-male bias.   *See Saravanan v. Drexel Univ.*, No. 17-cv-3409, 2017 WL 5659821, at *6 (E.D. Pa. Nov. 24, 2017) (noting that a disparate treatment claim under Title IX will face significant difficulties if a plaintiff cannot point to other students who "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the school's treatment of them for it").   And the limited Title IX process that took place was not initiated by a female student treated more favorably than Doe, but rather by Doe's male's coach, a mandatory reporter, further weakening any inference of disparate treatment based on sex.

Second, Doe fails to set forth any concrete facts to create an inference that the College's refusal to discipline Student A (and the other students allegedly harassing Doe) arose from anti-male bias.[7]  Doe puts forth no allegations that his Advising Dean was in any way prejudiced against men.   He does not point to any statistics suggesting that Haverford's disciplinary processes are

---

[7] It is also not clear what disciplinary process Doe sought to invoke, aside from a vague reference to Haverford's Honor Code.  *See* Am. Compl. ¶ 89 n.3.  He does not and cannot contend that his complaints of social harassment triggered protections provided by Title IX.

biased towards one gender.  Nor does he identify any pressure on the Haverford administration to protect women on campus or treat men as less credible in campus disciplinary investigations.  *See, e.g., USciences*, 961 F.3d at 210 (concluding that gender bias was plausibly alleged where the school, "encouraged by federal officials, ha[d] instituted solutions to sexual violence against women that abrogate the civil rights of men and treat men differently than women"); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (holding that gender bias was plausibly alleged where, among other facts, school-affiliated group shared an article titled "Alcohol isn't the cause of campus sexual assault. Men are.").[8]  Without more, Doe's allegations do not give rise to a Title IX discrimination claim.

### C.  False light (Count III)

Doe's third claim asserts that Haverford and Coach 1 committed the tort of false light when they stripped Doe of his leadership position as captain, removed him from his athletic team, and subsequently deleted his name and information from the team website, as these actions suggested that Doe had sexually assaulted someone.  Doe further asserts that Coach 1's communications with his athletic teammates about the allegations levied against Doe, as well as Coach 1's comments in a meeting that Doe had mental health problems, gave the appearance that the allegations were true.

Under Pennsylvania law, the tort of false light "imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'"  *Graboff v. Colleran Firm*, 744 F.3d 128, 136

---

[8] *See also Abraham v. Thomas Jefferson Univ.*, No. 20-cv-2967, 2021 WL 4132566 at *6 (E.D. Pa. Sept. 10, 2021) (finding that explicit comments that men cannot be sexually assaulted demonstrated gender bias in how school handles Title IX complaints); *cf. Gendia v. Drexel Univ.*, No. 20-cv-1104, 2020 WL 5258315 (E.D. Pa. Sept. 2, 2020)  (concluding  that general allegations of gender bias in Title IX process insufficient to create plausible inference of discrimination).

(3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988)). To establish that a defendant "published" material for purposes of a false light claim, a plaintiff must show that the defendant made the matter public "by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 567 (E.D. Pa. 2013) (Goldberg, J.) (citing *Harris by Harris v. Easton Publ'g Co.*, 483 A.2d 1377, 1384 (Pa. Super. Ct. 1984)). Publicity as to a false light claim requires broader dissemination of the false information than "publication" in a defamation context, such that the communication reaches or is certain to reach a large audience. *Id.* (citing Restatement (Second) Of Torts § 652D cmt. a). Communicating a fact about a plaintiff to a single person or a small group of persons is insufficient to establish publicity, whereas "publication in a newspaper or a statement made in an address to a large audience is sufficient to give publicity." *Id.*

### 1. *Coach 1's comments to Doe's teammates were not made publicly.*

Coach 1's communications to Doe's co-captains and to other administrators during meetings cannot satisfy the publicity requirement. Doe's complaint never suggests that Coach 1 made statements about the allegations against Doe, nor alleged that Doe had mental health issues, to groups larger than a handful of people. *See* Am. Compl. ¶¶ 59, 63 (conversations with team captains); *id.* ¶ 76 (meeting with Title IX coordinator, Athletic Director, Senior Associate Dean, and co-captains). Unlike defamation – which can occur even where a statement is communicated to just one other person – a false light claim requires that the tortious communication was made to a large audience or was "substantially certain to become one of public knowledge." *Byars*, 942 F. Supp. 2d at 567 (citation omitted). Coach 1's statements were only ever made to Doe's co-captains and university administrators, which is far too small a group to satisfy the requirement that his

statements were meant to reach the public.  Thus, in making these statements, Coach 1 could not have committed the tort of false light.

                   2.   *Doe's removal from his athletic team and online roster did not communicate anything "highly offensive."*

        Doe's removal from his athletic team, denial of reinstatement, and later removal from the online roster likely could satisfy the publicity requirement of a false light claim.  Taking the facts in the complaint as true, Doe alleges that while his separation from the team was already well-known to his teammates, "the denial of his reinstatement also quickly became known," in part based on the decision to remove Doe's name from the team roster on the Haverford athletics website.  Am. Compl. ¶¶ 80-81.  This is a plausible allegation given that Haverford is a "small," "close-knit," and "tightly intertwined" campus community.  *Id*. ¶¶ 26, 82.

        But assuming that Coach 1 and Haverford "published" Doe's removal from his athletic team to a sufficiently wide audience, this removal also did not communicate anything "highly offensive" about Doe.  In limited cases, a plaintiff may allege false light based on publication of *truthful* information, if a defendant selectively presents the information "in a fashion which renders the publication susceptible to inferences casting one in a false light."  *Graboff*, 744 F.3d at 136-37 (quoting *Larsen*, 543 A.2d at 1189).  Here, Doe claims that the way that Coach 1 and Haverford removed him from his athletic team "created the appearance that John had been found responsible for sexual assault" and "ratified the false notion that John had committed a sexual assault."  Am. Compl. ¶ 206.  But nothing in the complaint suggests that Haverford or Coach 1 selectively presented information about Doe's removal in a manner that would suggest that he was under investigation for sexual assault or was guilty of sexual assault.  There is no allegation that either Coach 1 or Haverford ever included any qualifier that Doe was removed due to a disciplinary

investigation, based on any misconduct allegations, or for violating any team rules. *Cf. Thomas v. Univ. of Pittsburgh*, No. CIV.A. 13-514, 2014 WL 3055361, at *10 (W.D. Pa. July 3, 2014) (Kelly, J.) (finding the plaintiff stated false light claim where university had made statements to two newspapers that plaintiff was removed from her basketball team for "violating team rules," which suggested that plaintiff committed a "grievous violation").

Indeed, courts routinely find that mere removal from a job or organizational position – without any public commentary alluding to the reason for that removal – is insufficient to support a false light claim, even where the lack of commentary leaves the public to speculate as to the reasons for that removal. *See, e.g.*, *Byars*, 942 F. Supp. 2d at 568 (dismissing false light claim for failure to state a claim where the plaintiff alleged that he was "escorted out of the building in the presence of others"); *Woodward v. ViroPharma Inc.*, No. 3222 EDA 2011, 2013 WL 1485110, at *6 (Pa. Super. Ct. Apr. 3, 2013) ("False conclusions about what observers might think or assume about the circumstances of appellants' removal . . . are not equivalent to false light claims."); *Smith v. Bell Atl. Network Servs., Inc*., No. CIV. A. 94-1605, 1995 WL 389697, at *4 (E.D. Pa. June 28, 1995), *aff'd*, 82 F.3d 406 (3d Cir. 1996) (finding that a plaintiff failed to state a false light claim where she alleged that Defendants did not publicize the "true reasons" for her demotion at work, which "left her co-workers free to speculate" that she was guilty of "something more egregious than a vacation day violation").  As such, Doe's false light claims against Coach 1 and Haverford must be dismissed.

### D.  Intentional infliction of emotional distress (Count IV)

Next Doe asserts that Haverford and Coach 1 committed the tort of intentional infliction of emotion distress ("IIED") because both engaged in "outrageous" conduct intended to inflict severe distress on Doe.

IIED liability requires the intentional or reckless infliction of "extreme and outrageous conduct" such that it "causes severe emotional distress to another" or bodily harm. *Hoy v. Angelone,* 720 A.2d 745, 753 (Pa. 1998). The level of outrageousness required to support a claim is extraordinarily high:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.  Described another way, it has not been enough that the defendant has acted with intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

*Id.* at 754 (cleaned up and citations omitted).

When the allegations against Haverford and the Coach are considered under this exacting standard, this claim can only be described as frivolous, and will be dismissed.

### E.  Defamation (Count V)

Doe's fifth claim asserts that Coach 1 defamed him by removing him from his athletic team and communicating the sexual assault allegation to Doe's teammates and assistant coaches, and by stating that Doe had mental health issues in the March 22 meeting with administrators and Doe's co-captains.

To plead a claim for defamation under Pennsylvania law, a plaintiff must establish: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; (7) abuse of a conditional privilege.  42 Pa.C.S. § 8343.

Coach 1 argues that Doe has not stated a defamation claim because the statements did not possess a defamatory character, particularly given that Doe's teammates were already aware of the assault allegations – and indeed, had brought the concerns to the coach.  Coach 1 further asserts that his statements cannot constitute a cognizable claim of defamation because he had a privilege in discussing the allegations with Doe's teammates, and because the statements were mere expressions of opinion.  Although Doe's claim is marginal, dismissal is premature.

### 1.  *Coach 1's statements were defamatory.*

The statements at issue here have a defamatory character.  "A communication may be considered defamatory if it tends to harm the reputation of another so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, 1085 (Pa. Super. Ct. 2019) (citation omitted).  "It is not enough that the victim of the statements be embarrassed or annoyed," and the victim "must have suffered the kind of harm which has grievously fractured [their] standing in the community of respectable society." *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004) (citation omitted).

Here, Coach 1 allegedly communicated that Doe (1) required psychological help severe enough that he needed to take a leave of absence from his studies at Haverford, and (2) had sexually assaulted another student. *See* Am. Compl. ¶¶ 63, 76, 223.  These statements are certainly enough to grievously harm Doe's reputation. *See Rose v. Dowd*, 265 F. Supp. 3d 525, 531 (E.D. Pa. 2017) (citing *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 343 (3d Cir. 2005)) (noting that where "a defamatory statement 'imputes a criminal offense, loathsome disease, business misconduct, or serious sexual misconduct, the statement constitutes defamation *per se*").  Coach 1 disputes whether any of his statements about the assault allegation could be defamatory,

pointing to a paragraph of the complaint that simply states that he "discussed the sexual assault allegations with John's co-captains." *See* Defs.' Mem. at 28, ECF 30-1; Am. Compl. ¶ 63.  But the complaint specifically alleges elsewhere that "Coach 1 repeated the allegation that John sexually assaulted women to at least his assistant coaches and student team members."  Am. Compl. ¶ 223.  Taken as true, this likely constitutes a defamatory statement.

### 2.   *Coach 1 is not entitled to a privilege determination at this stage.*

Coach 1 next asserts that even if defamatory, his communications with Doe's teammates and other coaches are privileged.[9]  "Liability for publication of defamatory matter may be defeated by a privilege to publish the defamation."  *Agriss v. Roadway Exp., Inc*., 483 A.2d 456, 463 (Pa. Super. Ct. 1984).  Communications which are made on a proper occasion, from a proper motive, in a proper manner, and which are based upon reasonable cause are privileged.  *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1268 (Pa. Super. Ct. 2005).  Courts recognize that close-knit groups such as "members of religious, fraternal, charitable or other non-profit associations" will often have a common interest such that "communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society." *Rankin v. Phillippe*, 211 A.2d 56, 58 (Pa. Super. Ct. 1965) (citing Restatement of Torts § 596 cmt. d); *see also Wilson v. Am. Gen. Fin. Inc*., 807 F. Supp. 2d 291, 299 (W.D. Pa. 2011) (noting that to assert this type of privilege, the group must have some sort of "close relationship").

Some form of privilege may well apply to Coach 1's statements to Doe's teammates and coaches.  Coach 1 and the leadership of the athletic team certainly had a "close relationship" and likely shared a common interest in the integrity of the team's captains.  *See Rankin*, 211 A.2d at

---

[9] Haverford does not appear to claim that Coach 1's statements in the March 22 meeting were privileged.

58 (noting a cognizable common interest in the qualification of officers of an organization). And most – if not all – of Coach 1's allegedly defamatory statements to Doe's team were not made team-wide but were made only to the assistant coaches and co-captains. *See* Am. Compl. ¶ 223. Although Coach 1 makes a compelling argument that privilege may apply, more facts about the statements and his subjective beliefs at the time of the statements are necessary to properly analyze the application of privilege. *See Rankin*, 211 A.2d at 58 ("One relying on the rule of privilege for uttering defamatory statements must establish all facts necessary to bring himself within the rule, that is, that the communication was one made on a proper occasion, from a proper motive, in a proper manner, and based on reasonable or probable cause."). As such, I will reserve ruling on privilege until after discovery.

### 3. *Coach 1's statements are not protected opinion.*

Coach 1 further argues that his statements about Doe's mental health were merely expressing a subjective point of view, and his statements about the assault allegations were nothing more than speculative discussion about how to handle such allegations, and as such constitute non-actionable opinion. "[O]nly statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (citing *Moore v. Cobb–Nettleton,* 889 A.2d 1262, 1267 (Pa. Super. Ct. 2005). "If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Pace v. Baker-White*, 432 F. Supp. 3d 495, 513 (E.D. Pa. 2020) (Beetlestone, J.), *aff'd*, 850 F. App'x 827 (3d Cir. 2021) (citation omitted). Nonetheless, "[d]espite this general rule, an opinion that could reasonably be understood to imply undisclosed defamatory facts may support

23

a cause of action based upon those unenumerated facts." *Id.* at 509 (citing *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001)).

It cannot be determined whether Coach 1's statements are protected as mere opinion simply based on the Complaint.  Coach 1 is alleged to have "repeated the allegation that John sexually assaulted women to at least his assistant coaches and student team members," and in the March 22 meeting stated that Doe "needed serious psychological help."  Am. Compl. ¶ 223.  These are statements of fact that, *if* communicated in the manner described in the complaint, likely constitute actionable defamation, rendering dismissal premature.  As such, I cannot dismiss Doe's defamation claim at this juncture.  But I am skeptical of the long-term viability of this claim.[10]

### F.  Injunctive relief

As part of Doe's prayer for relief, he seeks an injunction ordering Haverford to restore his name to the team roster for the 2021-22 and 2022-23 athletic seasons.  Haverford and Coach 1 move to strike this request, arguing that this type of specific performance is not the proper remedy for his breach of contract claim, nor would it be the appropriate remedy for any of Doe's remaining claims.

I agree.  Such relief is disfavored where a plaintiff has an adequate remedy at law.  *See Toys "R" Us-Penn Inc. v. Discovery Zone, Inc.*, No. 95-cv-2534, 1996 WL 47980, at *3 (E.D. Pa. Feb. 6, 1996) (quoting *Cimina v. Bronich*, 537 A.2d 1355, 1358 (Pa. 1988)) (noting that specific performance is generally disfavored for breach of contract claims, except "where adequate remedy

---

[10] This claim is based on minimal first-hand knowledge, *see* Am. Compl. ¶¶ 5, 223, and Plaintiff himself recognizes this deficiency – conceding in his opposition brief that "John was not present for the team meetings between Coach 1, the assistant coaches, and John's teammates and therefore cannot recite precisely what was said."  Pl.'s Opp. at 43, ECF 39.

at law does not exist, and where justice requires it"); *Dixon v. Boscov's, Inc.*, No. 02-cv-1222, 2002 WL 1740583, at *4 (E.D. Pa. July 17, 2002) (citing *Barnes v. Am. Tobacco Co*., 989 F. Supp. 661, 667 (E.D. Pa. 1997)) (granting motion to strike request for injunctive relief where plaintiff alleged no facts that would warrant the grant of injunctive relief, because equitable relief "is not available when a plaintiff has an adequate remedy at law").  This request for relief will therefore be stricken as framed, but I note that this does not preclude me from considering appropriate remedies if Doe prevails on his breach of contract claim.

**IV.    Conclusion**

    For the reasons set forth above, Haverford and Coach 1's motion will be granted in part and denied in part.  An appropriate order follows.


                              /s/ Gerald Austin McHugh_____
                           United States District Judge